# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

BROOKE HENDERSON, et al,

*Plaintiffs – Appellants,*

v.

SPRINGFIELD R-12 SCHOOL DISTRICT, et al,

*Defendants – Appellees.*

On Appeal from the United States District Court
for the Western District of Missouri, Southern Division
No. 6:21-cv-03219 (Harpool, J.)

# BRIEF OF APPELLANTS
# BROOKE HENDERSON AND JENNIFER LUMLEY

Kimberly S. Hermann
Braden H. Boucek
Celia Howard O'Leary
SOUTHEASTERN LEGAL FOUNDATION
560 W. Crossville Rd., Ste. 104
Roswell, GA 30075
(770) 977-2131
khermann@southeasternlegal.org
bboucek@southeasternlegal.org
coleary@southeasternlegal.org

*Attorneys for Plaintiffs-Appellants*

## SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT

This case is one of first impression about whether a school district "can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion" among its employees. *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Plaintiffs-Appellants alleged that Springfield Public Schools ("SPS") violated the First Amendment by compelling their speech and discriminating against their views when it directed them to actively participate in a training on controversial topics like white supremacy and oppression, told them to "commit" to anti-racism and advocate for political and social change, and chastised them as "wrong" when they expressed their personal views on current affairs. Plaintiffs also alleged that this created an unconstitutional condition of employment.

Although SPS did not once call Plaintiffs' claims frivolous in their summary judgment pleadings, the district court granted summary judgment to SPS and invited Defendants to file a motion for attorney fees. The court held that because Plaintiffs failed to establish a First Amendment injury, their claims were frivolous. It awarded fees to Defendants in the amount of $312,869.50, and costs of $3,267.10.

Given the unprecedented nature of these First Amendment issues and the unprecedented attorney fee award, Plaintiffs respectfully request oral argument of 30 minutes.

Appellate Case: 23-1374     Page: 2     Date Filed: 05/12/2023 Entry ID: 5276776

# TABLE OF CONTENTS

SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT .......... ii

TABLE OF AUTHORITIES ................................................................... v

JURISDICTIONAL STATEMENT ......................................................... 1

STATEMENT OF THE ISSUES ............................................................. 2

STATEMENT OF THE CASE ................................................................ 4

    Plaintiffs believe in equality and colorblindness. ............................................. 4

    SPS declared that all staff have a responsibility to be equity champions .............. 5

    SPS required active engagement at its fall 2020 equity training. ........................ 6

    The equity training covered controversial political and social topics. ................. 8

    SPS directed staff to discuss current affairs ........................................... 14

    Understanding that they had speak, Plaintiffs each tried sharing their views, only
        to be chastised. ................................................................... 18

    Other staff members self-censored during the training. ..................................... 20

    SPS urged staff to commit to anti-racism beyond the equity training. ................ 21

    Ms. Henderson gave answers on questions of public concern that were contrary
        to her beliefs. ................................................................... 24

    Plaintiffs sued SPS, and both parties moved for summary judgment. ................ 25

    The district court entered summary judgment for Defendants. ........................... 25

    The court awarded attorney fees and costs to Defendants. ................................ 27

STANDARD OF REVIEW ................................................................... 27

SUMMARY OF ARGUMENT ............................................................. 28

Appellate Case: 23-1374     Page: 3     Date Filed: 05/12/2023 Entry ID: 5276776

ARGUMENT ...................................................................................31

   I.  SPS unconstitutionally compelled Plaintiffs' speech. ..................................31

      A.  SPS compelled Plaintiffs to become anti-racist as a job requirement. ...34

      B.  SPS compelled Plaintiffs' speech during the equity training. ...............36

      C.  SPS compelled Ms. Henderson's speech through the Canvas modules. 45

   II.  SPS discriminated against Plaintiffs' views. ..................................................47

      A.  SPS discriminated against Plaintiffs' views during equity training. ......48

      B.  SPS discriminated against Ms. Henderson's views through the Canvas modules. ..................................................................................................51

  III.  SPS cannot meet any burden to survive Plaintiffs' First Amendment challenge. ..................................................................................................52

  IV.  SPS placed an unconstitutional condition on Plaintiffs' speech when it violated their First Amendment rights. ..................................................56

   V.  Plaintiffs, not Defendants, are entitled to attorney fees and costs. ................57

      A.  Plaintiffs' claims had a basis in law and fact. ..........................................59

      B.  If allowed to stand, the district court's holding would have a devastating impact on civil rights litigation. ...........................................................64

  VI.  This Court should reassign this case on any remand. ....................................66

CONCLUSION ..................................................................................................66

CERTIFICATE OF COMPLIANCE ..................................................................68

CERTIFICATE OF SERVICE ...........................................................................68

Appellate Case: 23-1374   Page: 4   Date Filed: 05/12/2023 Entry ID: 5276776

# TABLE OF AUTHORITIES

## Cases

*281 Care Comm. v. Arneson*, 638 F.3d 621 (8th Cir. 2011)...................... 43, 49, 62

*Altman v. Minn. Dep't of Corr.*, 251 F.3d 1199 (8th Cir. 2001) ...........................54

*Axson-Flynn v. Johnson*, 356 F.3d 1277 (10th Cir. 2004).............................. *passim*

*Babbitt v. UFW Nat'l Union*, 442 U.S. 289 (1979) ............................. 42, 43, 44, 46

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963) ...................................... *passim*

*Bokhari v. Metro. Gov't of Nashville & Davidson Cty.*, 2014 U.S. Dist. LEXIS
    39171 (M.D. Tenn. Dec. 3, 2014)..........................................................................66

*Bond v. Keck*, 629 F. Supp. 225 (E.D. Mo. 1986) ........................................... 64, 65

*Christiansburg Garment Co. v. EEOC*, 434 U.S. 412 (1978) ....................... *passim*

*Clajon Prod. Corp. v. Petera*, 70 F.3d 1566 (10th Cir. 1995)......................... 58, 59

*Cody v. Hillard*, 304 F.3d 767 (8th Cir. 2002) ......................................................28

*Connick v. Myers*, 461 U.S. 138 (1983)..................................................................54

*Cressman v. Thompson*, 719 F.3d 1139 (10th Cir. 2013)................................. 39, 46

*CRST Van Expedited, Inc. v. EEOC*, 578 U.S. 419 (2016) .....................................58

*Cummings v. Benco Bldg. Servs.*, 11 Cal. App. 4th 1383 (1992)...........................60

v

*Denton v. Hernandez*, 504 U.S. 25 (1992)........................................................ 3, 58

*Elrod v. Burns*, 427 U.S. 347 (1976) ...................................................... 32, 36

*Farrar v. Hobby*, 506 U.S. 103 (1992) ...................................................... 3, 65

*Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994) .......................................... 3, 65

*Frost & Frost Trucking Co. v. Railroad Comm'n. of Cal.*, 271 U.S. 583 (1926) ....2,
    56

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) ................................................ 53, 54

*Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410 (1979)....................................54

*Gralike v. Cook*, 191 F.3d 911 (8th Cir. 1999)................................................ *passim*

*Hensley v. Eckerhart*, 461 U.S. 424 (1983) ............................................................60

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
    515 U.S. 557 (1995).......................................................................... *passim*

*Janus v. AFSCME, Council 31*, 138 S. Ct. 2448 (2018)................................ *passim*

*Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (2022) .............................. 54, 55

*Koester v. YMCA of Greater St. Louis*, No. 4:14-cv-1772 RLW, 2018 U.S. Dist.
    LEXIS 75732 (E.D. Mo. May 4, 2018) ..............................................................64

*Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595 (2013) ................. 2, 57

*Marquart v. Lodge 837, Int'l Ass'n of Machinists & Aerospace Workers*,

Appellate Case: 23-1374    Page: 6    Date Filed: 05/12/2023 Entry ID: 5276776

26 F.3d 842 (8th Cir. 1994) .........................................................57

*Martinez v. Turner*, 977 F.2d 421 (8th Cir. 1992)..................................58

*Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789 (1984)... 2, 48, 49

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) ................................ 31, 40, 46

*Nagel v. City of Jamestown*, 952 F.3d 923 (8th Cir. 2020) ......................................55

*Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) ..........38

*Neitzke v. Williams*, 490 U.S. 319 (1989) .............................................58

*Perry v. Sindermann*, 408 U.S. 593 (1972) ......................................... 2, 56

*Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968)........................................57

*Police Dep't of Chi. v. Mosley*, 408 U.S. 92 (1972) ..................................49

*Richmond v. Southwire Co.*, 980 F.2d 518 (8th Cir. 1992) ......................... 3, 28, 66

*Riley v. Nat'l Fed'n of Blind*, 487 U.S. 781 (1988) .................................... 38, 47, 51

*Riverside v. Rivera*, 477 U.S. 561 (1986) ..............................................65

*Rosenberger v. Rector & Visitors of U. of Va.*, 515 U.S. 819 (1995) .... 2, 47, 49, 52

*Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*, 479 F. Supp. 3d 808 (D. Ariz. 2020) .48

*Shurtleff v. City of Bos.*, 142 S. Ct. 1583 (2022) ....................................... 53, 54, 55

*Speech First, Inc. v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022) ................... *passim*

Appellate Case: 23-1374    Page: 7    Date Filed: 05/12/2023 Entry ID: 5276776

*Speech First, Inc. v. Schlissel*, 939 F.3d 756 (6th Cir. 2019) ............... 43, 46, 50, 51

*Speiser v. Randall*, 357 U.S. 513 (1958) .........................................................56

*Telescope Media Grp. v. Lucero*, 936 F.3d 740 (8th Cir. 2019) .................... *passim*

*Thomas v. Collins*, 323 U.S. 516, 530 (1945) ................................................52

*Tumey v. Mycroft AU, Inc.*, 27 F.4th 657 (8th Cir. 2022) .................................. 3, 66

*United Food & Com. Workers Int'l Union v. IBP, Inc.*,
  857 F.2d 422 (8th Cir. 1988) ................................................... 36, 43, 46

*United States v. Weiland*, 284 F.3d 878 (8th Cir. 2002) .........................................28

*Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383 (1988) ................................. 49, 62

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) ........................ ii, 28, 31

*Williams v. City of Carl Junction*, 523 F.3d at 842 (8th Cir. 2008) ........... 57, 58, 60

*Wooley v. Maynard*, 430 U.S. 705 (1976) ....................................................... 31, 52

*Zieper v. Metzinger*, 474 F.3d 60 (2d Cir. 2007) ....................................... *passim*

**Statutes**

18 U.S.C. § 2106 .......................................................................... 1, 3, 66

28 U.S.C. § 1291 ...............................................................................1

28 U.S.C. § 1331 ...............................................................................1

28 U.S.C. § 1343 ...............................................................................1

Appellate Case: 23-1374   Page: 8   Date Filed: 05/12/2023 Entry ID: 5276776

42 U.S.C. § 1983 ................................................................................1, 2

42 U.S.C. § 1988 ...................................................................................2

**Rules**

Fed. R. Civ. P. 54(d) ...........................................................................66

Appellate Case: 23-1374    Page: 9    Date Filed: 05/12/2023 Entry ID: 5276776

# JURISDICTIONAL STATEMENT

The district court had jurisdiction to hear Plaintiffs' claims under 42 U.S.C. § 1983 because they alleged that Defendants violated their rights under the First Amendment to the United States Constitution. 28 U.S.C. §§ 1331; 1343. The district court granted summary judgment to Defendants on January 12, 2023, which Plaintiffs appealed on February 10, 2023. Add.3-27, App.5306-30, R.Doc.88 at 1-25; App.5331-32, R.Doc.89 at 1-3. The court granted Defendants attorney fees on March 31, 2023, and entered a final judgment on April 3, 2023. Add.28-32, App.5510-13, R.Doc.107 at 1-4. Plaintiffs amended their appeal on April 7, 2023. App.5524-25, R.Doc.110 at 1-3. After the court awarded costs to Defendants on April 20, 2023, Plaintiffs amended their appeal on April 25, 2023, which this Court consolidated. Add.33-34, App.5534-35, R.Doc.120 at 1-2; App.5536, R.Doc.122 at 1-3. This Court has jurisdiction to hear Plaintiffs' claims under 28 U.S.C. § 1291 and 18 U.S.C. § 2106.

