# Nos. 23-1374 and 23-1880

# In the
# United States Court of Appeals
# for the Eighth Circuit

Brooke Henderson; Jennifer Lumley,

*Plaintiffs-Appellants,*

v.

Springfield R-12 School District;
Board of Education of the Springfield R-12 School District; Grenita Lathan,

*Defendants-Appellees,*

Martha  Doenning,

*Defendant,*

Yvania Garcia-Pusateri; Lawrence Anderson,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Western District of Missouri

**BRIEF OF *AMICUS CURIAE*
CENTER OF THE AMERICAN EXPERIMENT
IN SUPPORT OF
PLAINTIFFS-APPELLANTS**

Douglas P. Seaton
James V. F. Dickey
UPPER MIDWEST LAW CENTER
8421 Wayzata Boulevard, Suite 300
Golden Valley, MN  55426
(612) 428-7002

*Attorneys for Amicus Curiae
Center of the American Experiment*

Appellate Case: 23-1374     Page: 1     Date Filed: 05/19/2023 Entry ID: 5279103

# CORPORATE DISCLOSURE STATEMENT[1]

*Amicus curiae* Center of the American Experiment has no parent corporation, and no publicly held corporation owns 10% or more of its stock. The Center is a nonprofit, tax-exempt educational organization under Section 501(c)(3) of the Internal Revenue Code.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................... i

TABLE OF CONTENTS.................................................................... i

TABLE OF AUTHORITIES ............................................................. ii

IDENTITY AND INTEREST OF *AMICUS CURIAE* .................................... 1

SUMMARY OF ARGUMENT ..................................................... 2

ARGUMENT.................................................................... 4

I. The Supreme Court and this Court have struck a balance between employee speech and legitimate employer requirements, and forcing or chilling speech on matters of public concern as part of "training" is not legitimate.................................................................... 4

II. "Antiracist" DEI training is inherently coercive, but unlike legitimate training, it does not fulfill legal requirements or reduce liability for an employer.................................................................... 6

III. Courts have repeatedly recognized the coercion inherent in requirements of speech or action by the government and those in positions of authority. ................................................................ 8

IV. The district court's own order demonstrates that the DEI training at issue compels the government's political message and chills Appellants' speech.................................................................... 10

---

[1] No party's counsel authored this brief, in whole or in part. No party or party's counsel contributed money intended to fund preparing or submitting this brief. No person, other than the amicus curiae, its members, or its counsel, contributed money intended to fund preparing or submitting this brief.

i

VI. Appellants are not alone in facing coercive DEI training. ....................... 15

VII. This Court does not even allow *sanctions*, much less attorney fees to defendants in Section 1983 claims, in cases involving difficult arguments related to complex areas of law. ............................................. 17

CONCLUSION ......................................................................................... 18

CERTIFICATE OF COMPLIANCE ............................................................. 19

CERTIFICATE OF SERVICE ....................................................................... 20

## TABLE OF AUTHORITIES

**Statutes**

42 U.S.C. § 1983 ....................................................................................... 2

42 U.S.C. § 1988 ....................................................................................... 2

Fed. R. App. P. 29(a)(3)-(4) ...................................................................... 2

**Cases**

*Altman v. Minn. Dep't of Corr.*, 251 F.3d 1199 (8th Cir. 2001) ................... 3, 5

*Am. Communications Ass'n v. Douds*, 339 U.S. 382 (1950) ........................... 9

*Axson-Flynn v. Johnson*, 356 F.3d 1277 (10th Cir. 2004) ............................. 8

*Calvit v. Minneapolis Pub. Sch.*, 122 F.3d 1112 (8th Cir. 1997) .................... 5

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) ................................................ 5

*Hughes v. Rowe*, 449 U.S. 5 (1980) ......................................................... 17

*Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (2022) ............................. 9

*Laird v. Tatum*, 408 U.S. 1 (1972) ............................................................. 8

*Lee v. Weisman*, 505 U.S. 577 (1992) ................................................... 9, 10

*Phelan v. Laramie Cnty. Cmty. Coll. Bd. of Trustees*, 235 F.3d 1243 (10th Cir. 2000) ...................................................................................... 8

*Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968) .......................................... 4

