Case No. 23-1374 & 23-1880

UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

BROOKE HENDERSON and JENNIFER LUMLEY,

Plaintiffs-Appellants,

v.

SCHOOL DISTRICT OF SPRINGFIELD R-12, et al.,

Appellees.

BRIEF *AMICUS CURIAE* OF GOLDWATER INSTITUTE,
KANSAS JUSTICE INSTITUTE, MISSISSIPPI JUSTICE INSTITUTE,
AND SHOW ME INSTITUTE IN SUPPORT OF APPELLANTS
AND REVERSAL OF ATTORNEY FEES

On Appeal from the United States District Court
for the Western District of Missouri - Springfield
Case No. 6:21-cv-03219, Hon. M. Douglas Harpool, presiding

**Scharf-Norton Center for
Constitutional Litigation at the
GOLDWATER INSTITUTE**
Timothy Sandefur
Adam C. Shelton
500 E. Coronado Rd.
Phoenix, Arizona 85004
(602) 462-5000
litigation@goldwaterinstitute.org

*Attorney for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 29(a)(4)(A) of the Federal Rules of Appellate Procedure, *Amici Curiae* Goldwater Institute, nonprofit corporations organized under the laws of Arizona, Kansas Justice Institute, Mississippi Justice Institute, Show Me Institute, hereby state that they have no parent companies, subsidiaries, or affiliates that have issued shares to the public.

i

# TABLE OF CONTENTS

Corporate Disclosure Statement ............................................................. i

Table of Contents .................................................................................... ii

Table of Authorities ............................................................................... iii

Identity and Interest of *Amicus* ............................................................. 1

Introduction and Summary of Argument ................................................. 1

Argument ................................................................................................. 3

I.  Plaintiffs' speech was chilled by government marshalling pressure to conform to AR doctrine, and to silence dissent. ........................................... 3

    A.  A chill exists where a reasonable person would have refrained from speaking in order to avoid reprisals. ................................................. 4

    B.  The chilling effect is built into the very structure of "anti-racist" theory. ................................................................................. 10

II.  The attorney fee award is contrary to public policy. ................................. 21

    A.  The purpose of § 1988 is to encourage the rooting out of racist social institutions—of which AR is one instance. .................................... 22

    B.  Courts should grant fees against unsuccessful plaintiffs only where they have engaged in misconduct. ................................................. 26

Conclusion ............................................................................................. 30

Certificate of Compliance ..................................................................... 31

Certificate of Service ............................................................................ 32

Appellate Case: 23-1374    Page: 3    Date Filed: 05/19/2023 Entry ID: 5279143

# TABLE OF AUTHORITIES

**Cases**

*Adem v. Jefferson Mem'l Hosp. Ass'n.*, No. 4:11-CV-2102-JAR, 2013 WL 1351869 (E.D. Mo. Apr. 2, 2013)................................................................. 27, 28

*Adem v. Jefferson Mem'l Hosp. Ass'n,* 2012 WL 5493856, at *4 (Nov. 13, 2012) .27

*Bart v. Telford*, 677 F.2d 622 (7th Cir. 1982)............................................................4

*Bennett v. Hendrix*, 423 F.3d 1247 (11th Cir. 2005) ...............................................4, 6

*Biggs v. City of Maryland Heights,* 2022 WL 1451670, at *7 (May 9, 2022) ........28

*Biggs v. City of Maryland Heights*, No. 4:20-cv-01499-JCH, 2022 WL 2045892 (E.D. Mo. June 7, 2022)...........................................................................................28

*Christiansburg Garment Co. v. EEOC*, 434 U.S. 412 (1978) .......................... 23, 29

*Coal. for Econ. Equity v. Wilson*, 122 F.3d 692 (9th Cir. 1997) ...................... 25, 26

*Davis v. City of Charleston, Mo*., 917 F.2d 1502 (8th Cir. 1990) .................... 27, 29

*Eaton v. Meneley*, 379 F.3d 949 (10th Cir. 2004) ....................................................4

*Engel v. Vitale*, 370 U.S. 421 (1962) ................................................................ 18, 19

*Garcia v. City of Trenton,* 348 F.3d 726 (8th Cir. 2003)...................... 2, 4, 7, 10, 21

*Gilmore v. Gallego*, No. 1 CA-CV 22-0049, 2023 WL 2979302 (Ariz. App. Apr. 18, 2023) ...................................................................................................................29

*Henderson v. Sch. Dist. of Springfield R-12*, No. 6:21-CV-03219-MDH, 2023 WL 170594 (W.D. Mo. Jan. 12, 2023) .............................................................. passim

*Hirabayashi v. United States*, 320 U.S. 81 (1943) ..................................................22

*Hi-Voltage Wire Works, Inc. v. City of San Jose*, 12 P.3d 1068 (Cal. 2000) ..........22

*Kilborn v. Amiridis*, No. 22 C 475, 2023 WL 2058061 (N.D. Ill. Feb. 15, 2023) ....5

*Laird v. Tatum*, 408 U.S. 1 (1972) ............................................................................7

iii

*Mendocino Env't Ctr. v. Mendocino Cnty.*, 192 F.3d 1283 (9th Cir. 1999)..............4

*Mitchell v. Horn*, 318 F.3d 523 (3d Cir. 2003) ........................................................4

*Neitzke v. Williams*, 490 U.S. 319 (1989) ................................................................21

*Newman v. Piggie Park Enters., Inc*., 390 U.S. 400 (1968) ........................ 2, 23, 26

*Parker v. Hurley,* 514 F.3d 87 (1st Cir. 2008)................................................. 19, 20

*Plessy v. Ferguson,* 163 U.S. 537 (1896) ................................................................22

*Poole v. Cnty. of Otero*, 271 F.3d 955 (10th Cir. 2001) ...........................................4

*Revis v. Meldrum*, 489 F.3d 273 (6th Cir. 2007) .....................................................27

*Rodriguez v. Serna*, No. 1:17-cv-01147-WJ-LF, 2019 WL 2340958 (D.N.M. June 3, 2019) ..................................................................................................................6

*Rothberg v. Walt Disney Co.*, 168 F.3d 501 (9th Cir. 1999) ...................................18

*Speech First, Inc. v. Schlissel*, 939 F.3d 756 (6th Cir. 2019) .................................19

*Thaddeus–X v. Blatter*, 175 F.3d 378 (6th Cir. 1999) ..............................................4

*Toolasprashad v. Bureau of Prisons*, 286 F.3d 576 (D.C. Cir. 2002)......................4

*Veasey v. Abbott*, 13 F.4th 362 (5th Cir. 2021) ......................................................22

*W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) ...........................................20

**Statutes**

42 U.S.C. § 1988 ................................................................................... 2, 23, 25, 26

**Other Authorities**

Applebaum, *Being White, Being Good* (2010) ................................................. 11, 12

