BROOKE HENDERSON, *ET AL.*,

*Plaintiffs-Appellants,*

v.

SCHOOL DISTRICT OF SPRINGFIELD R-12, *ET AL.*,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Western District of Missouri – Southern Division
The Honorable District Judge Douglas Harpool
Case No. 6:21-cv-03219-MDH

## AMICUS BRIEF OF AMERICANS FOR PROSPERITY FOUNDATION, ALLIANCE DEFENDING FREEDOM, FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION, DEFENSE OF FREEDOM INSTITUTE FOR POLICY STUDIES, REASON FOUNDATION, AND THE AMERICAN CIVIL LIBERTIES UNION OF MISSOURI IN SUPPORT OF PLAINTIFFS-APPELLANTS AND REVERSAL

John J. Bursch
Tyson C. Langhofer
Mathew W. Hoffmann
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, Virginia 20176
Telephone: (571) 707-4655
jbursch@ADFlegal.org
tlanghofer@ADFlegal.org
mhoffmann@ADFlegal.org
*Attorneys for* Amicus Curiae
*Alliance Defending Freedom*

Cynthia Fleming Crawford
*Counsel of Record*
Casey Mattox
AMERICANS FOR PROSPERITY FOUNDATION
1310 N. Courthouse Road
Arlington, VA 22201
Telephone: (571) 329-2227
ccrawford@afphq.org
*Attorneys for* Amicus Curiae *Americans for Prosperity Foundation*

Donald A. Daugherty, Jr.
DEFENSE OF FREEDOM INSTITUTE
1455 Pennsylvania. Ave., NW
Suite 400
Washington, DC 20004
Telephone: (414) 559-6902
don.daugherty@dfipolicy.org
*Attorney for* Amicus Curiae *Defense of Freedom Institute for Policy Studies*

## CORPORATE DISCLOSURE STATEMENT

Americans for Prosperity Foundation is a Section 501(c)(3) nonprofit corporation. It has no parent corporation and no publicly held corporation has an ownership interest of 10% or more.

Alliance Defending Freedom has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Foundation for Individual Rights and Expression has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Defense of Freedom Institute has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Reason Foundation has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

The American Civil Liberties Union of Missouri is a nonprofit corporation, has no parent corporations, and is not publicly held.

Appellate Case: 23-1374    Page: 3    Date Filed: 05/19/2023 Entry ID: 5279148

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT..............................................i

INTEREST OF *AMICI CURIAE* ...............................................1

    Americans for Prosperity Foundation ...........................................1

    Alliance Defending Freedom..................................................2

    Foundation for Individual Rights and Expression .........................3

    Defense of Freedom Institute for Policy Studies ...........................4

    Reason Foundation.........................................................4

    American Civil Liberties Union of Missouri ..................................5

SUMMARY OF THE ARGUMENT .......................................6

ARGUMENT .................................................................8

I.   Attorney's fee awards for prevailing plaintiffs vindicate the purposes of civil rights statutes like section 1983. .........................8

    A.   Congress enacted section 1983 to throw open the doors to federal court for plaintiffs and hold state officials responsible...............................................................9

    B.   So important was vindicating constitutional rights under section 1983 that courts began awarding attorney's fees to plaintiffs—despite the default "American Rule." ..................................................10

    C.   The Supreme Court withdraws federal courts' discretion to award attorney's fees, but Congress—recognizing the need for fees in vindicating constitutional rights—restores it...........................................................11

    D.   To avoid hollowing out section 1983, defendants can recover attorney's fees in only the most extreme cases........14

Appellate Case: 23-1374    Page: 4    Date Filed: 05/19/2023 Entry ID: 5279148

E. *Amici* well know that awards of attorney's fees to defendants will chill civil rights litigation, stagnate the development of the law, and frustrate the goals of section 1983. .......................................................................... 16

II. Plaintiffs' claims to a First Amendment injury were not frivolous. .......................................................................... 20

A. Plaintiffs provided evidence of non-frivolous First Amendment injury. .............................................................. 20

B. Protected political speech and political questions are not the same thing. ......................................................................... 23

C. The district court's ruling here is especially troubling because it granted the fee request without analyzing the reasonableness of the request in the context of the case. .... 25

CONCLUSION ......................................................................... 28

CERTIFICATE OF COMPLIANCE ........................................... 30

CERTIFICATE OF SERVICE ................................................... 31

Appellate Case: 23-1374     Page: 5     Date Filed: 05/19/2023 Entry ID: 5279148

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*,
    421 U.S. 240 (1975) ........................................................................ 11, 12

*Baker v. Carr*,
    369 U.S. 186 (1962) ................................................................................ 24

*Barnes v. Zaccari*,
    592 F. App'x 859 (11th Cir. 2015) ........................................................ 2

*Barnette v. W.V. State Bd. of Educ.*,
    47 F. Supp. 251 (S.D.W.V. 1942) .................................................... 18, 19

*Bus. Leaders In Christ v. Univ. of Iowa*,
    991 F.3d 969 (8th Cir. 2021) .................................................................. 3

*Citizens United v. Fed. Election Comm'n*,
    558 U.S. 310 (2010) .......................................................................... 20, 24

*City of Riverside v. Rivera*,
    477 U.S. 561 (1986) .................................................................... 13, 14, 19

*Lowry ex rel. Crow v. Watson Chapel Sch. Dist.*,
    540 F.3d 752 (8th Cir. 2008) ................................................................ 17

*Davis v. City of Charleston*,
    917 F.2d 1502 (8th Cir. 1990) .............................................................. 21

*District of Columbia v. Carter*,
    409 U.S. 418 (1973) ................................................................................ 9

*Elrod v Burns*,
    427 U.S. 347 (1976) .............................................................................. 21

*Flores v. Bennett*,
    2022 WL 9459604 (E.D. Cal. Oct. 14, 2022) .................................... 17

iv

*Fowler v. Schwarzwalder,*
  498 F.2d 143 (8th Cir. 1974)...................................................... 11

*Fox v. Vice,*
  563 U.S. 826 (2011) ....................................................... 13, 15

*Gerlich v. Leath,*
  861 F.3d 697 (8th Cir. 2017)........................................... 3, 16

