No. 23-1374, No. 23-1880

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

BROOKE HENDERSON, *et al.*,
*Plaintiff-Appellants,*

v.

SCHOOL DISTRICT OF SPRINGFIELD R-12, *et al.*,
*Defendant-Appellees.*

Appeal from the United States District Court for the Western District of Missouri, The Honorable Douglas Harpool, Case No. 6:21-cv-03219-MDH

**BRIEF FOR THE STATES OF MISSOURI, ARKANSAS, GEORGIA, IDAHO, IOWA, KANSAS, KENTUCKY, MONTANA, NEBRASKA, NORTH DAKOTA, SOUTH CAROLINA, TENNESSEE, TEXAS, UTAH, VIRGINIA, AND WEST VIRGINIA AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF-APPELLANTS AND REVERSAL**

OFFICE OF THE MISSOURI
ATTORNEY GENERAL
Supreme Court Building
P.O. Box 899
Jefferson City, Missouri 65102
Phone: 573-751-8870
Fax: 573-751-0774
Joshua.Divine@ago.mo.gov

ANDREW T. BAILEY
*Attorney General*

Joshua M. Divine, MO 69875
*Solicitor General*
Samuel C. Freedlund, MO 73707
*Assistant Attorney General*

*Attorneys for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ii

STATEMENT OF INTEREST AND INTRODUCTION ..........................1

BACKGROUND ........................................................................................2

    I.  Activists begin to reject Dr. King's vision ........................................2

    II.  Officials at Springfield Public Schools push the growing movement to reject Dr. King's vision. ...............................................8

    III. Lumley and Henderson sue for relief. ............................................11

ARGUMENT ..........................................................................................12

    I.  Lumley and Henderson suffered a cognizable injury when they were forced to choose between 1) advocating certain political views and 2) losing pay and being branded a racist. ......13

    II.  Based on the evidence in the record, the school district violated the First Amendment rights of the school employees. ................................................................................................16

        A.  Lumley and Henderson were unconstitutionally pressured to express favored political views. ............................17

        B.  Lumley and Henderson were unconstitutionally pressured not to speak disfavored political views....................19

        C.  The school district cannot shield itself by noting that its unlawful conduct took place during a "training." ....................23

    III. The district court's heavy financial penalty imposed on Lumley and Henderson was erroneous and threatens to chill parents, teachers, and school staff from exercising their rights .................................................................................................26

CONCLUSION .......................................................................................29

CERTIFICATE OF COMPLIANCE .....................................................31

CERTIFICATE OF SERVICE ...............................................................31

Appellate Case: 23-1374    Page: 2    Date Filed: 05/22/2023 Entry ID: 5279541

# TABLE OF AUTHORITIES

**Cases**            **Page(s)**

*Adarand Constructors, Inc. v. Pena*,
515 U.S. 200 (1995)....................................................6

*Arkansas Times LP v. Waldrip as Tr. of Univ. of Arkansas Bd. of
Trustees*, 37 F.4th 1386 (8th Cir. 2022)................................. 16, 17, 24

*Brown v. Board of Educ.*,
347 U.S. 483 (1954).....................................................20

*Crozier for A.C. v. Westside Community School District*,
973 F.3d 882 (8th Cir. 2020)........................................21, 22

*Faust v. Vilsack*,
519 F. Supp.3d 470 (E.D. Wis. 2021)....................................7

*Frazier v. Bd. of Trs. Of Nw. Miss. Reg'l Med. Ctr.*,
765 F.2d 1278 (5th Cir. 1985)..........................................23

*Hughes v. Rowe*,
449 U.S. 5 (1980) ....................................................27

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,
138 S. Ct. 2448 (2018).................................................24

*Jt. Anti-Fascist Refugee Comm. v. McGrath*,
341 U.S. 123 (1951)...................................................15

*Keene Corp. v. Cass*,
908 F.2d 293 (8th Cir. 1990)...........................................27

*La Liberte v. Reid*,
966 F.3d 79 (2d Cir. 2020) ............................................15

*League of United Latin Am. Citizens v. Perry*,
548 U.S. 399 (2006)....................................................7

*Marquart v. Lodge 837, Int'l Ass'n of Machinists*,
26 F.3d 842 (8th Cir. 1994)............................................26

ii

*Mathis v. Pac. Gas & Elec. Co.,*
 891 F.2d 1429 (9th Cir. 1989) ............................................................. 19

*Norwood v. Harrison,*
 413 U.S. 455 (1973) ............................................................................. 22

*Parents Involved in Community Schools v. Seattle Sch. Dist. No.,*
 *1*, 551 U.S. 701 (2007) ..................................................................... 6, 7

*Perry v. Sindermann,*
 408 U.S. 593 (1972) ............................................................................. 16

*Peterson v. City of Greenville,*
 373 U.S. 244 (1963) ............................................................................. 19

*Plessy v. Ferguson,*
 163 U.S. 537 (1896) ............................................................................. 20

*Reitman v. Mulkey,*
 387 U.S. 369 (1967) ............................................................................. 22

