**Case Nos. 23-1374 & 23-1880**

---

# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

---

BROOKE HENDERSON and JENNIFER LUMLEY

*Plaintiffs-Appellants*

v.

SCHOOL DISTRICT OF SPRINGFIELD R-12, et al.,

*Defendants-Appellees*

---

On Appeal from the United States District Court
for the Western District of Missouri - Springfield
Case No. 6:21-cv-03219, Hon. M. Douglas Harpool, presiding

---

**Brief of *Amici Curiae* Mountain States Legal Foundation and
Texas Public Policy Foundation in Support of Plaintiffs-Appellants**

---

William E. Trachman
Erin M. Erhardt
MOUNTAIN STATES LEGAL FOUNDATION
2596 S. Lewis Way
Lakewood, CO 80227
Tele: (303) 292-2021
Email: wtrachman@mslegal.org

Matthew Miller
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, Texas 78701
Tele: (512) 472-2700
Email: mmiller@texaspolicy.com

*Attorneys for Amici Curiae Mountain States Legal Foundation and
Texas Public Policy Foundation*

## CORPORATE DISCLOSURE STATEMENTS

Counsel for *amicus curiae* Mountain States Legal Foundation (MSLF) certifies that MSLF is a nonprofit corporation, has no parent company, subsidiary, or affiliate, and that no publicly held company owns more than 10 percent of its stock.

Counsel for *amicus curiae* Texas Public Policy Foundation (TPPF) certifies that TPPF is a nonprofit corporation, has no parent company, subsidiary, or affiliate, and that no publicly held company owns more than 10 percent of its stock.

Appellate Case: 23-1374     Page: 2     Date Filed: 05/26/2023 Entry ID: 5281325

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENTS .................................. i

TABLE OF AUTHORITIES .................................................. iii

IDENTITY AND INTEREST OF *AMICUS CURIAE* ........................... 1

SUMMARY OF THE ARGUMENT ...................................... 3

ARGUMENT ................................................................ 6

I.     The "Official Duties" of Public School Employees Have Never Encompassed Affirmatively Supporting Social Causes, and Could not Encompass Perpetuating Racism in Violation of Federal Civil Rights Laws.................................... 6

II.    Speech About Racism Touches on a Matter of Public Concern .......................................................... 13

III.   The *Pickering* Balancing Test was Never Meant to Weigh Compelled Speech .......................................... 13

IV.    Even Under *Pickering*, A Public Employer Cannot Claim an Interest in Disruptive Speech................................ 20

CONCLUSION ............................................................ 26

Appellate Case: 23-1374    Page: 3    Date Filed: 05/26/2023 Entry ID: 5281325

# TABLE OF AUTHORITIES

CASE                                                      PAGE(S)

*303 Creative LLC v. Elenis*,
142 S. Ct. 1106 (2022) ........................................................... 1

*Adarand Constr., Inc. v. Pena*,
515 U.S. 200 (1995) ............................................................. 1

*Arnett v. Kennedy*,
416 U.S. 134 (1974) ............................................................. 21

*Bonn v. City of Omaha*,
623 F.3d 587 (8th Cir. 2010) ................................................. 8

*Brammer-Hoelter v. Twin Peaks Charter*,
492 F.3d 1192 (10th Cir. 2007) ............................................. 9

*Bresnahan v. City of St. Peters*,
58 F.4th 381 (8th Cir. 2023) ................................................. 13

*Burnham v. Ianni*,
119 F.3d 668 (1997) ............................................................ 21

*Calvit v. Minneapolis Pub. Sch.*,
122 F.3d 1112 (8th Cir. 1997) .............................................. 13

*Connick v. Myers*,
461 U.S. 138 (1983) ........................................................ *passim*

*Elrod v. Burns*,
427 U.S. 347 (1976) ............................................................ 16

*Gala v. City of New York*,
525 F. Supp. 3d 425 (E.D.N.Y. 2021) ................................... 19

*Garcetti v. Ceballos*,
547 U.S. 410 (2006) ........................................................ *passim*

*Hiers v. Bd. of Regents of the Univ. of N. Texas Sys.*,
No. 4:20-cv-321-SDJ, 2022 WL 748502,
(E.D. Tex. Mar. 11, 2022) .................................................... 19

iii

*Hurley v. Irish-Am. Gay, Lesbian, & Bisexual Grp. of Boston*,
515 U.S. 557 (1995) ............................................................. 15

*Janus v. Am. Fed'n of State, Cty., and Mun. Emps., Council 31*,
138 S. Ct. 2448 (2018) ...................................................... *passim*

*Jeffries v. Harleston*,
52 F.3d 9 (2d Cir. 1995) ..................................................... 21

*Kennedy v. Bremerton Sch. Dist.*,
142 S. Ct. 2407 (2022) ...................................................... *passim*

*Keyishian v. Bd. of Regents*,
385 U.S. 589 (1967) ............................................................ 15

*Lane v. Franks*,
573 U.S. 228 (2014) ............................................................. 7

*McGee v. Pub. Water Supply, Dist. No. 2 of Jefferson Cty., Mo.*,
471 F.3d 918 (8th Cir. 2006) ............................................. 7, 8

*Meriwether v. Hartop*,
992 F.3d 492 (6th Cir. 2021) ............................................ 16, 18

