Nos. 23-1374 & 23-1880

# In the United States Court of Appeals
## for the Eight Circuit

---

BROOKE HENDERSON et al.,

*Plaintiffs-Appellants*,

v.

SCHOOL DISTRICT OF SPRINGFIELD R12, et al.,

*Defendants-Appellees*.

---

Appeal from a Judgment of the United States District Court
for the Western District of Missouri (Southern Division),
The Hon. Douglas M. Harpool
(Dist. Ct. No. 6:21-cv-03219)

---

BRIEF OF AMICI CURIAE
INSTITUTE FOR FREE SPEECH AND MANHATTAN INSTITUTE
IN SUPPORT OF APPELLANTS AND REVERSAL

---

Ilya Shapiro
MANHATTAN INSTITUTE
52 Vanderbilt Ave.
New York, NY 20017
212-599-7000
ishapiro@manhattan-institute

Endel Kolde
Alan Gura
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., N.W., Ste. 801
Washington, DC 20036
202-301-1664
dkolde@ifs.org
agura@ifs.org

May 17, 2023

Counsel for Amici Curiae

## DISCLOSURE STATEMENT

Counsel for amicus curiae Institute for Free Speech (IFS), Endel Kolde, certifies that IFS is a nonprofit corporation, has no parent company, subsidiary, or affiliate, and that no publicly held company owns more than 10 percent of its stock.

Counsel for amicus curiae Manhattan Institute (MI), Ilya Shapiro, certifies that MI is a nonprofit corporation, has no parent company, subsidiary, or affiliate, and that no publicly held company owns more than 10 percent of its stock.

Appellate Case: 23-1374    Page: 2    Date Filed: 06/08/2023 Entry ID: 5285075

TABLE OF CONTENTS

DISCLOSURE STATEMENT ..................................................................ii

TABLE OF CONTENTS ..................................................................... iii

TABLE OF AUTHORITIES............................................................iv

INTERESTS OF AMICI CURIAE...................................................... 1

SUMMARY OF ARGUMENT ............................................................ 2

ARGUMENT.................................................................................. 3

I.   THE SCHOOL DISTRICT'S MANDATORY TRAINING PROGRAM PROMOTED A DEEPLY CONTROVERSIAL IDEOLOGY THAT ADVOCATES UNLAWFUL BEHAVIOR ........................................ 3

II.  THE SCHOOL DISTRICT'S MANDATORY TRAINING PROGRAM INCLUDED INTENTIONALLY COERCIVE FEATURES IN VIOLATION OF PLAINTIFFS' FIRST AMENDMENT RIGHTS.................................... 13

     A.   The First Amendment forbids compelled speech and coercive ideological indoctrination ...................... 13

     B.   Standing doctrine favors pre-enforcement challenges to government speech burdens ................ 18

     C.   It is per se illegal for a school district to indoctrinate its employees to subvert Constitutional and other legal norms......................... 21

III.  PLAINTIFFS' CLAIMS WERE NEITHER FRIVOLOUS NOR UNFOUNDED.................................................................. 25

IV.  THIS CASE SHOULD BE RE-ASSIGNED TO A NEW JUDGE ON REMAND ................................................................... 27

CONCLUSION .......................................................................... 29

CERTIFICATE OF COMPLIANCE ................................................. 30

CERTIFICATE OF SERVICE ....................................................... 31

Appellate Case: 23-1374    Page: 3    Date Filed: 06/08/2023 Entry ID: 5285075

TABLE OF AUTHORITIES

## Cases

*Adarand Constructors v. Pena,*
   515 U.S. 200 (1995)........................................................................ 4, 14

*Axson-Flynn v. Johnson,*
   356 F.3d 1277 (10th Cir. 2004)........................................................ 19

*Bass v. Sw. Bell Tel., Inc.,*
   817 F.2d 44 (8th Cir. 1987)............................................................. 25

*Bowen v. Mo. Dep't of Soc. Servs.,*
   311 F.3d 878 (8th Cir. 2002)............................................................. 5

*Coal. to Defend Affirmative Action v. Granholm,*
   473 F.3d 237 (6th Cir. 2006).............................................................. 5

*Connick v. Thompson,*
   563 U.S. 51 (2011)........................................................................... 21

*EEOC v. Kenneth Balk & Assocs.,* Inc.,
   813 F.2d 197 (8th Cir. 1987)............................................................ 25

*Elk Grove Unified Sch. Dist. v. Newdow,*
   542 U.S. 1 (2004)............................................................................ 13

*Founding Church of Scientology, Inc. v. Dir., FBI,*
   459 F. Supp. 748 (D.D.C. 1978)...................................................... 19

*Franco v. City of Boulder,*
   Civil Action No. 19-cv-02634-MEH, 2022 U.S. Dist. LEXIS
   28059 (D. Colo. Feb. 16, 2022)....................................................... 22

*Hughes v. Rowe,*
   449 U.S. 5 (1980)............................................................................ 25

*Hurley v. Irish-American Gay,*
   515 U.S. 557 (1995)........................................................................ 24

iv

*Janus v. AFSCME, Council 31,*
    138 S. Ct. 2448 (2018)..........................................................14, 21

*Kennedy v. Bremerton Sch. Dist.,*
    142 S. Ct. 2407 (2022)..................................................................21

*Lee v. Weisman,*
    505 U.S. 577 (1992)................................................................15, 16

*Liteky v. United States,*
    510 U.S. 540 (1994)......................................................................27

*Marquart v. Lodge 837, Int'l Ass'n of Machinists,*
    26 F.3d 842 (8th Cir. 1994)..........................................................25

*McDonald v. Santa Fe Trail Transp. Co.,*
    427 U.S. 273 (1976)........................................................................5