Appellate Case: 23-1374     Page: 10     Date Filed: 05/12/2023 Entry ID: 5276776

# STATEMENT OF THE ISSUES

1. Whether SPS unconstitutionally compelled Plaintiffs to speak on matters of public concern and adopt its views in violation of the First Amendment.

> U.S. Const. amend. I
>
> *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448 (2018)
>
> *Telescope Media Grp. v. Lucero*, 936 F.3d 740 (8th Cir. 2019)
>
> *Gralike v. Cook*, 191 F.3d 911 (8th Cir. 1999)

2. Whether SPS unconstitutionally discriminated against Plaintiffs' views when it adopted a position on current affairs and told Plaintiffs that their views were wrong.

> U.S. Const. amend. I
>
> *Rosenberger v. Rector & Visitors of U. of Va.*, 515 U.S. 819 (1995)
>
> *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789 (1984)
>
> *Speech First, Inc. v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022)

3. Whether SPS created an unconstitutional condition of employment when it compelled speech on matters of public concern and engaged in viewpoint discrimination.

> *Frost & Frost Trucking Co. v. Railroad Comm'n. of Cal.*, 271 U.S. 583 (1926)
>
> *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595 (2013)
>
> *Perry v. Sindermann*, 408 U.S. 593 (1972)

4. Whether the district court erred in finding Plaintiffs' claims frivolous.

> 42 U.S.C. § 1983
>
> 42 U.S.C. § 1988

Appellate Case: 23-1374   Page: 11   Date Filed: 05/12/2023 Entry ID: 5276776

*Christiansburg Garment Co. v. EEOC*, 434 U.S. 412 (1978)

*Denton v. Hernandez*, 504 U.S. 25 (1992)

5. Whether the district court erred in awarding attorney fees in the amount of $312,869.50 and costs in the amount of $3,267.10 to Defendants.

    *Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994)

    *Farrar v. Hobby*, 506 U.S. 103 (1992)

    *Richmond v. Southwire Co.*, 980 F.2d 518 (8th Cir. 1992)

6. Whether reassignment to a different judge is appropriate on any remand.

    18 U.S.C. § 2106

    *Tumey v. Mycroft AU, Inc.*, 27 F.4th 657 (8th Cir. 2022)

Appellate Case: 23-1374   Page: 12   Date Filed: 05/12/2023 Entry ID: 5276776

## STATEMENT OF THE CASE

**Plaintiffs believe in equality and colorblindness.**

Brooke Henderson and Jennifer Lumley are colleagues and employees of Springfield Public Schools ("SPS"). Ms. Henderson serves as 504 Process Coordinator for SPS, advocating for students with disabilities to ensure they have equal access to educational opportunities. App.2617 at 6:2-8:15, R.Doc.78-3 at 2. Ms. Lumley began as Records Secretary for the SPS Special Services Department and now serves in the Analytics, Accountability, and Assessment Department. App.1314-15, R.Doc.77-1 at 3-4; App.2599 at 4:1-3, R.Doc.78-1 at 1.

Ms. Henderson and Ms. Lumley believe in equality and equal opportunity. App.1322, R.Doc.77-2 at 1; App.1334, R.Doc.77-3 at 1. They believe in colorblindness, meaning individuals should not be judged or assigned moral characteristics based on skin color, and they believe that identity is found in God and that all lives matter in God's eyes. App.1322-23, App.1327, R.Doc.77-2 at 1-2, 6; App.1334, App.1339, R.Doc.77-3 at 1, 6. They reject the ideas that America is fundamentally racist or divided into classes based on skin color, where white people are privileged oppressors and non-white people are oppressed, and they support treating individuals equally regardless of skin color, as required by civil rights laws

4

and our nation's founding documents. App.1322-23, R.Doc. 77-2 at 1-2; App.1334-35, R.Doc.77-3 at 1-2.

### SPS declared that all staff have a responsibility to be equity champions.

As the COVID-19 pandemic and Black Lives Matter protests gripped the nation in the summer of 2020, SPS declared via email that all staff members had a "responsibility to be equity champions." App.1642, R.Doc.77-8 at 1. According to SPS, equity is different from equality: "Equity is looking at specific unique needs. Equality is ensuring that everyone gets the same." App.2722 at 65:18-20, R.Doc.79-1 at 17.

While directing staff to be "equity champions," SPS pointed them to "resources" about white privilege, oppression, and anti-racism. App.1642, R.Doc.77-8 at 1. According to SPS, "anti-racism helps promote the work of equity," but equality based on race does not "correspond" with anti-racism. App.2726 at 84:17, R.Doc.79-1 at 21; App.2728 at 89:15-17, R.Doc.79-1 at 23.

One article SPS sent to staff said, "Privilege means that you owe a debt. . . . It is up to you whether you choose to pay this debt and how you choose to do so. . . . [A] system of white privilege afforded you access to opportunities while denying them to so many others." App.1693, R.Doc.77-8 at 52. Another said, "When I call [white people] on their racism, they practically come unglued. They swear they

5

'didn't mean anything by it' and 'don't have a racist bone' in their bodies. They might pipe up some ridiculous white sh—[.]" App.1697, R.Doc.77-8 at 56.

SPS implemented a mandatory district-wide equity training that fall, telling staff that their "learning should not stop with these resources" on oppression and anti-racism, "but continue to expand." App.1315, R.Doc.77-1 at 4; App.1642, R.Doc.77-8 at 1. It required every certificated and hourly staff member, including Plaintiffs, to attend a session. App.1315, R.Doc.77-1 at 4. If they refused, SPS warned that it would "dock" pay and that staff could lose necessary professional development credit. App.1324, R.Doc.77-2 at 3; App.1335, R.Doc.77-3 at 2; App.1612-13, R.Doc.77-6 at 1-2; App.2021, R.Doc.77-17 at 1; App.2758 at 211:14-21, R.Doc.79-1 at 53.

**SPS required active engagement at its fall 2020 equity training.**

Ms. Henderson attended an equity training session virtually, and Ms. Lumley attended a session in person. App.1317, R.Doc.77-1 at 6. Defendant Garcia-Pusateri—the district's Chief Equity and Diversity Officer who implemented the training—conducted both sessions, along with members of her department. *Id*. Before their sessions even began, SPS gave Plaintiffs handouts that directed them to "Be Professional," "Lean into your discomfort," "Speak YOUR Truth," "remain engaged," and "Stay Engaged." App.1715-17, R.Doc.77-9 at 8-10.

6

Through the handouts, SPS told Plaintiffs, "[Equity and diversity] is more than a value, but now part of our work and job responsibilities," which they "must commit to" for their "personal and professional development." App.1717, R.Doc.77-9 at 10. SPS handed Plaintiffs an Oppression Matrix that labeled white people as privileged oppressors and all other races as oppressed, while another handout instructed them to "Acknowledge YOUR privileges." App.1711, R.Doc.77-9 at 4; App.1715, R.Doc.77-9 at 8. Through the handouts, SPS made clear that the training sessions would be an extension of its summer missive about white supremacy, oppression, and anti-racism, and that SPS expected staff not only to attend but to actively engage.

SPS repeated these concepts and directives throughout the training session through a slideshow and statements by trainers. SPS began by reminding staff that equity was "now part of our work and job responsibilities" which staff "must commit to." App.2023, R.Doc.77-17 at 3; App.2731 at 101:11-22, R.Doc.79-1 at 26. Then, SPS told staff "to have some courageous conversations." App.1963, R.Doc.77-15 at 6; App.1985, R.Doc.77-16 at 8. It repeated, "Stay Engaged," "stay locked into the conversations," "Speak YOUR Truth," and "Acknowledge YOUR privileges." App.1774, R.Doc.77-13 at 7. And it warned to "Be Professional – Or be Asked to Leave with No Credit." App.1774, R.Doc.77-13 at 7. In Ms. Henderson's session,

SPS expected staff to keep their cameras on for the entire training and to write things down. App.1324, R.Doc.77-2 at 3; App.1766:12-13, R.Doc.77-12 at 6; App.2747 at 167:12-20, R.Doc.79-1 at 42.

Defendant Garcia-Pusateri made sure that staff were attentive in every session. When she learned that one of the sessions "had very low participation," she said that "it is important staff, no matter their personal opinion or political affiliation treat this training with the same value and importance as any other professional learning[.]" App.2022, R.Doc.77-17 at 2. She then urged an administrator to "address[]" the lack of participation with staff. *Id*. Additionally, when staff were not engaged, she would "document that" for "an end-of-the-year discussion with administration[.]" App.2742 at 148:2-12, R.Doc.79-1 at 37. When asked to define engagement, Defendant Garcia-Pusateri said it was a "fluid" concept that meant "not doing anything" to "derail[] the training." App.2743 at 149:13-17, R.Doc.79-1 at 38.

**The equity training covered controversial political and social topics.**

After SPS presented its expectations for participation, SPS told staff that they would learn about white supremacy and oppression, "[r]eflect on current issues that have impacted our society nationally," receive tools to become anti-racist educators, and "share and dialogue" with each other. App.1775, R.Doc.77-13 at 8. SPS also

8

conveyed its goal to create a "shared understanding" about "(1) identity; (2) racism; and (3) responsibility." App.1772, R.Doc.77-13 at 5.



SPS made clear that staff were expected to discuss current events and concepts like white supremacy and oppression—through what the district called "turn and talk" exercises—with the goal of equipping them "to become Anti-Racist[.]" *Id.*; *see also* App.2192 at 21:11-14, R.Doc.77-23 at 6.

In the presentation, SPS instructed that "white supremacy" is "the all-encompassing centrality and assumed superiority of people defined and perceived as white." App.1787, R.Doc.77-13 at 20; App.2756 at 202:2-4, R.Doc.79-1 at 51.

9



Trainers required staff to watch a [video](#) called "Understanding White Supremacy," where a cartoon character, dressed in a white robe and white pointed hood resembling the Ku Klux Klan, waved while the narrator described eradicating white supremacy. App.1788, R.Doc.77-13 at 21.



Understanding White Supremacy (And How to Defeat It)

Later in the video, the same character appeared with the caption, "Now with White House Allies," a reference to the Trump administration. *Id*.; App.2772 at

266:5-16, R.Doc.79-1 at 67; App.2972, R.Doc.79-1 at 267. This occurred after SPS told staff that a "divisive election" was coming.[1] App.1964, R.Doc.77-15 at 7.

Then, SPS instructed that white supremacy is not just a label for the KKK—it includes anyone who believes in colorblindness or says that all lives matter. App.1789, R.Doc.77-13 at 22. According to SPS, equality "takes in colorblindness," and colorblindness is "harmful." App.2722 at 66:12-71:16, R.Doc.79-1 at 17; App.2729 at 96:4-7, R.Doc.79-1 at 24. SPS also taught that "white silence" is a form of white supremacy. App.1789, R.Doc.77-13 at 22; App.2745 at 157:11-18, R.Doc.79-1 at 40.