*Pulaski Cnty. Republican Comm. v. Pulaski Cnty. Bd. of Election Comm'rs*, 956 F.2d 172 (8th Cir. 1992) .................................................... 17

*Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819 (1995)... 9

*Tucker v. Cal. Dep't of Educ.*, 97 F.3d 1204 (9th Cir. 1996) .......................... 6

ii

*United States v. National Employees Treasury Union*, 513 U.S. 454 (1995) .. 6

*United States v. Seeger*, 380 U.S. 163 (1965) ................................................. 13

*Williams v. City of Carl Junction*, 523 F.3d 841 (8th Cir. 2008).................... 17

*Wolfchild v. Redwood Cnty.*, 824 F.3d 761 (8th Cir. 2016) ........................... 17

**Other Authorities**

Ben Clements, *Defining Religion in the First Amendment: A Functional Approach*, 74 Cornell L. Rev. 532 (1989)................................................... 13

Carl Trueman, "Evangelicals and race theory," *First Things*, Feb. 2021, available at https://www.firstthings.com/article/2021/02/evangelicals -and-race-theory ........................................................................................... 14

Ibram X. Kendi, "Ibram X. Kendi defines what it means to be and antiracist," June 9, 2020, *available at* https://www.penguin.co.uk/articles/2020/06/ ibram-x-kendi-definition-of-antiracist ......................................................... 6

John McWhorter, "The Virtue Signalers Won't Change the World," *The Atlantic*, Dec. 23, 2018, *available at* https://www.theatlantic.com/ideas/ archive/2018/12/why-third-wave-anti-racism-dead-end/578764/ ............. 14

Katherine Kersten, "The Revolution in Minnesota's Schools," *Center of the American Experiment*, Jan. 21, 2021, *available at* https://www. americanexperiment.org/the-revolution-in-minnesotas-schools/ ............... 12

*Norgren v. Minn. Dep't of Human Servs.*, 8th Cir. No. 23-1207, Appellants' Br., filed Mar. 27, 2023........................................................... 16

Appellate Case: 23-1374    Page: 4    Date Filed: 05/19/2023 Entry ID: 5279103

## IDENTITY AND INTEREST OF *AMICUS CURIAE*

Center of the American Experiment ("CAE") is "Minnesota's think tank." It is a non-partisan educational organization dedicated to the principles of individual sovereignty, private property and the rule of law. It advocates for creative policies that limit government involvement in individual affairs and promotes competition and consumer choice in a free market environment. CAE supports colorblind, race-neutral policies in education and employment, consistent with the promise of the Fourteenth Amendment to the United States Constitution.

CAE also supports employee freedom from deprivation of First Amendment rights, whether from public-sector unions or government employers themselves. CAE believes that school districts cannot force public employees to speak in a certain manner on matters of public concern, especially when that speech is unrelated to curriculum or any legitimate pedagogical interest.

To that end, CAE opposes the mandatory imposition of coercive and doctrinaire "antiracist" diversity, equity, and inclusion ("DEI") training on K-12 students, teachers, and government employees.

CAE supports Appellants in this appeal because the district court's decision below allows the Defendant-Appellee District, and other school districts, to pressure their faculty and staff to comply with government viewpoints on

1

matters of public concern, contrary to the First Amendment. CAE believes this is wrong. Perhaps worse, the district court's *attorney fee award to a defendant* in a complex First Amendment case went further than this Court has allowed even in *Rule 11 sanctions* decisions by district courts. The decision below itself not only misapprehends the First Amendment, but it will also chill individuals and attorneys from pursuing legitimate 42 U.S.C. § 1983 claims for fear of being forced to bear the burden of the defendants' litigation costs—a result totally irreconcilable with the purpose of sections 1983 and 1988. CAE thus urges the Court to reverse the district court's decisions and direct it to enter summary judgment in favor of Appellants.

CAE has filed a motion for the Court to accept this brief *amicus curiae* pursuant to Fed. R. App. P. 29(a)(3)-(4). It is upon that authority, if the Court grants the motion, that CAE submits this brief.

## SUMMARY OF ARGUMENT

Employee training, like DEI training, is inherently meant to both educate and produce a change in behavior. Training itself is not a problem where it is dedicated to achieving conformity with legal requirements for employees. Likewise, training is appropriate where it leads educators to comply with school curriculum and convey legitimate pedagogical speech to students.