Arnesto, *"The Future of Grading is Antiracist,"* The Faculty (Dec. 11, 2020)......24

iv

Babineau, *White Teacher in Texas Fired after Telling Students His Race is "The Superior One,"* CNN.com (Nov. 15, 2022) ........................................................17

Bernays, *Propaganda* (Brooklyn: Ig Publishing, 2005) (1928) .............................17

Bernstein, *Classified: The Untold Story of Racial Classification in America* (2022) .............................................................................................................................23

Capatides, *The Difference Between Being Not Racist and Being Antiracist*, CBS News (June 25, 2020) ............................................................................................12

Deggans, *"Not Racist" Is Not Enough*, NPR (Aug. 25, 2020)...............................12

DiAngelo, *Nice Racism: How Progressive White People Perpetuate Racial Harm* (2021) ......................................................................................................................15

DiAngelo, *White Fragility* (2018)...........................................................................12

Dobbin & Kalev, *Why Doesn't Diversity Training Work?*, 10 Anthropology Now 48 (2018) ................................................................................................ 2, 11, 20

Dover, *et al.*, *Members of High-Status Groups are Threatened by Pro-Diversity Organizational Messages,* 62 J. Experimental Psych. 45 (2016)........................11

Edelman, et al., *Richard Carranza Held "White-Supremacy Culture" Training for School Admins,* N.Y. Post (May 20, 2019)........................................................24

El-Mekki, *No, You Should Not Be Teaching Black Children if You Reject Anti-Racism*, EdPost (May 5, 2021) .................................................................... 14, 23

Flaherty, *Failure to Communicate*, Inside Higher Ed. (Sept. 7, 2020) .................17

Goldberger, *First Amendment Constraints on the Award of Attorney's Fees Against Civil Rights Defendant-Intervenors*, 47 Ohio St. L.J. 603 (1986)......................29

Jaschik, *What You Can't Win in Court*, Inside Higher Ed. (Nov. 16, 2008)...........16

Jones, et al., *On "Ceding Space": Pushing Back on Idealized Whiteness to Foster Freedom for Students of Color, in, Reconceptualizing Social Justice in Teacher Education* (Brown & Jean-Marie eds., 2022)................................................. 13, 14

v

Kendi, *"The Very Heartbeat of Racism is Denial,"* University of Rochester News Center (Feb. 25, 2021) .........................................................................14

Kendi, *How To Be An Antiracist* (2023)................................................... 1, 2, 13, 23

Kulik, *et al.*, *The Rich Get Richer,* 28 J. Organizational Behavior 753 (2007).......11

Lanum, *North Carolina Professor Claims he was Fired for Criticizing Critical Race Theory, Files Lawsuit,* N.Y. Post (Dec. 22, 2022) ........................................9

Livingston, *How to Promote Racial Equity in the Workplace*, Harv. Bus. Rev. (2020)......................................................................................................24

Loubriel, *4 Ways White People Can Process Their Emotions Without Bringing the White Tears,* Everyday Feminism (Feb. 16, 2016)................................16

McWhorter, *The Dehumanizing Condescension of White Fragility,* The Atlantic (July 14, 2020) ........................................................................................15

Medish, *The Soviet Union* (3d ed. 1987) ...................................................19

Morrison, *Becoming Trustworthy White Allies*, Reflections (Spring 2013)............15

Parks, *College Professor Claims He's Being Fired for Asking Questions During Campus Diversity Meeting*, N.Y. Post (Jan. 17, 2023)........................................17

Plaut, *et al.,* *"What About Me?" Perceptions of Exclusion and Whites' Reactions to Multiculturalism,* 101 J. Personality & Soc. Psych. 337 (2011) ......................15

Poff, *Massachusetts Teacher Fired for Opposing CRT on TikTok Sues Superintendent and Principal,* Wash. Exam'r (Dec. 3, 2021)...............................9

Quinn, *A DEI Director Ousted for Questioning DEI?*, Inside Higher Ed (Mar. 9, 2023) .........................................................................................................9

Reid, *No More White Saviours, Thanks*, The Guardian (Sept. 19, 2021)...............15

Rosa, *N.J. Teacher Suspended after Calling George Floyd a "Criminal,"* N.Y. Times (May 1, 2021) ....................................................................................17

Safir & Dugan, *12 Tips for Antiracist Grading* (Feb. 2021) ...................................25

Appellate Case: 23-1374      Page: 7      Date Filed: 05/19/2023 Entry ID: 5279143

Soave, *San Diego Public Schools Will Overhaul Its Grading System to Achieve "Anti-Racism,"* Reason (Oct. 19, 2020)............................................................25

*Talking About Race*, Smithsonian (June 2020 version)...........................................25

*Talking About Race: Being Antiracist*, Smithsonian (June 2020)..........................12

*Teacher Exposes CRT: My Job Was No Longer About Teaching*, Goldwater Institute: In Defense of Liberty Blog (May 23, 2022)...........................................8

*White Anti-Racism*, Learning for Justice .................................................................12

Appellate Case: 23-1374     Page: 8     Date Filed: 05/19/2023 Entry ID: 5279143

## IDENTITY AND INTEREST OF AMICI CURIAE

The identity and interest of amici is set forth in the accompanying motion for leave to file.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The District Court erred in holding that no chill existed due to the fact that Plaintiffs either refrained from speaking, or did so but in the end experienced no adverse employment consequences. Those factors are irrelevant. The question is whether a reasonably prudent person would have feared to express disagreement, and it is obvious that *any rational person* in Plaintiffs' position would have. To understand why, one must consider both the nature of the "anti-racism" (AR) theory that has become fashionable in recent years and the nature of the propaganda sessions to which public employees such as the Plaintiffs are now routinely subjected.

AR posits that all white people are inherently racist, or occupy a position of "privilege," and consequently have a moral obligation to renounce that "privilege" and to undertake at all times to eliminate their inherent—indeed, subconscious— racism. On those premises, to *disagree* with AR is itself deemed racist. Indeed, AR advocates expressly proclaim this principle. *See, e.g.,* Kendi, *How To Be An Antiracist* 10 (2023) ("The claim of 'not racist' neutrality is a mask for being racist.").

1

Obviously, to be deemed a racist is to risk severe penalties and ostracism, especially for public school employees. In many recent high-profile cases, teachers opposing AR theory have been terminated for that—but so have teachers *practicing* AR theory. No wonder that employees feel they aren't allowed to hold or express pro-"color-blindness" opinions in such training sessions. *See, e.g.,* Dobbin & Kalev, *Why Doesn't Diversity Training Work?*, 10 Anthropology Now 48 (2018).