*Hall v. Cole,*
  412 U.S. 1 (1973) .................................................................. 13

*Houston Cmty. Coll. Sys. v. Wilson,*
  142 S. Ct. 1253 (2022) ...................................................... 21

*Hughes v. Rowe,*
  449 U.S. 5 (1980) ................................................................ 15

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council
  31,*
  138 S. Ct. 2448 (2018) ................................................. 22, 23

*Keyishian v. Bd. of Regents,*
  385 U.S. 589 (1967) ............................................................. 1

*Koopman v. Water Dist. No. 1,*
  41 F.3d 1417 (10th Cir. 1994) ........................................... 17

*Lyle v. Teresi,*
  327 F. Supp. 683 (D. Minn. 1971) ..................................... 11

*Minersville Sch. Dist. v. Gobitis,*
  310 U.S. 586 (1940) ..................................................... 18, 19

*Mitchum v. Foster,*
  407 U.S. 225 (1972) .............................................................. 9

*Monroe v. Pape,*
  365 U.S. 167 (1961) .............................................................. 9

*Owen v. City of Independence,*
  445 U.S. 622 (1980) .............................................................. 9

Appellate Case: 23-1374    Page: 7    Date Filed: 05/19/2023 Entry ID: 5279148

*Perdue v. Kenny A. ex rel. Winn*,
  559 U.S. 542 (2010) ..................................................... 27, 28

*Ross v. Goshi*,
  351 F. Supp. 949 (D. Haw. 1972) ..................................... 10, 11

*Shaw v. Burke*,
  2018 WL 459661 (C.D. Cal. Jan. 17, 2018) ......................... 17

*Sims v. Amos*,
  340 F. Supp. 691 (M.D. Ala. 1972) .................................... 11

*Stanford Daily v. Zurcher*,
  366 F. Supp. 18 (N.D. Cal. 1973) ....................................... 13

*Tinker v. Des Moines Ind. Cmty. Sch. Dist.*,
  393 U.S. 503 (1969) ......................................................... 17

*Turning Point USA at Ark. State Univ. v. Rhodes*,
  973 F.3d 868 (8th Cir. 2020) .......................................... 2, 16

*United States v. Students Challenging Regulatory Agency
  Procedures (SCRAP)*,
  412 U.S. 669 (1973) ......................................................... 21

*Uzuegbunam v. Preczewski*,
  141 S. Ct. 792 (2021) ..................................................... 2, 23

*Vines v. Welspun Pipes Inc.*,
  9 F.4th 849 (8th Cir. 2021) ............................................. 27

*W.V. State Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1943) ......................................................... 18

*Williams v. City of Carl Junction*,
  523 F.3d 841 (8th Cir. 2008) ............................................ 15

*Zadeh v. Robinson*,
  928 F.3d 457 (5th Cir. 2019) ............................................ 14

*Zivotofsky v. Clinton*,
  566 U.S. 189 (2012) ......................................................... 24

Appellate Case: 23-1374    Page: 8    Date Filed: 05/19/2023 Entry ID: 5279148

## Constitutions

U.S. Const. Amend. I ...................... 1, 3, 5, 7, 16, 17, 18, 19, 20, 21, 23, 25

U.S. Const. Amend. XIV ........................................................................ 10

## Statutes

42 U.S.C. § 1983 .......................................................................... *passim*

42 U.S.C. § 1988 .......................................................................... *passim*

## Rules

Fed. R. App. P. 29(a)(5) ...................................................................... 30

Fed. R. App. P. 32(a)(5) ...................................................................... 30

Fed. R. App. P. 32(a)(6) ...................................................................... 30

Fed. R. App. P. 32(a)(7)(B) ................................................................. 30

Fed. R. App. P. 32(f) .......................................................................... 30

Local Rule 28A(h)(2) ......................................................................... 30

## Legislative Materials

Cong. Globe, 42d 1st Sess. 374–76 (1871) ............................................. 9

H.R. Rep. 94-1558 (1976) ................................................................... 14

S. Rep. No. 94-1011 (1976), *reprinted in* 1976 U.S.C.C.A.N.
  5908 ........................................................................... 12, 13, 15

## Other Authorities

*The Background of Section 1983*, 90 HARV. L. REV. 1137,
  1153 (1977) .................................................................................. 9

Randall R. Rader, *The Fee Awards Act of 1976: Examining
  the Foundation for Legislative Reform of Attorney's Fees
  Shifting*, 18 J. MARSHALL L. REV. 77 (1984) ................................. 12

Appellate Case: 23-1374    Page: 9    Date Filed: 05/19/2023 Entry ID: 5279148

## INTEREST OF *AMICI CURIAE*

## Americans for Prosperity Foundation

Americans for Prosperity Foundation (AFPF) is a 501(c)(3) organization committed to educating and training Americans to be courageous advocates for the ideas, principles, and policies of a free and open society. AFPF works toward these goals by defending the individual rights that are essential to all members of society. As part of this mission, it appears as *amicus curiae* before federal and state courts.

AFPF is committed to ensuring the freedom of expression and association guaranteed by the First Amendment for all Americans, including students. Campuses are not just places where First Amendment rights should be protected; that protection is vital to their mission. They are uniquely positioned to instill in the next generation an appreciation for free speech and association. This is why "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967).[1]

---

[1] This brief was not authored in whole or in part by a party or counsel to a party. No person other than *amici curiae* and their counsel contributed money intended to fund this brief. All parties have consented to the filing of this brief.

1

## Alliance Defending Freedom

Alliance Defending Freedom (ADF) is a not-for-profit, public-interest legal organization that protects speech, religious liberty, and the right to life. ADF regularly defends students, adults, and organizations in cases before this Court and the Supreme Court involving the right to free speech. *E.g.*, *Turning Point USA at Ark. State Univ. v. Rhodes*, 973 F.3d 868 (8th Cir. 2020); *Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021). It provides all representation pro bono.