*Republican Party of Minn., Third Cong. Dist. v. Klobuchar,*
 381 F.3d 785 (8th Cir. 2004) ........................................................ 13, 21

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.,*
 487 U.S. 781 (1988) ............................................................................. 19

*S. Mut. Help Ass'n, Inc. v. Califano,*
 574 F.2d 518 (D.C. Cir. 1977) ............................................................ 15

*Schermerhorn v. Rosenberg,*
 426 N.Y.S.2d 274 (N.Y. App. Div. 2d Dept. 1980) .............................. 15

*Schrottman v. Barnicle,*
 437 N.E.2d 205 (Mass. 1982) .............................................................. 15

*Telescope Media Group v. Lucero,*
 936 F.3d 740 (8th Cir. 2019) .............................................................. 13

*Thomas v. Tenneco Packaging Co.,*
 293 F.3d 1306 (11th Cir. 2002) .......................................................... 21

iii

*Vitolo v. Guzman,*
   999 F.3d 353 (6th Cir. 2021)..........................................................7, 28

*Wooley v. Maynard,*
   430 U.S. 705 (1977)....................................................................17, 25

## Other Authorities

*A Pathway to Equitable Math Instruction: Dismantling Racism in
   Mathematics Instruction* (May 2021) ...................................................5

Amar, *America's Unwritten Constitution* (2012) ......................................3

Curry, *Will the Real Crt Please Stand Up? The Dangers of Philosophical
   Contributions to Crt,*
   2 the crit: Critical Stud. J. 1 (2009)..................................................3

Delgado & Stefancic, *Critical Race Theory: An Introduction* (3d ed.
   2017)..............................................................................................6

Kendi, *How to be an Antiracist* (2019) ...................................................4

McCardle, *African American History Museum Publishes Graphic
   Linking 'Rational Linear Thinking,' 'Nuclear Family' to White
   Culture*, National Review Online (July 15, 2020) ...............................4

*Read Martin Luther King Jr.'s 'I Have a Dream' speech in its
   entirety*, NPR (Jan. 16, 2023)..........................................................2

Wildman & Davis, *Language and Silence: Making Systems of Privilege
   Visible*, 35 Santa Clara L. Rev. 881 (1995) .........................................3

York, Twitter Post (July 15, 2020).........................................................4

iv

## STATEMENT OF INTEREST AND INTRODUCTION

The States of Missouri, Arkansas, Georgia, Idaho, Iowa, Kansas, Kentucky, Montana, Nebraska, North Dakota, South Carolina, Tennessee, Texas, Utah, Virginia, and West Virginia have a strong interest in both securing adequate training of government employees and in protecting the First Amendment rights of those employees. As parties responsible for the training of thousands of government employees, *Amici* States are the first to recognize the importance of employers being allowed to conduct employee trainings without micromanaging by courts.

But courts should be involved when, as the record reflects here, a local government goes far beyond what is permitted under the Constitution. Rather than conduct a run-of-the-mill employee training seen every day across the country, the record includes evidence that respondent school district told teachers and staff that they were required to adopt, affirm, and advocate highly controversial viewpoints both at school *and* in all other aspects of their lives. And to compel compliance, the school district threatened to dock pay and brand employees as bigots.

The district court's conclusion that the school employees did not even allege an injury for standing is quite incorrect. Based on this record,

1

the Court should reverse the district court and grant summary judgment to the school employees.[1]

**BACKGROUND**

## I.    Activists begin to reject Dr. King's vision.

On August 28, 1963, in the shadow of the Lincoln Memorial, Dr. Martin Luther King Jr. delivered one of the most iconic speeches in American history. Dr. King spoke of freedom and justice, called on America to "honor[]" her "sacred obligation," and urged all Americans to remember the guarantee of the Declaration of Independence and "the American dream" that all Americans—regardless of the color of their skin—are created equal.[2] Central to his vision was this: that all children "will one day live in a nation where they will not be judged by the color of their skin but by the content of their character."

---

[1] No counsel for a party in this case authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation of this brief.  No person other than amicus curiae made a monetary contribution to the preparation or submission of this brief. Because this brief is submitted by a number of States, no motion or consent of the parties is necessary. F.R.A.P. 29(a)(2).

[2] *Read Martin Luther King Jr.'s 'I Have a Dream' speech in its entirety*, NPR (Jan. 16, 2023), https://www.npr.org/2010/01/18/122701268/i-have-a-dream-speech-in-its-entirety.

Appellate Case: 23-1374     Page: 7     Date Filed: 05/22/2023 Entry ID: 5279541

This speech, along with the tireless efforts of the civil rights movement, inspired monumental legislative changes and a great leap forward in the pursuit of equality for all Americans. As a result of the moving words of Dr. King and others like him, generations of Americans came to embrace the long-overdue conviction that nobody should be treated with disfavor because of skin color. So important to the fabric of this nation is Dr. King's speech that it has been placed on a pedestal with the Constitution itself, as well as the Declaration of Independence. *See* Amar, *America's Unwritten Constitution* 270 (2012) (describing "King's final crowning vision" as "*part* of America's Constitution, rightly understood" (emphasis added)).