*Pickering v. Bd. of Ed. of Tp. High Sch. Dist. 205, Will Cty, Il.*,
391 U.S. 568 (1968) ........................................................... *passim*

*Pleasant Grove City v. Summum*,
555 U.S. 460 (2009) ............................................................. 8

*Sch. of the Ozarks, Inc. v. Biden*,
2022 WL 4589688 (8th Cir. Sept. 30, 2022) ...................... 1

*Shurtleff v. City of Boston*,
142 S. Ct. 1583 (2022) ....................................................... 7, 17

*Thompson v. Shock*,
852 F.3d 786 (8th Cir. 2017)............................................. 21

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
393 U.S. 503 (1969) ........................................................... 14

iv

Appellate Case: 23-1374     Page: 5     Date Filed: 05/26/2023 Entry ID: 5281325

*W. VA. State Bd. of Ed. v. Barnette*
   319 U.S. 624 (1943) ............................................................. 14, 17

*Wooley v. Maynard*,
   430 U.S. 705 (1977) ............................................................. 15

<u>STATUTES</u>

42 U.S.C. § 2000d ................................................................. 3

<u>OTHER AUTHORITIES</u>

*Black Lives Matter Protests*, BRAINPOP (June 29, 2020) ...................... 26

*Elementary Computer Science Teacher and Lead Technology Coordinator*,    Springfield   Public   Schools, SALARY.COM (May 6, 2023) .................................................... 22, 23

Jennifer Miller, *Why Some Companies Are Saying 'Diversity and Belonging' Instead of 'Diversity and Inclusion'* NEW YORK TIMES (May 13, 2023) ........................................... 22

*Non-Discrimination Statement*, SPRINGFIELD PUBLIC SCHOOLS ............. 23

OFFICE FOR CIVIL RIGHTS WEBINAR ON RACIALLY EXCLUSIVE PRACTICES AND TITLE VI (Jan. 19, 2021) ................................................. 11

Robin DiAngelo, *No, I Won't Stop Saying "White Supremacy"*, YES MAGAZINE (June 30, 2017) ............................................... 25

*Systemic Racism Explained*, ACT.TV (Apr. 16, 2019) ........................... 23, 24

U.S. DEPARTMENT OF EDUCATION, OFFICE FOR CIVIL RIGHTS, ANNUAL REPORT TO THE SECRETARY, PRESIDENT, AND THE CONGRESS (2021) .................................................................. 4, 10

*Understanding White Supremacy (And How to Defeat It)*, ACT.TV (Sept. 12, 2017) ...................................................................... 25

Appellate Case: 23-1374   Page: 6   Date Filed: 05/26/2023 Entry ID: 5281325

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

Mountain States Legal Foundation ("MSLF") is a nonprofit public-interest law firm organized under the laws of the State of Colorado. MSLF is dedicated to bringing before the courts issues that are vital to the defense and preservation of individual liberties: the right to speak freely, the right to own and use property, and the need for limited and ethical government. Since its creation in 1977, MSLF attorneys have been active in litigation regarding the proper interpretation and application of statutory, regulatory, and constitutional provisions. *See*, *e.g.*, *Adarand Constr., Inc. v. Pena*, 515 U.S. 200 (1995) (MSLF serving as lead counsel); *303 Creative LLC v. Elenis*, 142 S. Ct. 1106 (2022) (mem.) (*amici curiae* in support of petitioners); *Sch. of the Ozarks, Inc. v. Biden*, No. 21-2270, 2022 WL 4589688 (8th Cir. Sept. 30, 2022) (*amicus curiae* in support of appellants).

Texas Public Policy Foundation is a 501(c)(3) nonprofit, non-partisan research institute. Its mission is to promote and defend liberty, personal responsibility, and free enterprise in Texas and the nation. Through its litigation arm, the Center for the American Future, it also frequently sues governmental entities on behalf of people and businesses whose livelihood, liberty, and property are threatened by government action. Because this lawsuit concerns the circumstances

---

[1] No counsel for a party authored this brief in whole or in part, and no party, party's counsel, or any person other than *amicus curiae* or their counsel contributed money intended to fund preparation or submission of this brief.

1

under which public-interest litigation centers can be made to pay the legal fees of their government opposition, *Amicus* believes that its participation will provide valuable insight to the Court as it considers the merits of this case.

2

## SUMMARY OF THE ARGUMENT

Brooke Henderson and Jennifer Lumley ("Appellants") are public school employees who were forced to speak the ideological messages contained in racist training materials adopted by their employer, the School District of Springfield ("District"). The materials involved affirmatively compelling public employees to make certain statements—outside of the classroom—about race, and their relationship to race. Employees were asked "to identify where they fall on the oppression matrix[,]" App. 11; R. Doc. 1, at 11, were told "[w]hite people are oppressors . . . [and] must accept their privilege and own their whiteness[,]" App. 16; R. Doc. 1, at 16, and "warned staff that 'white silence' constituted white supremacy." App. 1291; R. Doc. 77, at 27. Employees were "directed to conclude the training by participating in an 'Anti-Racist Solo Write,' wherein they [were] expected to disclose the steps they plan 'to become an Anti-Racist' in conformance with the training's lessons." App. 4; R. Doc. 1, at 4.