*Menders v. Loudoun Cty. Sch. Bd.,*
    No. 22-1168, 2023 U.S. App. LEXIS 8978 (4th Cir. Apr. 14,
    2023)..............................................................................................19

*Okruhlik v. Univ. of Ark.,*
    255 F.3d 615 (8th Cir. 2001)..........................................................5

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1,*
    551 U.S. 701 (2007)........................................................................4

*Plessy v. Ferguson,*
    163 U.S. 537 (1896)...................................................................4, 5

*Santa Fe Indep. Sch. Dist. v. Doe,*
    530 U.S. 290 (2000)......................................................................15

*Sentis Grp., Inc. v. Shell Oil Co.,*
    559 F.3d 888 (8th Cir. 2009)........................................................27

*Socialist Workers Party v. Attorney General*, 419 U.S. 1314 (1974).......19

v

*Speech First, Inc. v. Fenves*,
  979 F.3d 319 (5th Cir. 2020)......................................................19

*Speech First, Inc. v. Schlissel*,
  939 F.3d 756 (6th Cir. 2019)......................................................19

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014)..................................................................18

*Telescope Media Grp. v. Lucero*,
  936 F.3d 740 (8th Cir. 2019)................................................18, 24

*Torcaso v. Watkins*,
  367 U.S. 488 (1961)..................................................................13

*Town of Greece v. Galloway*,
  572 U.S. 565 (2014)..................................................................15

*Tumey v. Mycroft AI, Inc.*,
  27 F.4th 657 (8th Cir. 2022) .....................................................27

*Washington v. Davis*,
  426 U.S. 229 (1976)....................................................................5

*Williams v. City of Carl Junction*,
  523 F.3d 841 (8th Cir. 2008)......................................................25

## Statutes

42 U.S.C. § 1988 .............................................................3, 25, 27

42 U.S.C. § 2000d ......................................................................5

42 U.S.C. § 2000e-2(a)(1) ..........................................................5

## Other Authorities

IBRAM X. KENDI, HOW TO BE AN ANTIRACIST (2023) .........................6, 7, 10

JOHN MCWHORTER, WOKE RACISM (2021) ...........................................8, 15

Appellate Case: 23-1374    Page: 6    Date Filed: 06/08/2023 Entry ID: 5285075

John Staddon, *Credo Quia Absurdum: Education and the Cult of Anti-Racism,* MARTIN CENTER FOR ACADEMIC RENEWAL, Feb. 14, 2022, https://bit.ly/3NX6ijI ..................................................................7

MERRIAM-WEBSTER, *creed* (last visited May 15, 2023), https://bit.ly/3OcNfly ..........................................................................16

Michael Dolich, *Alleging a First Amendment "Chilling Effect" to Create a Plaintiff's Standing: A Practical Approach,* 43 Drake L. Rev. 175 (1994) ...........................................................................20

NAT'L MUSEUM OF AFRICAN AMERICAN HIST., *Talking About Race: Being Antiracist* (last visited May 9, 2023), https://bit.ly/44O5vr2 ...........................................................................8

OREGON ASSOC. OF SCHOLARS, *The Spread of Diversity, Equity, and Inclusion (DEI) Ideology in Colleges and Universities (diagnostic tool)* (last visited May 9, 2023), https://bit.ly/3pnHtDc ..........................................................................6

UNIV. OF MICHIGAN, *Practicing Anti-Racism and Anti-Racist Pedagogy: An Overview* (last visited May 10, 2023), https://bit.ly/3MeWjVr .......................................................................10

Appellate Case: 23-1374     Page: 7     Date Filed: 06/08/2023 Entry ID: 5285075

Interests of Amici Curiae[1]

The Institute for Free Speech is a nonpartisan, nonprofit organization dedicated to the protection of the First Amendment rights of speech, assembly, petition, and press. In addition to scholarly and educational work, the Institute represents individuals and civil society organizations in litigation securing their First Amendment liberties. Resisting compelled speech is a core aspect of the Institute's organizational mission in fostering free speech.

The Manhattan Institute is a nonprofit public policy research foundation whose mission is to develop and disseminate new ideas that foster economic choice and individual responsibility. To that end, it has historically sponsored scholarship supporting the rule of law and opposing government overreach, including in the marketplace of ideas.

This case concerns amici because it implicates government intrusion not just into the freedom of speech, but into the freedom of conscience. It's a problem—a constitutional problem—when state actors tell people what they must think about controversial issues.

---

[1] No counsel for a party authored this brief in whole or part, nor did any person or entity, other than amici, their members, or their counsel, financially contribute to preparing or submitting this brief. Counsel for the school district declined to consent to the filing of this brief, so amici have filed the required motion.

1

SUMMARY OF ARGUMENT

Government policy is the product of politics. Accordingly, government employees will often be called upon to implement or follow directives with which they disagree. It does not, however, follow that the government may seek to politically indoctrinate its employees or require that they subvert legal norms. A government's demand that employees pledge loyalty to a political ideology would ordinarily violate the First Amendment. That defendant's ideology extols unlawful racial discrimination, and that plaintiffs cannot lawfully implement it without exposing themselves to personal liability, underscores the First Amendment violation's severity. And when the inevitable First Amendment lawsuits contesting such indoctrination reach the courts, judges cannot punish *the plaintiffs* for objecting.

Plaintiffs' dissent from the school district's official ideology is unsurprising. Our Constitution's Equal Protection Clause embodies a norm of colorblindness, as do Titles VI and VII of the Civil Rights Act. This befits a pluralistic, racially diverse society that has traditionally emphasized individual rights over group rights. The defendant school district sought to subvert these norms by forcing its employees to participate in a mandatory workplace training that pressured them into becoming "antiracist" activists advocating race-centric societal change. Among other things, the training program called on plaintiffs Brooke Henderson and Jennifer Lumley to share their personal opinions about

2

contested social issues, confess their alleged privilege, and write an aspirational statement declaring fealty to "antiracist" ideology. When Henderson and Lumley objected to aspects of the training, defendant's trainers dismissed them as wrong or confused, and plaintiffs began self-censoring, including giving the district answers that they personally disagreed with.