---

[1] In earlier presentations, SPS taught that the slogan "Make America Great Again" was white supremacy. App.2736 at 122:16-20, R.Doc.79-1 at 31.

Appellate Case: 23-1374     Page: 20     Date Filed: 05/12/2023 Entry ID: 5276776



Case 6:21-cv-03219-MDH   Document 77-15   Filed 07/22/22   Page 13 of 20

In the slideshow, SPS displayed the same Oppression Matrix from the handouts that labeled white people as oppressors and all other races as oppressed. App.1784, R.Doc.77-13 at 17.



12

It told staff, "In the United States, systems of oppressions [sic] (like systemic racism) are woven into the very foundation of American culture, society, and laws. . . . Society's institutions, such as government, education, and culture, all contribute or reinforce the oppression of marginalized social groups while elevating dominant social groups." App.1783, R.Doc.77-13 at 16. Ms. Henderson's trainers warned that denying one's privilege is also a form of white supremacy. App.1327, R.Doc.77-2 at 6.

SPS told staff that being "anti-racist" meant "advocating for changes in political, economic, and social life." App.1798, R.Doc.77-13 at 31. Trainers repeated, "We will actively oppose racism by advocating for change. There is a proactive element in place to no longer remain silent or inactive." App.1975, R.Doc.77-15 at 18; App.2016, R.Doc.77-16 at 39.

Appellate Case: 23-1374    Page: 22    Date Filed: 05/12/2023 Entry ID: 5276776



Slide 31 (Anti-Racism – Definition & Video)

We want to spend some time at the end of the training tackling the idea of Anti-Racism.

Anti-Racism is defined as the work of actively opposing racism by advocating for changes in political, economic, and social life. Anti-racism tends to be an individualized approach, and set up in opposition to individual racist behaviors and impacts.

The most important thing to reiterate here is that we will actively oppose racism by advocating for change. There is a proactive element in place to no longer remain silent or inactive.

The video I am going to share with you quickly details why educators need anti-racist training.

*[Play Video]*

**SPS directed staff to discuss current affairs.**

Throughout the training, SPS issued directives to speak during "turn and *talk*" exercises. App.2192 at 21:11-14 (emphasis added), R.Doc.77-23 at 6. Following its commands to "stay locked into the conversations," "Speak YOUR Truth," "have some courageous conversations" and "share and dialogue," SPS broke staff into small groups, where they were expected to discuss controversial topics, and then brought them back to share with the larger group. App.2192 at 21:11-14, R.Doc.77-23 at 6.

14

For example, after showing a video about George Floyd, trainers directed staff to partner up and "take the next 3 minutes to discuss[.]" App.1779, R.Doc.77-13 at 12; App.1965, R.Doc.77-15 at 8.



Case 6:21-cv-03219-MDH   Document 77-15   Filed 07/22/22   Page 8 of 20

The trainers also warned that SPS expected to hear from two individuals once they returned to the larger group. Trainers warned that if staff remained silent, they would be called on. App.2763 at 229:19-230:14, R.Doc.79-1 at 58; App.2983 at 33:23-34:9, R.Doc.79-2 at 9; App.2987 at 50:4-13, R.Doc.79-2 at 13.

Next, SPS showed images depicting major events that occurred in 2020, such as the COVID-19 pandemic and summer protests. App.1781, R.Doc.77-13 at 14.

15

Trainers again broke staff into small groups to discuss the images and warned that they would "bring everyone back together for a group share." App.1782, R.Doc.77-13 at 14; App.1967, R.Doc.77-15 at 10.

In the "turn and talk" exercises, SPS also directed staff to discuss how oppression, systemic racism, and white supremacy have taken place in the community. App.1790, R.Doc.77-13 at 23; App.1971, R.Doc.77-15 at 14.



SPS provided staff with a copy of a Social Identity Map, and in Ms. Henderson's session, trainers instructed them to complete the circle by filling in answers. App.1795, R.Doc.77-13 at 28; App.2011, R.Doc.77-16 at 34.



Complete the social identities activity and write your answers corresponding to the identity marker (on the rim of the circle)
Then answer 2 of the 5 questions in the center. (6 minutes)

Ask some participants to share their identities and how they felt filling out the identity portion (ask 2-3 people)

Jimi's Notes:

[Identity Map]

Finally, SPS presented an "Anti-Racism Statement," which said, "To fight against systemic racism means to buck norms. Educators at every level must be willing to be uncomfortable . . . District level administrators must more firmly root their anti-racist messaging . . . making expectations for educators clear." App.1799-App.1804, R.Doc.77-13 at 32-37. It also told principals to "communicate the anti-racist vision for their school." App.1802, R.Doc.77-13 at 35. SPS then told staff to complete a "Solo Write" exercise, answering, "What steps will you take to become an Anti-Racist?" App.1805, R.Doc.77-13 at 38.

**Understanding that they had speak, Plaintiffs each tried sharing their views, only to be chastised.**

Given SPS's frequent directives to speak and stay engaged, Plaintiffs each understood that they had to actively participate in the training or risk being labeled white supremacists and asked to leave without credit and pay. App.1324, App.1329, R.Doc.77-2 at 3, 8; App.1335, App.1337, R.Doc.77-3 at 2, 4; App.2630 at 57:1-5, R.Doc.78-3 at 15; App.2631 at 62:15-64:5, R.Doc.78-3 at 2630. But because neither Plaintiff agreed with the presentation, and because SPS instructed them to "speak their truth," each initially believed she could offer a dissenting viewpoint.

When staff began discussing Kyle Rittenhouse and BLM protests as a large group in Ms. Henderson's session, Ms. Henderson expressed a belief that Rittenhouse was defending himself from rioters. App.1326, R.Doc.77-2 at 5. Defendant Garcia-Pusateri told Ms. Henderson that she was confused and wrong, and that Rittenhouse murdered an innocent person. *Id.*

And when SPS directed staff to discuss how oppression, systemic racism, and white supremacy took place in the community during Ms. Lumley's session, she expressed her belief that all humans are equal, that not all white people are racist, and that sometimes people of other races can be racist. App.1338, R.Doc.77-3 at 5. As a personal example, she shared that when her white nephew married a black

18

woman, black people told his wife that she no longer counted as black. *Id*. Her trainer responded that black people cannot be racist. *Id*. Ms. Lumley expressed that she came from a poor, broken home that received government handouts and that she did not grow up in privilege. *Id*. Her trainer told her she was wrong and that she was born into white privilege. App.1338-39, R.Doc.77-3 at 5-6. Finally, when she expressed that the training was singling out white people, her trainers responded by telling her to "reflect" on herself more. *Id*. During this exchange, Ms. Lumley's coworkers berated her, and the trainers did not try to stop them. App.1339, R.Doc.77-3 at 6.

SPS admitted that it endorsed certain viewpoints and reacted differently based on the responses it received during the training. App.2756 at 202:8-208:2, R.Doc.79-1 at 51-52; App.2780 at 300:20-24, R.Doc.79-1 at 75. For example, SPS approached conversations differently depending on whether individuals believed that America was or was not founded on oppression. App.2756 at 203:7-204:13, R.Doc.79-1 at 51. It also took different approaches depending on whether individuals acknowledged or refused to acknowledge their privilege. App.2757 at 205:10-206:23, R.Doc.79-1 at 52. Plaintiffs learned this the hard way after they were rejected and shamed for "speaking their truth." Fearing further chastisement, they

19

did not express their true views again. App.1329, R.Doc.77-2 at 8; App.1339, R.Doc.77-3 at 6.

### Other staff members self-censored during the training.

Plaintiffs were not alone in fearing consequences if they failed to engage and affirm SPS's views. Other staff understood that they were "expected" to "express their feelings/opinions" on the topics but felt "uncomfortable" doing so. App.2021, R.Doc.77-17 at 1. They worried that if they contradicted trainers, "they would have a target on their back" because "the topics were very political[.]" *Id.* (internal quotation marks omitted). When one staff member dissented during her session, her trainer was so dismissive that she cried. *Id.* And 17.3% of staff said the training made them uncomfortable. App.2786 at 321:6-24, R.Doc.79-1 at 81.

When an administrator suggested that "if we are inviting/challenging our staff to engage, the trainer(s) should honor their willingness to speak up and share without being dismissive[,]" Defendant Garcia-Pusateri responded: "Its [sic] unfortunate that staff are rather taking the content personally and a challenge to their own beliefs and making this political rather than questioning why topics like systemic racism and white supremacy negatively impact them"; "I understand that the content is controversial in nature and some may be uncomfortable, but at the end of the day we are asking everyone to lean into their discomfort and explore different thinking and

20

perspectives"; "Equity work is not easy and is meant to be difficult and at times uncomfortable"; and "Staff cannot support these students if they are not willing to address these issues and start the work of becoming antiracist educators." App.2021, R.Doc.77-17 at 1.

**SPS urged staff to commit to anti-racism beyond the equity training.**

Before, during, and after the equity training, SPS reinforced that staff had a "responsibility" to adopt equity. App.1642, R.Doc.77-8 at 1; App.1717, R.Doc.77-9 at 10; App.2023, R.Doc.77-17 at 3. It told staff that they "must commit to" equity work and that they "are now accountable in this work[.]" App.1717, R.Doc.77-9 at 10. SPS warned that staff cannot do their jobs properly "if they are not willing to address these issues and start the work of becoming antiracist educators." App.2021, R.Doc.77-17 at 1. And it urged administrators and principals to "mak[e] expectations for educators clear" by "more firmly root[ing] their anti-racist messaging" and "communicat[ing] the anti-racist vision for their school[.]" App.1802-03, R.Doc.77-13 at 35-36.

SPS's expectation that staff become anti-racist educators who supported political change became more apparent when SPS issued *another* directive following the training, declaring that "as anti-racist educators," it was important for staff to "keep the momentum going" with additional programming. App.2184, R.Doc.77-22

at 1. Although the equity training was complete, SPS required most staff, including Ms. Henderson, to complete online Canvas modules on the same controversial topics. App.1318-19, R.Doc.77-1 at 7-8.

Through videos in the modules, SPS taught that white people tell myths about race, such as "I don't see color" and "Focusing on race is what divides us." App.1319, R.Doc.77-1 at 8. Another video—a repeat from the equity training—told staff that systemic racism is evident "in every area of life" and that staff should do something about it by supporting "systemic changes" to allow "equal access to resources." *Id*. Another video called, "Advice for White People from an Anti-Racism Trainer" taught that "anti-racism depends on white America asking itself the critical question of are you still willing to receive these privileges, most of which . . . can be extended to all people without you losing those privileges." App.1320, R.Doc.77-1 at 9.