2

But because of its inherent coercive effect, mandatory training must be carefully crafted to ensure that employees' personal beliefs on matters of public concern are not chilled, nor the government's viewpoint compelled. If certain training has the effect of coercing government speech on matters of public concern, or chilling public employees from maintaining their own opinions as a condition of their employment, the training is illegitimate. This is the First Amendment balance the Supreme Court has struck, and this Court has struck, in recent employee-speech cases. *See, e.g.*, *Altman v. Minn. Dep't of Corr.*, 251 F.3d 1199 (8th Cir. 2001) (Loken, J.) (deciding employees who were reprimanded after reading the Bible during a required training on lesbians and gays in the workplace had triable free speech, equal protection, and Title VII claims).

The so-called "antiracist" DEI training in this case both compels and chills speech on matters of public concern: it compels the District's view of race which is anathema to the Fourteenth Amendment's guarantee of colorblindness under the law, and it chills employees from speaking their own views on matters of public concern. The District's DEI training here goes far further than any legitimate diversity training ought to go, with a liturgical, compelled-response approach that makes it appear like a novel state-sponsored religion.

3

The district court was wrong to dismiss Appellants' claims, and even more wrong to award attorney fees to the Defendant-Appellees in this Section 1983 lawsuit. CAE urges the Court to reverse and enter judgment in favor of Appellants.

## ARGUMENT

**I.    The Supreme Court and this Court have struck a balance between employee speech and legitimate employer requirements, and forcing or chilling speech on matters of public concern as part of "training" is not legitimate.**

Government employers do not have an unfettered right to force employees to say or do anything. Likewise, government employees do not have an unfettered right to say or do what they want within the scope of their employment. The Supreme Court's balancing test, recognized in *Pickering* and applied recently in *Garcetti*, balances these rights.

As the Supreme Court in *Pickering* held, "[t]he problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). *Garcetti* sharpened this analysis: "[s]o long as employees are speaking as citizens about matters of public concern, they must face only those speech

restrictions that are necessary for their employers to operate efficiently and effectively." *Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006).

This Court has been more specific on these issues. *Altman*, 251 F.3d 1199. To be sure, when an employee takes part in employer training, those trainings are "internal," in the sense that they take place at the office. *Id.* at 1202. But where a training drags matters of public concern from outside of work into the employment setting, the government employer "create[s] a context in which employees speaking out in opposition to their public employer's handling of this social issue should be considered speech on a matter of public interest and concern." *Id.* Indeed, the "first amendment protects the speech of a government employee even when it is made privately to his employer." *Calvit v. Minneapolis Pub. Sch.*, 122 F.3d 1112, 1117 (8th Cir. 1997) (Murphy, J.).

In other words, a government employer cannot force its particular view on social norms and politics on employees in a manner that would require employees to affirm those political or social views or be chilled from holding to their own. While a training invoking these matters of public concern may take place "internally" in the school district building, that is no shield to liability for forcing government employees to accede to government views on race and society.

Appellate Case: 23-1374    Page: 9    Date Filed: 05/19/2023 Entry ID: 5279103

Further, the design of the DEI training in this case also invokes the heightened burden the Supreme Court places on a government defendant where the government action bans certain types of speech, as in requiring specific responses to the multiple-choice test briefly discussed below. *United States v. National Employees Treasury Union*, 513 U.S. 454, 468 (1995) ("Unlike an adverse action taken in response to actual speech, this ban chills potential speech before it happens."); *accord Tucker v. Cal. Dep't of Educ.*, 97 F.3d 1204, 1210-11 (9th Cir. 1996). It acts as a categorical ban on those who, for example, believe that the Fourteenth Amendment requires colorblindness, not "antiracism," whose proponents define it as *requiring* discrimination itself.[2]

## II. "Antiracist" DEI training is inherently coercive, but unlike legitimate training, it does not fulfill legal requirements or reduce liability for an employer.