*Anybody* in Plaintiffs' position would have thought exercising their First Amendment rights by openly disagreeing with the AR theory being promulgated would result in severe repercussions. That simply *is* a "chilling effect." *Garcia v. City of Trenton,* 348 F.3d 726, 729 (8th Cir. 2003).

Even if that weren't true, the circumstances do not warrant the District Court's finding of frivolousness, or its consequent awarding of fees. The Civil Rights laws, including 42 U.S.C. § 1988, were designed to encourage people to sue to vindicate the principle of color-blindness, which is "a policy that Congress considered of the highest priority." *Newman v. Piggie Park Enters., Inc*., 390 U.S. 400, 402 (1968). Yet AR expressly rejects color-blindness. It labels color-blindness racist and instructs people to treat others differently on account of race, in violation of the civil rights laws. *See, e.g.,* Kendi, *Antiracist, supra* at 11 ("The language of color blindness—like the language of 'not racist'—is a mask to hide

2

when someone is being racist.").  That, plus the fact that training sessions such this one are designed to bring intense personal and professional pressure on school employees to conform to AR doctrine, and to *reject* the nation's anti-discrimination principles, means the Plaintiffs were well warranted in bringing this case.  Penalizing citizens who in good faith seek to challenge the constitutionality of government action contradicts the policy behind the civil rights laws and deters meritorious public interest litigation that seeks to support this nation's policy of race-neutral treatment.

## ARGUMENT

### I.  Plaintiffs' speech was chilled by government marshalling pressure to conform to AR doctrine, and to silence dissent.

The District Court found this case frivolous on the grounds that the Plaintiffs experienced no injury, and that this lawsuit was only a "political" dispute. *Henderson v. Sch. Dist. of Springfield R-12*, No. 6:21-CV-03219-MDH, 2023 WL 170594, at **2, 6 (W.D. Mo. Jan. 12, 2023).  That was reversible error.  The injury here—the chilling effect on Plaintiffs' First Amendment rights—is *quite* clear, and the District Court waved it away based on misapprehensions about how both "chill" theory and AR doctrine work.

3

### A. A chill exists where a reasonable person would have refrained from speaking in order to avoid reprisals.

The test in a speech-chill case is an objective one: whether, under the circumstances, "a person of ordinary firmness" or "ordinary prudence" *would have* believed that exercising First Amendment rights would incur penalty or punishment. *Garcia,* 348 F.3d at 729. "The question," this Court said in *Garcia*, "is *not* whether the plaintiff herself was deterred" from speaking, but whether a reasonable person might have been. *Id.* (emphasis added). That means a person can still bring a chill claim even if she went ahead and spoke out. And, in fact, the plaintiff in *Garcia* did continue speaking, but could still sue because a person of ordinary prudence would have declined to speak.

That's the rule in most circuits: even someone "who perseveres despite governmental interference" can still challenge the constitutionality of a speech restriction. *Eaton v. Meneley*, 379 F.3d 949, 955 (10th Cir. 2004); *accord*, *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003); *Thaddeus–X v. Blatter*, 175 F.3d 378, 396 (6th Cir. 1999) (en banc); *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982); *Mendocino Env't Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999); *Poole v. Cnty. of Otero*, 271 F.3d 955, 960 (10th Cir. 2001); *Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 585 (D.C. Cir. 2002); *Bennett v. Hendrix*, 423 F.3d 1247, 1251–52 (11th Cir. 2005).

4

Here the District Court acknowledged that attendance at the training session was "mandatory," and that the Plaintiffs "had to attend [it] to receive professional development credit and compensation." 2023 WL 170594 at **1, 6, 9. Any reasonable person in their position would have thought participation was compulsory and that disagreement would incur penalty. *See Kilborn v. Amiridis*, No. 22 C 475, 2023 WL 2058061, at *6 (N.D. Ill. Feb. 15, 2023) (forcing a college professor to attend sensitivity training that required an affirmative commitment to diversity was likely "compelled speech."). The District Court found that Plaintiffs ended up "suffer[ing] no adverse employment action," 2023 WL 170594 at *1, but that's not the question. The question is whether they would *reasonably have believed* that they would suffer adverse action from refusing to participate or from expressing dissent.

In *Hendrix*, the plaintiffs sued the sheriff's office for engaging in an intimidation campaign against them for supporting a referendum that the sheriff's department opposed. Among other things, officers targeted them for surveillance, pulled them over and ticketed them without justification, and even obtained warrants for their arrest on baseless charges. 423 F.3d at 1249. But the plaintiffs *continued to speak and to contribute to political causes*. *Id.* The sheriff's office argued that no liability could apply unless the plaintiffs proved they had "actually [been] chilled in the exercise of their First Amendment rights," but the court

5

rejected that argument, explaining that under the objective chill analysis, even someone who persists in speaking may sue if the complained-of conduct would have deterred an ordinary person from speaking. *Id*. at 1251–52. *See also Rodriguez v. Serna*, No. 1:17-cv-01147-WJ-LF, 2019 WL 2340958, at *8 (D.N.M. June 3, 2019) (plaintiff prevailed on chill theory even though she was not dissuaded from speaking).

Here, the District Court said the Plaintiffs experienced no "chilling effect" because they actually expressed disagreement with AR doctrines being promulgated, and experienced no "specific" penalty. 2023 WL 170594 at *6. That is irrelevant. The fact that someone in such an intimidating environment still has enough courage of her convictions—perhaps, enough foolhardiness—to speak out despite the risk is not grounds for depriving her of the right to challenge the government's effort to silence her. As *Bennett* said, to hold that someone who speaks anyway cannot bring a "chill" case would "'reward' government officials for picking on [an] unusually hardy speaker[]." 423 F.3d at 1252. The purpose of the "chill" theory is to protect the rights of those who are less "hardy" than Plaintiffs Henderson and Lumley in the face of overwhelming pressure. Yet by holding that these two lack standing, the District Court deprived those unknown individuals of the protection that the "chill" doctrine is supposed to provide.

6

The District Court's reasoning with respect to the "agree" / "disagree" sign was even more off-base. The record showed that at the training session, participants were given a sign saying "agree" or "disagree," and were asked to use it to indicate their reactions to various AR propositions. Plaintiff Henderson chose to just always display the "agree" sign even though this was "actually at odds with her own beliefs" because, as the District Court said, she found it "easier to agree." *Id.* 2023 WL 170594, at *6. Bizarrely, the court said this proved she suffered no legal injury—when it actually proves the opposite: that her speech *was chilled*. The fact that she felt it necessary to say "agree" when she actually disagreed, because she feared reprisals or harassment if she expressed her true beliefs, is literally a chilling effect. She chose to self-censor. That's just what a chilling effect is.