Nationwide, ADF represents students, student organizations, public employees, and others who seek to vindicate their free speech and religious freedoms under civil rights statutes like section 1983. These clients often have limited resources and would not otherwise be able to afford attorneys. The prospect of having to pay not only the plaintiff's attorney's fees but also the government's attorneys would cause the vast majority of these civil rights plaintiffs to hesitate to file suit. ADF thus has a strong interest in ensuring constitutional violations do not go unremedied due to the threat of large attorney's fees awards against plaintiffs. *See, e.g.*, *Barnes v. Zaccari*, 592 F. App'x 859, 861 (11th Cir. 2015) (ADF participating as amicus curiae in support of plaintiff-appellant; reversing award of attorney's fees to defendant university officials).

Appellate Case: 23-1374    Page: 11    Date Filed: 05/19/2023 Entry ID: 5279148

## Foundation for Individual Rights and Expression

The Foundation for Individual Rights and Expression (FIRE) is a nonpartisan, nonprofit organization dedicated to defending the individual rights of all Americans to the freedoms of speech, expression, and conscience—the essential qualities of liberty. Because colleges and universities play an essential role in preserving free thought, FIRE places a special emphasis on defending these rights on our nation's campuses. Since 1999, FIRE has successfully defended the First Amendment rights of countless students and teachers at campuses nationwide through public advocacy, targeted litigation, and participation as *amicus curiae* in cases that implicate expressive rights under the First Amendment. *See, e.g.*, *Gerlich v. Leath*, 861 F.3d 697 (8th Cir. 2017); Amicus Curiae Brief of FIRE in Support of Reversal and Appellant, *Bus. Leaders In Christ v. Univ. of Iowa*, 991 F.3d 969 (8th Cir. 2021).

FIRE regularly represents civil rights plaintiffs that seek in good faith to defend the boundaries of First Amendment law to ensure and expand free expression for all, whether on or off campus. FIRE provides its legal services at no cost to clients who often could not otherwise afford counsel. The district court's ruling on fees, if allowed to stand, would have a serious chilling effect on FIRE's clients' willingness to bring First Amendment challenges, because they almost universally could not afford to cover defendants' legal fees. Whether plaintiffs ultimately

3

prevail on the merits or not, they easily satisfied the very low bar for non-frivolous claims. FIRE urges this Court to reverse the district court's ruling on fees and reaffirm that fees are available to section 1983 defendants only in the most plainly frivolous, bad faith cases.

## Defense of Freedom Institute for Policy Studies

The Defense of Freedom Institute for Policy Studies, Inc. (DFI) is a nonprofit, nonpartisan 501(c)(3) institute dedicated to defending and advancing freedom and opportunity for every American family, student, entrepreneur, and worker, and to protecting the civil and constitutional rights of Americans at school and in the workplace. Former senior leaders of the U.S. Department of Education who are experts in education law and policy founded DFI in 2021. DFI's efforts in support of its mission include litigating civil rights claims in federal court. DFI's Senior Litigation Counsel also has relevant experience litigating pro bono Section 1983 claims on behalf of prisoners in federal district and appellate courts.

## Reason Foundation

Reason Foundation is a national, nonpartisan, and nonprofit public policy think tank, founded in 1978. Reason's mission is to advance a free society by applying and promoting libertarian principles and policies— including free markets, individual liberty, and the rule of law. Reason supports dynamic market-based public policies that allow and encourage individuals and voluntary institutions to flourish. Reason advances its

4

mission by publishing Reason Magazine, as well as commentary on its websites, and by issuing policy research reports. To further Reason's commitment to "Free Minds and Free Markets," Reason selectively participates as amicus curiae in cases raising significant constitutional or legal issues.

## American Civil Liberties Union of Missouri

The American Civil Liberties Union of Missouri is a nonprofit, nonpartisan organization with more than 19,000 members dedicated to defending the principles embodied in the United States Constitution and our nation's civil rights laws. Since 1920, the ACLU of Missouri and its predecessor entities have been devoted to the protection of constitutional rights, including free speech, writing, publication, assembly, and thought. Through direct representation and as amicus curiae, the ACLU of Missouri regularly engages in state and federal litigation to protect the rights embodied in the First Amendment.

Appellate Case: 23-1374   Page: 14   Date Filed: 05/19/2023 Entry ID: 5279148

## SUMMARY OF THE ARGUMENT

*Amici* regularly advocate on behalf of civil rights plaintiffs and their interests. Their clients generally do not have deep pockets but bring cases of constitutional merit, sometimes presenting cutting edge legal theories and occasionally recovering fees under section 1988. They are just the type of plaintiffs Congress sought to support in implementing Sections 1983 and 1988. But, if, as here, these clients risk bearing the legal fees of government defendants, they would hesitate to file suit, chilling the protection of their own civil rights and the development of the law.

Uncritically awarding government officials hundreds of thousands of dollars defeats the purpose of our fundamental civil rights statutes, prevents the vindication of vital constitutional protections, and stagnates the law. Congress enacted section 1983 to provide a forum in which those injured by state action can vindicate their rights because, by violating constitutional rights, state officials had abdicated their role to enforce and uphold the law. To fulfill the promise of section 1983, Congress amended section 1988 to allow prevailing parties to recover attorney's fees. Congress recognized that civil rights litigation both provides remedies for injured citizens and vindicates our constitutional guarantees—benefitting the whole country. To enable those injured to obtain the competent representation necessary for such a suit, Congress provided for fee-shifting.

Appellate Case: 23-1374    Page: 15    Date Filed: 05/19/2023 Entry ID: 5279148

State officials can recover their fees in only the most extreme cases. To avoid discouraging those injured from vindicating their fundamental rights, Congress and the courts have required a determination that a plaintiff's suit is "frivolous." Any higher standard would threaten plaintiffs—who often do not have many resources—with large monetary liabilities and discourage them from filing suit to vindicate exactly those rights Congress wanted vindicated. That, in turn, would stagnate the law. Attorney's fees awards for state officials chill both citizens and attorneys from bringing novel claims for fear of those arguments being deemed frivolous. But some of our most fundamental guarantees—such as the prohibition on religious discrimination in the award of public benefits and protection for criticism of law enforcement—have been vindicated only by challenging longstanding laws seemingly backed by history and precedent.