Recently, however, a growing number of advocates and organizations have begun to reject Dr. King's "final crowning vision." Many of these advocates teach that certain individuals are, because of their skin color, inherently racist (and thus inherently inferior). *See, e.g.*, Curry, *Will the Real Crt Please Stand Up? The Dangers of Philosophical Contributions to Crt*, 2 the crit: Critical Stud. J. 1, 41 (2009) ("all whites remain racist"); Wildman & Davis, *Language and Silence: Making Systems of Privilege Visible*, 35 Santa Clara L. Rev. 881, 897 (1995)

3

(defining "racist" in a way that ensures that "[a]ll whites are racist in this use of the term"). Many of these advocates expressly *endorse* discrimination on the basis of skin color. Ibram Kendi, a prominent theorist in this area, advocates "treating, considering, or making a distinction in favor *or against* an individual based on that person's race" if that discrimination leads to desired outcomes. Kendi, *How to be an Antiracist* 18–19 (2019) (emphasis added); *see also id.* ("The only remedy to past discrimination is present discrimination. The only remedy to present discrimination is future discrimination.").

According to these groups, abandoning Dr. King's theory does not just mean treating some individuals worse on account of skin color. It also means abandoning widespread cultural commitments about treating people equally that generations of Americans of all races have strived to teach their children. And it means that once-universal values are now deemed racist by these advocates, including "hard work," the "scientific method," "plan[ing] for the future," celebrating holidays like Christmas and Thanksgiving, and even simply "be[ing] polite."[3]

---

[3] https://twitter.com/ByronYork/status/1283372233730203651; *see also* McCardle, *African American History Museum Publishes Graphic Linking 'Rational Linear Thinking,' 'Nuclear Family' to White Culture,*

Appellate Case: 23-1374     Page: 9     Date Filed: 05/22/2023 Entry ID: 5279541

Not even something as objective as mathematics has escaped this philosophy. Indeed, the very idea of "objectivity" is now deemed part of "white supremacy" according to a document funded in part by the Bill and Melinda Gates Foundation and intended to change the way educators teach math. *A Pathway to Equitable Math Instruction: Dismantling Racism in Mathematics Instruction*, 5, 27, 41, 45, 66 (May 2021).[4] Also part of "white supremacy," according to this document, are formerly universal mathematical values such as a focus on "getting the right answer," teaching in a "linear fashion," and teaching students to "show their work." *Id.* at 7.

This once-obscure philosophy has gained steam in the last few years, spreading in academia, Hollywood, the mainstream press, large corporations, and (as this case illustrates) K-12 education. No single term encompasses all of it, but it has been labeled "Critical Race Theory," "antiracism," and "diversity, equity, and inclusion." Advocates under

---

National Review Online (July 15, 2020), https://www.nationalreview.com/news/african-american-history-museum-publishes-graphic-linking-rational-linear-thinking-nuclear-family-to-white-culture/

[4] https://equitablemath.org/wp-content/uploads/sites/2/2020/11/1_STRIDE1.pdf

Appellate Case: 23-1374     Page: 10     Date Filed: 05/22/2023 Entry ID: 5279541

these banners have dismissed Dr. King's vision. Indeed, they have advocated against the idea of neutrality in the law at all. *See, e.g.*, Delgado & Stefancic, *Critical Race Theory: An Introduction* 3 (3d ed. 2017) ("[C]ritical race theory questions the very foundations of the liberal order, including equality theory, legal reasoning, Enlightenment rationalism, and neutral principles of constitutional law.").

One institution in our country, however, largely continues to reject the suggestion that one group of people should be treated worse than others based on the color of their skin: the American legal system. Although it took far too long for America to enact landmark laws like the Reconstruction Amendments and the Civil Rights Act of 1964, and although there is still much room for progress, it is now widely understood that "distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Parents Involved in Community Schools v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 745–46 (2007) (plurality op.) (quoting *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 214 (1995)) (brackets omitted).

6

In just the last two years, activists rejecting Dr. King's vision have pushed their views into federal policy, and courts have not hesitated to strike down those tainted policies as unconstitutional. For example, when Congress passed a law to provide economic relief to businesses harmed during the COVID pandemic, the U.S. Small Business Administration "injected explicit racial and ethnic preferences into the priority process," thus sending individuals "from non-favored racial groups (including whites, some Asians, and most Middle Easterners) to the back of the line." *Vitolo v. Guzman*, 999 F.3d 353, 357, 361 (6th Cir. 2021). The Sixth Circuit declared this "racial gerrymandering" unconstitutional and admonished the federal government that "[i]t is indeed 'a sordid business' to divide 'us up by race.'" *Id.* at 364 (quoting *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 511 (2006) (op. of Roberts, C.J.)); *see also Faust v. Vilsack*, 519 F. Supp.3d 470, 473 (E.D. Wis. 2021) (enjoining USDA officials from implementing a loan-forgiveness program based on racial classifications). Each of these cases is consistent with the Supreme Court's observation, contra Ibram Kendi, that "[t]he way to stop discrimination on the basis of race is to stop

Appellate Case: 23-1374    Page: 12    Date Filed: 05/22/2023 Entry ID: 5279541

discriminating on the basis of race." *Parents Involved in Community Schools*, 551 U.S. at 748 (plurality op.).