The District cloaked the training in an innocuous word—equity. But the materials indisputably cast Caucasian individuals as the source of numerous social ills and racial oppression. And the required statements were both ideological and highly politically divisive. That Appellants would fear for their careers if they spoke out against such assertions is hardly surprising. Yet the District Court held that Appellants lacked standing to pursue their claims.

3

The training was designed to force Appellants to engage in private speech, at times when they were not performing their day-to-day job duties; the speech was not related specifically to their job titles or duties. Indeed, this Court should hold that it is impossible for a public employee's duties to encompass engaging in conduct that potentially violates federal civil rights laws, such as the speech at issue here. *See* 42 U.S.C. § 2000d *et seq.* (Title VI); U.S. DEPARTMENT OF EDUCATION, OFFICE FOR CIVIL RIGHTS, ANNUAL REPORT TO THE SECRETARY, PRESIDENT, AND THE CONGRESS, at 46 (2021) (hereinafter "2021 OCR Annual Report") ("[P]olicies or pedagogical practices that perpetuate the idea that students may be categorized by race, assigned a set of characteristics, and be considered to possess certain characteristics based on that race, may subject students or staff to discrimination in violation of Title VI.").[2]

And undoubtedly, the speech was on a matter of public concern—the topic of racism. *See Connick v. Myers*, 461 U.S. 138, 146 (1983) (Employee expression is a matter of public concern if it can "be fairly considered as relating to any matter of political, social, or other concern to the community."). In other words, when they were forced to express the relevant messages, Appellants were not merely engaging in the course of performing their ordinary job duties, such that their words constituted government speech.

---

[2] https://www2.ed.gov/about/reports/annual/ocr/report-to-president-and-secretary-of-education-2020.pdf

When weighing the rights of public employees, like Appellants, against the government's interest in an orderly workplace, courts typically apply the *Pickering* balancing test. *See Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563, 568 (1968). But the *Pickering* balancing test is difficult to apply in the compelled speech context. It is far from clear that a school district may force its employees to speak private messages based on a purported need for order and efficiency. *See Janus v. Am. Fed'n of State, Cnty., and Mun. Emps., Council 31*, 138 S. Ct. 2448, 2473 (2018) ("If *Pickering* applies at all to compelled speech—a question that we do not decide—it would certainly require adjustment in that context.").

Moreover, even if compelled speech regarding racism was placed on *Pickering*'s scale, the balance could never tip in the District's favor. That is because the actual racially divisive training adopted by the District could never promote efficiency in public services. Indeed, accepting the notion of inherent "white privilege," and learning to view students in their school differently based on skin color would cause disorder and strife among staff and students, along direct racial lines.

For the foregoing reasons, this Court should reverse the holding of the District Court.

5

**ARGUMENT**

To be sure, the government can largely dictate what educators say, so long as the message pertains to their official duties. History teachers can be made to discuss historical events. Math teachers can be made to work through equations. This principle has been affirmed again and again since the Supreme Court's decision in *Pickering* fifty-five years ago, which balanced the interests of government employee subordinance with the promises of the First Amendment.

*Pickering* created an if-then decision tree, with two branches. This Court must first inquire whether the speech is private speech on a matter of public concern, or if it is essentially public speech, pursuant to official duties. If the speech is private speech on a matter of public concern, the government bears the burden of proving "that its interests as employer outweigh even an employee's private speech on a matter of public concern." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2425 (2022) (describing "the *Pickering-Garcetti* framework"). Here, the Appellee cannot establish satisfaction of any of the *Pickering* factors.

## I. The "Official Duties" of Public-School Employees Have Never Encompassed Affirmatively Supporting Social Causes, and Could not Encompass Perpetuating Racism in Violation of Federal Civil Rights Laws.

When the government contends that an employee's speech is pursuant to his or her official duties, it must base such arguments on a practical understanding of the employee's role, and whether the speech in question was "speech the employee

6

was expected to deliver in the course of carrying out his job." *Id.* at 2424; *Lane v. Franks*, 573 U.S. 228, 240 (2014) ("The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties.").

For this inquiry, courts often look outside the four corners of the employee's job description. *See McGee v. Pub. Water Supply, Dist. No. 2 of Jefferson Cty., Mo.*, 471 F.3d 918, 921 (8th Cir. 2006) ("The Court noted that determining the scope of an employee's official duties for these purposes is a practical inquiry that focuses on 'the duties an employee actually is expected to perform,' rather than his formal job description.") (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 424–25 (2006)); *Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1595 (2022) (Alito, J., concurring) ("[C]ourts must be very careful when a government claims that speech by one or more private speakers is actually government speech.").

But an employee's job description cannot be crafted in such a broad way as to effectively undermine appropriate constitutional protections through vague obligations. *See Kennedy*, 142 S. Ct. at 2424 ("To proceed otherwise would be to allow public employers to use excessively broad job descriptions to subvert the Constitution's protections.") (internal quotation marks omitted); *see also Shurtleff*, 142 S. Ct. at 1596 (Alito, J., concurring) ("The ultimate question is whether the government is actually expressing its own views or the real speaker is a private party

7

and the government is surreptitiously engaged in the 'regulation of private speech.'")
(quoting *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009)).