The district court ignored the training's coercive aspects, including its clear ideological content, and dismissed plaintiffs' claims. Not content to leave it at that, the judge bent over backwards to find that the school district's conduct was completely lawful and imposed a crippling reverse-fee shift under 42 U.S.C. § 1988 that both punishes plaintiffs for seeking to vindicate their civil rights and deters future challenges to the capture of our public institutions by "antiracism" and related ideologies that tolerate no dissent from their goals of reordering society along identity-based lines.

This Court should reverse the decision below and re-assign the case to a different judge on remand.

ARGUMENT

I.  THE SCHOOL DISTRICT'S MANDATORY TRAINING PROGRAM PROMOTED A DEEPLY CONTROVERSIAL IDEOLOGY THAT ADVOCATES UNLAWFUL BEHAVIOR

That the school district's mandatory "antiracism" training program generated a First Amendment challenge should have hardly been

3

surprising. The school district, after all, asked its employees to dispute a foundational concept of American society and government—and to do so in the course of violating some of our most basic laws. The Equal Protection Clause calls for colorblindness, but the school district's mandatory antiracism course instructed its employees to focus on race in dealing with others. This was no ordinary employee training.

"Our Constitution is color-blind, and neither knows nor tolerates classes among citizens. In respect of civil rights, all citizens are equal before the law." *Plessy v. Ferguson*, 163 U.S. 537, 559 (1896) (Harlan, J. dissenting). Although our national institutions nurtured race-based decisionmaking for far too long, Justice Harlan's words proved prophetic and would become the legal norm in America. It is now well established that the Equal Protection Clause makes race-conscious government decisionmaking presumptively illegal. *Adarand Constructors v. Pena*, 515 U.S. 200, 223-24 (1995) ("[A]ny person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny"); *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007) ("The way to stop discrimination on the basis of race is to stop discriminating on the basis of race") (Roberts, C.J., plurality op.). "The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the

4

basis of race." *Washington v. Davis*, 426 U.S. 229, 239 (1976); *see also Okruhlik v. Univ. of Ark.,* 255 F.3d 615, 626 (8th Cir. 2001). The Equal Protection Clause thus embodies a color-blind goal. *Coal. to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 249 (6th Cir. 2006) (citing *Plessy,* 163 U.S. at 559 (Harlan, J., dissenting)).

Colorblind decisionmaking is similarly called for by Titles VI and VII, which apply to most school districts in America. 42 U.S.C. § 2000e-2(a)(1) (unlawful to discriminate in employment based on race); 42 U.S.C. § 2000d ("No person in the United States shall, on the ground of race... be subjected to discrimination under any program or activity receiving Federal financial assistance"). These statutory protections apply to all Americans and "are not limited to discrimination against members of any particular race." *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 278-80 (1976); *see also Bowen v. Mo. Dep't of Soc. Servs.*, 311 F.3d 878, 884 (8th Cir. 2002) (white employee had articulated viable race-based harassment claim). Our legal norms, absorbed by American culture generally, and by plaintiffs in particular, reject the concept of allocating legal rights and government benefits based on race.

Although we fought a bloody Civil War to end slavery, and many other Americans worked to dismantle Jim Crow through protest, boycotts, education, and legislation; a more recent ideological movement has sought to reintroduce race-based decisionmaking into government,

5

schooling, and employment. *See, e.g.,* OREGON ASSOC. OF SCHOLARS, *The Spread of Diversity, Equity, and Inclusion (DEI) Ideology in Colleges and Universities (diagnostic tool)* (last visited May 9, 2023), https://bit.ly/3pnHtDc (mapping and diagnosing institutional capture at post-secondary educational institutions). This movement bears many names: "wokeness" (both derisively and as a badge of honor), "diversity, equity, and inclusion" (aka DEI), and "antiracism" (being racist to address legacy racism) among others. It is the ideology of "antiracism" that is at issue in this case.

To quote the racial-theorist Ibram X. Kendi: "To be antiracist is a *radical* choice in the face of this history, requiring a radical reorientation of our consciousness." IBRAM X. KENDI, HOW TO BE AN ANTIRACIST 29 (2023) (emphasis added). Antiracism calls for discrimination to obtain equity. *Id.* at 24 ("The only remedy to negative racist discrimination that produces inequity is *positive antiracist discrimination* that produces equity") (emphasis added). Anti-racism further posits that unequal outcomes based on race are always the product of racist policies and that colorblindness is itself a form of white supremacy:

> Racial inequity (or disparity) is when two or more racial groups are not standing on approximately equal footing . . . .
> A racist policy is any measure that produces or sustains racial inequity or injustice . . . . There is no such thing as a nonracist or race-neutral policy. Every policy in every

Appellate Case: 23-1374     Page: 13     Date Filed: 06/08/2023 Entry ID: 5285075

institution in every community in every nation is producing
or sustaining either racial inequity or equity[.]

*Id.* at 20-21. "The language of color blindness—like the language of 'not racist'—is a mask to hide when someone is being racist . . . . A colorblind Constitution for a White-supremacist America." *Id.* at 11.[2] To put a finer point on it, Kendi explicitly declares that not being racist is itself racist.

Naturally, this doctrine attracts critics: "Kendi's allegations—color-blindness is racist, racial disparities mean racism—which he has repeated in many forms throughout his books and speeches, are in fact racist, since he judges whites and blacks by different standards." John Staddon, *Credo Quia Absurdum: Education and the Cult of Anti-Racism,* MARTIN CENTER FOR ACADEMIC RENEWAL, Feb. 14, 2022, https://bit.ly/3NX6ijI.