After staff watched the videos reinforcing SPS's views, they were required to participate in interactive exercises. One exercise involved a "Self-assessment Awareness Checklist," designed to assess "competence" based on one's "awareness" of certain social issues. App.2111-12, R.Doc.77-20 at 32-33. Prompts included, "I have a clear sense of my own ethnic, cultural, and racial identity," "I am aware of my stereotypes as they arise and have developed personal strategies for reducing the

harm they cause," and "If I am a White person working with a person of color, I will likely be perceived as a person with power and racial privilege, and . . . I [may] not be seen as 'unbiased' or as an ally." *Id.*

| | | Never | Sometimes/ Occasionally | Fairly Often/ Pretty Well | Always/ Very Well |
|---|---|---|---|---|---|
| Reflect on how my culture informs my judgment | I am aware of how my cultural perspective influences my judgment about what are "appropriate," "normal," or "superior" behaviors, values, and communication styles. | | | | |
| Accept ambiguity | I accept that in cross-cultural situations there can be uncertainty and that uncertainty can make me anxious. It can also mean that I do not respond quickly and take the time needed to get more information. | | | | |
| Be curious | I take any opportunity to put myself I place where I can learn about differences and create relationships. | | | | |
| Aware of my privilege if I am White | If I am a White person working with a person of color, I understand that I will likely be perceived as a person with power and racial privilege, and that I any not be seen as "unbiased" or as an ally. | | | | |

**Reflection**

At the end of each section add up the number of times you have checked that column
Multiple the number of times you have checked the columns by:
Never - 1
Sometimes/Occasionally - 2
Fairly Often/Pretty Well - 3
Always/Very Well - 4
The more points you have, the more culturally competent you are becoming.

Source: https://racialdiscoveryboom.org/files/414/cultural-competence-self-assessment-checklist.pdf?1342110427

To be considered competent, white staff needed to acknowledge their power and privilege. *Id.*

SPS also required staff to respond to Quick Check questions throughout the modules. One question asked, "When you witness racism and xenophobia in the classroom, how should you respond?" App.2137, R.Doc.77-20 at 58. The two answer choices were: "Address the situation in private after it has passed," or "Address the situation the moment you realize it is happening." *Id.* If staff selected the first option, they were told, "Incorrect! It is imperative adults speak up

23

immediately and address the situation with those involved. Being an anti-racist requires immediate action." App.2172, R.Doc.77-20 at 93. If they selected the second option, they were told, "Correct! Being an anti-racist requires immediate action." *Id*. Staff could not move forward if they selected the incorrect response. App.1320, R.Doc.77-1 at 9. They could only move forward in the module and receive necessary credit if they selected the "correct" response: being an anti-racist.

**Ms. Henderson gave answers on questions of public concern that were contrary to her beliefs.**

After SPS told Ms. Henderson that responses were required in the Canvas modules, Ms. Henderson answered all the Quick Check questions and completed the self-assessment checklist. App.2185, R.Doc.77-22 at 1; App.2646 at 121:17-122:24, R.Doc.78-3 at 31. Because she sees and treats people equally regardless of skin color, Ms. Henderson disagreed with the statement "If I am a White person working with a person of color, I will likely be perceived as a person with power and racial privilege[.]" App.1331, R.Doc.77-2 at 10. Despite her opposition, she answered "Always/Very Well" or "Fairly Often/Pretty Well" because she believed that SPS would review her responses and expected her to respond in that way. *Id*.

Ms. Henderson also disagreed with the Quick Check response, "Being an anti-racist requires immediate action." App.1332, R.Doc.77-2 at 11. She disagreed with

24

anti-racism as SPS taught it and, after working with students for over 20 years, she believed any response should be tailored to the situation. *Id*. But because she needed to give the correct response to move on and receive necessary credit, she selected the answer that adopted anti-racism. *Id*.

**Plaintiffs sued SPS, and both parties moved for summary judgment.**

Plaintiffs sued, alleging that SPS compelled their speech and discriminated against their views in violation of the First Amendment. App.24-25, R.Doc.1 at 24-25. They alleged that because SPS required staff to adopt anti-racism and equity as a job responsibility, SPS also created an unconstitutional condition of employment. App.25-26, R.Doc.1 at 25-26. Defendants did not move to dismiss the lawsuit. *See* App.30-61, R.Doc.17 at 1-32; App.62-95, R.Doc.31 at 1-34. Both parties moved for summary judgment. App.138-40, R.Doc.74; App.1262-63, R.Doc.76.

During the 2021-2022 school year, SPS did not conduct the training due, in part, to the lawsuit, but it "will resume equity training at some point[.]" App.2199 at 50:12-53:11, R.Doc.77-23 at 13-14; App.2702, R.Doc.78-7.

**The district court entered summary judgment for Defendants.**

The district court granted SPS's motion for summary judgment. It held that Plaintiffs were not injured because they were free to express their own views during the training without penalty, and SPS did not have a formal policy requiring

25

employees to articulate a viewpoint with which they disagreed. *See* Add.9, App.5312, R.Doc.88 at 7. It characterized Plaintiffs' challenge as a right-not-to-hear case, even though Plaintiffs disclaimed that theory. *Compare* Add.25, App.5328, R.Doc.88 at 23 *with* App.108:22-25; App.4377, R.Doc.82 n.5. And it concluded that Plaintiffs' "claim and theory" was frivolous, holding that even if they had standing, it would still rule in Defendants' favor. Add.26, App.5329, R.Doc.88 at 24.

Although Defendants never moved to dismiss the case or even mention frivolity during the litigation, they requested attorney fees in their summary judgment motion without citing any supporting authority. App.142-205, R.Doc.75 at 1-64; App.3122-3207, R.Doc.80 at 1-86. Once Plaintiffs responded that Defendants were barred from recovering fees under Section 1988 because they did not allege that Plaintiffs' claims were frivolous, Defendants appeared to abandon their request altogether. *Compare* App.2591, R.Doc.78 at 84 *with* App.4417, R.Doc.83 at 29. Even so, the district court held that Defendants' assertion that Plaintiffs lacked standing could be construed as an argument that Plaintiffs' claims were frivolous, and it invited Defendants to file a motion for attorney fees. Add.26-27, App.5329-30, R.Doc.88 at 24-25.

26

**The court awarded attorney fees and costs to Defendants.**

Following briefing from both parties, and having already found that Plaintiffs' claims were frivolous, the district court awarded attorney fees to Defendants in the amount of $312,869.50.[2] Add.31, App.5513, R.Doc.107 at 4. It reiterated its opinion that there was no policy requiring Plaintiffs to articulate a specific message and that they did not suffer adverse employment action. Add.29-30, App.5511-12, R.Doc.107 at 2-3. It concluded that the amount of $312,869.50 was reasonable. Add.30-31, App.5512-13, R.Doc.107 at 3-4. And because it held that Defendants were the prevailing party, the court also awarded them costs totaling $3,267.10. Add.33-34, App.5534-35, R.Doc.120 at 1-2.

## STANDARD OF REVIEW

This court reviews summary judgment decisions de novo. *Gralike*, 191 F.3d at 916. In First Amendment cases, a reviewing court has "a constitutional duty to conduct an independent examination of the record as a whole, without deference to

---

[2] The amount awarded, $312,869.50, exceeded the amount requested. Although Defendants initially requested that sum, they agreed to reduce the amount to $308,512.85 following Plaintiffs' response to their motion. *Compare* App.5355, R.Doc.98 at 22 *with* App.5442, R.Doc.106 at 9. The court awarded the original request without acknowledging Defendants' reduction.

27

the trial court." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 567 (1995).

This Court reviews "legal issues relating to fee awards de novo, the awards themselves for abuse of discretion." *Cody v. Hillard*, 304 F.3d 767, 772 (8th Cir. 2002); *accord Richmond*, 980 F.2d at 520 (reviewing costs). "A district court abuses its discretion when it makes an error of law or a clearly erroneous assessment of the evidence." *United States v. Weiland*, 284 F.3d 878, 882 (8th Cir. 2002).

## SUMMARY OF ARGUMENT

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). This is true even—or perhaps *especially*—for those who work in government. The government cannot compel its employees to "speak[] at all" on political and social matters, and it certainly cannot compel its employees to adopt its political views. *See Janus*, 138 S. Ct. at 2463-64.

But that is exactly what SPS did in the fall of 2020, when it directed Ms. Henderson and Ms. Lumley to engage in speech on controversial topics and become political advocates. SPS gathered Plaintiffs in mandatory training sessions and

28

presented its views on current affairs, focusing on concepts like white supremacy, oppression, and anti-racism. It issued literal directives to speak and remain engaged in conversation, and it warned that anyone who dared to remain silent or dissent would be complicit in white supremacy.

In addition to the risk of being labeled white supremacists, Plaintiffs faced a loss of pay, professional development credit, and even being reported to school officials if they failed to be active participants in the training. Faced with an impossible choice, Plaintiffs initially participated by "speaking their truth" and sharing their real views. But when they did, SPS discriminated against them, shaming them into silence. Rather than verbally affirming SPS's views, they self-censored for the rest of their sessions. In doing so, they automatically assumed the white supremacist label for their "white silence," endorsing SPS's view that unless white people become anti-racist advocates, they are complicit in white supremacy. When Ms. Henderson had to complete online modules later, she did not want to risk the same consequences for refusing to speak or saying the "wrong" thing. Thus, she gave answers that she believed SPS wanted to hear, even though she firmly opposed those views.

Yet the district court held that because SPS never enacted a formal policy that required Plaintiffs to articulate a specific message on anti-racism, they could not

29

state a First Amendment claim. Add.11, App.5314, R.Doc.88 at 9. It held that because Plaintiffs did not suffer adverse employment action, they could not state a claim. Add.5, App.5308, R.Doc.88 at 3. And it held that because SPS was their employer, they could not succeed on the merits of their claim. Add.24, App.5327, R.Doc.88 at 22. The court went a step further by finding sua sponte that Plaintiffs' First Amendment claims were frivolous because they were not injured. Add.26, App.5329, R.Doc.88 at 24. It awarded over $316,136.60 in costs and fees to Defendants. Add.31, App.5513, R.Doc.107 at 4; Add.33-34, App.5534-35, R.Doc.120 at 1-2.

If allowed to stand, the district court's ruling will undermine longstanding precedent. *See, e.g.*, *Telescope Media*, 936 F.3d at 753-54 (striking down law even though it did not require individuals to articulate a specific message); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 68 (1963) (holding that the "acts and practices" of state officials were unconstitutional despite there being no policy or enforcement mechanism); *Janus*, 138 S. Ct. at 2473 (holding that employers can only require employees to engage in speech pursuant to official duties); *Christiansburg*, 434 U.S. at 423-24 (rejecting defendant's request for attorney fees in case of first impression). For the reasons below, the district court's ruling should be reversed and the case reassigned on any remand.

30

**ARGUMENT**

## I. SPS unconstitutionally compelled Plaintiffs' speech.

"The Supreme Court has 'held time and again that freedom of speech includes both the right to speak freely and the right to refrain from speaking at all.'" *Telescope Media*, 936 F.3d at 752 (quoting *Janus*, 138 S. Ct. at 2463). Indeed, "[f]orcing free and independent individuals to endorse ideas they find objectionable is always demeaning, and for this reason, . . . a law commanding 'involuntary affirmation' of objected-to beliefs would require 'even more immediate and urgent grounds' than a law demanding silence." *Janus*, 138 S. Ct. at 2464 (quoting *Barnette*, 319 U.S. at 633). Because the "choice of a speaker not to propound a particular point of view . . . is presumed to lie beyond the government's power to control," the right to refrain from speaking is held sacred. *Id.* (quotation omitted).

The government violates the First Amendment any time it "tries" to "compel affirmance of a belief with which the speaker disagrees[.]" *Meriwether v. Hartop*, 992 F.3d 492, 503 (6th Cir. 2021) (quoting *Hurley*, 515 U.S. at 573); *accord Barnette*, 319 U.S. at 642; *Wooley v. Maynard*, 430 U.S. 705, 717 (1976). The government's refusal to allow individuals "to remain silent" on matters of public concern "is precisely the type of state-compelled speech which violates the First Amendment right not to speak." *Gralike*, 191 F.3d at 917-18.