The very purpose of "training" is to train—to encourage an employee to adopt a particular view or behavior within the legitimate scope of an employee's job. Sexual harassment training, for example, is designed to help employees avoid speech or behaviors which could constitute sexual

---

[2] Ibram X. Kendi, "Ibram X. Kendi defines what it means to be and antiracist," June 9, 2020, *available at* https://www.penguin.co.uk/articles/2020/06/ibram-x-kendi-definition-of-antiracist ("The only remedy to racist discrimination is antiracist discrimination. The only remedy to past discrimination is present discrimination. The only remedy to present discrimination is future discrimination.").

6

harassment, specifically in the workplace. The implicit threat that an employee can be fired for failing to adhere to prohibitions on sexual harassment is obvious. Why? Because sexual harassment is an obvious invasion of the rights of colleagues and students, and so it is an illegitimate behavior and should rightly be punished. Training of this type is often meant to fulfill true legal compliance requirements and to address real liability risks in the workplace, such as causing physical harm to men and women if they are harassed.

In other words, legitimate training in the workplace fulfills at least two core requirements: it prevents harm to other employees recognized by the law, and it protects the employer from liability because of a failure to prevent violations of employee rights.

The type of "antiracist" DEI training engaged in by the District accomplishes none of the goals of diversity and inclusion advanced by the Fourteenth Amendment or other federal law. In fact, it is inherently discriminatory itself, as the record shows: it promotes the concept that white people in this country are inherently racist and that those who believe in "colorblindness," *the very concept of equal rights under law*, are perpetuating white supremacy and discrimination. *E.g.,* J.App.5316, R.Doc. 88, Order at 11. Instead of telling employees to refrain from commonly understood misbehavior disruptive to a workplace environment and highly offensive to

7

coworkers and students, the District's training tells employees to reject prevailing constitutional law. It uses positions of authority to force political conformity. It trains employees to conform to the employer's viewpoint and chills contrarian speech.

So, like a legitimate training, the DEI training at issue seeks to obtain a behavioral change and response from employees. That is as far as the similarities go. But as the district court's own description demonstrates, instead of persuading employees to abide by the law, the disputed DEI training here encourages discrimination itself against people based on race, and essentially identifies those who would adopt the engraving above the Supreme Court Building, "Equal Justice Under Law," as advancing white supremacy.

### III. Courts have repeatedly recognized the coercion inherent in requirements of speech or action by the government and those in positions of authority.

The government compels speech when it takes action that is "'regulatory, proscriptive, or compulsory in nature'" that "punish[es], or threaten[s] to punish, protected speech." *Phelan v. Laramie Cnty. Cmty. Coll. Bd. of Trustees*, 235 F.3d 1243, 1247 (10th Cir. 2000) (citing *Laird v. Tatum*, 408 U.S. 1, 11 (1972)). Such a threat may be "'indirect discouragement'" rather than direct punishment like "'imprisonment, fines, injunctions or taxes.'" *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1290 (10th Cir. 2004) (citing *Am. Communications*

8

*Ass'n v. Douds*, 339 U.S. 382, 402 (1950)). The government may also "not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828 (1995).

The district court minimized the District's coercive actions in the record by stating, "Defendants' verbal response to Plaintiffs' personal views during training constitutes at most simple disagreement," and that "Defendants' verbal response offers no evidence whatsoever Defendants would subject Plaintiffs to any sort of negative consequence, should Plaintiffs choose to reassert their personal views." J.App.5317, R.Doc. 88, Order at 12.

But the Supreme Court has recognized that people in positions of authority, such as school districts, inherently carry the ability to compel speech with their directives, even absent any explicit threat. For example, the Supreme Court has found that school districts can place public pressure, even if "subtle and indirect, [that] can be as real as any overt compulsion." *Lee v. Weisman*, 505 U.S. 577, 593 (1992). In *Lee*, the Court held that "school officials violated the Establishment Clause" by having "in every practical sense compelled attendance and participation in a religious exercise." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2431 (2022) (quoting *Lee*, 505 U.S. at 580) (cleaned up). In *Lee*, the Court held that "[e]ven for those students who object to the religious exercise, their attendance and participation in the state-sponsored

religious activity are in a fair and real sense obligatory, though the school district does not require attendance as a condition for receipt of the diploma." *Lee*, 580 U.S. at 586.