True, the chill test is not subjective. *Laird v. Tatum*, 408 U.S. 1 (1972), said a person's fear, standing alone, is insufficient injury for a "chill" case. Instead, the test is a reasonable person standard: would a person of "ordinary prudence" in the Plaintiffs' position have had legitimate reason to believe that expressing disagreement would incur a penalty? *Garcia,* 348 F.3d at 729.

It is *patently obvious* that the answer here is yes. *Any* rational person in the training session would have refrained from expressing her views that AR doctrine is irrational and wrong.

There is probably no act more fraught in today's political environment than for a public school employee to openly disagree with AR doctrine. To do so is to risk *extreme* forms of recrimination, including the loss of professional opportunities, social ostracism, widespread publicity and shaming, and—obviously—the potentially career-ending accusation of racism.

Consider the case of Kali Fontella. *See generally Teacher Exposes CRT: My Job Was No Longer About Teaching*, Goldwater Institute: In Defense of Liberty Blog (May 23, 2022).[1] A teacher in Salinas, California, Fontanilla was shocked when she discovered that she was required to teach AR theory—including giving students "a 'privilege quiz' where students would compare and contrast their gender, race, class, and sexual orientation with those of their classmates," and conducting "a mock trial to 'charge various persons implicated in…genocide against Native Californians,'…to 'create a social justice…counter-narrative.'" *Id.* She objected—and, as a result, the president of the Salinas School Board labeled her "anti-people of color" (despite the fact that she is half-Jamaican herself). *Id.* Frustrated by the school board's policy, she quit her job and moved out of the state. "[T]he 'guiding principle' of the curriculum," she explained "was to 'critique…white supremacy, racism, anti-blackness…patriarchy…capitalism…and

---

[1] https://www.goldwaterinstitute.org/teacher-exposes-crt-my-job-was-no-longer-about-teaching/.

Appellate Case: 23-1374    Page: 16    Date Filed: 05/19/2023 Entry ID: 5279143

other forms of power and oppression,'" and the school would tolerate no dissent. *Id.*

Fontanilla's case is not unusual. A North Carolina teacher named David Phillips was fired for objecting to the teaching of AR doctrine at his school in 2022. Lanum, *North Carolina Professor Claims he was Fired for Criticizing Critical Race Theory, Files Lawsuit,* N.Y. Post (Dec. 22, 2022).[2] A Massachusetts teacher named Kari MacRae was fired in 2021 for posting videos online expressing opposition to AR theory. Poff, *Massachusetts Teacher Fired for Opposing CRT on TikTok Sues Superintendent and Principal,* Wash. Exam'r (Dec. 3, 2021).[3] One California college even fired its director of Diversity, Equity, and Inclusion—a black woman—because she opposed AR. Quinn, *A DEI Director Ousted for Questioning DEI?*, Inside Higher Ed (Mar. 9, 2023).[4]

Yet to *comply* with AR's demands is also unacceptable. In November, a white teacher in Texas (whose name was withheld) was fired after he put AR theory into practice by telling his students that he was a racist because all white people are racist. In *accordance* with AR, he told black students "Deep down in

---

[2] https://nypost.com/2022/12/22/dr-david-phillips-sues-ncgs-claims-he-was-fired-for-criticizing-critical-race-theory/.

[3] https://www.washingtonexaminer.com/policy/education/massachusetts-teacher-fired-for-opposing-crt-on-tiktok-sues-superintendent-and-principal.

[4] https://www.insidehighered.com/news/2023/03/10/equity-director-targeted-she-says-questioning-antiracist-orthodoxy.

Appellate Case: 23-1374     Page: 17     Date Filed: 05/19/2023 Entry ID: 5279143

my heart, I'm ethnocentric…. I think everybody thinks that…. I think everybody is racist at that level."[5] Yet he was terminated. Under such circumstances, it's logically impossible for a "person of ordinary prudence" to doubt that expressing a position on AR at the training session would incur punishment. *Garcia*, 348 F.3d at 729.[6]

Again, the question before the District Court was *not* whether Plaintiffs Henderson and Lumley actually ended up receiving similar treatment, but whether, going into the required training session, a person of ordinary firmness would have believed she would suffer a penalty for expressing dissent. *Garcia,* 348 F.3d at 729. The answer is unquestionably yes.

### B. The chilling effect is built into the very structure of "anti-racist" theory.

"Training" sessions like that at issue here are not places for free and open discussion. Rather, they are confrontational exercises at which disagreement is not only unwelcome but treated as a blameworthy aberration.

---

[5] A video of the incident is available at https://twitter.com/trtworld/status/1593217890164932608?lang=en.

[6] To be clear, amicus does not deny that schools may dictate the curriculum or limit teachers' speech in their capacity as employees. *Cf. Urofsky v. Gilmore*, 216 F.3d 401 (4th Cir. 2000); *Richardson v. Sugg*, 448 F.3d 1046, 1061–62 (8th Cir. 2006). That is not at issue here, however, because this case does not involve curricula or the Plaintiffs' speech in their employee capacity; this case concerns Plaintiffs' *individual* free speech rights.

10

Research demonstrates that AR "function[s] as a cue that [white employees] are unwelcome or under-valued," and that in such training sessions, "contextual cues signal to [white] individuals that they may be treated poorly, devalued, or made to feel that members of their group do not belong."  Dover, *et al.*, *Members of High-Status Groups are Threatened by Pro-Diversity Organizational Messages,* 62 J. Experimental Psych. 45, 65 (2016).  White employees often feel that they "do not know what to say or how to act" in such a context, *id.*, and often "perceive [such] programs as offering an unfair advantage to the non-traditional employee, rather than leveling the playing field for all."  Kulik, *et al.*, *The Rich Get Richer,* 28 J. Organizational Behavior 753, 754 (2007).  "Mandatory participation" in such sessions "send[s] the message that employees need to change, and the employer will require it," which "lead[s] employees to think that commitment to diversity is being coerced."  Dobbin & Kalev, *supra* at 51.[7]

Whether or not such impressions are warranted in the context of ordinary anti-discrimination training, they are *certainly* justified with respect to the AR movement.  That's because intimidation, pressure, and threats are built into AR's structure.  AR differs from  anti-discrimination principles in that it holds that disagreement with AR's theses—including the proposition that all white people are racist—is "normative violence," Applebaum, *Being White, Being Good* 73, 172

---

[7] https://scholar.harvard.edu/files/dobbin/files/an2018.pdf.

Appellate Case: 23-1374     Page: 19     Date Filed: 05/19/2023 Entry ID: 5279143

(2010), or a form of "denial[ism] [which] is a fundamental way in which white people maintain unequal racial power." DiAngelo, *White Fragility* 86 (2018). In other words, disagreeing with AR ideology is automatically deemed a racist act.