Plaintiffs here demonstrated more than enough to overcome the low frivolous barrier, providing evidence that Defendants both censored and compelled their speech. The district court found that "political disagreement" motivated Plaintiffs' lawsuit, so it did not properly conduct the analysis required by the First Amendment and instead relied entirely on the political questions doctrine. But speech on political issues deserves *more* protection, not less. And Congress opened federal courts precisely to protect our most fundamental guarantees—like the utmost protection given political speech, even with novel claims or issues of first

impression. What's more, in awarding attorney's fees, the district court did not do the required lodestar analysis. It awarded Defendants their full amount of claimed fees for their full amount of claimed hours—over $300,000 for over 1,500 hours—despite allowing the case to proceed to summary judgment and without analyzing the reasonableness of the request.

## ARGUMENT

### I. Attorney's fee awards for prevailing plaintiffs vindicate the purposes of civil rights statutes like section 1983.

Congress enacted section 1983 to throw open the doors of federal court to those who suffered injury from state action. When the Supreme Court withdrew federal courts' discretion to award attorney's fees, Congress abrogated its decision by amending section 1988, ensuring that constitutional guarantees would not become mere hollow pronouncements because plaintiffs could not afford an attorney. By the same logic, the legislature allowed state officials to recover their attorney's fees in only the most extreme cases—when the plaintiff's action lacked any foundation. The award of attorney's fees to defendants—as the district court did here—defeats the purposes of our most venerable civil rights statutes, discourages injured Americans from vindicating their freedoms, and stagnates the law. It cannot stand.

Appellate Case: 23-1374    Page: 17    Date Filed: 05/19/2023 Entry ID: 5279148

### A. Congress enacted section 1983 to throw open the doors to federal court for plaintiffs and hold state officials responsible.

The precursor to section 1983, the Civil Rights Act of 1871 also known as the Ku Klux Klan Act, "grew out of a message sent to Congress by President Grant on March 23, 1871." *Monroe v. Pape*, 365 U.S. 167, 172 (1961). The President "requested emergency legislation" because "a virtual state of anarchy existed in the South" and "the states were powerless to control the widespread violence." Note, *The Background of Section 1983*, 90 HARV. L. REV. 1137, 1153 (1977). Congress had grave concerns with "the abdication of law enforcement responsibilities by Southern officials." *Id.* at 1154.

But "Congress had neither the means nor the authority to exert any direct control, on a day-to-day basis, over the actions of state officials." *District of Columbia v. Carter*, 409 U.S. 418, 427 (1973). So it chose the federal judiciary. *Id.* "The very purpose of s 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under color of state law, whether that action be executive, legislative, or judicial." *Mitchum v. Foster*, 407 U.S. 225, 242 (1972). In other words, section 1983 "throws open the doors of the United States courts to those whose rights under the Constitution are denied or impaired." Cong. Globe, 42d Cong., 1st Sess. 374–76 (1871) (remarks of Rep. Lowe); *accord Owen v. City of Independence*, 445 U.S. 622, 650–51

Appellate Case: 23-1374    Page: 18    Date Filed: 05/19/2023 Entry ID: 5279148

(1980) ("By creating an express federal remedy, Congress sought to enforce provisions of the Fourteenth Amendment against those who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it." (cleaned up)).

**B.** **So important was vindicating constitutional rights under section 1983 that courts began awarding attorney's fees to plaintiffs—despite the default "American Rule."**

As enacted, section 1983 had no provision authorizing attorney's fees. That meant that the "American Rule" under which each party paid its own attorney's fees applied in section 1983 litigation. Randall R. Rader, *The Fee Awards Act of 1976: Examining the Foundation for Legislative Reform of Attorney's Fees Shifting*, 18 J. MARSHALL L. REV. 77, 77 (1984). But courts realized that the American Rule presented a daunting obstacle for plaintiffs seeking to vindicate their constitutional rights. Section 1983 cases are "enterprise[s] on which any private individual should shudder to embark." *Ross v. Goshi*, 351 F. Supp. 949, 956 (D. Haw. 1972). The "public authorities normally charged with the enforcement of the law" are defendants in 1983 actions, so "the only practicable means of enforcing section 1983 is by private parties." *Id.* at 955. But those private parties have the "least ab[ility] to bear the cost of vindicating constitutional rights"—especially when "they are vigorously opposed by a governmental entity." *Id.* at 956. Many civil rights cases have no potential for a "substantial damage award," even when "the costs

10

of proving a case" are "high." *Id.* And "few aggrieved parties would have the financial resources to pay [their own attorney's] fees." *Fowler v. Schwarzwalder*, 498 F.2d 143, 145 (8th Cir. 1974). The inability to afford competent counsel thus frustrates the fundamental purpose of section 1983 by leaving constitutional wrongs unremedied. So "equity intervene[d]" to prevent either "plaintiff or lawyer" from making "a great sacrifice" in "undertak[ing] the job of trial." *Ross*, 351 F. Supp. at 956.

Courts awarded these attorney's fees under the "private attorney general" rationale. *E.g.*, *Fowler*, 498 F.2d at 146; *Lyle v. Teresi*, 327 F. Supp. 683, 685–86 (D. Minn. 1971). Section 1983 plaintiffs—just like an attorney general—"advance the public interest" by "seeking to vindicate Congressional policy of the highest priority." *Fowler*, 498 F.2d at 145. Such plaintiffs "should not be forced to bear the costs of litigation." *Id.* Courts found attorney's fees "essential" to "eliminate the[ ] impediments to *pro bono publico* litigation." *Sims v. Amos*, 340 F. Supp. 691, 695 (M.D. Ala. 1972).

### C. The Supreme Court withdraws federal courts' discretion to award attorney's fees, but Congress—recognizing the need for fees in vindicating constitutional rights—restores it.