## II.   Officials at Springfield Public Schools push the growing movement to reject Dr. King's vision.

As two employees in Missouri public schools recently discovered, this once-obscure vision has spread from academia to public schools in Middle America. Appellants Brooke Henderson and Jennifer Lumley, employees of Springfield Public Schools, have sued the school district after being forced to attend "Equity Training" where staff were pressured to advocate this philosophy.

As part of their employment duties, Henderson and Lumley were required to attend what the school district called "Equity Training" and were expressly told they would be docked pay if they failed to do so. App. 1271, R. Doc. 77, at 3. At these trainings, teachers and staff were told orally or through distributed materials that individuals of one skin color were necessarily inferior to others. The training instructed teachers and staff that "all white people are racist" and that Ms. Lumley "was racist simply because she was white." Add. 9, App. 5312, R. Doc. 88, at 7. Teachers and staff were told that individuals of one skin color inherently

8

have inferior moral status and thus "owe a debt" to everybody else. App. 1271, R. Doc. 77, at 4.

Appellants Lumley and Henderson do not agree with that message. They "believe strongly in equality, and that all individuals should have equal rights and opportunities under the law as set forth in our nation's founding documents and our civil rights laws." App. 1270, R. Doc. 77, at 2. They believe that "individuals should not be judged or assigned moral characteristics based on skin color," and they use the term "colorblind" to refer to this belief. App. 1270, R. Doc. 77, at 2. As religious Americans, they also believe "that we all have equal worth based on our status as God's creation, and that our value is not found in superficial characteristics like race and sex." App. 1270, R. Doc. 77, at 2. And they "reject the ideas that America is fundamentally racist or is divided into classes based on skin color or that skin color designates you as either privileged oppressors or oppressed." App. 1270, R. Doc. 77, at 2.

But although Lumley and Henderson disagreed with the school district's views, they were not allowed to disagree quietly. Through the training and training materials, teachers and staff were told that their "work and job responsibilities" now included advocating and being

9

"champions" for these ideas. App. 1271, 1276, R. Doc. 77, at 3, 8. Their "work and job responsibilities" included being "anti-racist," which the training defined as "advocating for changes in political, economic, and social life." App. 1271, 1277, R. Doc. 77, at 3, 9. The trainings stressed that the "most important thing" for teachers and staff to remember was that they had to be "proactive" and "no longer remain silent." App. 1284, R. Doc. 77, at 16.

SPS also made clear that anyone who *did* remain silent or disagreed with these views would be branded a racist and possibly docked pay. The school district made clear that it considered "silence" equivalent to "white supremacy." App. 1276, 1278–79, 1281, R. Doc. 77, at 8, 10–11, 13. Similarly, teachers and staff were told that expressing support for legal colorblindness or the belief that "all lives matter," or denying that any race "owes a debt" to others, was tantamount to racism. App. 1274, 1281, R. Doc. 77, at 6, 13. Teachers and staff were also told that told they would be "asked to leave" (and thus lose pay) if they were not "professional." App. 1277, R. Doc. 77, at 9. And because nothing could be less professional than being racist, employees understood that they might

10

lose pay based on what they said or did not say. App. 1308, R. Doc. 77, at 40.

These instructions caused teachers and staff to self-censor their own views and even express views with which they disagreed. When Lumley initially expressed disagreement with the "antiracism" principles, her "coworkers berated her." Add. 10, App. 5313, R. Doc. 88, at 8. That caused her to "shut down" and stop expressing her true views. App. 1282, R. Doc. 77, at 14. Henderson likewise decided not to "express her disagreement" out of fear "that if she voiced her true views, she would be corrected or considered unprofessional" and possibly docked pay. App. 1277, 1284, R. Doc. 77, at 9, 16. Indeed, when asked to respond to specific questions in an online portion of the training, Henderson expressed views contrary to her personal beliefs because she was worried about how her employer would respond if she answered truthfully. App. 1287–1289, R. Doc. 77, at 19–21.

## III. Lumley and Henderson sue for relief.

Lumley and Henderson turned to the court system to protect their fundamental First Amendment rights. This did not provide them relief. Not only did the district court conclude Lumley and Henderson were not

Appellate Case: 23-1374    Page: 16    Date Filed: 05/22/2023 Entry ID: 5279541

injured by being compelled to express SPS' political ideology over their own, the district court ultimately imposed hundreds of thousands of dollars of costs and fees on Lumley and Henderson after concluding that their attempt to protect their First Amendment rights was "frivolous."

## ARGUMENT

Nobody disputes that public school districts, like other government agencies, have authority to require their employees to go through training programs. *Amici* States conduct these kinds of trainings all the time, and have a strong interest in preventing employees from suing over training programs simply because they do not like the content of those programs.