The inquiry into the scope of an employee's duties is crucial. In *Garcetti*, the Supreme Court held that the First Amendment does not protect "a government employee from discipline based on speech made pursuant to the employee's *official duties*." 547 U.S. at 413, 426 (emphasis added). "Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Id.* at 418. The rationale is that "[r]estricting speech that *owes its existence* to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id*. at 421–22 (emphasis added).

This Circuit has applied *Garcetti*, recognizing that "determining the scope of an employee's official duties . . . is a practical inquiry that focuses on 'the duties an employee *actually is expected to perform*,' rather than his formal job description." *McGee*, 471 F.3d at 921 (quoting *Garcetti*, 547 U.S. at 424–25) (emphasis added); *Bonn v. City of Omaha*, 623 F.3d 587, 593 (8th Cir. 2010) ("The controlling factor is whether the expressions were made pursuant to the employee's duties, not whether the employer ultimately approved of the expressions or related actions."); *see also*

8

*Kennedy*, 142 S. Ct. at 2425 (rejecting the "error of positing an 'excessively broad job description' by treating everything teachers and coaches say in the workplace as government speech subject to government control.") (internal brackets omitted).

In this context, it is clear that Appellants' speech was not delivered in the normal course of "carrying out [their] jobs." *Id.* at 2424; *accord Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1204 (10th Cir. 2007) ("[N]ot all speech that *occurs at work* is made pursuant to an employee's official duties. . . . Nor is all speech about the subject matter of an employee's work necessarily made pursuant to the employee's official duties.") (cleaned up).

Here, the training at issue could never be considered integral to Appellants' work as public employees, considering that the program was in fact halted, and Appellants were able to subsequently perform their jobs successfully. *See* App. 2203; R. Doc. 77-23, at 17 ("Q[.] . . . [W]ere staff able to do their job in fall of 2021, continuing through the school year, without mandatory equity training as of fall of 2020? A[.] Yes."); App. 2206; R. Doc. 77-23, at 20 ("[D]id the district ever come up with any evidenced-based reason to think the fall 2020 equity training, including the equity-focused Canvas modules, actually lead to a more equitable learning environment?" After the question was repeated and reworded the school answered, "A[.] No.").

9

But even more broadly, this Court should reject the idea that public employees may have, as part of their official job duties, obligations to engage in speech that is arguably illegal. *See* 2021 OCR Annual Report, at 46 ("OCR has concerns that using curricular or training materials for students or staff which are based on racial classifications or stereotypes of individuals—solely based on their race—may violate Title VI by requiring school personnel to engage in activities that result in the different treatment of students based on their race, or which constitute racial harassment.").

Indeed, the Department of Education's Office for Civil Rights (OCR) 2021 Annual Report—which covered the time period that includes the training at issue in this case, in October 2020—wrote:

> OCR has [] opened investigations involving . . . race-exclusionary policies or practices in schools, [such as where] . . . [a] teacher in a Chicago-area school district filed a complaint with OCR alleging that the district implemented a series of racial "equity" policies and programs that discriminated against staff, students, and job applicants; implemented certain policies and programs that discriminate against staff, students, and job applicants, including segregating staff and students into affinity groups based on race; used "Black Lives Matter" materials to advocate to students that white individuals bear collective guilt for racism, police brutality, and other social ills; and failed to discipline some students appropriately by allegedly taking race into consideration in its disciplinary decisions.

2021 OCR Annual Report, at 46.

In other materials, the Department of Education's Office for Civil Rights echoed these concerns, and articulated the position of the Trump Administration, which was still in office at the time of the training in October 2020:

> Unfortunately, OCR is aware of recent concerning reports that schools across the country are discriminating on the basis of race in different ways. Sometimes, these reports have involved schools' purported efforts to promote diversity and equity among students, but are nevertheless prohibited because they violate Title VI. OCR offers this video to highlight how these and other examples may create Title VI violations.

*See* OFFICE FOR CIVIL RIGHTS, WEBINAR: RACIALLY EXCLUSIVE PRACTICES AND TITLE VI, at 1 (Jan. 19, 2021) (hereinafter "OCR Webinar").[3]

OCR's Webinar on Racially Exclusive Practices specifically addressed school districts that sought to embrace racially charged employee training. *Id.* at 2–3 ("One example that might violate Title VI is advocating a position that a particular race is collectively guilty of misconduct, or advocating a position that a particular race or something about that race is negative or evil."); *id.* at 3 ("In the same vein, training which is designed to separate individuals by race, or pressure members of a certain race to repudiate or 'recover from' their race, raises the same Title VI issues. This

---

[3] https://www2.ed.gov/about/offices/list/ocr/docs/ocr-tvi-webinar-reptvi.pdf. Note that this Webinar has been withdrawn by the Biden Administration. However, it reflects OCR's interpretation of Title VI under the Trump Administration, and how OCR would have reacted to the October 2020 training materials at issue here. The script of the Webinar remains on OCR's website for historical purposes.

11

includes instructing members of a particular race or races that they must "re-wire" themselves. . .").