Antiracism is also a totalizing ideology, because it requires adherents to make race-conscious decisions in all aspects of their lives. "When we choose to be antiracist, we become actively conscious about race and racism *and* take actions to end racial inequities in our daily lives." NAT'L MUSEUM OF AFRICAN AMERICAN HIST., *Talking About Race: Being*

---

[2] Kendi explicitly disagrees with Supreme Court precedent: "Justice Samuel Alito, writing for the court's antidemocratic majority, said, 'The mere fact that there is some disparity in impact does not necessarily mean that a system is not equally open or that it does not give everyone an equal opportunity to vote.' Actually it does, Justice Alito." KENDI, *supra*, at 28.

Appellate Case: 23-1374     Page: 14     Date Filed: 06/08/2023 Entry ID: 5285075

*Antiracist* (last visited May 9, 2023), https://bit.ly/44O5vr2. "Third Wave Antiracism exploits modern Americans' fear of being thought racist to promulgate not just antiracism, but an obsessive, self-involved, totalitarian, and utterly unnecessary kind of cultural reprogramming." JOHN MCWHORTER, WOKE RACISM 15 (2021).

In this lawsuit, Dr. Garcia-Pusateri's testimony as the district's Rule 30(b)(6) witness displays a worldview consistent with Kendian antiracism; one that requires both an embrace of race-conscious decisionmaking to reach equitable outcomes and a rejection of equality based notions of colorblindness:

> Q. Is it anti-racist to not acknowledge people's race or treat everyone the same?
>
> A. I think it's anti-racist to -- to -- to acknowledge people's identities and treat them the way that they want to be treated.
>
> Q. Okay. So it's not -- is not acknowledging people's race or saying you don't see color anti-racist?
>
> A. I would say it goes against anti-racism.
>
> Q. Does colorblindness correspond with anti-racism?
>
> A. No.
>
> Q. Does equality on the basis of race correspond with anti-racism?
>
> A. No. Based on the definition for anti-racism, it

8

> would be to ensure that there's equitable practices
> and going beyond equality.

App. 1363 at 89:5-19, R. Doc. 77-4, at 23.

In accordance with Kendian antiracism, and the binding admissions of the district's Rule 30(b)(6) witness, the mandatory trainings' PowerPoint slides aggressively promoted an embrace of conscious antiracism and a rejection of colorblindness. Against the backdrop of explicit political imagery—a socialist-realist-propaganda-style poster depicting Black Panther Party leader Fred Hampton and his quotation calling for revolution—one slide even exhorted employees to become advocates for "political, economic, and social" change:



App. 1798, R. Doc. 77-13, at 31; *see also* App. 1799, R. Doc. 77-13, at 32 ("To fight against systemic racism means to buck norms"); App. 1856, R.

9

Doc. 77-14, at 46 (training script: "The most important thing to reiterate here is that we will actively oppose racism by *advocating for change*. There is a *proactive element* in place to no longer remain silent or inactive") (emphasis added). The training also called on participants to conduct a "solo write" explaining what they would take to "become an Anti-Racist" and then asked two people to share a response. App. 1805-1806, R. Doc. 77-13, at 38-39; App. 1329, R. Doc. 77-2, at 8.

Asking public employees to write down what they will do to adopt antiracism is a method of obtaining buy-in; it is akin to an ideological loyalty oath. That is especially true because the work of a true antiracist is never done. *See* KENDI, *supra,* at 29 (" Like fighting an addiction, being an antiracist requires persistent self-awareness, constant self-criticism, and regular self-examination."); UNIV. OF MICHIGAN, *Practicing Anti-Racism and Anti-Racist Pedagogy: An Overview* (last visited May 10, 2023), https://bit.ly/3MeWjVr ("Practicing anti-racist pedagogy does not entail seeking out a final destination where we can claim to have done all the necessary work to be anti-racist teachers. It is a lifelong, ongoing process . . ."). The district's prompt is not unlike asking employees what they will do to become a better Christian (for example, "sin less" or "pray more") or committed Objectivist ("be more rational") or how they will work to achieve nirvana ("seek enlightenment").

Appellate Case: 23-1374    Page: 17    Date Filed: 06/08/2023 Entry ID: 5285075

In line with Kendi, and the district's Rule 30(b)(6) witness's testimony, the training also equated colorblindness with "white supremacy:"



Case 6:21-cv-03219-MDH   Document 77-13   Filed 07/22/22   Page 22 of 43
JA1789

App. 1789, R. Doc.77-13, at 22 ("colorblindness" is a "socially acceptable" form of "covert white supremacy"); *see also* App. 1851, R. Doc. 77-14, at 41 (training script: "Saying you are 'Colorblind' . . . are all forms of White Supremacy").

The district's training explicitly called for its employees to become practicing antiracists who advocate for social change. The training also called on employees to reject the principle of colorblindness as "white supremacy" that is incompatible with antiracism. To a fair observer, the district's training was designed to normalize race-conscious decisionmaking and generate a committed cadre of antiracist employees

11

to implement such decisions, all in contravention of legal norms and plaintiffs' personal beliefs. And even if plaintiffs were sympathetic to the district's antiracist ideology, the fact that anti*discrimination* is so clearly established in our legal tradition means that they would not enjoy qualified immunity were they to follow through on this training and discriminate based on race. Punitive damages, for which public entities typically do not compensate their employees, ought to be a real concern for public employees who actually implement Kendian antiracism in the workplace.

In the face of defendants' blatant political indoctrination, the district court inexplicably "found *nothing* in the professional training, or policy suggested by the training, requiring an employee to violate the Constitution or federal law." App. 5328, R. Doc. 88, at 23 (emphasis added). The district court's holding was plainly erroneous and exhibited a willful blindness to undisputed evidence of a "training" agenda that calls for subversion of equality before the law—a goal that many if not most Americans would reject.