31

Thus, unconstitutional compulsion exists when the government directs an individual to speak, *even if* it does not direct the individual to convey a specific message. *Telescope Media*, 936 F.3d at 753-54 (striking down compulsory law because even though the government did not force individuals to articulate a specific message, it still forced them to engage in speech they "would not otherwise make") (citation omitted); *Gralike*, 191 F.3d at 917-19 (striking down requirement that candidates express *a* view on a ballot measure, even though the government did not require them to articulate a specific viewpoint); *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1284 n.4 (10th Cir. 2004) ("The constitutional harm—and what the First Amendment prohibits—is being forced to speak rather than to remain silent.").

Just as compulsion exists when the government issues literal directives to speak, it also exists when the government creates an inducement that could lead a reasonable person to abandon her beliefs. *Elrod v. Burns*, 427 U.S. 347, 356, 358 n.11, 359 n.13 (1976) (holding that the First Amendment bans "dampen[ing] the exercise generally of First Amendment rights, however slight the inducement to the individual to forsake those rights" and that the inducement "need not be particularly great in order to find that rights have been violated"). Compulsion "need not take the form of a direct threat or a gun to the head." *Axson-Flynn*, 356 F.3d at 1290 (finding "no question" that compulsion was present when a university required a

32

student to recite language she opposed because even though it never even threatened to punish her, the plaintiff "believed that it was only a matter of time"). "[I]ndirect pressure may suffice" to establish an injury, including the injury of self-censorship. *Cartwright*, 32 F.4th at 1123 (striking down bias response team because its appearance of authority could lead students to self-censor).

And in First Amendment cases, courts must consider all facts on the record to determine "whether a given course of conduct falls on the near or far side of the line of constitutional protection." *Hurley*, 515 U.S. at 567. That includes reviewing "the entirety of the defendants' words and actions" when assessing whether the government unconstitutionally compelled speech or silence. *Zieper v. Metzinger*, 474 F.3d 60, 66 (2d Cir. 2007); *accord Bantam Books,* 372 U.S. at 67 (looking "through forms to the substance" to find "informal censorship").

The district court erred by failing to consider the entirety of Defendants' words and actions. The undisputed facts show that SPS compelled Plaintiffs to adopt anti-racism as a job responsibility. SPS then compelled Plaintiffs to speak by directing them to participate in "turn and talk" exercises and Canvas module exercises and by warning them to stay engaged and be professional or risk consequences. SPS even warned that any white person who remained silent or rejected anti-racism was complicit in white supremacy.

33

Given the appearance of authority SPS and its trainers had over Plaintiffs, Plaintiffs faced a Hobson's choice: (1) affirm SPS's views by adopting anti-racism and admitting their racial privilege; (2) share their real views and risk being labeled white supremacists, seen as unprofessional, losing credit and pay, and being referred to administrators at the end of the year; or (3) not speak at all and face the same consequences, including being labeled white supremacists for their "white silence." SPS put Plaintiffs in a no-win situation, where the only real option was to forsake their beliefs and adopt anti-racism.

## A. SPS compelled Plaintiffs to become anti-racist as a job requirement.

SPS unconstitutionally compelled Plaintiffs' speech when it directed them to adopt anti-racism as a job requirement. Starting that summer, SPS told staff that they had a "responsibility to be equity champions." App.1642, R.Doc.77-8 at 1. In the mandatory equity training designed to teach staff how to become so-called equity champions "for [their] own personal *and* professional development," App.1717, R.Doc.77-9 at 10, SPS told staff that they "*will*" actively advocate for social and political change. App.1975, R.Doc.77-15 at 18 (emphasis added). It told staff that they "*must* commit to" SPS's views on equity. App.1717, R.Doc.77-9 at 10 (emphasis added). And it repeated often that such views were now each staff

34

member's "responsibility." *See id*.; App.1642, R.Doc.77-8 at 1; App.2023, R.Doc.77-17 at 3; App.2731 at 101:11-22, R.Doc.79-1 at 26.

SPS also directed school leaders to hold their educators accountable. It directed them to "more firmly root their anti-racist messaging" with staff, "communicate the anti-racist vision for their school," and make "expectations for educators clear." App.1802-03, R.Doc.77-13 at 35-36. It began the equity training by saying it would give staff "tools" to become anti-racist educators, it reinforced throughout the training that staff had to become anti-racist advocates, and it concluded by directing staff to answer the question, "What steps will *you* take to become an Anti-Racist?" App.1775, R.Doc.77-13 at 8; App.1798-1806, R.Doc.77-13 at 31-39 (emphasis added).

And as the training and Canvas modules made clear, by telling staff to become anti-racist, SPS really meant that they could not support equality and colorblindness. App.1642-1707, R.Doc.77-8; App.2722 at 66:12-71:16, R.Doc.79-1 at 17; App.2729 at 96:4-7, R.Doc.79-1 at 24. Worse still, SPS made clear that a white staff member would be complicit in white supremacy if she dared to oppose anti-racism or even just wanted to remain silent. App.1798, R.Doc.77-13 at 31; App.2729 at 157:11-18, R.Doc.79-1 at 24; *accord Gralike*, 191 F.3d at 917-19 (8th Cir. 1999) (holding that the government unconstitutionally compelled speech when it attached

35

a label "calculated to give[] a negative impression" to candidates who remained silent or dissented on a ballot measure). In tying anti-racism directly to their "work and job responsibilities," App.1717, R.Doc.77-9 at 10, SPS unconstitutionally coerced Plaintiffs into adopting anti-racism at the expense of their own beliefs. *See Elrod*, 427 U.S. at 356.

## B. SPS compelled Plaintiffs' speech during the equity training.

**1.** SPS unconstitutionally compelled Plaintiffs' speech during the equity training when it coerced them to speak on matters of public concern, all in the name of anti-racism. First, SPS gave express commands to "Speak YOUR truth," "stay locked into the conversations," and "Acknowledge YOUR privileges." App.1774, R.Doc.77-13 at 7. It then told Plaintiffs to "share and dialogue" and "have some courageous conversations." App.1775, R.Doc.77-13 at 8; App.1963, R.Doc.77-15 at 6; App.1985, R.Doc.77-16 at 8. It carried out its commands by breaking Plaintiffs into small groups for "turn and talk" exercises, with warnings that they would be called on when they returned to the larger group. App.2192 at 21:11-14, R.Doc.77-23 at 6; App.2763 at 229:19-230:14, R.Doc.79-1 at 58; App.2983 at 33:23-34:9, R.Doc.79-2 at 9; App.2987 at 50:4-13, R.Doc.79-2 at 13. And SPS never told Plaintiffs that silence was an option. App.2743 at 151:22-25, R.Doc.79-1 at 38. *See United Food & Com. Workers Int'l Union v. IBP, Inc.*, 857 F.2d 422, 430 (8th Cir.

36

1988) (holding that the government's failure to clearly say it would *not* punish speakers presented a First Amendment injury). Instead, it warned that silence on the part of white people was white supremacy. App.1789, R.Doc.77-13 at 22; App.2745 at 157:11-18, R.Doc.79-1 at 40.

SPS did not just invite Plaintiffs to talk about the weather; it directed them to speak about controversial matters of public concern.[3] *See Gralike*, 191 F.3d at 917 ("[T]he burden upon freedom of expression is particularly great where . . . the compelled speech is in the public context."). In directing Plaintiffs to discuss current events and concepts like white supremacy, oppression, and anti-racism—which it defined as advocating for political, social, and economic change—SPS violated their right not to speak. *See Janus*, 138 S. Ct. at 2493 (finding public employer violated the First Amendment when it compelled employees to subsidize speech on ideological issues); *Telescope Media*, 936 F.3d at 753-54. The district court thus erred when it held that SPS did not compel Plaintiffs' speech because it did not

---

[3] SPS has admitted that the training involved "societal and political ideologies," App.3198-99, R.Doc.80 at 77-78, and that associating colorblindness with white supremacy is a political statement. App.197, R.Doc.75 n.21.

37

require them to articulate a specific message.[4] Add.11, App.5314, R.Doc.88 at 9. Directing Plaintiffs to speak on public matters *at all* violated the First Amendment.

On top of that, SPS warned that if Plaintiffs' behavior was unprofessional, they could be kicked out of the session, losing necessary credit and pay. App.1774, R.Doc.77-13 at 7; App.2630 at 57:1-5, R.Doc.78-3 at 15; App.2631 at 62:15-23, 64:3-5, R.Doc.78-3 at 16. SPS monitored their behavior by repeatedly directing them to "stay engaged" and keep their cameras on. App.1324, R.Doc.77-2 at 3; App.1766:12-13, R.Doc.77-12 at 6. Defendant Garcia-Pusateri ensured that staff were attentive in every session by urging administrators to "address[]" lacking participation. App.2022, R.Doc.77-17 at 2. And SPS directed administrators to "more firmly root their anti-racist messaging" and to make their expectations "clear" for employees. App.1803, R.Doc.77-13 at 36.

Defendant Garcia-Pusateri would even "document" subpar participation and refer those incidents to administrators for end-of-year review. App.2742 at 148:2-12, R.Doc.79-1 at 37. Yet she also said that engagement was a "fluid" concept, which she could not readily define. App.2743 at 149:13-17, R.Doc.79-1 at 38. Because not

---

[4] SPS *did* require Plaintiffs to adopt a specific viewpoint: anti-racism. Moreover, even compelled factual disclosure requirements violate the First Amendment in the noncommercial context. *See Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2372 (2018); *Riley v. Nat'l Fed'n of Blind*, 487 U.S. 781, 798 (1988).

38

even the Chief Equity and Diversity Officer could describe what "engagement" meant, Plaintiffs were left to hazard guesses about what sort of speech would prompt removal from the training.

One thing was clear: SPS employees could not just silently observe the equity training. In the training, SPS told staff that they could "no longer remain *silent* or *inactive*" but must engage in proactive advocacy as anti-racists. App.1975, R.Doc.77-15; at 18; App.2016, R.Doc.77-16 at 39. It made clear that anti-racism and equity required forsaking equality. App.2722 at 65:18-20, R.Doc.79-1 at 17; App.2728 at 89:15-17, R.Doc.79-1 at 23. And if staff believed in colorblindness or that all lives mattered equally—as Plaintiffs did—they were complicit in white supremacy and racism. App.1789, R.Doc.77-13 at 22; App.1798, R.Doc.77-13 at 31.

Based on "the entirety of the defendants' words and actions," *Zieper*, 474 F.3d at 66, Plaintiffs understood that they had a choice: (1) verbally affirm SPS's views on white supremacy, oppression, and anti-racism; (2) share their real views and risk being seen as disruptive white supremacists, asked to leave with no credit or pay, and referred to administrators; or (3) stay silent and *still* risk those consequences while endorsing SPS's view that "white silence" is white supremacy.

Such a Hobson's choice is an injury in itself. *See Cressman v. Thompson*, 719 F.3d 1139, 1145 (10th Cir. 2013) (finding injury where the government presented a

speaker with three options: display the government's message, pay to avoid displaying the message, or refuse to speak and face consequences); *Meriwether*, 992 F.3d at 517 (finding coercion where a professor had to affirm a student's preferred pronouns or risk punishment); *Axson-Flynn*, 356 F.3d at 1290 (suggesting to student that unless she said words with which she was uncomfortable, she would be unable to continue program).