The District's DEI training here was not merely "leading" people in a silent prayer, but was mandatory and required actual responses from the Appellants. J.App.5318-19, R.Doc 88, Order at 13-14. Like students facing the coercion inherent in teacher instruction, District employees face similar pressures when confronted by administrators and school boards. In fact, the evidence shows that the DEI training facilitator told Appellant Lumley that "she needed to work on herself," and Appellee Garcia-Pusateri told Appellant Henderson that she was "wrong and confused." J.App.5317, R.Doc. 88, Order at 12. These are more direct and overt incidents than the subtle pressure of being silent during a public prayer endorsed by a school district. And while *Lee* dealt with compelled religious expression, it illustrates that figures of authority telling subordinates to be quiet and behave during trainings can constitute compulsion.

### IV. The district court's own order demonstrates that the DEI training at issue compels the government's political message and chills Appellants' speech.

The record in this case is substantial, but the first place the Court should look in evaluating the district court's treatment of the facts is the district court's order itself. J.App.5306-30, R.Doc. 88, Order. The district court identified no

10

fewer than a dozen examples of coercive training at issue here and about which the Appellants complained. These examples demonstrate, as noted just above, the inherently coercive nature of DEI training like the District's:

1) The District commanded the employee Appellants that they "must commit to" the District's description of equity and anti-racism, J.App.5312, R.Doc. 88, Order at 7;

2) The District defined anti-racism as requiring proactive advocacy against what the District defines as racism, *id.*;

3) The District told employee Appellant Henderson that her views on American race relations were "confused and wrong," *id.*;

4) The District told employee Lumley that she was wrong that people can only be racist based on skin color, and her failure to acknowledge that means Lumley should engage in "additional self-reflection," *id.*;

5) Appellants' co-workers "berated [Lumley] during training for opposing equity and anti-racism," J.App.5313, R.Doc. 88, Order at 8;

6) The District told Appellants that "white people failing to speak out against racism," as the District defines it, "constitutes white supremacy," J.App.5314, R.Doc. 88, Order at 9;

7) The District required Appellants to attend the "training to receive professional development credit and financial compensation," *id. & id.* at 9 n.2, and that "failure to attend the training would result in less pay," J.App.5317, R.Doc. 88, Order at 12;

8) The District asserted during the training that "equity and anti-racism generally require advocacy and proactivity," J.App.5314, R.Doc. 88, Order at 9;

9) The District "taught that white supremacy is not just a label for the KKK—it includes anyone who believes in colorblindness or says that all lives matter," J.App.5316, R.Doc. 88, Order at 11;

11

10) Appellants alleged and argued that the District "warned staff that denying one's white privilege is in itself white supremacy," *id.*;

11) Appellants alleged they were literally required to speak in response to cues using survey-type responses indicating agreement or disagreement with principles of anti-racism, J.App.5318, R.Doc. 88, Order at 13; and,

12) Appellants alleged that they were forced to complete multiple choice questionnaires with particular answers in order to complete training modules (their preferred answers were rejected by the module), J.App.5320-21, R.Doc. 88, Order at 15-16.

These examples, cited by the district court as it brushed them aside or sought to minimize them, are just some examples from a lengthy record. The Appellants' opening brief describes many more. But these examples show the District's drive for conformity of thought on matters of the highest public concern. They follow a playbook for "coercive thought reform," as CAE's Katherine Kersten has written, to "undermine the subject's identity" to "sow doubt," "introduce an alternate, closed system of reality, and restrict ideas that challenge it," and "use 'emotional blackmail' tactics—including threats of social rejection backed up by group pressure—to compel subjects to accede to groupthink." Katherine Kersten, "The Revolution in Minnesota's Schools," *Center of the American Experiment*, Jan. 21, 2021, *available at* https://www.americanexperiment.org/the-revolution-in-minnesotas-schools/.

12

## V. The liturgical nature of the DEI training at issue closely resembles religious practice, which intensifies its coercive effect.

It is well established that "religion" under federal law is not limited to organized religion alone, but includes "sincere and meaningful belief which occupies in the life of its possessor a place parallel to that filled by . . . God . . . ." *United States v. Seeger*, 380 U.S. 163, 176 (1965). As one scholar comments, under a functional approach to religion, it "might be defined as a set of beliefs that occupies a place in the life of its possessor parallel to that filled by the religious beliefs of an adherent to something that would clearly qualify as a religion within the meaning of the First Amendment." Ben Clements, *Defining Religion in the First Amendment: A Functional Approach*, 74 Cornell L. Rev. 532, 551-52 (1989). Many prominent religions of the world, such as Buddhism, Confucianism, Taoism, and Jainism, do not incorporate a theistic component, instead focusing on the practice of the religion itself.