AR's basic premises are that whites are inherently "privileged" on account of their race, and that it is morally insufficient for them to not be racists. They are morally obligated at all times to root out and eliminate their own subconscious racist attitudes—i.e., they must "striv[e] to undo racism in [their] mind[s]," including racism of which they are unaware. Deggans, *"Not Racist" Is Not Enough*, NPR (Aug. 25, 2020).[8] It is essential to this theory that *all* white people "have a space and place of privilege," *White Anti-Racism*, Learning for Justice,[9] and that "there is racism in all of us." Capatides, *The Difference Between Being Not Racist and Being Antiracist*, CBS News (June 25, 2020).[10] The Smithsonian, for example, instructs white people that they "must acknowledge and understand their privilege [and] work to change their internalized racism." *Talking About Race: Being Antiracist*.[11]

---

[8] https://www.npr.org/2020/08/24/905515398/not-racist-is-not-enough-putting-in-the-work-to-be-anti-racist.

[9] https://www.learningforjustice.org/professional-development/white-antiracism-living-the-legacy.

[10] https://www.cbsnews.com/news/antiracist-not-racist-difference/.

[11] https://nmaahc.si.edu/learn/talking-about-race/topics/being-antiracist.

Appellate Case: 23-1374    Page: 20    Date Filed: 05/19/2023 Entry ID: 5279143

For a white person to deny that she is a racist constitutes—according to AR theory—a blameworthy refusal to accept responsibility, a refusal which is itself just another means of perpetuating the inherently racist character of American society. As Ibram Kendi, the foremost spokesman for this theory, expresses it, "the problem with being 'not racist'" is that it "signifies neutrality," whereas

> there is no neutrality in the racial struggle.... One either believes racial inequities are rooted in groups of people, as a racist, or locates the roots of racial inequities in power and policies, as an antiracist. One either allows racial injustice to persevere, as a racist, or confronts racial injustice, as an antiracist. There is no in-between safe space of "not racist." *The claim of "not racist" neutrality is a mask for being racist.*

*Antiracist, supra* at 10 (emphasis added). Even more relevant to this case, public school employees are specifically counseled not to speak against the AR dogma that all white people are racists:

> For fear of being labeled racist, white teachers might profess "I don't see color, I just see children." *This notion is rooted in white ideologies* of teacher professionalism that proclaims all students should be treated equally, but *when white teachers profess not to see color, what they are doing is performing* in fear of being labeled "bad," "racist," or "unprofessional...." Colorblind pedagogies prevent the implementation of anti-racist pedagogies.... Maintaining power through fairness and treating everyone equally benefits white teachers by portraying them as "good," but this portrayal of whiteness as "good" and performative fear of being "bad" *results in the marginalization of the lived racial disparities experienced by their Students of Color.*

Jones, et al., *On "Ceding Space": Pushing Back on Idealized Whiteness to Foster*

*Freedom for Students of Color, in, Reconceptualizing Social Justice in Teacher*

13

*Education* 94 (Brown & Jean-Marie eds., 2022) (emphases altered). Thus for a teacher to assert that she is not a racist is itself a form of racism. *See also* Kendi, *"The Very Heartbeat of Racism is Denial,"* University of Rochester News Center (Feb. 25, 2021)[12] ("When people say they're not racist, they're sharing the words that white supremacists use.").

Indeed, Sharif El-Mekki, Founder and CEO of the Center for Black Educator Development, has declared that anyone who disagrees with AR theory is "unfit to teach Black and brown children." *No, You Should Not Be Teaching Black Children if You Reject Anti-Racism*, EdPost (May 5, 2021).[13] A white teacher "who can't see [her] own inherent racial biases against Black children," he writes, does not belong in a classroom with black students, because "a commitment to anti-racism should be non-negotiable in our profession." *Id.*

This is not just the idiosyncratic view of some AR acolytes, but part of AR's essence. Research comparing the experiences of employees who attended training sessions that taught color-blindness and those that taught "multicultural" theory found that white employees "feel excluded" from the latter because it "focus[es] exclusively on the recognition and appreciation of minority identities—as opposed

[12] https://www.rochester.edu/newscenter/ibram-x-kendi-the-very-heartbeat-of-racism-is-denial-470332/.
[13] https://www.edpost.com/stories/no-you-should-not-be-teaching-black-children-if-you-reject-anti-racism.

14

to unifying them under a single 'American' category." Plaut, *et al., "What About Me?" Perceptions of Exclusion and Whites' Reactions to Multiculturalism,* 101 J. Personality & Soc. Psych. 337, 339 (2011) (internal citation omitted). But AR is even overtly hostile to the idea of a race-neutral American identity. Because it perceives the mere absence of racism *as itself racism*, any white person who objects to AR's propositions—who denies, for instance, that the American constitutional system is a white supremacist order—is either deemed a racist deserving denunciation, or, at best, is instructed to practice "racial humility"—i.e., not to express her opinions. *See* DiAngelo, *Nice Racism: How Progressive White People Perpetuate Racial Harm* 87 (2021).

In fact, not only is expressing disagreement with AR ideology taken as proof of that person's racism, *see generally* McWhorter, *The Dehumanizing Condescension of White Fragility,* The Atlantic (July 14, 2020),[14] but even to *agree* with "anti-racism" can be a form of racism, because that, too, shows insufficient "humility" and "comes from a place of superiority and/or a desire to be forgiven." Morrison, *Becoming Trustworthy White Allies*, Reflections (Spring 2013)[15]; Reid, *No More White Saviours, Thanks*, The Guardian (Sept. 19, 2021).[16]

---

[14] https://www.theatlantic.com/ideas/archive/2020/07/dehumanizing-condescension-white-fragility/614146/

[15] https://reflections.yale.edu/article/future-race/becoming-trustworthy-white-allies.

[16] https://www.theguardian.com/world/2021/sep/19/no-more-white-saviours-thanks-how-to-be-a-true-anti-racist-ally.

Appellate Case: 23-1374      Page: 23      Date Filed: 05/19/2023 Entry ID: 5279143

Even for a white person to *weep* about an incident of racial injustice is considered a racist act; it's called "white tears." *See* Loubriel, *4 Ways White People Can Process Their Emotions Without Bringing the White Tears,* Everyday Feminism (Feb. 16, 2016).[17]

This explains why, when Plaintiffs expressed disagreement with the "anti-racist" theory at the training, they were told that they were "confused and wrong" and "needed to work on [themselves]"—not merely that they had a different opinion. *Henderson*, 2023 WL 170594, at **3, 5.