In 1975, the Court put a stop to federal courts awarding attorney's fees in their equitable discretion. *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 267–69 (1975). It held that federal courts "without legislative guidance" cannot "reallocate the burdens of

11

litigation." *Id.* at 247. Identifying "some statutes important and others unimportant" in connection with attorney's fees had logically and historically been left to Congress' legislative and policy judgment. *Id.* at 264. Indeed, "if any statutory policy is deemed so important that its enforcement must be encouraged by awards of attorneys' fees, how could a court deny attorneys' fees to private litigants in actions under [section] 1983 seeking to vindicate constitutional rights?" *Id.*

The very next year Congress answered the Court's question and passed The Civil Rights Attorney's Fees Act of 1976 to amend 42 U.S.C. § 1988 "in direct response to the *Alyeska* case." Rader, *supra*, at 81. The statute as amended grants federal courts authority in their "discretion" to award "the prevailing party . . . a reasonable attorney's fee" in section 1983 cases. 42 U.S.C. § 1988(b). Its "purpose" is "to remedy anomalous gaps in our civil rights laws created by the United States Supreme Court's . . . decision in *Alyeska Pipeline*." S. Rep. No. 94-1011, at 1 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5908, 5909.

Echoing the federal courts that had awarded attorney's fees in section 1983 cases, the Senate observed that "in many cases arising under our civil rights laws, the citizen who must sue to enforce the law has little or no money with which to hire a lawyer." *Id.* at 5910. To "assert their civil rights" and ensure "those who violate the Nation's fundamental laws [do] not . . . proceed with impunity," citizens "must have the opportunity to recover what it costs them to vindicate these

12

rights in court." *Id.*; *accord Fox v. Vice*, 563 U.S. 826, 833 (2011) (fee-shifting "reimburses a plaintiff for what it cost him to vindicate civil rights and holds to account a violator of federal law" (cleaned up)). The statute thus adopted the "private attorney general" theory whereby plaintiffs "vindicat[e] a policy that Congress considered of the highest priority"—in section 1983 cases, securing our "most fundamental" rights. S. Rep. No. 94-1011, at 3–4, *reprinted in* 1976 U.S.C.C.A.N. at 5910–11; *accord City of Riverside v. Rivera*, 477 U.S. 561, 575 (1986) (plurality) ("If the citizen does not have the resources, his day in court is denied him; the congressional policy which he seeks to assert and vindicate goes unvindicated; and the entire Nation, not just the individual citizen, suffers.").

Not allowing fee-shifting in 1983 cases would tacitly repeal the statute. Lack of fees "frustrat[es] its basic purpose" and renders the "grant of Federal jurisdiction . . . but an empty gesture." S. Rep. No. 94-1011, at 3, *reprinted in* 1976 U.S.C.C.A.N. at 5910 (quoting *Hall v. Cole*, 412 U.S. 1, 13 (1973)). "If the cost of private enforcement actions becomes too great, there will be no private enforcement" and civil rights plaintiffs will have no way to achieve justice. *Id.* at 5913. To prevent section 1983 from becoming a "mere hollow pronouncement[ ]," plaintiffs must have "the traditionally effective remedy of fee shifting." *Id.*; *accord Stanford Daily v. Zurcher*, 366 F. Supp. 18, 24 (N.D. Cal. 1973), *judgment rev'd on other grounds by* 436 U.S. 547 (1978) ("The *raison d'etre* of 42 U.S.C.

Appellate Case: 23-1374    Page: 22    Date Filed: 05/19/2023 Entry ID: 5279148

§ 1983 is to encourage the vindication of constitutional rights, to promote litigation of the rights involved, and to give the courts leeway to fashion appropriate remedies.").

Congress also observed the "particular[ ] importan[ce]" of attorney's fee awards to vindicate civil rights in cases involving governmental immunities. *City of Riverside*, 477 U.S. at 577 (quoting H.R. Rep. 94-1558, at 9 (1976)). Government officials, especially in 1983 cases, can rely on "immunity doctrines and special defenses"—such as qualified immunity—that "preclude *or severely limit the damage remedy*." *Id.* (quoting H.R. Rep. 94-1558, at 9). Qualified immunity "let[s] public officials duck consequences for bad behavior" so "long as they were the *first* to behave badly." *Zadeh v. Robinson*, 928 F.3d 457, 479 (5th Cir. 2019) (Willett, J., concurring dubitante). That "yes harm, no foul" reasoning "leaves victims violated but not vindicated." *Id.* So "awarding counsel fees to prevailing plaintiffs in such litigation" is "necessary if Federal civil and constitutional rights are to be adequately protected." *City of Riverside*, 477 U.S. at 577 (quoting H.R. Rep. 94-1558, at 9).

### D. To avoid hollowing out section 1983, defendants can recover attorney's fees in only the most extreme cases.

Precisely because Congress enacted section 1988 to allow plaintiffs to vindicate their civil rights, defendants—in almost all cases—cannot recover attorney's fees. "[P]rivate attorneys generals should not be deterred from bringing good faith actions to vindicate the fundamental

14

rights here involved by the prospect of having to pay their opponent's counsel fees should they lose." 1976 U.S.C.C.A.N. at 5912. Granting attorney's fees to defendants thus implicates "quite different equitable considerations." *Fox*, 563 U.S. at 833. Routinely granting such fees "would substantially add to the risks inhering in most litigation and would undercut the efforts of Congress to promote the vigorous enforcement of the provisions of [section 1983]." *Hughes v. Rowe*, 449 U.S. 5, 15 (1980).

Defendants can recover attorney's fees "*only*" when the defendants prove that the plaintiff brought a "clearly frivolous, vexatious," or "harass[ing]" suit. 1976 U.S.C.C.A.N. at 5912 (emphasis added); *accord Hughes*, 449 U.S. at 14 (defendants can recover attorney's fees "only if the District Court finds that the plaintiff's action was frivolous, unreasonable, or without foundation." (cleaned up)). This "stringent standard" means the plaintiff's suit must be "groundless or without foundation." *Hughes*, 449 U.S. at 14; *accord Williams v. City of Carl Junction*, 523 F.3d 841, 843 (8th Cir. 2008) ("A prevailing defendant, however, is entitled to attorney's fees only in very narrow circumstances." (cleaned up)). As the Supreme Court has "admoni[shed]," courts must "avoid post hoc reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation." *Williams*, 523 F.3d at 843 (cleaned up).