But that is not this case here. The evidence in the record reveals a "training" that went well beyond the scope of what the Constitution permits. Teachers and staff were informed that their job duties included "advocating for changes in political, economic, and social life"; that they had to advocate certain political views with which the plaintiffs disagreed; and that if they did not, they would be branded racists and potentially docked pay. The training exceeded the scope of the plaintiffs' official duties and harmed them by forcing them to self-censor their true

12

thoughts and express views they did not hold or else suffer reputational and economic harm.

The district court was wrong to dismiss the suit on standing grounds and wrong to award attorney's fees against the plaintiffs.

## I. Lumley and Henderson suffered a cognizable injury when they were forced to choose between 1) advocating certain political views and 2) losing pay and being branded a racist.

The district court wrongly determined that Lumley and Henderson failed to establish any injury in fact. To establish an injury from an alleged First Amendment violation, a plaintiff must simply demonstrate a "credible threat of enforcement" or imposition of penalties should they speak or refuse to speak. *Telescope Media Group v. Lucero*, 936 F.3d 740, 750 (8th Cir. 2019). "[A]ctual injury can exist for standing purposes even if the plaintiff has not engaged in the prohibited expression as long as the plaintiff is objectively reasonably chilled from exercising [her] First Amendment right to free expression in order to avoid" the consequences of exercising her First Amendment rights. *Republican Party of Minn., Third Cong. Dist. v. Klobuchar*, 381 F.3d 785, 792 (8th Cir. 2004). Lumley and Henderson easily met this burden for two reasons.

13

First, Lumley and Henderson were threatened with a loss in pay if they did not advocate certain positions or refrain from advocating others. There is no dispute that teachers and staff had to attend the "trainings" to earn pay. Indeed, SPS refused to pay five employees who failed to attend the equity training. App. 2531, R. Doc. 78, at 19. The district court thought that pay was tied only to attendance and that "no evidence suggests" any employee would have been docked pay based on her decision to speak or not speak. Add. 11, App. 5314, R. Doc. 88, at 9 n.2. But in fact, the school district informed Lumley and Henderson that they would be "asked to leave with no credit" if they were not "professional." App. 1277, R. Doc. 77, at 9. And the training materials instructed Lumley and Henderson that the *only* way to be "professional" was to advocate the school district's favored positions.

SPS made clear that the school district would brand employees as racists if they expressed disfavored views or failed to express favored views. SPS told employees that "silence" itself was "white supremacy," as was expressing the view that the Constitution is colorblind. App. 1274, 1276, 1278, 1281, R. Doc. 77, at 6, 8, 10, 13. Racism, of course, is despicable, and any person who utters a racist statement is certainly *not*

14

"professional." A reasonable fact finder could thus conclude that employees would be docked pay if they remained silent or expressed disfavored views. Henderson and Lumley certainly interpreted things this way. App. 1308, R. Doc. 77, at 40.

Second, the school district's threat to brand Henderson and Lumley as racists for their speech or failure to speak also caused injury, independent of any threat to dock pay. Courts have recognized an injury-in-fact where a person's "name and reputation have been damaged," especially in the professional field because "a good reputation is perhaps [a person's] most valuable asset." *S. Mut. Help Ass'n, Inc. v. Califano*, 574 F.2d 518, 524 (D.C. Cir. 1977); *see also Jt. Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 139 (1951) (injury where federal government labeled "organizations as 'Communist'" because the "effect is to cripple the functioning and damage the reputation of those organizations"). Given the sordid history of racism in this country, an accusation of racism or that a person has made a racist statement can be extraordinarily damaging to a person's reputation. *See, e.g., Schrottman v. Barnicle*, 437 N.E.2d 205, 214 (Mass. 1982) (defamation in certain circumstances for claiming a person made a racist statement); *Schermerhorn v. Rosenberg*,

426 N.Y.S.2d 274 (N.Y. App. Div. 2d Dept. 1980) (same); *La Liberte v. Reid*, 966 F.3d 79, 93 (2d Cir. 2020) (triable issue of defamation when media personality juxtaposed an individual with a photo of a racist from the 1950s). Henderson and Lumley presented evidence that they expressed the school district's favored views and refrained from expressing disfavored views because they were worried that the school district would brand them racists. App. 1308, R. Doc. 77, at 40.

The district court was wrong to disregard these substantial injuries. Threats of loss of pay and of being branded with an odious scarlet letter are more than enough to establish injury in fact here.

## II. Based on the evidence in the record, the school district violated the First Amendment rights of the school employees.

The facts in the record entitle Lumley and Henderson to summary judgment on their First Amendment claims. The broad protections of the First Amendment "don't just prevent outright prohibitions on speech; they also prohibit the government from imposing unconstitutional conditions that chill or deter speech." *Arkansas Times LP v. Waldrip as Tr. of Univ. of Arkansas Bd. of Trustees*, 37 F.4th 1386, 1391 (8th Cir. 2022) (citing *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)). "The

16

government imposes an unconstitutional condition when it requires someone to give up a constitutional right in exchange for a government benefit," including "making government benefits contingent on endorsing a particular message or agreeing not to engage in protected speech." *Id.* (internal citations omitted). Lumley and Henderson established both that they were unconstitutionally pressured to speak favored viewpoints and that they were unconstitutionally pressured not to speak disfavored viewpoints.