In the same Webinar, OCR also addressed "the use of curriculum, training materials, or classes that are based on racial classifications or racial stereotypes of individuals solely based on their race." OCR Webinar, at 2. OCR stated that in some instances, those "materials may violate Title VI because they could constitute racial harassment, or require teachers to engage in activities that result in different treatment of students on the basis of race." *Id*.; *accord id.* at 2–3 ("Title VI might also be violated if part of a curriculum instructs students that members of a particular race or racial identity pose specific dangers to other individuals, or if it advocates or forces members of certain races to deconstruct or confront their racial identities.").

OCR even announced that it was ready to investigate school districts that engaged in conduct like Appellee. *Id.* at 3 ("OCR stands ready to accept complaints from students or others alleging that a school has engaged in violations of Title VI as a means of remedying purported systemic racism."). It would thus be strange for the Court to conclude that it was part of a public employee's normal job duties to engage in conduct that would walk the District directly into lengthy and cumbersome federal civil rights investigation by OCR.

Put simply, Appellants' official duties could never encompass engaging in speech that arguably violates Title VI. Indeed, the Trump Administration took the

12

position that public entities like schools themselves lack First Amendment rights to engage in racially discriminatory speech. *Id.* at 4. ("Such treatment has no place in federally funded programs or activities, and is not protected by the First Amendment."). Because of this, the Court should reject any argument that the Appellants were engaged in speech pursuant to their official duties as school employees.

## II. Speech About Racism Touches on a Matter of Public Concern.

"Speech that involves a matter of political, social or other concern to the community is of public concern." *Calvit v. Minneapolis Pub. Sch.*, 122 F.3d 1112, 1117 (8th Cir. 1997). It cannot seriously be contested that speech about the existence of broad, societal racial discrimination is a matter of public concern. *Connick*, 461 U.S. at 148, n.8 (determining that a teacher's "right to protest racial discrimination" is "a matter inherently of public concern"). And the Eighth Circuit has rejected the idea that speech among co-workers cannot touch on a matter of public concern. *See Bresnahan v. City of St. Peters*, 58 F.4th 381, 385 (8th Cir. 2023) (text string among police officers mocking "Black Lives Matter" movement was speech on a matter of public concern).

## III. The *Pickering* Balancing Test was Never Meant to Weigh Compelled Speech.

Normally, the fact that certain speech is not in the course of a public employee's duties, and that it touches on a matter of public concern, would lead

13

courts to engage in *Pickering* balancing: "The problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. But here, affirmatively compelling such speech is inappropriate for *Pickering* balancing.

First, public employees maintain free speech rights beyond the entryway of the school. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969) ("First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students."). It is a basic tenant of the First Amendment that no one—and certainly no government official—can force his or her beliefs onto another. *See W. Va. Bd. of Educ. v. Barnette*, 319 US. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."). Indeed, "[c]ompelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command, and in most contexts, *any such effort would be universally condemned*." *Janus*, 138 S. Ct. at 2463 (2018) (emphasis added).

Appellate Case: 23-1374    Page: 20    Date Filed: 05/26/2023 Entry ID: 5281325

Second, the Supreme Court has never embraced the idea of *Pickering* balancing in the compelled speech context. Indeed, its precedents uniformly cut the other way. The government "may not compel affirmance of a belief with which the speaker disagrees." *Hurley v. Irish-Am. Gay, Lesbian, & Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995); *Wooley v. Maynard*, 430 U.S. 705, 717 (1977) ("[W]here the State's interest is to disseminate an ideology, no matter how acceptable to some, such interest cannot outweigh an individual's First Amendment right to avoid becoming the courier for such message.").

This is true even in the context of public employment. For over 50 years, the Supreme Court has recognized that "a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick*, 461 U.S. at 142; *see also Keyishian v. Bd. of Regents*, 385 U.S. 589, 605–606 (1967); *Pickering*, 391 U.S. at 568. And even long before that, "prominent members of the founding generation condemned laws requiring public employees to affirm or support beliefs with which they disagreed. . . . Jefferson denounced compelled support for such beliefs as 'sinful and tyrannical,' and others expressed similar views." *Janus*, 138 S. Ct. at 2471 (internal citations omitted).

Of course, an employer may impose certain speech requirements on its employees. For instance, a school may require a teacher to call roll or complete other "non-ideological ministerial tasks," and a teacher cannot object to such requirements

Appellate Case: 23-1374    Page: 21    Date Filed: 05/26/2023 Entry ID: 5281325

on First Amendment grounds. *Meriwether v. Hartop*, 992 F.3d 492, 507 (6th Cir. 2021). And "if the speech in question is part of an employee's official duties, the employer may insist that the employee deliver any lawful message." *Janus*, 138 S. Ct. at 2473 (citing *Garcetti*, 547 U.S. at 421–22, 425–26); *see supra* p. 6–13.

However, outside of the finite space of official duties, "it is not easy to imagine a situation in which a public employer has a legitimate need to demand that its employees recite words with which they disagree." *Janus*, 138 S. Ct. at 2473. School district personnel like Appellants may be "government employees paid in part to speak on the government's behalf," but they also remain private citizens to whom the protections of the First Amendment apply. *Kennedy*, 142 S. Ct. at 2423.