Simply put: the district's training program advocated race discrimination by government employees. It was not a mere "racial sensitivity" training (*see* App. 5329, R. Doc. 88, at 24), nor was it a classic workplace training program focused on risk management or the need to comply with existing anti-discrimination laws. On the contrary, the district sought to subvert legal norms because the norm of

12

colorblindness is an obstacle to the district's transformational antiracist agenda.

And while it may be permissible for academics or university students to debate the merits of race-conscious decisionmaking, or posit the need for a constitutional amendment to re-institute *de jure* racism in the name of social justice, a mandatory, tax-payer funded training program for government employees is not the venue for such activism. The district and its employees are obligated to follow the law. If they want to change legal norms, the activists running the school district must do so on their own time and their own dime; the First Amendment's guarantee against compelled speech bars them from using their offices to coerce others into affirming and promoting their politics.

II. THE SCHOOL DISTRICT'S MANDATORY TRAINING PROGRAM INCLUDED INTENTIONALLY COERCIVE FEATURES IN VIOLATION OF PLAINTIFFS' FIRST AMENDMENT RIGHTS

A. The First Amendment forbids compelled speech and coercive ideological indoctrination

"Our cardinal freedom is one of belief; leaders in this Nation cannot force us to proclaim our allegiance to *any* creed, whether it be religious, philosophic, or political." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 44 (2004) (O'Connor, J., concurring); *see also Torcaso v. Watkins*, 367 U.S. 488, 495 (1961) ("We repeat and again reaffirm that neither a State nor the Federal Government can constitutionally force a person 'to profess a belief or disbelief in any religion'"). The Supreme Court has

13

long recognized that the First Amendment also protects the right not to speak. *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2463 (2018) (collecting cases).

> Compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command, and in most contexts, any such effort would be universally condemned. Suppose, for example, that the State of Illinois required all residents to sign a document expressing support for a particular set of positions on controversial public issues—say, the platform of one of the major political parties. No one, we trust, would seriously argue that the First Amendment permits this.

*Id.* at 2463-64.

The *Janus* court's hypothetical proved prophetic because just a few years later, the school district in this case would claim the right to indoctrinate its employees into the creed of antiracism, which requires its adherents to renounce the Constitution's command of colorblindness and confess their positionality on a racialist spectrum. *See* App. 1784, R. Doc. 77-13, at 17; App. 1789, R. Doc. 77-13, at 22; App. 1805-1806, R. Doc. 77-13, at 38-39; App. 1851, R. Doc. 77-14, at 41; App. 1856, R. Doc. 77-14, at 46.

At first, "antiracism" may sound harmless. After all, who wants to be against being against racism? But antiracism requires discrimination based on race, and the Constitution does not countenance so-called benign discrimination. *See Adarand,* 515 U.S. at 227. The district's overreach would perhaps be more obvious had it asked employees to

14

join the Democratic party or sign-up to volunteer for Senator Josh Hawley's campaign; but asking employees to "become antiracists" is an ideological imposition of breathtaking ambition.

Some have even claimed that antiracism is a religion.[3] Whatever the merits of that assertion, the Supreme Court's jurisprudence on the Establishment Clause provides additional basis for concern where public employees are trained in a group setting that encourages conformity. "'[T]he government may no more use social pressure to enforce orthodoxy than it may use more direct means.'" *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 312 (2000) (quoting *Lee v. Weisman*, 505 U.S. 577, 594 (1992)); *see also Town of Greece v. Galloway,* 572 U.S. 565, 588 (2014) ("The analysis would be different if town board members directed the public to participate in the prayers, singled out dissidents for opprobrium, or indicated that their decisions might be influenced by a person's acquiescence in the prayer opportunity"). "That the intrusion was in the course of promulgating religion that sought to be civic or

_____

[3]"Something must be understood: I do not mean that these people's ideology is 'like' a religion . . . . I mean that it actually is a religion. An anthropologist would see no difference in type between Pentacostalism and this new form of antiracism." MCWHORTER, *supra,* at 23. It does have similar features: faith-based, unfalsifiable claims (systemic racism, implicit bias); confession of original sin (white privilege or other positionality on the oppression spectrum); everyday, venial sin (microaggressions); heresy or apostacy (white supremacy, claiming to be colorblind or "not racist" or claiming that any disparate outcome is not due to racism).

Appellate Case: 23-1374     Page: 22     Date Filed: 06/08/2023 Entry ID: 5285075

nonsectarian rather than pertaining to one sect does not lessen the offense or isolation to the objectors." *Lee,* 505 U.S. at 594. So too with the creed[4] of antiracism.

The district's training program did not just take a passive lecture format, conveying antiracism as one possible viewpoint among many— rather the training presented antiracism as the official goal and sought to cajole employees into compliance through peer pressure, including calling on employees and asking employees to speak during break-out discussion groups. *See, e.g,* App. 1326, R. Doc. 77-2, at 5; App. 1336-37, R. Doc. 77-3, at 3-4; App. 1774, R. Doc. 77-13, at 6 ("Guiding Principles[:]… Acknowledge YOUR privileges"); App. 1775, R. Doc. 77-13, at 7 ("Participants will… Share and dialogue with larger and smaller groups"). When plaintiffs Henderson and Lumley attempted to share views that dissented from the official narrative, they were publicly corrected by the trainers. App. 1338, R. Doc. 77-3, at 5 ("[Mr. Sode] responded that black people can be prejudiced but not racist");[5] App. 1326, R. Doc. 77-2, at 5 ("Dr. Garcia-Pusateri told me I was wrong,

---

[4] The term "creed" seems particularly suited to describe antiracism, which arguably straddles the line between the religious and secular. *See* MERRIAM-WEBSTER, *creed* (last visited May 15, 2023), https://bit.ly/3OcNfly ("1: a brief authoritative formula of religious belief…2: a set of fundament beliefs").