Understanding that they had to "speak their truth," Plaintiffs initially tried sharing their real views during their sessions. But rather than dialogue with them, their trainers and colleagues shamed and corrected them, confirming SPS's warning that dissent was white supremacy. When Ms. Henderson suggested that Kyle Rittenhouse was defending himself from rioters, Defendant Garcia-Pusateri told her that she was confused and wrong, and that Rittenhouse murdered an innocent person. App.1326, R.Doc.77-2 at 5. And when Ms. Lumley disagreed that all white people are born into privilege and expressed that all people are created equal, her coworkers berated her and her trainers corrected her, telling her to reflect on herself more. App.1338-39, R.Doc.77-3 at 5-6.

When their trainers refused to tolerate their personal beliefs, Plaintiffs again faced a "choice," where every option carried a penalty. The first option—keep engaging contentiously with their employer about controversial topics—bore the

40

risk of being seen as disruptive white supremacists, losing necessary credit and pay, and being reported to district administrators for a lack of professionalism. The second option—remaining silent—bore the pejorative white supremacist label. The third option—affirming that Rittenhouse was a murderer, that poor white people are inherently privileged, and that individuals are *not* created equal—required Plaintiffs to completely betray their convictions.

Faced with no other choice, Ms. Henderson and Ms. Lumley self-censored. In doing so, they automatically assumed the white supremacist label for their "white silence," thereby endorsing SPS's view that staff are either anti-racist political advocates or white supremacists. *See Gralike*, 191 F.3d at 918-19 ("The pejorative nature of the labels is heightened by the fact that there are no labels for the candidates who take the pledge or comply[.]"). Without even saying a word, they affirmed the district's views against their will. The coercion Plaintiffs faced to become anti-racist was real, enduring, and unconstitutional.

**2.** Although Plaintiffs did not suffer adverse employment action for the one time they spoke during the training, "[n]either formal punishment nor the formal power to impose it is strictly necessary[.]" *See Cartwright*, 32 F.4th at 1123. If speakers had to undergo punishment before challenging an unconstitutional action, it would mean chilled speech is never an injury and that pre-enforcement challenges

41

could never be brought. *Id.* at 1120 ("We have long emphasized that the injury requirement is most loosely applied—particularly in terms of how directly the injury must result from the challenged governmental action—where First Amendment rights are involved, because of the fear that free speech will be chilled even before the law, regulation, or policy is enforced."). Speakers need not speak—or refuse to speak—and wait to see what consequences befall them. *See Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 298 (1979).

But even so, Plaintiffs *were* punished for speaking. They were punished first when they were publicly shamed and embarrassed, and again when they were forced to assume the pejorative white supremacist label for their "white silence" after resorting to self-censorship. *See Gralike*, 191 F.3d at 918-19. The only reason Plaintiffs were not penalized further with adverse employment action is because they stopped dissenting, realizing their views would not be tolerated. *See Bantam Books*, 372 U.S. at 68 (finding injury when speaker complied with government requests). Plaintiffs' self-censorship was a dual win for SPS: in one fell swoop, SPS effectively forced them to admit that they were complicit in white supremacy while it silenced their dissenting views.

Moreover, speakers need not point to a formal policy that so much as *threatens* punishment. *Id.* So long as fear of punishment is not "imaginary or wholly

42

speculative," a challenger has standing. *Babbitt*, 442 U.S. at 298. Thus, a First Amendment injury exists when government officials appear to have authority to impose penalties, compelling speech or silence as a result. *281 Care Comm. v. Arneson*, 638 F.3d 621, 628-29 (8th Cir. 2011) (holding that a state law banning false statements about proposed ballot initiatives chilled speech when it deterred speakers from participating in a debate, even though they were never punished); *Zieper*, 474 F.3d at 66-67 (holding that even though an official used polite language and did not mention consequences, a reasonable person could find his actions coercive) (citing *Bantam Books*, 372 U.S. at 67); *Cartwright*, 32 F.4th at 1123-24; *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 764 (6th Cir. 2019) (collecting cases). And if an official fails to expressly disavow enforcement authority, the threat of injury is even greater. *Babbitt*, 442 U.S. at 302; *United Food*, 857 F.2d at 430; *Zieper*, 474 F.3d at 66.

Plaintiffs' fear of punishment was not imaginary or speculative. After warning employees that equity and anti-racism were part of their "work and job responsibilities," SPS gave every impression that it was monitoring employees' performance and would penalize disruptive staff. App.1717, R.Doc.77-9 at 10. On top of its multiple threats to be professional or lose credit and pay, Plaintiffs' trainers were members of the Office of Equity and Diversity. App.1317, R.Doc.77-1 at 6. None of the trainers disavowed their appearance of authority or otherwise indicated

43

that staff would *not* be punished if they dissented or refused to speak. *See Babbitt*, 442 U.S. at 302. Instead, SPS repeated instructions to speak one's truth and stay engaged in "turn and talk" exercises, threatened to remove unprofessional staff, and warned that "white silence" and opposition to anti-racism were white supremacy.

Plaintiffs' fears were reasonable because their colleagues also self-censored. Other staff understood that they were "expected" to "express their feelings/opinions" on these topics but felt "uncomfortable" doing so. App.2021, R.Doc.77-17 at 1. They worried that "they would have a target on their back" because "the topics were very political[.]" *Id*. When one staff member expressed a dissenting view during her training session, a trainer was so dismissive that she cried. *Id*. And as many as 17.3% of staff felt uncomfortable with the training. App.2786 at 321:6-24.

Rather than remedying those concerns, Defendant Garcia-Pusateri acknowledged the "controversial" nature of the training and said that it was meant to be "uncomfortable." App.2021, R.Doc.77-17 at 1. She lamented that staff were "taking the content personally and a challenge to their own beliefs and making this political rather than questioning why topics like systemic racism and white supremacy negatively impact them[.]" *Id*. SPS did not change the training because it wanted staff to "start the work of becoming antiracist educators." *Id*.

44

Since then, Defendant Lathan—who joined SPS as Superintendent after the training—expressed surprise at the presentation and admitted that the training "wasn't well thought out" because staff had to engage in uncomfortable conversations. App.2191 at 20:2-21:24, R.Doc.77-23 at 5.[5] But the damage was already done. SPS used its training to make clear that anti-racism was not merely a suggestion or a way to think about current events; it was a specific worldview Plaintiffs had a "responsibility" to adopt.

**C. SPS compelled Ms. Henderson's speech through the Canvas modules.**

SPS further compelled Ms. Henderson's speech through the Canvas modules. After telling staff that they had a "responsibility to be equity champions," then requiring staff to engage in "turn and talk" exercises about controversial, political topics, SPS directed staff to "keep the momentum going" through additional training online, this time through mandatory Canvas modules. App.1642, R.Doc.77-8 at 1; App.2184, R.Doc.77-22 at 1.

SPS informed Ms. Henderson that responses were required in the modules, so Ms. Henderson again faced an impossible choice to express her own views, adopt the district's views, or remain silent. App.2185, R.Doc.77-22 at 1; App.2646 at

---

[5] Defendant Lathan also admitted that SPS "will resume equity training at some point[.]" App.2200 at 53:5-11.

121:17-122:24, R.Doc.78-3 at 31; *accord Cressman*, 719 F.3d at 1145; *Meriwether*, 992 F.3d at 517; *Axson-Flynn*, 356 F.3d at 1290. Since responses were required to receive necessary professional development credit, silence was not an option. *See Gralike*, 191 F.3d at 917-18. And because SPS told Ms. Henderson that her views were wrong during the equity training and directed its employees to become anti-racist, she understood that it would not tolerate dissenting viewpoints in the module exercises either. App.1331, R.Doc.77-2 at 10; *accord Bantam Books*, 372 U.S. at 67-68; *Zieper*, 474 F.3d at 66-67; *Schlissel*, 939 F.3d at 764. Nor did SPS disavow punishment if she said the "wrong" thing or refused to participate. *See Babbitt*, 442 U.S. at 298; *United Food*, 857 F.2d at 430.

Thus, when Ms. Henderson was required to complete the "Self-assessment Awareness Checklist," which measured her social "competence," she gave answers she affirmatively did not believe. She agreed that she would "likely be perceived as a person with power and racial privilege" based on her skin color, even though she believes that no one has racial privilege because all people are created equal. App.1331, R.Doc.77-2 at 10. SPS thus compelled Ms. Henderson to adopt its views on equity and anti-racism when it gave every appearance that it would review her answers and failed to disavow punishment for saying the wrong thing or failing to complete the modules.

And like in the equity training, SPS gave Ms. Henderson literal directives to speak by requiring her to register answers before she could receive credit. App.1320. More than the government did in *Telescope Media*, 936 F.3d at 753-54, or *Gralike*, 191 F.3d at 917-19, SPS required Ms. Henderson to articulate specific messages when it required her to complete the Quick Check questions. For example, when asked, "how should you respond" to issues of racism in the classroom, Ms. Henderson wanted to respond that she would address the situation privately. App.1332, R.Doc.77-2 at 11. But SPS required her to adopt the alternative viewpoint, which included "Being an anti-racist." *Id*. Once again, SPS unconstitutionally commanded that she become an anti-racist advocate.

## II. SPS discriminated against Plaintiffs' views.

"It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger*, 515 U.S. at 828. Any time the government compels speech, it "alters the content of the speech" by "[m]andating speech that a speaker would not otherwise make[.]" *Riley*, 487 U.S. at 795. And "[w]hen the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger*, 515 U.S. at 829. Viewpoint discrimination is thus "an egregious form of content discrimination." *Id*. at 829-30.

47

Any attempt by the government to regulate a speaker's views—whether by demanding affirmation or forbidding dissent—is "presumptively unconstitutional" viewpoint discrimination. *Id*. at 829-30. The government "is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." *Hurley*, 515 U.S. at 579.

SPS violated the First Amendment when it stifled Plaintiffs' viewpoints through its equity programming. Not only did SPS command staff to adopt its worldview on anti-racism, but when Plaintiffs shared their views, SPS chastised them, forcing them to self-censor.

## A. SPS discriminated against Plaintiffs' views during equity training.

Any time the government favors one set of views over another, it engages in viewpoint discrimination, an injury in itself. *Vincent*, 466 U.S. at 804. SPS used its training to convey its position on political and social affairs and to create a "shared understanding" among staff. App.1772, R.Doc.77-13 at 5. It did not offer different perspectives on those current events but adopted a singular position. *See Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*, 479 F. Supp. 3d 808, 817-18, n.4 (D. Ariz. 2020) (holding that professor did not inhibit religion when he presented an author's opinion

48

on Islamic terrorism and evaluated whether students could recite the author's perspective).

When Plaintiffs tried to register their disagreement with SPS's position on those political matters, their trainers told them they were wrong. App.1326, R.Doc.77-2 at 5; App.1338-39, R.Doc.77-3 at 5-6; App.2605 at 27:9-30:4, R.Doc.78-1 at 7. SPS even admitted that it endorsed certain viewpoints and reacted differently based on the responses it received on topics like America's founding. App.2756 at 202:8-208:2, R.Doc.79-1 at 51-52; App.2780 at 300:20-24, R.Doc.79-1 at 75. SPS also refused to "honor [staff's] willingness to speak up and share" alternative points of view. App.2021, R.Doc.77-17 at 1. This alone ends the inquiry because it amounts to viewpoint discrimination. *Vincent*, 466 U.S. at 804; *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 96 (1972) ("[G]overnment must afford all points of view an equal opportunity to be heard.").