"Antiracism" imposed by the DEI training at issue, as presented by the District, has the hallmarks of religious fervor and demand for conformity. As one writer states,

> In fact, however, third-wave anti-racism is a profoundly religious movement in everything but terminology. The idea that whites are permanently stained by their white privilege, gaining moral absolution only by eternally attesting to it, is the third wave's version of original sin. The idea of a someday when America will "come to terms with race" is as vaguely specified a guidepost as Judgment Day. Explorations as to whether an opinion is

"problematic" are equivalent to explorations of that which may be blasphemous. The social mauling of the person with "problematic" thoughts parallels the excommunication of the heretic. What is called "virtue signaling," then, channels the impulse that might lead a Christian to an aggressive display of her faith in Jesus. There is even a certain Church Lady air to much of the patrolling on race these days, an almost performative joy in dog-piling on the transgressor, which under a religious analysis is perfectly predictable.

John McWhorter, "The Virtue Signalers Won't Change the World," *The Atlantic*, Dec. 23, 2018, *available at* https://www.theatlantic.com/ideas/archive/2018/12/why-third-wave-anti-racism-dead-end/578764/.

Another commentator has noted the religiosity of "antiracism" like that of the District:

All-embracing and transformative views often have a religious quality. Critical race theory is no exception. It has a creedal language and liturgy, with orthodox words ("white privilege," "systemic racism") and prescribed actions (raising the fist, taking the knee). To deviate from the forms is to deviate from the faith. Certain words are heretical ("non-racist," "all lives matter"). The slogan "silence is violence" is a potent rhetorical weapon. To fail to participate in the liturgy is to reject the antiracism the liturgy purports to represent—something only a racist would do.

Carl Trueman, "Evangelicals and race theory," *First Things*, Feb. 2021, available at https://www.firstthings.com/article/2021/02/evangelicals-and-race-theory.

The problem with imposing a "training" that appears to be religious in nature is twofold: first, as the *Lee* Court recognized, there is compulsion

inherent in forcing folks to join religious rituals; second, the training has no legitimacy in the employment context because it is designed to create adherents and shun dissenters, not to create an inclusive environment that helps an employer avoid liability.

The facts of the case bear out the religiosity of the District's "antiracism." Take, for example, the District's responses to Appellants' (limited) expression of their beliefs as to race relations. Appellant Henderson expressed during the training that BLM protests were at least in part riotous, and that Kyle Rittenhouse acted in self-defense when he shot and killed people during protests in Wisconsin. J.App.5312, R.Doc. 88, Order at 7. Appellee Garcia-Pusateri responded by telling Henderson she was "confused and wrong." *Id.* Likewise, the District told Appellant Lumley that she was wrong to believe that black people can be racist and was told that she should engage in "additional self-reflection." *Id.* In other words, repent and believe us and profess your new faith, regardless of factual evidence which may support your views.

**VI.  Appellants are not alone in facing coercive DEI training.**

DEI training is everywhere in 2023. In fact, this Court is currently facing another example arising from a dispute between two employees and the Minnesota Department of Human Services. In *Norgren v. Minnesota Department of Human Services*, 8th Cir. Nos. 23-1207 and 23-1208, two Native

Appellate Case: 23-1374    Page: 19    Date Filed: 05/19/2023 Entry ID: 5279103

American, Christian, father-and-son employees of the department objected to DEI training and training on gender theory which espoused the theory that people can select gender different from their biological sex.

The trainings each contained directives for employees to follow; the DEI training wrapped up with, "we need you to do this" (referring to no longer saying, "I am not a racist," and like phrases), and the gender theory training included a directive to use the pronouns chosen by another person regardless of religious belief. *Norgren v. Minn. Dep't of Human Servs.*, 8th Cir. No. 23-1207, Appellants' Br., filed Mar. 27, 2023, p. i. Understanding what the trainings entailed, the employees objected, and they were forced to complete the trainings anyway. The father, Joseph, felt forced to leave the DHS in part because DHS was forcing him to take trainings and speak in a way that contradicted his religious beliefs. *Id.* at 10-11. The son, Aaron, was refused time off for a snowstorm (an allowance routinely given), filed an EEOC charge, and then was promptly told that he was not qualified for a promotion that he had previously been told he was. *Id.* at 12-14.