Holding racist views is, of course, unacceptable, particularly in public schools. Consequently, being labeled a racist constitutes one of the severest forms of stigma possible. The sternness with which society treats alleged racists, even without evidence of guilt, is so extreme that the average person is terrified of such an accusation. Even under ordinary circumstances, such an allegation is rarely disprovable. *See, e.g.,* Jaschik, *What You Can't Win in Court*, Inside Higher Ed. (Nov. 16, 2008)[18] (detailing effort by teacher falsely accused of racism to vindicate his reputation). But AR theory considers it a racist act to even *try* to disprove it, because *attempting* to deny one's own racism constitutes proof of racism.

---

[17] https://everydayfeminism.com/2016/02/white-people-emotions-tears/.
[18] https://www.insidehighered.com/news/2008/11/17/what-you-cant-win-court.

Appellate Case: 23-1374     Page: 24     Date Filed: 05/19/2023 Entry ID: 5279143

This makes the risk of a racism accusation a powerful weapon in today's culture, especially in the public-school workplace. Examples abound of teachers falsely accused of racism being forced to apologize or being terminated. *See, e.g.*, Flaherty, *Failure to Communicate*, Inside Higher Ed. (Sept. 7, 2020)[19]; Parks, *College Professor Claims He's Being Fired for Asking Questions During Campus Diversity Meeting*, N.Y. Post (Jan. 17, 2023)[20]; Rosa, *N.J. Teacher Suspended after Calling George Floyd a "Criminal,"* N.Y. Times (May 1, 2021)[21]; Babineau, *White Teacher in Texas Fired after Telling Students His Race is "The Superior One,"* CNN.com (Nov. 15, 2022).[22] And that gives AR an extraordinary propagandistic advantage.

Propaganda rarely actually *forces* people to endorse views they disagree with, because overt compulsion just stiffens people's backbones. Propagandists therefore seek instead to "set up psychological and emotional currents" which, "[i]nstead of assaulting…resistance by direct attack…[find ways of] removing…resistance [by]…swing[ing] emotional currents." Bernays, *Propaganda* 77 (Brooklyn: Ig Publishing, 2005) (1928). This is done through

---

[19] https://www.insidehighered.com/news/2020/09/08/professor-suspended-saying-chinese-word-sounds-english-slur.
[20] https://nypost.com/2023/01/17/bakersfield-college-professor-says-hes-being-fired-for-false-racism-allegations/.
[21] https://www.nytimes.com/2021/05/01/nyregion/zoom-teacher-racist.html.
[22] https://www.cnn.com/2022/11/15/us/texas-teacher-fired-race-conversation/index.html.

Appellate Case: 23-1374    Page: 25    Date Filed: 05/19/2023 Entry ID: 5279143

pressures, vague intimidation, and the ever-present threat that disagreement or refusal to conform will be treated as racism.

This is central to the "chill" theory here because the law has long recognized that there are forms of pressure short of force or fraud can still rise to the level of compulsion. For example, in contract law, the principle of "undue influence" refers to a situation in which a person is subjected to pressures that "'overcome[] the will without convincing the judgment.'" *Rothberg v. Walt Disney Co.*, 168 F.3d 501 (9th Cir. 1999) (citation omitted). In the Establishment Clause context, too, the Supreme Court has acknowledged that a constitutional injury "does not depend upon any showing of direct governmental compulsion," but can exist based on the "indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion." *Engel v. Vitale*, 370 U.S. 421, 430–31 (1962).

Freedom of speech is as much a fundamental right as religious liberty, and is no less threatened by intimidation and pressure. That's the entire reason why the law recognizes the concept of a "chilling effect" in the first place—to cover situations in which people are pressured into waiving their free speech rights. Where an "implicit threat of punishment and intimidation" causes someone to fear the consequences of speaking, she has experienced a First Amendment injury, even

18

where there is "no indication" of "overt threats" of punishment for dissent. *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 765 (6th Cir. 2019).

Tactics that employ what *Engel* called "indirect coercive pressure…to conform," 370 U.S. at 430, are effective because they maintain a veneer of plausible deniability or voluntariness while nevertheless making clear to everyone involved that dissent or refusal to participate will be penalized in some unspecified manner. Even in totalitarian states, mandatory propaganda sessions for workers are typically labeled "voluntary" in the sense that no *immediate* punishment will flow from refusal to conform; but anyone who persists in disobedience will eventually find herself called to account for "poor citizenship" or some other vaguely defined offense. *See, e.g.,* Medish, *The Soviet Union* 239 (3d ed. 1987) (propaganda meetings were "held after quitting time making attendance voluntary. But all patriotic citizens would still be expected to be present, and any unexcused absence would not go unnoticed."). Likewise mandatory AR sessions rely on peer pressure, intimidation, and bullying to silence potential opposition through "indirect coercive pressure[s]," *Engel*, 370 U.S. at 431, and "implicit threat[s]" of ostracism and retaliation. *Speech First*, 939 F.3d at 765.

True, public school administrators have discretion in how to operate a school, and those in charge may prescribe curricula and require teachers to receive certain types of professional training. *See generally Parker v. Hurley,* 514 F.3d 87

19

(1st Cir. 2008).  They may even prohibit certain types of classroom speech by teachers.  *Urofsky, supra*.  What they may not do is "prescribe what shall be orthodox," *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943), by using personal and professional pressure to deprive people of their individual constitutional rights.

The District Court's view that there couldn't have been a chilling effect because Plaintiffs faced no "identifiable threat of negative consequences" for expressing their views is therefore blind to the reality of the situation.  *Henderson*, 2023 WL 170594, at *6.  The Plaintiffs were *required* to attend and participate in the training, where they were instructed to "[a]cknowledge YOUR privileges," and "become Anti-Racist educators,"[23] told that adopting AR was a job requirement, *see* Appellants' Opening Brief at 34–36, and where, when they objected, they were told that they were wrong and unprofessional.  They were subjected to peer pressure from their colleagues in an environment where they were especially sensitive to the risks of dissenting from the prescribed orthodoxy.  *Any* reasonably prudent person would have believed that expressing disagreement risked professional retribution and social opprobrium.  Dobbin & Kalev, *supra* at 51 ("By mandating participation, employers send the message that employees need to change, and the employer will require it…[and] that external government mandates

---

[23] Complaint, R. Doc. 1 at 10 ¶¶ 53, 55.

Appellate Case: 23-1374     Page: 28     Date Filed: 05/19/2023 Entry ID: 5279143

are behind [the] training.  These features may lead employees to think that commitment to [AR] is being coerced.").

Here, a "person of ordinary prudence" would certainly have declined to dissent from fear of retaliation. *Garcia*, 348 F.3d at 729.  The fact that Plaintiffs showed admirable fortitude in expressing at least some disagreement cannot therefore be taken as proof that no chill existed.  It was objectively reasonable for them to fear that exercising their speech rights would result in negative consequences.