Appellate Case: 23-1374   Page: 24   Date Filed: 05/19/2023 Entry ID: 5279148

**E.** ***Amici* well know that awards of attorney's fees to defendants will chill civil rights litigation, stagnate the development of the law, and frustrate the goals of section 1983.**

*Amici* regularly advocate on behalf of civil rights plaintiffs and their interests. These plaintiffs would hesitate to file suit if the district court's uncritical award of attorney's fees here went unchecked. As Congress and the Supreme Court have identified, civil rights plaintiffs often do not have resources to bring a case themselves, *supra* Section I.B–C, let alone pay attorneys for the government. That's especially true in the case of two classes of people *amici* frequently represent or advocate for: students and parents.

High school and college students generally have little to no income and only attend their institutions for a fixed duration. The prospect of a large fee award against them—one which they likely could not pay—will deter them from bringing suit in the first place. But, as the large body of First Amendment student speech case law attests, schools and universities regularly act unconstitutionally. *E.g.*, *Turning Point USA at Ark. State Univ. v. Rhodes*, 973 F.3d 868, 879–81 (8th Cir. 2020) (holding university policy violated First Amendment but granting qualified immunity); *Gerlich v. Leath*, 861 F.3d 697, 704–09 (8th Cir. 2017) (holding university policy violated student group's First Amendment rights and denying qualified immunity). Civil rights litigation is often students' only avenue to force changes in their schools' unconstitutional

Appellate Case: 23-1374     Page: 25     Date Filed: 05/19/2023 Entry ID: 5279148

policies. *See, e.g.*, *Flores v. Bennett*, 2022 WL 9459604, at \*17 (E.D. Cal. Oct. 14, 2022) (granting preliminary injunction to stop college's content-based ban on student group's flyers); *Shaw v. Burke*, 2018 WL 459661, at \*6–10 (C.D. Cal. Jan. 17, 2018) (finding college's "free speech zones," as alleged, restricted students' free expression in violation of the First Amendment). Given their limited stay on campus, students may prefer to avoid conflict and allow constitutional violations to go unremedied over fears of incurring thousands—or hundreds of thousands, as here—of dollars to pay attorneys for the other side.

What's more, students often challenge unconstitutional school and university action and policies that inflict real injury but for which damages are low. *E.g.*, *Tinker v. Des Moines Ind. Cmty. Sch. Dist.*, 393 U.S. 503, 504 (1969) (seeking injunction against school discipline and nominal damages). Free speech and other constitutional injury generally is "not readily reducible to a sum of money." *Lowry ex rel. Crow v. Watson Chapel Sch. Dist.*, 540 F.3d 752, 765 (8th Cir. 2008). But "[d]eterring meritorious lawsuits on constitutional issues because they offer a small likelihood of a significant money judgment presents as grave a danger to our legal system as frivolous litigation." *Koopman v. Water Dist. No. 1*, 41 F.3d 1417, 1421 (10th Cir. 1994). The district court's decision here sends the message that students do not have much to gain from challenging unconstitutional policies, but they have a lot to lose. And that will make them all the more hesitant to stand up for civil liberties.

17

Large potential attorney's fees liability will also discourage parents from bringing suit to vindicate their and their children's rights in education. Parents file suit on behalf of their children because they do not want their children to receive discipline from the school or "be deprived of the benefits of the . . . public school system." *Barnette v. W.V. State Bd. of Educ.*, 47 F. Supp. 251, 252 (S.D.W.V. 1942). They often cannot afford the "great expense" associated with private school. *Id.* Nor could those parents afford the risk of having to pay six figures in attorney's fees. But that litigation has achieved exactly what Congress envisioned with section 1983: opening the federal courts to vindicate constitutional rights. *Supra* Section I.A; *W.V. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

Routinely awarding defendants large sums in attorney's fees will also stagnate the law. For example, in 1940, the Supreme Court upheld a public-school policy requiring students to salute the flag that had been challenged by Jehovah's Witnesses on First Amendment grounds. *See Minersville Sch. Dist. v. Gobitis*, 310 U.S. 586, 591 (1940). In reliance on *Gobitis*, West Virginia's state board of education adopted a policy requiring all public-school students and teachers to salute the flag. *Barnette*, 319 U.S. at 626. Regardless of *Gobitis*, Jehovah's Witnesses' sincerely held religious beliefs prohibited them from saluting the flag, so they had no option but to file suit to enjoin the law—or suffer expulsion,

18

transfer to "reformatories maintained for criminally inclined juveniles," and criminal prosecution. *Id.* at 629–30.

Given *Gobitis*, the *Barnette* plaintiffs' claims could be seen as futile—if not frivolous. But those who suffered from compelled speech understood that the "very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials." *Id.* at 638. They continued to litigate what they knew to be meritorious claims, which only three years later, prompted the Court to overrule *Gobitis* and pen one of its most celebrated lines: "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Id.* at 642. The threat of having to pay for the government's attorneys in these cases would have discouraged many from litigating such claims. It would have left their injuries—and the correct interpretation of the First Amendment—unvindicated. Not only those injured, but the whole Nation, would continue to suffer from unremedied constitutional wrongs. *See City of Riverside*, 477 U.S. at 575.

Finally, awarding defendants attorney's fees in civil rights cases does not help federal district courts in recruiting attorneys in private practice to represent prisoners in Section 1983 cases. Although prisoners are largely judgment-proof, the prospects of such awards present an additional disincentive for law firms to allow attorneys to take on such

assignments. Most, if not all, federal courts face challenges in obtaining counsel for prisoners who bring section 1983 claims. Not only does representation by counsel benefit the prisoner-plaintiff, but it also makes analyzing and adjudicating such claims more efficient for courts than when they are brought pro se.

## II. Plaintiffs' claims to a First Amendment injury were not frivolous.

In light of the stringent standard that must be met before awarding fees to a government defendant, it was incumbent on the district court to ensure Plaintiffs' case fit the narrow circumstances justifying such an extraordinary approach. The delicacy of threading that needle was compounded by the nature of Plaintiffs' claims, which sounded in speech on a matter of conscience. Such claims are straightforward to plead and prove and do not require economic injury. In the ordinary course of events infringement or compulsion of speech—especially where the speech had political overtones—would trigger strict scrutiny. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010). But the district court skipped the scrutiny issue altogether by applying the political questions doctrine.