## A. Lumley and Henderson were unconstitutionally pressured to express favored political views.

It is axiomatic "that the right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). The right of an individual to refrain from expressing the government's preferred message is a fundamental liberty, as "[t]he First Amendment protects the rights of individuals to hold a point of view different from the majority and to refuse to foster . . . an idea they find morally objectionable." *Id.* at 715. According to the evidence in the record, SPS violated this fundamental liberty.

Appellate Case: 23-1374    Page: 22    Date Filed: 05/22/2023 Entry ID: 5279541

From start to finish, SPS engaged in an unconstitutional pressure campaign to induce teachers and employees to advocate favored political views. Throughout the process of mandatory "Equity Training," SPS instructed Lumley and Henderson that they "must commit to" its views on "equity" and "anti-racism." App. 1277, R. Doc. 77, at 9. Teachers and employees had to commit to becoming "champions" of "anti-racism," which was defined as "advocating for changes in political, economic, and social life"—that is, all aspects of a person's life, not just her time at work. App. 1271, 1277, R. Doc. 77, at 3, 9. And critically, SPS made it clear that no one could "champion" these ideas quietly. "Silence," the school district said, was tantamount to "white supremacy." App. 1276, 1278–79, 1281, R. Doc. 77, at 8, 10–11, 13.

The district court downplayed these issues as mere "[e]ncouragement to follow general principles of equity and anti-racism" without any "incentive or disincentive to actually express a specific message." Add. 12, App. 5315, R. Doc. 88, at 7. Not so. SPS said participation was mandatory—on pain of financial and professional punishment. And by branding silence as "white supremacy" and stating that staff "must commit" to certain values, the school district made clear

18

that participants had to speak up and affirmatively adopt certain views or risk having their pay docked for being "unprofessional." App. 1271, 1277, R. Doc. 77, at 3, 9. SPS thus backed up its requirements with both hard and soft pressure.

No stronger is the district court's suggestion that the plaintiffs could not have been improperly pressured to speak because one plaintiff expressed her own views at one point. Add. 9, App. 5312, R. Doc. 88, at 7. The Constitution forbids trying to impose penalties on silence. Unlawful pressure is not cured simply because the victims resist. *Peterson v. City of Greenville*, 373 U.S. 244, 248 (1963); *Mathis v. Pac. Gas & Elec. Co.*, 891 F.2d 1429, 1434 (9th Cir. 1989). In any event, Henderson *did* provide the responses that she understood the school district to be demanding, rather than the responses she believed, in the online portion of the training. App. 1287–89, R. Doc. 77, at 19–21.

## B. Lumley and Henderson were unconstitutionally pressured not to speak disfavored political views.

A government action, statement, or policy that unduly "chill[s] speech" is "in direct contravention of the First Amendment's dictates." *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 794 (1988). On the summary judgment record, the school district also

19

imposed substantial unlawful pressure to prevent Lumley and Henderson from speaking. Worse, this pressure was successful.

Here, too, the school district used the same playbook: silence dissenting voices by threatening ahead of time to withhold pay and brand dissenters racists, ruining their professional reputations. The school district made clear that a laundry list of ideas were forbidden unless a person wanted to be labeled as a "white supremacist." App. 1271, 1277, 1281–82, R. Doc. 77, at 3, 9, 13–14.

In a twist of irony, the school district even made clear that it would label teachers and employees racist for agreeing with Supreme Court justices who are famous for their opposition to racial discrimination. Staff were told they would be branded "white supremacists" if they professed a favorable view toward "colorblindness." App. 1274, 1281, R. Doc. 77, at 6, 13. But colorblindness was advanced by Justice Harlan, the "Great Dissenter," in his famous lone dissent against the pernicious "separate-but-equal" doctrine: "Our constitution is color-blind, and neither knows nor tolerates classes among citizens." *Plessy v. Ferguson*, 163 U.S. 537, 559 (1896) (Harlan, J., dis.). That view was also advanced by future Supreme Court Justice Thurgood Marshall on behalf of the NAACP when

Marshall successfully convinced the Supreme Court to overturn *Plessy*. Brief for Appellants in Nos. 1, 2, and 4 and for Respondents in No. 10 on Reargument at 41, *Brown v. Board of Educ.*, 347 U.S. 483 (1954). Yet according to the school district, expressing this view is unacceptable.

Given the sordid history of racism in this country, "the implications of being labeled racist" can lead to "huge reputational costs." *Thomas v. Tenneco Packaging Co.*, 293 F.3d 1306, 1330 (11th Cir. 2002). That is because "individuals take allegations of racism very seriously." *Id.* No one wants to risk being branded a racist, especially in a professional and educational setting. As this Court has noted, being "falsely label[ed] . . . as a racist" can result in "stress, anxiety and ostracization" sufficient to potentially give rise to a First Amendment claim. *Crozier for A.C. v. Westside Community School District*, 973 F.3d 882, 891 (8th Cir. 2020). Unquestionably, an employer labeling certain beliefs as "white supremacy" would reasonably chill an employee from expressing those beliefs. *Republican Party of Minn.*, 381 F.3d at 792.