Indeed, the Supreme Court "ha[s] never applied *Pickering*" to a case where a public employee is compelled to speak on a matter of public concern and the speech is outside of the employee's official duties. *Janus*, 138 S. Ct. at 2473. The *Janus* court provided an example that is particularly germane to the instant case:

> Suppose, for example, that the State of Illinois required all residents to sign a document expressing support for a particular set of positions on controversial public issues—say, the platform of one of the major political parties. No one, we trust, would seriously argue that the First Amendment permits this.

*Id.* at 2463–64; *see also Elrod v. Burns*, 427 U.S. 347, 356 (1976) ("Conditioning public employment on partisan support prevents support of competing political interests.").

Appellate Case: 23-1374     Page: 22     Date Filed: 05/26/2023 Entry ID: 5281325

Yet that is exactly what Appellees demand here. The District implemented mandatory equity training. App. 9; R. Doc. 1, at 9. All staff were required not just to attend but to actively participate in this training. App. 14; R. Doc. 1, at 14. And staff were instructed that they must "agree" or "strongly agree" with the positions espoused by the training. App. 14–15; R. Doc. 1, at 14–15. Appellants understood that if they did not complete the training, or if they disagreed with the training's positions, the District would potentially dock their pay or refuse to give them credit for attending the training. App. 10, 15; R. Doc. 1, at 10, 15. Therefore, to complete the training, Appellants were forced to express support for positions they did not agree with. App. 15; R. Doc. 1, at 15.

This "involuntary affirmation" is compelled speech, and as such it is highly questionable under the First Amendment. *See Janus*, 138 S. Ct. at 2464 ("[A] law commanding 'involuntary affirmation' of objected-to-beliefs would require 'even more immediate and urgent grounds' than a law demanding silence.") (quoting *Barnette*, 319 U.S. at 633); *see also Shurtleff*, 142 S. Ct. at 1599 (Alito, J., concurring) ("[G]overnment speech in the literal sense is not exempt from First Amendment attack if it uses a means that restricts private expression in a way that abridges the freedom of speech, as is the case with compelled speech.") (internal quotation marks omitted).

Even while engaging in classroom instruction, teachers have certain rights to be free from compelled speech. *See Garcetti*, 547 U.S. at 421 ("The First Amendment protects some expressions related to the speaker's job."); *Meriwether*, 992 F.3d at 506 ("If professors lacked free-speech protections when teaching, a university would wield alarming power to compel ideological conformity. A university president could require a pacifist to declare that war is just, a civil rights icon to condemn the Freedom Riders, a believer to deny the existence of God, or a Soviet émigré to address his students as 'comrades.'"); *accord Kennedy*, 142 S. Ct. at 2424 ("[T]he fact the speech touched on matters related to public employment was not enough to render it government speech.").

Here, when Appellants were told to state agreement with certain statements, they were not in engaged in their day-to-day jobs, where the District's power is likely at its apex. Nor were the statements connected to subject matters in classrooms, where the District could be understood to want consistent and appropriate lesson plans. Appellants, therefore, were hardly within the ambit of *Garcetti*'s primary concern, which related to the government's ability to "ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission." *Garcetti*, 547 U.S. at 422–23.

Instead, Appellants were compelled to state agreement with ideological messages outside of the course of their ordinary duties. But compelled speech is

18

highly questionable under *Pickering* balancing test. While the *Pickering* test may be useful in determining whether an employee should be *allowed* to speak on an issue or if he must remain silent, "the *Pickering* framework *fits much less well* where the *government compels* speech." *Janus*, 138 S. Ct. at 2473 (emphasis added).

"When a public employer *does not simply restrict* potentially disruptive speech but *commands that its employees mouth a message on its own behalf*, the calculus is very different." *Id.* (emphasis added); *Gala v. City of New York*, 525 F. Supp. 3d 425, 431 (E.D.N.Y. 2021) ("It is bad enough when a public employer chills legitimate discourse on matters of public concern by punishing those who express their views. It is even more egregious when a public employer requires an affirmative retraction of such speech from a decade earlier as a condition precedent to promotion."); *Hiers v. Bd. of Regents of the Univ. of N. Texas Sys.*, 2022 WL 748502, at *16 (E.D. Tex. Mar. 11, 2022) ("[P]recedent establishes that the government violates the First Amendment when it tries to compel public employees to affirm beliefs with which they disagree. Period.").

At a minimum, the Supreme Court in *Janus* announced that Pickering would need "adjustment," if it could even apply to compelled speech issues:

> Consider our decision in *Connick*. In that case, we held that an assistant district attorney's complaints about the supervisors in her office were, for the most part, matters of only private concern. As a result, we held, the district attorney could fire her for making those comments. Now, suppose that the assistant had not made any critical comments about the supervisors but that the district attorney, out of

19

the blue, demanded that she circulate a memo praising the supervisors. Would her refusal to go along still be a matter of purely private concern? And if not, would the order be justified on the ground that the effective operation of the office demanded that the assistant voice complimentary sentiments with which she disagreed? If *Pickering* applies at all to compelled speech—a question that we do not decide—*it would certainly require adjustment in that context*.

*Id.* at 2473 (emphasis added).

While *Janus* stopped short of conclusively rejecting *Pickering* in the context of compelled speech, it strongly implied that compelling private speech on matters of public concern was *per se* unconstitutional. *See Janus*, 138 S. Ct. at 2460 (forcing public employees to subsidize a union "violates the free speech rights of nonmembers by compelling them to subsidize private speech on matters of substantial public concern").