[5] The district's trainer's assertion is patently absurd, and a public school employee is no more obligated to agree with Mr. Sode's racialist views than to agree that 2+2=5 or that Aryans are racially incapable of being racist.

Appellate Case: 23-1374     Page: 23     Date Filed: 06/08/2023 Entry ID: 5285075

told me I was confused, and said Mr. Rittenhouse murdered an innocent person").[6]

It is also undisputed that the district encouraged employees to become antiracists. App. 1775, R. Doc. 77-13, at 7 ("Participants will… Receive tools on how to become Anti-Racist educators, leaders and staff members of SPS"); App. 1806, R. Doc. 77-13, at 39. And that the district asked each employee to complete a "solo write" that included answering the question: "What steps will you take to become an Anti-Racist?" App. 1805, R. Doc. 77-13, at 38; App. 1329, R. Doc. 77-2, at 8; App. 1339, R. Doc. 77-3, at 6. While the district did not require employees to turn in the antiracist solo-write for evaluation after this set of training sessions, it would have been reasonable for Henderson and Lumley to perceive that their careers were in jeopardy if they did not express fealty to the creed of antiracism, and that firmer declarations of ideological loyalty would be required in the near future.

Indeed, the district required Henderson to answer online questions pertaining to the subjects of white supremacy, anti-racism and social justice, where the only correct answers were political statements with which she disagrees. App. 1330-33, R. Doc. 77-2, at 9-12. Together,

---

[6] In Nov. 2021, a jury acquitted Kyle Rittenhouse of all charges. Dr. Garcia-Pusateri was thus incorrect in her characterization, as a matter of law.

Appellate Case: 23-1374    Page: 24    Date Filed: 06/08/2023 Entry ID: 5285075

these facts made for viable compelled speech claims. This Court should reverse the district court's finding to the contrary.

### B. Standing doctrine favors pre-enforcement challenges to government speech burdens

The district court found that Henderson and Lumley lacked standing to challenge the district's training program because "[a]t most, Defendants' training encouraged Plaintiffs to adhere to Defendant SPS' description of equity and anti-racism" (App. 5315, R. Doc. 88, at 10) and did not impose any discipline or dock plaintiffs' pay. This analysis posits that Henderson and Lumley must wait and sue until after they are punished for resisting the district's totalizing ideology; but in the free speech context, speakers are given wider latitude to bring a pre-enforcement challenge.

Although a harm must be actual or imminent, not conjectural or hypothetical, to constitute an injury in fact, a plaintiff need not wait for an actual prosecution or enforcement action before challenging a speech restriction's constitutionality. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158-61 (2014) (collecting cases); *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 749 (8th Cir. 2019). Moreover, standing to challenge speech restrictions is not limited to statutes authorizing criminal prosecutions or fines, but can extend to other government policies or conduct that chills speech. *Menders v. Loudoun Cty. Sch. Bd.*, No. 22-1168, 2023 U.S. App. LEXIS 8978, at *13-16 (4th Cir. Apr. 14,

18

2023) (parents plausibly alleged new reporting system chilled their children's free speech); *Speech First, Inc. v. Fenves*, <u>979 F.3d 319, 330-31</u> (5th Cir. 2020) (university students had standing to challenge speech rules and reporting system that chilled speech); *Speech First, Inc. v. Schlissel*, <u>939 F.3d 756, 765</u> (6th Cir. 2019) (university's bias-response team created implicit threat of punishment that chilled speech); *Axson-Flynn v. Johnson*, <u>356 F.3d 1277, 1290</u> (10th Cir. 2004) (actionable speech compulsion may take the form of indirect discouragement).

A justiciable chilling effect may also arise from any concrete government conduct, and not just from actions that are regulatory, proscriptive, or compulsory in nature. *Compare* App. 5311, R. Doc. 88, at 6 (district court implicitly limiting compelled speech to the latter). For example, a proposed FBI surveillance of a student political convention presented a justiciable claim that it might dissuade potential attendees from participating. *Socialist Workers Party v. Attorney General*, <u>419 U.S. 1314, 1318-19</u> (1974) (Marshall, J., as circuit justice); *see also Jackson v. Wright,* Civil Action No. 4:21-CV-00033, <u>2022 U.S. Dist. LEXIS 8684, at *19-20</u> (E.D. Tex. Jan. 18, 2022) (public university professor stated a viable chilled-speech claim where administrators froze his involvement with an academic journal after a controversial article); *Founding Church of Scientology, Inc. v. Dir., FBI,* <u>459 F. Supp. 748, 760-61</u> (D.D.C. 1978) (religious group had alleged justiciable claim regarding government use of informants and

19

infiltrators); Michael Dolich, *Alleging a First Amendment "Chilling Effect" to Create a Plaintiff's Standing: A Practical Approach,* 43 Drake L. Rev. 175, 176 (1994).

Here, the district forced Henderson and Lumley to participate in a mandatory ideological indoctrination, on pain of loss of pay or possible discipline. App. 1324, R. Doc. 77-2, at 3; App. 1335, R. Doc. 77-3, at 2. An explicit goal of the training was to promote the doctrine of antiracism and ask participants to explain what steps they would take to become antiracists. App. 1329, R. Doc. 77-2, at 8; App. 1798-1806, R. Doc. 77-13, at 31-39. The district asked participants to share their views on contested issues. *See, e.g.,* App. 1324-25, R. Doc. 77-2, at 3-4; App. 1336, R. Doc. 77-3, at 3. Both plaintiffs shared *some* of their opinions, but began self-censoring after they received pushback from the trainers or other participants. App. 1327-29, R. Doc. 77-2, at 6-8; App. 1331, R. Doc. 77-2, at 10; App. 1339, R. Doc. 77-3, at 6. It was not unreasonable for the plaintiffs to conclude that if they continued sharing their actual opinions, or did so at future trainings, they would face additional consequences. Indeed, forcing discussion of these highly contentious topics doesn't just serve to promote the official district narrative on race—it serves to identify those employees who dissent from that policy, who may then be targeted for special attention to either bring them into compliance or remove them from the workforce.