But because Plaintiffs self-censored after that, the constitutional violation was even greater. *See Rosenberger*, 515 U.S. at 835 (describing chill as a "corollary" danger of viewpoint discrimination). Like with their compelled speech claim, Plaintiffs need only show that SPS *appeared* to have authority to censor them. *See Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988) (self-censorship is a harm "even without an actual prosecution"); *Arneson*, 638 F.3d at 627; *Cartwright*,

49

32 F.4th at 1123-24; *Schlissel*, 939 F.3d at 764. If the mere words and actions of government officials could lead a reasonable person to self-censor, it is enough to establish a claim, even without a formal law or policy. *Bantam Books*, 372 U.S. at 68.

As described above, Plaintiffs' self-censorship was objectively reasonable based on SPS's commands to remain professional or risk losing credit and pay. After being chastised by trainers acting on behalf of SPS—their *employer*—they could hardly be expected to keep arguing and risk being dismissed as unprofessional. Their colleagues shared those same concerns after trainers dismissed their views and made them feel uncomfortable. App.2021, R.Doc.77-17 at 1. Yet SPS only doubled down on its commands to be uncomfortable, suggesting that staff should do more internal reflecting. *Id*.

The district court thus erred when it held that Plaintiffs were not injured because SPS did not have a policy threatening to punish them if they dissented. The Supreme Court does not require speakers to point to formal policies before challenging an unconstitutional government action. *See Bantam Books*, 372 U.S. at 67-68.

And while SPS did not withhold Plaintiffs' pay or take other adverse employment action, "[t]his misses the point. The lack of discipline . . . could just as

50

well indicate that speech has *already* been chilled." *Schlissel*, 939 F.3d at 766. Plaintiffs did not suffer retaliation from their employer because they complied with its commands to attend the training and remain engaged. *See Bantam Books*, 372 U.S. at 68. When SPS made clear that their views would not be tolerated, they had no other choice but to adopt silence because they did not want to continue debating their employer. And when they adopted silence, they unwillingly adopted the white supremacist label, endorsing SPS's worldview and betraying their own. SPS thus injured Plaintiffs the moment it presented one viewpoint to them on political matters and rejected their sincerely held beliefs.

## B. SPS discriminated against Ms. Henderson's views through the Canvas modules.

SPS used the Canvas modules to continue promoting its own views on political and social affairs while silencing others. In the modules, SPS directed staff to acknowledge bias, support "systemic changes," and debunk myths white people tell about race, while also discouraging staff from saying things like "I don't see color." App.1319, R.Doc.77-1 at 8; *Riley*, 487 U.S. at 789.

Each time Ms. Henderson selected the "wrong" answer to a Quick Check question, SPS corrected her. App.1332-33, R.Doc.77-2 at 11-12. In this way, SPS unconstitutionally "alter[ed] the expressive content" of her speech. *See Hurley*, 515

51

U.S. at 572-73 (altering the content of a parade by requiring organizers to include messages they did not support). "[H]owever enlightened" SPS may think its equity programming is, regulating expression to promote an approved message or discourage a disfavored one is "fatal." *Id.* at 579.

## III. SPS cannot meet any burden to survive Plaintiffs' First Amendment challenge.

SPS cannot meet any burden to overcome Plaintiffs' challenge. Compelled speech and viewpoint discrimination are *per se* unconstitutional; the government can *never* produce a compelling enough interest to coerce speech or silence. *See Wooley*, 430 U.S. at 717 ("[W]here the State's interest is to disseminate an ideology, no matter how acceptable to some, such interest *cannot outweigh* an individual's First Amendment right to avoid becoming the courier for such message.") (emphasis added); *Hurley*, 515 U.S. at 579 (holding that "[t]he Speech Clause has no more certain antithesis" than compulsion); *Rosenberger*, 515 U.S. at 829-30 (finding viewpoint discrimination without conducting strict scrutiny analysis).[6]

---

[6] Even under strict scrutiny, SPS lacks a compelling interest in requiring staff to become anti-racist. *Thomas v. Collins*, 323 U.S. 516, 530 (1945) ("Only the gravest abuses, endangering paramount interests, give occasion for permissible limitation[.]"). Nor can SPS show that its equity programming was narrowly tailored to achieve a compelling interest, as it did not consult any studies when creating the training or consider any alternatives to it. App.2720 at 57:22-62:5, R.Doc.79-1 at 15-16. SPS did not assess how the programming would address "gaps" in student

52

And even in the employment context, "it is not easy to imagine a situation in which a public employer has a legitimate need to demand that its employees recite words with which they disagree." *Janus*, 138 S. Ct. at 2473. The government cannot control all employee speech by creating "excessively broad job descriptions." *Garcetti v. Ceballos*, 547 U.S. 410, 424 (2006); *accord Shurtleff v. City of Bos.*, 142 S. Ct. 1583, 1598-99 (2022) (Alito, J., concurring) ("[N]ot all governmental activity that qualifies as 'government speech' . . . is exempt from First Amendment scrutiny.").

The Supreme Court has never so much as entertained a public employer's perceived interest in *compelling* employees to speak. *See Janus*, 138 S. Ct. at 2473 (holding that it has "never applied" a balancing test when "a public employer does not simply restrict potentially disruptive speech but commands that its employees mouth a message on its own behalf"). An employer may be able to compel employee speech *only* where the speech "is part of an employee's official duties" and includes a "lawful message." *Janus*, 138 S. Ct. at 2473.

---

experiences. *Id.* And SPS admitted that it achieved its stated goals in 2021 *without* any equity programming. App.2203 at 66:16-70:7, R.Doc.77-23 at 17.

Whether speech falls under an official job duty should be a "practical" inquiry. *Id*. It is not enough for speech to "touch[] on matters related to public employment[.]" *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2424 (2022). Instead, the speech must be "*ordinarily* within the scope of an employee's duties." *Id*. (quotation omitted) (emphasis added). And if a court finds that an employee "speaks as a citizen addressing a matter of public concern," the speech is *not* within her official job duties and thus cannot be restricted or compelled. *See id*. at 2423 (quoting *Garcetti*, 547 U.S. at 423); *accord Shurtleff*, 142 S. Ct. at 1599-1600 (finding speech must be "voluntarily assumed" by someone "acting within the scope of power to speak for the government").

The messages SPS conveyed during the 2020-2021 equity programming involved matters of public concern.[7] *See Connick v. Myers*, 461 U.S. 138, 146, 148 n.8 (1983) (holding speech "relating to any matter of political, social, or other concern to the community," including race relations, is a public concern); *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 415 (1979); *Altman v. Minn. Dep't of Corr.*, 251 F.3d 1199, 1202 (8th Cir. 2001). SPS directed Plaintiffs to discuss "current issues that have impacted our society nationally and globally," including

---

[7] SPS has already conceded this. *Supra* n.3.

how oppression, systemic racism, and white supremacy took place in their community. App.1775, R.Doc.77-13 at 8. And it made no secret that it expected Plaintiffs to "advocat[e] for changes in political, economic, and social life" as anti-racists. App.1798, R.Doc.77-13 at 31.

Even if these messages were somehow related to Ms. Henderson's role as 504 process coordinator or Ms. Lumley's role as secretary, that is not enough. Speech in the workplace must do more than "touch[] on matters related to public employment . . . to render it government speech." *Kennedy*, 142 S. Ct. at 2424. SPS must show that Plaintiffs were hired specifically to speak on race and political matters. *See id.* (holding prayer was not part of football coach's official job duties because the district paid him to "instruct[] players, discuss[] strategy, [and] encourag[e] better on-field performance"); *Nagel v. City of Jamestown*, 952 F.3d at 929-30 (8th Cir. 2020) (holding city could discipline police officer for disruptive speech during a public interview because he was acting as their official spokesperson); *Shurtleff*, 142 S. Ct. at 1598-1600 ("[C]ourts must be very careful when a government claims that speech by one or more private speakers is actually government speech.").

The speech SPS paid Ms. Henderson for during the 2020-2021 school year included advocating for individuals with physical or mental disabilities under

55

Section 504 of the Rehabilitation Act. App.2617, R.Doc.78-3 at 6:2-8:15. The speech SPS paid Ms. Lumley for included managing and producing student records. App.2599, R.Doc.78-1 at 4:1-3; App.3301-03, R.Doc.80-5. SPS did not pay either Plaintiff to speak on matters involving race, anti-racism, oppression, or white supremacy, or any other current events covered in its equity programming. Thus, the district court erred when it held that even if SPS compelled Plaintiffs' speech and discriminated against their views, SPS was still entitled to summary judgment simply because it was their employer.

## IV. SPS placed an unconstitutional condition on Plaintiffs' speech when it violated their First Amendment rights.

The unconstitutional conditions doctrine states that the government "may not impose conditions which require relinquishment of constitutional rights." *Frost*, 271 U.S. at 594. It prohibits the government from "deny[ing] a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Perry*, 408 U.S. at 597.

Through its equity training, SPS tried to produce a result which it "could not command directly": that staff members become anti-racist advocates for political, social, and economic change. *Speiser v. Randall*, 357 U.S. 513, 526 (1958) (striking down condition that individuals sign loyalty oaths before receiving tax exemptions);

56

*accord Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 574-75 (1968) (striking down restrictions on teachers' expression about public matters).

SPS placed an unconstitutional condition on Plaintiffs' employment when, in exchange for pay and professional development credit, it directed them to speak on matters of public concern and caused them to self-censor and adopt the white supremacy label. It does not matter whether SPS actually withheld pay or credit;[8] the government need not deny a benefit for the doctrine to apply. *See Koontz*, 570 U.S. at 606 ("[R]egardless of whether the government ultimately succeeds in pressuring someone into forfeiting a constitutional right, the unconstitutional conditions doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them."). And because SPS directed Plaintiffs to commit to anti-racism as a job requirement, the unconstitutional condition of employment still remains.

## V. Plaintiffs, not Defendants, are entitled to attorney fees and costs.

When requesting attorney fees in a Section 1983 case, a defendant must prove that a plaintiff's claim is "frivolous, unreasonable, or without foundation." *Williams v. City of Carl Junction*, 523 F.3d at 842, 844 (8th Cir. 2008); *Christiansburg*, 434

---

[8] As described above, they did not suffer a loss of pay or credit only because they complied with SPS's directives.

57

U.S. at 423-24. "[S]o long as the plaintiff has 'some basis' for [her] claim, a prevailing defendant *may not* recover attorneys' fees." *Marquart v. Lodge 837, Int'l Ass'n of Machinists & Aerospace Workers*, 26 F.3d 842, 853 (8th Cir. 1994) (finding plaintiff's claim was not frivolous because she "alleged and continued to allege throughout discovery" each of the elements of her claim) (emphasis added), *overruled in part on different grounds by CRST Van Expedited, Inc. v. EEOC*, 578 U.S. 419, 421 (2016).

Attorney fees are granted to defendants only in "rare circumstances," *Clajon Prod. Corp. v. Petera*, 70 F.3d 1566, 1581 (10th Cir. 1995), where a claim "lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). A claim lacks an arguable legal basis only when it "is based on an indisputably meritless legal theory." *Martinez v. Turner*, 977 F.2d at 423 (8th Cir. 1992). And a claim only lacks a factual basis if the "allegations . . . are fanciful, fantastic, and delusional[.]" *Denton*, 504 U.S. at 32-33 (quotation and citations omitted). Just because a plaintiff did not succeed on the merits does not mean her lawsuit was frivolous. *See Williams*, 523 F.3d at 843. This is especially true in cases of first impression. *See Christiansburg*, 434 U.S. at 423-24 (upholding order that *because* a claim involved an issue of first impression, it "*cannot* be characterized as

58

unreasonable or meritless") (emphasis added); *Clajon*, 70 F.3d at 1581 (rejecting fee request because "the instant case presents novel and difficult legal questions").