The Norgrens' claims sound in Title VII and section 1983 (compelled speech), and they tell a very similar story: government employers are more frequently seeking to force employees to adopt a worldview foreign to the U.S. Constitution, and to act accordingly.

16

**VII. This Court does not even allow *sanctions*, much less attorney fees to defendants in Section 1983 claims, in cases involving difficult arguments related to complex areas of law.**

Appellants deal well with the clear error made by the district court in awarding fees to Appellees below. Whether this Court eventually agrees with Appellants or Appellees in this case, there is no way it is of the type where a civil rights defendant should be entitled to fees. *E.g., Williams v. City of Carl Junction*, 523 F.3d 841, 843 (8th Cir. 2008) (defendants are not entitled to fees unless a plaintiff's case is "frivolous, unreasonable, or groundless") (quoting *Hughes v. Rowe*, 449 U.S. 5, 15 (1980)). This standard is very close to that applied under Federal Rule of Civil Procedure 11, and this Court has analyzed both issues together. *Pulaski Cnty. Republican Comm. v. Pulaski Cnty. Bd. of Election Comm'rs*, 956 F.2d 172, 174 n.4 (8th Cir. 1992).

In the Rule 11 context, this Court has reversed a sanctions award on the sole basis that "Federal Indian law is complex." *Wolfchild v. Redwood Cnty.*, 824 F.3d 761, 771 (8th Cir. 2016). The *Wolfchild* Court noted the complex legal and factual issues which had to be reasoned through and resolved to decide the case. *Id.* The Court held that the district court abused its discretion by sanctioning the plaintiffs, even though the Court upheld the district court's merits decision and affirmed the dismissal of the case. *Id.*

17

Likewise, First Amendment law on employer and employee relationships, where employers have embarked on entirely new types of diversity training in recent years, is complex. The district court may (incorrectly) disagree with the Appellants here, but it never should have crossed into what amounts to a punishment of Appellants for seeking to uphold their First Amendment rights.

## CONCLUSION

For these reasons, *amicus curiae* Center of the American Experiment urges the Court to reverse the district court and direct the entry of judgment for the Appellants.

**UPPER MIDWEST LAW CENTER**

Dated: May 19, 2023

_/s/ James V. F. Dickey_
Douglas P. Seaton (#127759)
James V. F. Dickey (#393613)
8421 Wayzata Blvd., Suite 300
Golden Valley, Minnesota 55426
Doug.Seaton@umlc.org
James.Dickey@umlc.org
(612) 428-7000

*Attorneys for Center of the American Experiment*

# CERTIFICATE OF COMPLIANCE

1.  This document complies with the type-volume limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 3,991 words.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word Version 2302 in Times New Roman font, 14-point.

3.  The brief has been scanned for viruses and is virus free.

**UPPER MIDWEST LAW CENTER**

Dated: May 19, 2023

*/s/ James V. F. Dickey*
Douglas P. Seaton (#127759)
James V. F. Dickey (#393613)
8421 Wayzata Blvd., Suite 300
Golden Valley, Minnesota 55426
doug.seaton@umlc.org
james.dickey@umlc.org
(612) 428-7000

*Attorneys for Center of the American Experiment*

## CERTIFICATE OF SERVICE

In accordance with Fed. R. App. P. 25, I hereby certify that I electronically filed this brief with the Clerk of Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system on May 19, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

**UPPER MIDWEST LAW CENTER**

Dated:  May 19, 2023        */s/ James V. F. Dickey*
Douglas P. Seaton (#127759)
James V. F. Dickey (#393613)
8421 Wayzata Blvd., Suite 300
Golden Valley, Minnesota 55426
Doug.Seaton@umlc.org
James.Dickey@umlc.org
(612) 428-7000

*Attorneys for Center of the American Experiment*

Appellate Case: 23-1374    Page: 24    Date Filed: 05/19/2023 Entry ID: 5279103