## II.  The attorney fee award is contrary to public policy.

Even if that were not enough to warrant judgment in their favor, it does make clear that Plaintiffs' chilled speech claim has an "arguable basis in either law or in fact," *Neitzke v. Williams*, 490 U.S. 319, 325 (1989), and that the fee award is unjustifiable.  That award was premised on the idea that the Plaintiffs' chilled speech claims are frivolous.  But a lawsuit is frivolous only where it has no "arguable basis in either law or in fact."  *Id*.  And as we have seen, Plaintiffs' claims were not just arguable, but well-grounded.  What's more, the fee award is contrary to public policy because by opposing AR, the Plaintiffs were acting consistently with the principle of color-blindness that underlies federal civil rights law.  To penalize them for it would be perverse.

21

**A.** **The purpose of § 1988 is to encourage the rooting out of racist social institutions—of which AR is one instance.**

The policy behind the civil rights laws is "color-blindness"—that is, all people should be treated equally regardless of skin color. As Judge Ho recently reminded us, Thurgood Marshall argued in his brief in *Brown v. Board of Education* "'[t]hat the Constitution is color blind,'" *Veasey v. Abbott*, 13 F.4th 362, 379 (5th Cir. 2021) (Ho, J., concurring)—a term that, in fact, originated in Justice Harlan's *Plessy v. Ferguson* dissent, where he said that "[o]ur constitution is color-blind, and neither knows nor tolerates classes among citizens….The law regards man as man, and takes no account of his surroundings or of his color when his civil rights as guaranteed by the supreme law of the land are involved." 163 U.S. 537, 559 (1896) (Harlan, J., dissenting).

The 1964 Civil Rights Act was intended to make good on that principle. *See Hi-Voltage Wire Works, Inc. v. City of San Jose*, 12 P.3d 1068, 1075 (Cal. 2000) ("Congress intended that the Act reflect Justice Harlan's understanding of the Constitution and 'be "colorblind" in its application.'" (citation omitted)). The policy of the United States is that people should be treated the same, without regard to race.[24]

---

[24] This policy is a wise one, both because treating people differently based on race is "odious to a free people whose institutions are founded upon the doctrine of equality," *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943), and because discriminating between people on a racial basis leads to insoluble problems, such

Appellate Case: 23-1374     Page: 30     Date Filed: 05/19/2023 Entry ID: 5279143

Section 1988's fee provision was designed to create an incentive for citizens to enforce that policy, given that the federal government lacks the resources necessary to crack down on all instances of wrongful discrimination. As the Supreme Court explained in *Newman*, 390 U.S. at 402, color-blindness is "a policy that Congress considered of the highest priority," and consequently Section 1988 works in one direction but not the other: losing defendants must ordinarily pay fees; losing plaintiffs only in frivolous cases. That asymmetry is meant to "giv[e] the private plaintiff substantial incentives to sue." *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 419 (1978).

AR theory explicitly rejects the principle of color-blindness. Indeed, it regards that principle as *itself* a form of racism. *See* Kendi, *Antiracist, supra,* at 11 ("The language of color blindness—like the language of 'not racist'—is a mask to hide when someone is being racist."). Again, this is especially significant for public-school employees. As El-Mekki, *supra,* asserts, "aspiring to

_____

as: whose ancestors have suffered enough injustice to warrant special privileges being given to their living descendants? How do we distinguish between "privilege" and the hard-earned deserts of those who (and whose families) have lifted themselves from poverty through admirable diligence? Why should the latter be penalized, especially if their ancestors were not even present in the country when others' ancestors were harmed? What even constitutes a viable racial category in the first place? *See generally* Bernstein, *Classified: The Untold Story of Racial Classification in America* (2022) (documenting the arbitrariness of government's racial categorizations).

Appellate Case: 23-1374    Page: 31    Date Filed: 05/19/2023 Entry ID: 5279143

'colorblindness' is disqualifying.  Teachers are not fit to teach Black and brown children if they fail to understand that colorblindness is erasure."

AR theory therefore does not prescribe treating people equally, but the exact opposite: it exhorts people to treat others *differently* based on their race, (ostensibly) to equalize outcomes.  The *Harvard Business Review*, for example, counsels businesses to award contracts based on a contractor's race, and to give raises and promotions to employees based on their race.  *See* Livingston*, How to Promote Racial Equity in the Workplace*, Harv. Bus. Rev. (2020).[25]  Schools are encouraged to provide additional resources to students based on their color, and even to grade them differently based on color.  *See, e.g., * Arnesto, *"The Future of Grading is Antiracist,"* The Faculty (Dec. 11, 2020)[26] ("[T]here should be *purposeful* discrimination when teachers grade students[.]").  AR educational guidelines tell teachers that "objectivity," "perfectionism," and "individualism" are forms of "white supremacy."  Edelman, et al., *Richard Carranza Held "White-Supremacy Culture" Training for School Admins,* N.Y. Post (May 20, 2019).[27]  So are punctuality, hard work, and "rational linear thinking," according to the

---

[25] https://hbr.org/2020/09/how-to-promote-racial-equity-in-the-workplace.
[26] https://medium.com/the-faculty/the-future-of-grading-is-antiracist-96d60f1fd432.
[27] https://nypost.com/2019/05/20/richard-carranza-held-doe-white-supremacy-culture-training/.

24

Smithsonian. *Talking About Race* (June 2020 version).[28] Teachers are therefore told to "stop grading homework," "welcome late work," and "eliminate the zero," Safir & Dugan, *12 Tips for Antiracist Grading* (Feb. 2021),[29] and not to penalize students for failing to complete assignments, or consider "factors that directly measure students' knowledge and skills in the content area" when assigning grades. Soave, *San Diego Public Schools Will Overhaul Its Grading System to Achieve "Anti-Racism,"* Reason (Oct. 19, 2020).[30]

In other words, "anti-racism" is—notwithstanding its self-serving euphemistic title—*racism*. It's an argument that individuals should be treated differently based on skin color; that the content of their minds is a consequence of their biological ancestry, and that people should enjoy benefits or suffer burdens based on what their forebears did. That's exactly what Section 1988 was designed to root out. This lawsuit is just what Section 1988 was written to encourage.

The clash between AR and the civil rights laws is nothing new. In *Coal. for Econ. Equity v. Wilson*, 122 F.3d 692, 709 (9th Cir. 1997), plaintiffs, who endorsed an early version of AR, argued that the California Civil Rights Initiative—which

---

[28]

https://web.archive.org/web/20200601153458/https://nmaahc.si.edu/learn/talking-about-race/topics/whiteness

[29] https://shanesafir.com/wp-content/uploads/2021/02/12-Tips_ShaneSafir.vs2_.pdf.

[30] https://reason.com/2020/10/19/san-diego-public-schools-grades-antiracism/.