### A. Plaintiffs provided evidence of non-frivolous First Amendment injury.

Plaintiffs compiled detailed facts sufficient to support non-frivolous claims for First Amendment injury. Whatever the ultimate merits decision, applying the protective standard applicable to First

Amendment claims, Defendants have not met their burden to "provide[ ] a basis for well-supported findings that the suit is frivolous, unfounded, and vexatiously brought and pursued." *Davis v. City of Charleston*, 917 F.2d 1502, 1505 (8th Cir. 1990) (cleaned up).

When government seeks to silence or compel speech based on viewpoint, redressable injury does not require lengthy or consistent deprivation. *See United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973) ("small" injury or "identifiable trifle is enough" to establish standing). Any First Amendment deprivation is serious, even if it's fleeting: The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v Burns*, 427 U.S. 347, 373 (1976). Nor is it necessary for a speaker to both obey *and* defy government demands to show infringement. Rather, the Supreme Court has identified two standards for injury: the "person of ordinary firmness" standard which requires the plaintiff to be at least as brave or defiant as a person of ordinary firmness; or the completed adverse action standard which finds injury where the plaintiff has already been silenced. *Houston Cmty. Coll. Sys. v. Wilson*, 142 S. Ct. 1253, 1261 (2022).

Here, the district court required Plaintiffs to demonstrate both strength and weakness by completely capitulating in some circumstances, App. 5312; R. Doc. 88, at 7 (highlighting examples of Plaintiffs speaking in opposition to pressure as demonstrating lack of

21

injury from being silenced), and exerting sufficient "firmness" to resist being compelled to agree in other circumstances, App. 5318; R. Doc. 88, at 13; App. 14–15; R. Doc. 1, at 14–15 (highlighting Plaintiffs' consistent compliance with prompts after being told not to disagree as demonstrating no injury). Under either standard, the compelled speech claims here are not frivolous. *See, e.g.*, *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463–64 (2018) ("Compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command, and in most contexts, any such effort would be universally condemned."). The Constitution does not give government a pass on speech infringement unless plaintiffs demonstrate both consistent defiance and actual capitulation.

Moreover, section 1983 claims for nominal damages or equitable relief are commonplace and appropriate with or without a claim for compensatory damages. For example, in *Carey v. Piphus*, students who were suspended from school filed suit under section 1983 alleging violation of their due process rights. 435 U.S. 247, 249–50 (1978). Both students sought declaratory and injunctive relief as well as actual and punitive damages. *Id*. The question presented to the Supreme Court was whether the plaintiffs needed to prove actual injury to obtain substantial damages under section 1983. The Court held that they did; but, consistent with the common law's traditional vindication of deprivation of certain absolute rights by the award of nominal damages, the Court

further held that "the denial of procedural due process should be actionable for nominal damages without proof of actual injury." *Id*. at 266.

Similarly, in *Memphis Community School District v. Stachura*, the plaintiff alleged that his suspension as a schoolteacher deprived him of liberty and property without due process of law and violated his First Amendment right to academic freedom. He sought compensatory and punitive damages under section 1983 for those constitutional violations. 477 U.S. 299, 301–02 (1986). The Court affirmed the holding in *Carey* that compensatory damages are available for actual losses under section 1983, *Id*. at 308, and that nominal damages are "the appropriate means of 'vindicating' rights whose deprivation has not caused actual, provable injury." *Id*. at n.11. And, in *Uzuegbunam*, the Court held a "request for nominal damages satisfies the redressability element of standing where a plaintiff's claim is based on a completed violation of a legal right." 141 S. Ct. at 802. Here, Plaintiffs covered all the bases.

## B. Protected political speech and political questions are not the same thing.

The district court awarded fees based on its interpretation of Plaintiffs' claims as a "frivolous political disagreement" that "attempted to drag Defendants into a political dispute rather than seek remedy for a genuine harm" and "trivialized the important work of the federal judiciary." App. 5512; R. Doc. 107, at 3. To reach this conclusion the court

Appellate Case: 23-1374   Page: 32   Date Filed: 05/19/2023 Entry ID: 5279148

confused political speech with non-justiciable political questions. App. 5309; R. Doc. 88, at 4 ("The injury-in-fact requirement allows courts to avoid becoming involved in disputes of a political nature, unnecessarily injecting the judicial branch into politicized controversies."). Confounding political speech with political questions dropped the standard of review from the most protective to not protected at all.

Political speech is among the most protected categories of speech and "must prevail against laws that would suppress it, whether by design or inadvertence." *Citizens United*, 558 U.S. at 340. Laws that burden political speech are "subject to strict scrutiny," requiring the Government to prove that the restriction "furthers a compelling interest and is narrowly tailored to achieve that interest." *Id*.

A political question, by contrast, involves "a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it." *Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012) (citations omitted). Unsurprisingly, non-judiciable political questions are rare and comprise issues such as: recognition of foreign governments; duration of hostilities; and calling forth the militia—questions that are committed to the political branches. *Baker v. Carr*, 369 U.S. 186, 211–13 (1962). The private rights of individuals or other "claims of constitutional deprivation which are amenable to judicial correction" are not non-justiciable political questions. *Id*. at 229.

Appellate Case: 23-1374      Page: 33      Date Filed: 05/19/2023 Entry ID: 5279148

The difference in treatment between infringement of political speech and political questions could not be starker. Courts strictly scrutinize the infringement of political speech and do not scrutinize political questions at all because they are wholly outside their jurisdiction.

Here the district court equated adjudication of compelled political expression with "injecting the court into politicized controversies." This is like equating pineapples with pine trees—the same prefix does not make them the same. Whether a controversy is politicized is a different question from whether resolution is committed to a different political branch. Here, Plaintiffs asserted individual harm under the First Amendment and sought equitable and legal relief. That claim is squarely and exclusively within the jurisdiction of the court—as granted by Congress in section 1983—without reference to how the court feels about the underlying topic. The district court could have and should have ruled on the speech infringement allegations. There was no need for it to venture into the policy merits of the school district's policies or the best use of taxpayer funds.