The district court failed to properly consider this threat of opprobrium. Indeed, both Lumley and Henderson censored themselves in response to these threats. App. 1281–84, R. Doc. 77, at 13–16. And the

Appellate Case: 23-1374    Page: 26    Date Filed: 05/22/2023 Entry ID: 5279541

district court did not dispute that after Lumley expressed some views declared anathema by the school district, her "coworkers berated her." Add. 10, App. 5313, R. Doc. 88, at 8.

That Lumley was berated by her coworkers and not her employer makes no difference here. The district court thought it significant that the school district officials did not themselves "call Plaintiffs or other employees white supremacists." Add. 14, App. 5317, R. Doc. 88, at 12. But the school district marched the ball 99 yards down that field. The school district did not need to specifically declare that *Plaintiffs* were white supremacists. It was more than enough for the school district to brand people *like* Plaintiffs as racists. Once the school district did so, it was entirely foreseeable Lumley and Henderson would experience professional ostracism from coworkers. *Crozier*, 973 F.3d at 891.

The government is still liable for "significant encouragement" when third parties—at the backing of the government—ostracize people for their speech. A "state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973). Under this standard, government conduct need not be the but-for cause of

22

censorship. Rather, the government acts unconstitutionally in some circumstances even when it "can be charted with only encouraging, rather than commanding" improper conduct. *Reitman v. Mulkey*, 387 U.S. 369, 375 (1967) (quotation marks omitted); *accord Frazier v. Bd. of Trs. Of Nw. Miss. Reg'l Med. Ctr.*, 765 F.2d 1278, 1286 (5th Cir. 1985) (government is responsible for private conduct that it "had some affirmative role, albeit one of encouragement short of compulsion," in promoting), *amended on other grounds*, 777 F.2d 329 (5th Cir. 1985) (Mem.). Even if SPS did not directly censor Lumley and Henderson's speech, it significantly encouraged its employees to compel them into silence when SPS took steps to brand them racists.

### C. The school district cannot shield itself by noting that its unlawful conduct took place during a "training."

As governments responsible for the annual training of thousands of people every year, *Amici* States are the first to recognize the importance of allowing governments to conduct trainings without micromanagement by courts every time an employee dislikes the content of a governmental training. But according to the record here, SPS far exceeded the scope of any legitimate government training of employees.

23

"The government imposes an unconstitutional condition when it requires someone to give up a constitutional right in exchange for a government benefit," including "making government benefits contingent on endorsing a particular message or agreeing not to engage in protected speech." *Arkansas Times*, 37 F.4th at 1391 (internal citations omitted). In the employment context, this occurs when government seeks to compel speech (or quash speech) that is unrelated to the employees' official duties, for outside the context of official duties, "it is not easy to imagine a situation in which a public employer has a legitimate need to demand that its employees recite words with which they disagree." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2473 (2018).

The scope of the "training" here was not reasonably limited to the employees' official duties. Just the opposite. Although SPS characterized this "training" as "personal and professional development," it stated that it expected teachers and employees to "advocate[] for changes in *political, economic, and social life.*" App. 2577–78, R. Doc. 78, at 65–66; App. 1291, R. Doc. 77, at 23–24 (emphasis added). SPS cannot evade judicial

24

scrutiny simply by defining the scope of its employees' duties to include every aspect of their lives.

A ruling in favor of plaintiffs here would in no way artificially constrain governments from conducting necessary training that is in fact within the scope of employment. School districts and other agencies may instruct their employees on the positions that the agencies have decided to take—even when those positions are controversial. But what they cannot do is compel individuals to affirmatively speak up and agree with those controversial positions in all "political, economic, and social" aspects of life.

Consider, for example, if a school district wanted to train its staff on the policy the district adopted to prevent gun violence. And suppose the policy was in line with the recommendations of a political organization such as the NRA or the Brady Campaign. The school district could certainly instruct its teachers and staff about the policy the district was implementing. What it could not do is force its employees—on pain of loss of pay or ostracism—to "advocate" that position in all aspects of their "political, economic, and social life."

Appellate Case: 23-1374    Page: 30    Date Filed: 05/22/2023 Entry ID: 5279541

"[W]here the State's interest is to disseminate an ideology, no matter how acceptable to some, such interest cannot outweigh an individual's First Amendment right to avoid becoming the courier for such message." *Wooley*, 430 U.S. at 716. SPS compelled Lumley and Henderson, under threat of financial and professional penalties, to consent to and disseminate SPS' chosen ideology of categorizing people by the color of their skin rather than the contents of their character. App. 1271–72, 1276, R. Doc. 77, at 3–4, 8. No matter how strongly SPS believes in its message, it may not demand Lumley and Henderson support it.

## III. The district court's heavy financial penalty imposed on Lumley and Henderson was erroneous and threatens to chill parents, teachers, and school staff from exercising their rights.