## IV. Even Under *Pickering*, A Public Employer Cannot Claim an Interest in Disruptive Speech.

*Pickering* is meant to preserve the balance of free speech with necessary public efficiencies. The Court in *Pickering* considered whether the speech "impeded the teacher's proper performance of his daily duties in the classroom or [] interfered with the regular operation of the schools generally." *Pickering*, 391 U.S. at 572–73. Additionally, "[s]o long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to *operate efficiently and effectively*." *Garcetti*, 547 U.S. at 419 (emphasis added). "[T]he closer the employee's speech reflects on matters of public

20

concern, the greater must be the employer's showing that the speech is likely to be disruptive before it may be punished." *Burnham v. Ianni*, 119 F.3d 668, 679 (1997) (quoting *Jeffries v. Harleston*, 52 F.3d 9, 13 (2d Cir. 1995), *cert denied*, 516 U.S. 862 (1995)).

In *Arnett v. Kennedy*, Justice Powell elaborated on the government's role as an employer:

> [T]he Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch. Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately *impair the efficiency of an office or agency*.

416 U.S. 134, 168 (1974) (Powell, J., concurring in part) (emphasis added); *see also Connick*, 461 U.S. at 150–51 (discussing *Pickering*'s "consideration of the government's interest in the effective and efficient fulfillment of its responsibilities to the public" and quoting Powell's concurrence in *Arnett*). "The typical *Pickering-Connick* case involves a government employee causing workplace disruption by speaking as a citizen on a matter of public concern, followed by government action adversely affecting the employee's job." *Thompson v. Shock*, 852 F.3d 786, 791 (8th Cir. 2017).

Here, however, the disruption calculus is inverted: rather than *silencing* an employee to *prevent* disruption, the District is *compelling* its employees to speak in

21

a manner that is likely to *create* disruption. In other words, it is the District—not Appellants—injecting disruptive speech into the workplace.[4] In fact, roughly 95% of teachers and professional staff in the District are white. App. 3449–50; R. Doc. 80-5, at 163–64. Assuming *nearly the entire* body of the District are "white supremacists" is not exactly the hallmark of unity. Even statewide, approximately 93% of teachers in Missouri are white. App. 3461; R. Doc. 80-5, at 175. It is inherently disruptive to label nearly the entire District "oppressors." *Accord* Jennifer Miller, *Why Some Companies Are Saying 'Diversity and Belonging' Instead of 'Diversity and Inclusion'*, NEW YORK TIMES (May 13, 2023) ("Irshad Manji, founder of the consultancy Moral Courage College, says an 'almost offensive focus on group labels' is a big problem with mainstream diversity, equity and inclusion efforts.").[5]

Even formal documents promulgated by the District cut against the idea of using racial strife to positively affect the educational setting for students. The District's description of its teaching positions, for instance, suggests that an ideal learning environment appropriately considers the interests of the students. *See Elementary Computer Science Teacher and Lead Technology Coordinator*,

---

[4] Indeed, the District notes that Appellants were allowed to speak freely (or refrain from speaking) during at least some of the equity training sessions, but does not allege that such speech caused (or potentially caused) any disruption to the District's operations. *See*, *e.g.*, App. 166, 176; R. Doc. 75, at 25, 35.

[5] https://www.nytimes.com/2023/05/13/business/diversity-equity-inclusion-belonging.html

Appellate Case: 23-1374     Page: 28     Date Filed: 05/26/2023 Entry ID: 5281325

*Springfield Public Schools*, SALARY.COM (May 6, 2023) (stating that an ideal teacher would "[c]reate[] a classroom environment that is conducive to learning and appropriate to the maturity and interests of the students.").[6] Similarly, the District's non-discrimination statement claims that it does not discriminate based on race, among other classes. *See Non-Discrimination Statement*, SPRINGFIELD PUBLIC SCHOOLS.[7]

But that is not what happened here. Instead, the materials in the training were part and parcel of a District initiative that seemed to foster racial division. Clearly, the District's training paints Caucasian individuals as enemies to other racial groups, and offers essentially a narrative of hopelessness to black students. One training video claimed that when the students sought career advancement, they were entering a job market where black sounding names on resumes will invariably garner fewer job interviews. App. 1786; R. Doc. 77-13, at 19 (citing *Systemic Racism Explained*, ACT.TV, at 3:04 (Apr. 16, 2019)).[8]

---

[6] https://www.salary.com/job/springfield-public-schools/elementary-computer-science-teacher-and-lead-technology-coordinator/j202304241947273421851 (last visited May 17, 2023). Note that while this job posting may be closed before resolution of this case, it appears that this reference is a common feature in Springfield Public Schools' job postings.

[7] https://www.springfieldpublicschools.com/cms/one.aspx?portalId=494689&pageId=4730516 (last visited May 17, 2023).

[8] https://www.youtube.com/watch?v=YrHIQIO_bdQ

Appellate Case: 23-1374    Page: 29    Date Filed: 05/26/2023 Entry ID: 5281325



*Id.*

The video went on to indicate to students that they still suffered from the lingering effects of racism from generations past—apparently whether they knew it or not—by insisting that "the consequences of slavery and Jim Crow laws are still affecting access to opportunity today." App. 1786; R. Doc. 77-13, at 19 (citing *Systemic Racism Explained*, ACT.TV, at 3:47 (Apr. 16, 2019)).