Under the circumstances, the district court should have identified the injury in fact sufficient to support standing. Self-censorship and compelled speech can support justiciable claims. That the school district sought to impose its norms-defying ideology and stifle dissent from it by way of novel means—a mandatory training program with intentionally coercive features—does not vitiate standing. And it is not as if the school district asked its employees to implement a politically anodyne aspect of school board policy, such as, for example, teaching kids to read through phonics. The district asked its employees to adopt a totalizing philosophy that is designed to govern all aspects of their lives.

C.   It is per se illegal for a school district to indoctrinate its employees to subvert Constitutional and other legal norms

A school district may have broad authority to control employee speech when employees are speaking on the job and in their roles as an educator or government employee. *See Janus,* 138 S. Ct. at 2473; *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2423 (2022) ("In addition to being private citizens, teachers and coaches are also government employees paid in part to speak on the government's behalf and convey its intended messages"). But that control extends only to lawful speech. "[T]he employer may insist that the employee deliver any *lawful* message…" *Janus,* 138 S. Ct. at 2473 (emphasis added); *see also Connick v. Thompson,* 563 U.S. 51, 62 (2011) (pattern of failure to train leading to violation of constitutional rights may create municipal

21

liability); *Franco v. City of Boulder*, Civil Action No. 19-cv-02634-MEH, 2022 U.S. Dist. LEXIS 28059, at *22 (D. Colo. Feb. 16, 2022) (city's inadequate training caused the complained of conduct because all the officers believed they had authority to arrest for a probation violation). The school district had no legal authority to ask its employees to disregard the principle of colorblindness enshrined in the Equal Protection Clause and other federal laws such as Titles VI and VII.[7] It also had no legal authority to ask its employees to adopt the totalizing philosophy of antiracism, which asks its adherents to apply its principles in all aspects of their everyday lives, even when they are not at work.

---

[7] Indeed the trainings may have generated legal risk and liability for both the district and its employees, especially if students, or their parents, later bring suit for racial discrimination.

Appellate Case: 23-1374    Page: 29    Date Filed: 06/08/2023 Entry ID: 5285075

And let us be clear about what the district asked: it wanted its employees to "see the race" of its students, and also to categorize their positionality and that of their students and co-workers on a spectrum of oppression:



App. 1784, R. Doc. 77-3, at 17.

Trainings advocating antiracism have no more place in our public schools than trainings advocating the adoption of any other race-based ideologies, such as those which drove the Axis powers. And it is not as if the district invited an open debate about how to approach divisive social issues—antiracist ideology was not presented as an issue that students might bring into the classroom and with which faculty would have to wrestle, or as an abstract academic concept. Rather, the district

23

prescribed adherence to this ideology in one's work and daily life as the *only* acceptable option. But teachers violate constitutional rights, and likely break a variety of laws, if they racially discriminate against their students—even if the district's favored ideologues would overturn the Constitution itself to allow such allegedly positive discrimination.

Contrasting speech and conduct, this Court has previously noted that governments may prohibit discriminatory conduct without interfering with citizens' rights to speak about contested issues. *Telescope Media,* 936 F.3d at 755 (citing *Hurley v. Irish-American Gay*, 515 U.S. 557, 579 (1995)). But the First Amendment does not authorize a school district to train its employees to intentionally discriminate and violate the law.

The First Amendment protects district officials' right to advocate for social revolution on their own time. But they may not use taxpayer funds to force their norms-defying ideology on other employees or condition public employment on an agreement to aspire to become antiracists, even if imperfectly implemented. The district court erred when it held that the school district "was not requiring any employee to engage in illegal activity." App. 5328, R. Doc. 88, at 23. This Court should hold that the school district's training was per se unlawful because it promoted subversion of the Constitution and federal law.

24

III.   PLAINTIFFS' CLAIMS WERE NEITHER FRIVOLOUS NOR UNFOUNDED

Fee shifting under 42 U.S.C. § 1988 favors plaintiffs for good reason: without it there would be a great disincentive to bring civil rights actions under 42. U.S.C. § 1983. A prevailing government defendant is entitled to attorney's fees "only in very narrow circumstances." *Williams v. City of Carl Junction*, 523 F.3d 841, 843 (8th Cir. 2008) (citing *Marquart v. Lodge 837, Int'l Ass'n of Machinists*, 26 F.3d 842, 848 (8th Cir. 1994)). The district court must find that the plaintiffs' claim was "'frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so." *Williams,* 523 F.3d at 843 (quoting *Hughes v. Rowe*, 449 U.S. 5, 15 (1980) (per curiam)); *see also Bass v. Sw. Bell Tel., Inc.,* 817 F.2d 44, 46 (8th Cir. 1987). Filing a weak lawsuit is not enough. *Id.* at 46-47. If a plaintiff has some basis to bring her claims, reverse fee shifting is not allowed. *Williams,* 523 F.3d at 843 (citing *EEOC v. Kenneth Balk & Assocs.,* Inc., 813 F.2d 197, 198 (8th Cir. 1987)).

The district court abused its discretion by finding that plaintiffs' claims were frivolous and unfounded. App. 5329-30, R. Doc. 88, at 24-25; App. 5511, R. Doc. 107, at 2. Civil rights plaintiffs must have room to make arguments for extensions of the law to cover novel situations—on behalf of any side, of any issue. And for the reasons stated *infra*, Henderson and Lumley did state viable claims.