The district court erred when it held that Plaintiffs' claims were frivolous and awarded attorney fees of $312,869.50 to Defendants. This case is one of first impression about whether a school district can compel its employees to adopt its views on anti-racism and equity. No precedent has ever addressed the type of training involved in this lawsuit, so there is no case law that would render this challenge frivolous. Defendants must do more than show that Plaintiffs did not succeed on the merits, particularly when they did not so much as raise frivolity at any point during summary judgment. Given our nation's expansive free speech protections, speakers must be allowed to present novel First Amendment challenges. If the district court's assessment is upheld, it will dramatically impair public interest litigation.

### A. Plaintiffs' claims had a basis in law and fact.

In holding that Plaintiffs lacked a factual basis for their claims, the district court appeared to accept that their First Amendment claims had a settled basis in law. *See* Add.29, App.5511, R.Doc.107 at 2. But it erred when it held that SPS did not compel their speech or discriminate against their views, rendering their claims frivolous. *Id*.

59

First, the district court improperly placed the burden for attorney fees on *Plaintiffs*, not Defendants. *See Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) ("[T]he fee applicant bears the burden of establishing entitlement to an award[.]"). Second, the court disregarded that the parties stipulated to most of the key facts on which Plaintiffs relied, and the remaining facts were materially undisputed. *See* App.1312-21, R.Doc.77-1; *accord Williams*, 523 F.3d at 843-44 (reversing decision to award fees because there was "at least a colorable argument that [plaintiff's claim] could be inferred"). The court itself even considered at least some facts Plaintiffs presented to support their claim. *See* Add.3-27, App.5306-30, R.Doc.88; *accord Cummings v. Benco Bldg. Servs.*, 11 Cal. App. 4th 1383, 1388 (1992) (reversing attorney fee award because even though plaintiff did not succeed on the merits, the lower court "nevertheless recognized [plaintiff] presented *some* evidence") (emphasis added).

The district court reasoned that because SPS did not enforce a policy that required Plaintiffs to articulate a specific message, and because SPS did not punish them, their claims lacked a factual basis that amounted to frivolity. Add.29-30, App.5511-12, R.Doc.107 at 2-3. But even if they lacked injury, courts have a duty to "resist the understandable temptation to engage in post hoc reasoning by

60

concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation." *See Christiansburg*, 434 U.S. at 421-22.

At a minimum, Plaintiffs presented an evidentiary basis that SPS compelled their speech and discriminated against their views. They showed that SPS required them to adopt anti-racism as a job "responsibility." *Supra* at 5, 21. They showed that SPS issued literal directives to speak at the mandatory equity training, including reminders to participate in "turn and talk" exercises involving large and small groups. *Supra* at 14-17. And they established that SPS told them that silence would be viewed as a form of white supremacy, never saying staff could remain silent during the exercise or otherwise disavowing penalties. *Supra* at 11-13.

Plaintiffs also showed that when they did follow the command to "speak YOUR truth," the trainers told them that they were wrong and even told Ms. Lumley to work on herself more. *Supra* at 18-20. Plaintiffs also showed that SPS expected staff to commit to anti-racism as a job responsibility, particularly when it concluded the training by asking staff about the steps they would take to solidify their commitment to anti-racism going forward. *Supra* at 17, 21. Furthermore, Ms. Henderson completed the Canvas self-assessment checklist and Quick Check questions, affirming things that she did not believe because she objectively feared consequences. *Supra* at 22-25. Finally, Plaintiffs presented evidence that their

61

concerns were objectively reasonable because they were not the only staff members to fear some sort of consequence for failing to adopt SPS's message. *Supra* at 20-21. Thus, Plaintiffs had a factual basis to plead that SPS was not merely offering a way to think about political topics and that SPS accepted only one viewpoint: anti-racism.

As consistently pled, the mere words and actions of government officials are enough to establish a factual basis for compelled speech and viewpoint discrimination, even without a formal law or policy. *See Bantam Books*, 372 U.S. at 67-68; *Cartwright*, 32 F.4th at 1123-24; *Zieper*, 474 F.3d at 66-67. It does not matter whether those officials had formal enforcement power, much less whether they actually executed penalties. *See Arneson*, 638 F.3d at 629; *American Booksellers*, 484 U.S. at 393; *Axson-Flynn*, 356 F.3d at 1283. Plaintiffs did not suffer retaliation because they complied with their employer's directives. When they realized that their views would not be tolerated, they self-censored rather than risk further consequences. And Ms. Henderson even ultimately agreed with things that she did not support in the Canvas modules to avoid punishment.

Thus, Plaintiffs had a reasonable basis to allege that SPS presented them with a Hobson's choice: (1) become anti-racist advocates and forsake their own beliefs; (2) share their true views and risk potential consequences; or (3) remain silent and

risk potential consequences. Together with the rest of the facts presented, these facts suggest at least a plausible inference of compulsion and viewpoint discrimination. Even if they did not succeed on the merits, the facts on which they relied were not "fanciful" or "delusional" such that their claims were devoid of a factual basis.

Despite this basis, the court characterized Plaintiffs' position as arguing that "they should not have to listen to, learn, or follow" SPS's training, even though Plaintiffs repeatedly disclaimed that theory. *Compare* Add.25, App.5328, R.Doc.88 at 23 *with* App.108:22-25; App.4377, R.Doc.82 n.5. Starting with the initial scheduling conference, the Court called Plaintiffs' complaint "political" and asked, ". . . [D]oesn't a school district in fact have an affirmative duty to see that racial justice occurs within its school district?" App.104:22-25. When Plaintiffs' counsel described that there was similar litigation happening elsewhere, the court interrupted to state, "Right. A bunch of the people who don't like the modern trend of race relations are now filing a bunch of lawsuits." App.105:17-22. The court proceeded to strike paragraphs from Plaintiffs' complaint sua sponte as "political." Add.1-2, R.Doc.30 at 1-2. The court's doubts about Plaintiffs' position were reflected in its summary judgment and attorney fees orders, when it held that educators impede school districts' racial policy goals when they file "political" lawsuits, and that such

63

lawsuits are frivolous. Add.26, App.5329, R.Doc.88 at 24; Add.30, App.5512, R.Doc.107 at 3.

### B. If allowed to stand, the district court's holding would have a devastating impact on civil rights litigation.

Because Congress enacted Section 1983 with a "remedial purpose," awarding attorney fees to the government "may discourage plaintiffs from seeking a judicial remedy in all but the most airtight claims." *Bond v. Keck*, 629 F. Supp. 225, 227 (E.D. Mo. 1986) (citing *Christiansburg*, 434 U.S. at 420). On the rare occasions when defendants meet their burden of establishing that a plaintiff's claim was so delusional as to be frivolous, courts commonly reduce fees to an amount sufficient to "deter the filing of frivolous or groundless civil rights suits, *not* to make the defendant whole." *Id*. at 228 (reducing fee 91%, from $23,040 to $2,000) (emphasis added); *Koester v. YMCA of Greater St. Louis*, No. 4:14-cv-1772 RLW, 2018 U.S. Dist. LEXIS 75732, at *2-3 (E.D. Mo. May 4, 2018) (reducing request of nearly $200,000 to $25,000).

Federal courts are wary of the chilling effect "an award of attorney's fees might have . . . upon the filing of meritorious claims." *Id*. at *2-3. Particularly in civil rights cases—which involve "the Nation's fundamental laws," require "vigorous enforcement," and take "substantial expenditures of time and effort,"

64

*Riverside v. Rivera*, 477 U.S. 561, 577-78 (1986)—courts avoid awarding fees to defendants when litigation is meant to vindicate *plaintiffs'* fundamental rights. *See Fogerty*, 510 U.S. at 523 (describing the "important policy objectives of the Civil Rights statutes," including plaintiffs' roles as "private attorneys general") (citations omitted). This is especially true in cases of first impression dealing with emergent issues like mandatory anti-racism training, when plaintiffs *cannot* know with certainty what the resolution will be. *Christiansburg*, 434 U.S. at 423-24.

Thus, even if this Court were to find that Plaintiffs' claims were so frivolous that they were "delusional," the award of $312,869.50 should be reduced by 90%.[9] *See Bond*, 629 F. Supp. at 228 (reducing fee 91%, from $23,040 to $2,000). Plaintiffs are public school employees who only requested $1.00 in damages. *See Farrar*, 506 U.S. at 114 (holding that a court must consider the amount of damages sought when fixing fees) (citation omitted). There is little need to deter them from filing such lawsuits in the future. The amount of $312,869.50 instead appears aimed at making the government whole and restoring "tax dollars" and "resources" to schools,

---

[9] At the very least, it must be reduced to the amount Defendants requested: $308,512.85. *See* App.5442, R.Doc.106 at 9.

Appellate Case: 23-1374    Page: 74    Date Filed: 05/12/2023 Entry ID: 5276776

contrary to Section 1983's purpose of vindicating individual civil rights. *See* Add.30, App.5512, R.Doc.107 at 3.

For the same reasons, Defendants are not entitled to costs of $3,267.10. *See* Add.33-34, App.5534, R.Doc.120 at 1-2. SPS should not be the prevailing party. *See* Fed. R. Civ. P. 54(d). But even so, Plaintiffs' financial position requires a far more reasonable sum. *See Richmond*, 980 F.2d at 520; *Bokhari v. Metro. Gov't of Nashville & Davidson Cty.*, 2014 U.S. Dist. LEXIS 39171, at *6 (M.D. Tenn. Dec. 3, 2014) ("[L]itigants pressing important public interests should not be deterred by the specter of having to pay enormous costs to the opposing party.") (quotation omitted). The district court erred when it assessed $316,136.60 in costs and fees against Plaintiffs for requesting only a $1.00 remedy.

## VI. This Court should reassign this case on any remand.

For the foregoing reasons, the judge's "impartiality might reasonably be questioned by the average person on the street who knows all the relevant facts of a case." *Tumey*, 27 F.4th at 668 (citations omitted). As such, this Court should reassign this case to a different judge on any remand under 18 U.S.C. § 2106. *Id*. at 667.

## CONCLUSION

This Court should reverse the district court's judgment, grant summary judgment to Plaintiffs, and reassign the case on any remand.

66

May 12, 2023.                    /s/ Braden H. Boucek

Kimberly S. Hermann
  GA Bar No. 646473
Braden H. Boucek
  TN BPR No. 021399
  GA Bar No. 396831
Celia H. O'Leary
  GA Bar No. 747472
Southeastern Legal Foundation
560 W. Crossville Road, Suite 104
Roswell, GA  30075
Telephone: (770) 977-2131
khermann@southeasternlegal.org
bboucek@southeasternlegal.org
coleary@southeasternlegal.org

67

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. Proc. 32(g)(1), this is to certify the foregoing complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,983 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), using Microsoft Word 2016. The foregoing complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it was prepared on a computer using Times New Roman font (14 point).

 May 12, 2023.                          /s/ Braden H. Boucek_____
                                        Braden H. Boucek


## CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2023 a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail and/or facsimile. Parties may access the filing through the Court's electronic filing system.

                                        /s/ Braden H. Boucek_____
                                        Braden H. Boucek

68