25

prohibits discriminating against or in favor of people based on their race—was unconstitutional because it "burden[ed]" those who think government should treat people differently based on their race. *Id.* at 708. They claimed that the Constitution mandates so-called benign racial discrimination, and cited cases in which the Supreme Court allowed race-based remedies to redress past discrimination. This, they claimed, proved that the Initiative's color-blindness requirement was unconstitutional. The *Wilson* court did not fall for that sophistry: "The Fourteenth Amendment," it said, "does not require what it barely permits." *Id.* at 709.

In other words, what AR prescribes—i.e., treating people differently based on race—are actions that, if undertaken by a public-school employee, would almost certainly violate the civil rights laws, and which are contrary to some of this country's most cherished constitutional principles. For Plaintiffs to object to it was therefore *consistent with* the "policy that Congress considered of the highest priority," *Newman*, 390 U.S. at 402, and for them to file suit over it was therefore consistent with Section 1988. To penalize them for doing so is contrary to the entire theory of that statute.

### B. Courts should grant fees against unsuccessful plaintiffs only where they have engaged in misconduct.

This Court has said that a prevailing defendant in a civil rights case is entitled to attorney fees only on a "show[ing] that the evidence provided a basis for

26

well-supported findings that the suit is frivolous, unfounded, and vexatiously brought and pursued." *Davis v. City of Charleston, Mo*., 917 F.2d 1502, 1505 (8th Cir. 1990) (cleaned up). Or, as the Sixth Circuit has put it, "an award of attorney fees against a losing plaintiff in a civil rights action is 'an extreme sanction' that should be limited to 'truly egregious cases of misconduct.'" *Revis v. Meldrum*, 489 F.3d 273, 292 (6th Cir. 2007) (citation omitted). There is no evidence of misconduct on the part of Plaintiffs or their counsel, however. The award of fees was therefore improper.

Compare this case with *Adem v. Jefferson Mem'l Hosp. Ass'n.*, No. 4:11-CV-2102-JAR, 2013 WL 1351869 (E.D. Mo. Apr. 2, 2013). The plaintiff was a physician who sued a hospital for revoking his privileges, on the grounds that this was racially discriminatory. The court found that he had no contractual right to those privileges in the first place. *See* 2012 WL 5493856, at *4 (Nov. 13, 2012). Indeed, the hospital's bylaws said that explicitly, and because he had no such right, he could not have a cause of action. *Id.* Yet the District Court did not grant fees to the prevailing defendant, because "[a]s long as the plaintiff has *some* basis for his claim, a prevailing defendant may not recover attorneys' fees." 2013 WL 1351869, at *1. The defendant argued that it should have been obvious that the plaintiff could not recover, but the court said that he had "'brought [his] claim in

Appellate Case: 23-1374    Page: 35    Date Filed: 05/19/2023 Entry ID: 5279143

good faith'" and had not committed any "'egregious…misconduct.'" *Id.* at **2–3 (citations omitted).

Or consider *Biggs v. City of Maryland Heights*, No. 4:20-cv-01499-JCH, 2022 WL 2045892 (E.D. Mo. June 7, 2022), in which the plaintiff sued a police officer for forcing him to stop using a risky "rolling roadblock" procedure and drawing his gun on the plaintiff. The court found the officer's behavior "objectively reasonable," and concluded that he was shielded by qualified immunity. *See* 2022 WL 1451670, at *7 (May 9, 2022). Yet the court refused to award fees to the prevailing defendant, because "[a] civil rights litigant should not be punished for pursuing a reasonable legal theory." 2022 WL 2045892, at *3. The case was not "vexatiously brought," nor was there any other justification for penalizing the plaintiff with a fee award. *Id.*

The same reasoning applies here. The District Court made no findings that the Plaintiffs here brought the case vexatiously or with any culpable lack of due diligence. On the contrary, their claims are grounded in a reasonable application of existing First Amendment precedent. The District Court's only findings with respect to "egregiousness" were that the case involved a "political dispute" and that there was a "lack of a factual basis for any sort of First Amendment claim." *See* 2023 WL 2754902, at *2. As explained above, the latter assertion is incorrect; it rested on the court's erroneous belief that the lack of actual retaliation forecloses

28

a "chill" claim, which it does not. As for the fact that the issue in question is "political," that does not prove the case "frivolous, unfounded, and vexatiously brought and pursued." *Davis*, 917 F.2d at 1505 (citation omitted). Many cases have a political valence to them.

What's more, courts considering a fee award should be cognizant of the effect it will have on plaintiffs acting in good faith to challenge the constitutionality of government actions. The courts are the traditional forum for adjudicating civil rights disputes, and imposing fee awards against unsuccessful plaintiffs runs counter to the policy announced in *Christiansburg Garment*. As one scholar puts it, "the primary goal of [attorney fees] is to force civil rights violators to pay their victims' fees, not to penalize innocent volunteers for engaging in legitimate courtroom advocacy." Goldberger, *First Amendment Constraints on the Award of Attorney's Fees Against Civil Rights Defendant-Intervenors*, 47 Ohio St. L.J. 603, 604 (1986). To impose a crushing fee award on these Plaintiffs is excessive punishment and likely to deter future civil rights litigation.

The Arizona Court of Appeals recently remarked that "[w]here aggrieved citizens, in good-faith, seek a determination of the legitimacy of governmental actions, attorney's fees should not usually be awarded. Courts exist to hear such cases; we should encourage resolution of constitutional arguments in court rather than on the streets." *Gilmore v. Gallego*, No. 1 CA-CV 22-0049, 2023 WL

29

2979302, at *9 (Ariz. App. Apr. 18, 2023) (citation omitted). The same reasoning applies here. Plaintiffs brought this case in good faith and with legitimate cause. They should not be penalized for petitioning the government for a redress of grievances.

## CONCLUSION

The District Court's decision should be *vacated.*


Respectfully submitted this 18th day of May, 2023.

/s/ *Timothy Sandefur*
Timothy Sandefur
Adam C. Shelton
**Scharf-Norton Center for**
**Constitutional Litigation**
**at the GOLDWATER INSTITUTE**
*Attorney for Amici Curiae*

30

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,494 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionately spaced typeface using Microsoft Word Times New Roman 14-point font.

Date: May 18, 2023

/s/ *Timothy Sandefur*
Timothy Sandefur
Adam C. Shelton
**Scharf-Norton Center for**
**Constitutional Litigation**
**at the GOLDWATER INSTITUTE**
*Attorney for Amici Curiae*

31

**CERTIFICATE OF SERVICE**

I hereby certify that on May 18, 2024, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Timothy Sandefur*
Timothy Sandefur

Appellate Case: 23-1374    Page: 40    Date Filed: 05/19/2023 Entry ID: 5279143