**C.    The district court's ruling here is especially troubling because it granted the fee request without analyzing the reasonableness of the request in the context of the case.**

The district court's award of $312,869.50 in attorneys' fees is particularly troubling given the court's dismissive treatment of Plaintiffs'

claims and lack of scrutiny of the fee request. Fees were awarded at the full amount requested without consideration of whether the request was appropriate for the complexity of the case or whether the hours billed were commensurate with claims the district court characterized as wholly frivolous and showing a "total lack of injury." App. 5330; R. Doc. 88, at 25; App. 5510; R. Doc. 107, at 1.

If the district court were correct in its conclusions that there was *no* factual or legal basis for the case, then what would justify awarding fees for 1,538.6 hours of work? No motion to dismiss was filed in this case, strongly suggesting Defendants did not view the claims—at least at the outset—as frivolous; and even the district court's *sua sponte* striking of paragraphs 4, 5, 9, and 23 of the Complaint as "purely political advocacy" did not even hint that Plaintiffs had failed to state a claim or spur Defendants to move to dismiss. R. Doc. 30, at 1–2.

But it must be one way or the other—either the case was a slam dunk that would not justify the hours request, or the hours request was justified by something about the claims made and the discovery needed to resolve the case. Either way, at a minimum, the district court should have performed more than a bare-bones lodestar analysis before taking the unusual step of awarding government defendants hundreds of thousands of dollars in attorney fees.

The Supreme Court has identified the lodestar approach as the "guiding light" in the Court's fee-shifting jurisprudence to address just

these kind of questions. *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551 (2010). In this Circuit, "the district court must calculate the lodestar," which multiplies the number of hours reasonably expended by reasonable hourly rates, as the starting point for determining attorney's fees. *Vines v. Welspun Pipes Inc.*, 9 F.4th 849, 856 (8th Cir. 2021). This approach in intended to assure that a fee award is "sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case." *Kenny A.*, 559 U.S. at 552.

Here, of course, there was no question of inducing an attorney to undertake representation because payment did not hinge on a fee award. It was thus even more important that any fee award be reasonable to avoid being punitive. But the district court never performed the lodestar analysis required to ensure that a section 1988 fee award was reasonable. Instead, the district court noted extensive discovery and "significant time . . . spent preparing dispositive motions." App. 5513; R. Doc. 107, at 4. Again, if there was no factual support, no disputed facts, and no viable legal theory, what would justify that magnitude of effort? Moreover, the court declared that "even if [P]laintiffs could demonstrate injury-in-fact," the "court would enter summary judgment on behalf of Defendants"— presumably because the court also found the legal theory frivolous. App. 5330; R. Doc. 88, at 15. The district court's unbending characterization of Plaintiffs' political speech as non-justiciable would seem to indicate that

27

some scrutiny of time-spent was in order. At a minimum, that question should have been asked and the required analysis performed.

This apparent contradiction demonstrates why courts examine fee requests under the proper framework. *Kenny A.*, 559 U.S. at 566 ("the lodestar includes most, if not all, of the relevant factors constituting a reasonable attorney's fee.") (cleaned up). The most logical conclusion here is that Plaintiffs demonstrated injury and presented non-frivolous legal theories. Otherwise, the district court had no reason to spend nineteen pages weighing the evidence. App. 5311–29; R. Doc. 88, at 6–24.

## CONCLUSION

With section 1983, Congress threw open the doors of federal courts to vindicate constitutional and civil rights. Seeing that some victims of governmental overreach could not afford to vindicate those rights, the legislature extended section 1983's promise by providing for attorney's fees. To avoid hollowing out both section 1983 and section 1988, this Court should reverse the district court's order granting Defendants attorney's fees. If allowed to stand, that order will chill citizens who have suffered constitutional and civil rights violations from seeking remedies in federal court. And that's the exact opposite of what our civil rights legislation mandates.

Appellate Case: 23-1374     Page: 37     Date Filed: 05/19/2023 Entry ID: 5279148

Respectfully submitted this 18th day of May, 2023,

s/ Cynthia Fleming Crawford

John J. Bursch
Tyson C. Langhofer
Mathew W. Hoffmann
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, Virginia 20176
Telephone: (571) 707-4655
jbursch@ADFlegal.org
tlanghofer@ADFlegal.org
mhoffmann@ADFlegal.org

*Attorneys for* Amicus Curiae
*Alliance Defending Freedom*

Donald A. Daugherty, Jr.
DEFENSE OF FREEDOM INSTITUTE
1455 Pennsylvania. Ave., NW
Suite 400
Washington, DC 20004
Telephone: (414) 559-6902
don.daugherty@dfipolicy.org

*Attorney for* Amicus Curiae *Defense of Freedom Institute for Policy Studies*

Cynthia Fleming Crawford
*Counsel of Record*
Casey Mattox
AMERICANS FOR PROSPERITY FOUNDATION
1310 N. Courthouse Road
Arlington, VA 22201
Telephone: (571) 329-2227
ccrawford@afphq.org

*Attorneys for* Amicus Curiae *Americans for Prosperity Foundation*

29

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 29(a)(5) because this brief contains 6,459 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as determined by the word counting feature of the software (Microsoft Office 365) used to prepare this brief.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using 14-point Century Schoolbook.

Pursuant to Local Rule 28A(h)(2), I also certify that this brief has been scanned for viruses utilizing a commercial virus scanning program, Microsoft Defender, and is virus-free.

Dated: May 18, 2023

*s/ Cynthia Fleming Crawford*
Cynthia Fleming Crawford
*Counsel for* Amicus Curiae *Americans for Prosperity Foundation*

Appellate Case: 23-1374    Page: 39    Date Filed: 05/19/2023 Entry ID: 5279148

## CERTIFICATE OF SERVICE

I hereby certify that on May 18, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system, which will send a notification of such filing to all registered users.

*s/ Cynthia Fleming Crawford*
Cynthia Fleming Crawford
Americans for Prosperity Foundation
1310 N. Courthouse Road
Arlington, VA 22201
Telephone: (571) 329-2227
*Counsel for* Amicus Curiae
*Americans for Prosperity Foundation*

Dated: May 18, 2023

Appellate Case: 23-1374     Page: 40     Date Filed: 05/19/2023 Entry ID: 5279148