As established above, the plaintiffs' claim here is more than colorable; it is compelling. Yet the district court held that Lumley and Henderson's belief that they were injured by being compelled to conform to SPS' ideology was so unsupported by the record as to be "frivolous." The district court thus awarded the school district hundreds of thousands of dollars in costs and attorneys' fees. That decision was both incorrect and risks chilling future civil rights plaintiffs, such as parents exercising their rights to direct the education of their children.

26

A defendant in a 1983 claim "is entitled to attorney's fees only in very narrow circumstances." *Marquart v. Lodge 837, Int'l Ass'n of Machinists*, 26 F.3d 842, 848 (8th Cir. 1994) (internal citation and quotation marks omitted) (abrogated on other grounds). These "very narrow circumstances" dictate that "[a] plaintiff should not be assessed his opponent's attorney's fees" unless the district court "finds that his claim was frivolous, unreasonable, or that the plaintiff continued to litigate after it clearly became so." *Hughes v. Rowe*, 449 U.S. 5, 15 (1980) (per curiam) (internal quotation marks omitted).

Even if the district court's analysis about standing were correct (and it was not), the court's decision to award fees was wrong because binding precedent prohibits awarding attorney's fees where the court dismisses the case for lack of jurisdiction. That is because "section 1988 does not by its terms confer subject matter jurisdiction upon federal courts, but rather relies upon the provisions of other federal statutes, such as section 1983." *Keene Corp. v. Cass*, 908 F.2d 293, 298 (8th Cir. 1990). When, as here, a court dismisses a section 1983 suit for lack of jurisdiction, "[t]hat lack of jurisdiction bar[s] an award of attorneys fees." *Id.* Similarly, a party can receive fees under section 1988 only if it is a

27

"prevailing party," but "[w]here a complaint has been dismissed for lack of subject matter jurisdiction, the defendant has not prevailed over the plaintiff on any issue central to the merits of the litigation." *Id.* (quotation marks omitted) (brackets adopted). Having determined (wrongly) that it lacked jurisdiction, the district court could not then award attorney's fees.

The district court's award of attorney's fees also risks chilling parents, teachers, and school staff from asserting their rights. The once-obscure philosophy pressed here by the school district has been pressed across the country. Quite apart from the First Amendment issue, this philosophy, once put into practice, will very likely violate the legal rights of students and their parents. Already, this philosophy has violated the rights of farmers and business owners. *See Vitolo*, 999 F.3d at 365 (enjoining the federal government's practice of pushing "non-favored racial groups to the back of the line" (parenthetical omitted)). To the extent this philosophy is now or will in the future be used by school districts to treat some students worse than others because of their skin color, parents should not be chilled from pressing their claims.

28

## CONCLUSION

For the foregoing reasons, this Court should reverse both the district court's summary judgment for the school district and the district court' award of attorneys' fees.

May 19, 2023                    Respectfully submitted,

                               **ANDREW T. BAILEY**,
                               Attorney General

                               /s/ *Joshua M. Divine*
                               Joshua M. Divine, 69875MO
                                 Solicitor General
                               Samuel C. Freedlund, 73707MO
                                 Assistant Attorney General

                               Office of the Attorney General
                               207 West High St.
                               Jefferson City, MO 65101
                               Phone: (573) 751-8870
                               Josh.Divine@ago.mo.gov
                               Samuel.Freedlund@ago.mo.gov

                               *Counsel for Amici Curiae*

Appellate Case: 23-1374    Page: 34    Date Filed: 05/22/2023 Entry ID: 5279541

*Counsel for Additional Amici States*

Tim Griffin
Attorney General
State of Arkansas

Drew H. Wrigley
Attorney General
State of North Dakota

Christopher M. Carr
Attorney General
State of Georgia

Alan Wilson
Attorney General
State of South Carolina

Raúl Labrador
Attorney General
State of Idaho

Jonathan Skrmetti
Attorney General
State of Tennessee

Brenna Bird
Attorney General
State of Iowa

Ken Paxton
Attorney General
State of Texas

Kris W. Kobach
Attorney General
State of Kansas

Sean D. Reyes
Attorney General
State of Utah

Daniel Cameron
Attorney General
Commonwealth of Kentucky

Jason S. Miyares
Attorney General
Commonwealth of Virginia

Austin Knudsen
Attorney General
State of Montana

Patrick Morrisey
Attorney General
State of West Virginia

Michael T. Hilgers
Attorney General
State of Nebraska

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that Appellants' Brief complies with the typeface and formatting requirements of Fed. R. App. P. 29 and 32, in that it is written in Century Schoolbook 14-point font, and that it contains 5,665 words as determined by the word-count feature of Microsoft Word, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). The hard copies submitted to the clerk are exact copies of the CM/ECF submission.

*/s/ Joshua M. Divine*
Joshua M. Divine

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document was electronically filed on May 19, 2023, with the Clerk of Court for the United States Court of Appeals for the Eighth Circuit using the CM/ECF system; that all participants are registered CM/ECF users; and that service will be accomplished by the CM/ECF system.

*/s/ Joshua M. Divine*
Joshua M. Divine

Appellate Case: 23-1374    Page: 36    Date Filed: 05/22/2023 Entry ID: 5279541