*Id.* at 3:51.

One of the training's principles is to directly "Acknowledge YOUR privileges[,]" App. 1774; R. Doc. 77-13, at 7, and lists white, male, "gender conforming," heterosexual, rich, able-bodied, Protestant adults as "privileged social group[s,]" App. 1784; R. Doc. 77-13, at 17. The presentation goes further, and

discusses "white supremacy" by linking to a Robin DiAngelo article. App. 1787; R. Doc. 77-13, at 20. That article announces that all Caucasian individuals must take responsibility for "our complicity with and investment in racism." Robin DiAngelo, *No, I Won't Stop Saying "White Supremacy"*, YES MAGAZINE (June 30, 2017).[9] DiAngelo also says that "white supremacy" refers "to a socio-political economic system of domination based on racial categories that benefit those defined and perceived as white." *Id.* The training then likens white supremacy—which the materials indicate that all Caucasians are "complicit in"—to Nazis and Confederates.



App. 1788; R. Doc. 17-13, at 21 (citing *Understanding White Supremacy (And How to Defeat It)*, ACT.TV, at 1:20 (Sept. 12, 2017)).[10]

Yet another video claims there's a "built-in system of bias that makes life easier for white people and more difficult for [b]lack people and other people of

---

[9] https://www.yesmagazine.org/democracy/2017/06/30/no-i-wont-stop-saying-white-supremacy

[10] https://www.youtube.com/watch?v=0gqQzbp5wk4&t=1s

Appellate Case: 23-1374     Page: 31     Date Filed: 05/26/2023 Entry ID: 5281325

color." *See* App. 20; R. Doc. 1, at 20 (citing *Black Lives Matter Protests*, BRAINPOP, at 2:27 (June 29, 2020)).[11]



*Id*. at 2:29.

It would be difficult to imagine how these statements could ever foster a healthy working environment, much less preserve public efficiencies. If anything, the District was clearly trying to make employees feel uncomfortable, by charging them with complicity in racism, and a need to acknowledge that their privilege was responsible for any success that they achieved. While the District may be allowed to engage in certain equity training in some circumstances, it certainly cannot compel disruptive and divisive speech—speech which *reduces* public efficiencies—under the *Pickering* framework.

## CONCLUSION

Appellants were compelled to engage in private speech on a matter of public concern, which was potentially illegal at the time under Title VI. In the context of *Pickering* balancing, this Court should reject the idea that compelled statements

---

[11] https://www.youtube.com/watch?v=xv3dAJUTCT0

Appellate Case: 23-1374     Page: 32     Date Filed: 05/26/2023 Entry ID: 5281325

ought to weigh in favor of public efficiency. And in any event, the Court should find that the speech at issue here—which was disruptive and racially divisive—can never weigh in favor of public efficiencies. For the aforementioned reasons, this Court should reverse the decision of the District Court.

Dated this 26th day of May 2023.

Respectfully submitted,

*/s/ William E. Trachman*
William E. Trachman (CO Bar No. 45684)
Erin M. Erhardt (CO Bar No. 49360)
MOUNTAIN STATES LEGAL FOUNDATION
2596 S. Lewis Way
Lakewood, CO 80227
Phone: (303) 292-2021
Fax: (877) 349-7074
wtrachman@mslegal.org
eerhardt@mslegal.org

and

Matthew Miller (TX Bar No. 24046444)
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, Texas 78701
Tel:   (512) 472-2700
Fax:   (512) 472-2728
mmiller@texaspolicy.com

*Attorneys for Amicus Curiae*

27

## CERTIFICATE OF COMPLIANCE

In compliance with Fed. R. App. P. 32, this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and Fed. R. App. P. 32(a)(7)(B) because it contains than 5,865 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in Microsoft Word using 14-point Times New Roman proportionally spaced typed font.

I further certify that this brief is virus free, as verified by SentinelOne – Virus & threat protection.

*/s/ William E. Trachman*
William E. Trachman
MOUNTAIN STATES LEGAL FOUNDATION

*Attorney for Plaintiffs-Appellants*

28

## CERTIFICATE OF CONFERENCE

On Friday, May 5, 2023, Plaintiffs-Appellants' counsel gave blanket consent for filing this brief. Counsel for *amicus curiae* sought conference via email on Friday, May 5, 2023, with counsel for Defendants-Appellees. Defendants-Appellees stated on May 10, 2023, that they oppose the filing of this brief.

*/s/ William E. Trachman*
William E. Trachman
MOUNTAIN STATES LEGAL FOUNDATION

Appellate Case: 23-1374   Page: 35   Date Filed: 05/26/2023 Entry ID: 5281325

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of May 2023, I electronically filed the foregoing using this Court's CM/ECF system. I certify that all participants, in this case are registered CM/ECF users and service will be accomplished by this Court's CM/ECF system.

*/s/ William E. Trachman*
William E. Trachman
MOUNTAIN STATES LEGAL FOUNDATION

Appellate Case: 23-1374   Page: 36   Date Filed: 05/26/2023 Entry ID: 5281325