25

Even if this Court finds that the district did not quite go far enough in requiring an explicit antiracist loyalty oath from its employees, the district does not hide its goal. The training contained coercive features, designed to pressure employees into adopting the district's racialist program. The extremists pushing antiracist ideology know what they are doing. Peer pressure is a powerful tool for enforcing conformity and few people can be expected to push back in the employment setting, especially in the face of being labeled a racist or white supremacist. Can anyone seriously entertain the notion that the plaintiffs' continued open dissent against antiracism programming would be received with indifference by the district's leadership? People take tremendous personal and professional risk dissenting in the face of righteous extremists who believe they are on a mission to change society. The First Amendment, and Section 1983, call on federal courts to protect such individuals who stand up to defend their conscience. The district court did the opposite.

Nor would a finding in favor of plaintiffs make the administration of public-school training programs "untenable," as claimed by the district court. App. 5329, R. Doc. 88, at 24. School districts are free to train employees on how to comply with legal requirements, and they remain free to select from a menu of lawful policy options. They are also free to ask that their employees work to implement a lawful policy, even one they might personally disagree with. But they are not free to compel

26

political conformity, let alone indoctrinate employees in a totalizing political ideology that requires them to subvert legal norms embodied in the U.S. Constitution and federal law.

IV. THIS CASE SHOULD BE RE-ASSIGNED TO A NEW JUDGE ON REMAND

Recusal or reassignment is appropriate where the judge's impartiality might reasonably be questioned by the average person who knows all the relevant facts of a case. *Sentis Grp., Inc. v. Shell Oil Co.*, 559 F.3d 888, 904 (8th Cir. 2009); *see also Liteky v. United States,* 510 U.S. 540, 548 (1994); *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 667-68 (8th Cir. 2022). Federal appellate courts are vested with authority to reassign a case to a different judge on remand. *Id.* (citations omitted).

Judge Harpool's opinions in this case raise the specter of bias against plaintiffs and their colorblind worldview. While labeling plaintiffs' claims as "trivializing the important work of the federal judiciary" and decrying the use of courts for "judicial activism" (App. 5309, R. Doc. 88, at 4), Judge Harpool delivered a profoundly aggressive set of opinions. Federal courts have original jurisdiction over federal questions (28 U.S.C. § 1331), and presenting a novel claim for the extension of First Amendment rights to coercive workplace trainings is not a trivial matter. The granting of a *defendant's* Section 1988 motion is vanishingly rare under long-established standards, and for good reason.

27

Yet Judge Harpool essentially invited defendants to file a fee motion. App. 5329-30, R. Doc. 88, at 24-25.

In his fees ruling, Judge Harpool again reiterated the shibboleth that "it is not acceptable for public employees to simply disregard a training that is lawful[.]" App. 5512, R. Doc. 107, at 3. He criticized the "political undertones of Plaintiffs' allegations" and characterized their claims as a "frivolous political disagreement." *Id.* Sounding more like a legislator than a judge, he opined that the money expended on defense "would have been better spent ensuring educational opportunities for students." *Id.* He then ordered plaintiffs to pay $312,869.50 in attorneys' fees. App. 5513, R. Doc. 107, at 4. Even under a parsimonious view of standing that fails to acknowledge that coercive race-conscious ideological mandates might raise a First Amendment case or controversy, the very fact of fee-shifting here, to say nothing of the amount, is an extreme outlier in few-shifting jurisprudence.

Judge Harpool's opinions in this case authorize school districts to use coercive trainings to indoctrinate employees into the ideology of antiracism and normalize race-based decisionmaking. They also serve as a warning to other putative civil-rights plaintiffs not to challenge the ideology of antiracism, especially if they work in public schools.

Perhaps Judge Harpool misperceives the nature of antiracism or is himself sympathetic to its creed or ideology. On the record, that is a fair suspicion. More to the point, an average person on the street who

28

viewed those PowerPoint slides would at least understand that there was something wrong with the district's training, and that a judge who dismissively brushed that evidence aside; and flouted legal norms to deliver an exotic, punitive fee-shifting award might not be impartial with respect to this emotionally charged issue. The mere fact that a judge would disagree with plaintiffs' claims would be unfortunate, but not cause for reassignment. Because the record here would suggest something more to a reasonable observer, this Court should reassign this case on remand.

CONCLUSION

The district court should be reversed and this case re-assigned to a new judge on remand.

Dated: May 17, 2023

Respectfully submitted,

<u>s/Ilya Shapiro</u>
Ilya Shapiro
MANHATTAN INSTITUTE
52 Vanderbilt Ave.
New York, NY 20017
212-599-7000
ishapiro@manhattan-institute

<u>s/Endel Kolde</u>
Endel Kolde
Alan Gura
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., N.W., Ste. 801
Washington, DC 20036
202-301-1664
dkolde@ifs.org
agura@ifs.org

Counsel for Amici Curiae

29

CERTIFICATE OF COMPLIANCE

In accordance with FED. R. APP. P. 29 and 32, I certify that this brief is set in 14-point Century Schoolbook, a proportionately spaced font, and as, calculated by Microsoft Word, contains 6,190 words, less than half the number of words permitted for the parties' briefs. I further certify that this brief is virus free, as determined by Windows Security – Virus & threat protection.

Dated: May 17, 2023

<em>s/Endel Kolde</em>

Appellate Case: 23-1374    Page: 37    Date Filed: 06/08/2023 Entry ID: 5285075

CERTIFICATE OF SERVICE

I hereby certify that today I electronically filed this brief using the appellate CM/ECF system and that all participants are registered CM/ECF users and will be served via that platform.

Dated: May 17, 2023

*s/Endel Kolde*

31