## IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

BROOKE HENDERSON and JENNIFER LUMLEY,
*Plaintiffs-Appellants*,

v.

SCHOOL DISTRICT OF SPRINGFIELD R-12, BOARD OF EDUCATION
FOR THE SCHOOL DISTRICT OF SPRINGFIELD R-12,
DR. GRENITA LATHAN, DR. YVANIA GARCIA-PUSATERI, and
LAWRENCE ANDERSON,
*Defendants-Appellees*.

Appeal from the United States District Court for the
Western District of Missouri, Southern Division
The Honorable Douglas Harpool
Case No. 6:21-cv-03219-MDH

## BRIEF OF APPELLEES
## SCHOOL DISTRICT OF SPRINGFIELD R-12, BOARD OF EDUCATION
## FOR THE SCHOOL DISTRICT OF SPRINGFIELD R-12,
## DR. GRENITA LATHAN, DR. YVANIA GARCIA-PUSATERI, and
## LAWRENCE ANDERSON

Ransom A Ellis, III, Mo. Bar 29129
Tina G. Fowler, Mo. Bar 48522
ELLIS ELLIS HAMMONS & JOHNSON, P.C.
2808 S. Ingram Mill Road, Suite A-104
Springfield, Missouri 65804
rellis3@eehjfirm.com
tfowler@eehjfirm.com
Phone: (417) 866-5091
*Attorneys for Defendants-Appellees*

# SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT

Plaintiffs are current employees of the School District of Springfield, R-12. Plaintiffs do not believe in equity and anti-racism. They filed suit arguing their First Amendment rights were violated when they attended equity and diversity training. Despite their assertion that this case is one of first impression, this Court has addressed their unexceptional position and held that a public employer can require employees to attend such trainings without infringing on their constitutional rights. This Court has too found that when one suffers no adverse action, or injury-in-fact, they lack standing to proceed. Such occurred here. Plaintiffs received credit and pay for attending the training, and they spoke openly, voicing objections to the principles presented. They were not required to speak favorably about anti-racism, which they reject. Nor were Plaintiffs fired, demoted, transferred, or disciplined. In sum, after analyzing Plaintiff's conflated constitutional theories, the district court properly granted summary judgment for Defendants due to Plaintiffs' lack of standing.

The district court also properly awarded Defendants their attorney's fees. Plaintiffs did not seek a remedy for a genuine harm, but drug Defendants into a political dispute, and continued to pursue their action even after the district court's early warning. They then pursued their claims aggressively even after discovery confirmed their obvious lack of injury-in-fact, solidifying the basis for the fee award.

If the Court grants oral argument, Defendants too request 30 minutes per side.

Appellate Case: 23-1374    Page: 2    Date Filed: 07/19/2023 Entry ID: 5297480

# TABLE OF CONTENTS

SUMMARY OF THE CASE…………..…………………………………………i

TABLE OF AUTHORITIES …………..………………………………………iv

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW...……….………1

STATEMENT OF THE CASE……………..……………………………………2

    I.    The Training Endeavored to Increase Employee Awareness
        of, and Sensitivity to, Potential Discrimination Faced by
        Under-Represented and Under-Resourced Students………..…..……...2

    II.   Henderson's Employment and Training………………………………4

    III.  Lumley's Employment and Training…………………………………6

    IV.  Plaintiffs Attended the Training, Expressed Their Views,
         Were Not Penalized, and Remain Employees of SPS………..……...8

    V.   Procedural History………………..……………..…..………………8

SUMMARY OF THE ARGUMENT……………..……………………..………10

STANDARD OF REVIEW………………………………………………………12

ARGUMENT………………..……………………………………………...13

    I.    The District Court Properly Granted Summary Judgment
        in Favor of Defendants Because Plaintiffs' Claims
        Are Not Justiciable…………………………………………..………13

        A.   The District Court Correctly Held Plaintiffs
            Lacked Standing…………………………….………..…………14

        B.   Plaintiffs' Factual Mischaracterizations Provide
            No Basis for Injury Sufficient to Show that
            SPS Compelled Plaintiffs' Speech…………………………...…18

Appellate Case: 23-1374   Page: 3   Date Filed: 07/19/2023 Entry ID: 5297480

C.    Plaintiffs' Factual Mischaracterizations Provide
      No Basis for Injury Sufficient to Show
      that SPS Chilled Plaintiffs' Speech or
      Discriminated Against Plaintiffs' Views……………..………..26

D.    Plaintiffs' Factual Mischaracterizations Provide
      No Basis for Injury Sufficient to Show
      that SPS Subjected Plaintiffs to an
      Unconstitutional Condition of Employment……...…………..31

II.   Irrespective of Their Lack of Standing, the District Court
      Properly Granted Summary Judgment in Favor of
      Defendants Because Plaintiffs' Interests in Speaking
      Do Not Outweigh SPS's Interest in an Effective and
      Efficient, Nondiscriminatory Environment………..……..…………..31

III.  The District Court Did Not Abuse Its Discretion When
      Awarding Defendants Their Attorney's Fees and Costs……..………38

      A.    The District Court Correctly Found Plaintiffs'
            Claims to be Frivolous, Unreasonable, or
            Without Foundation…………………………………………..39

      B.    The District Court Correctly Found Defendants'
            Hourly Rates and the Attorney Hours Expended
            Reasonable……………………………………………………44

IV.   If Remanded, Which Should Not Occur, Plaintiffs
      Have Not Shown a Basis for Case Reassignment……………………47

V.    Plaintiffs' Appeal is Frivolous—Defendants Should Be
      Awarded Just Damages Pursuant to FED.R.CIV.P. 38……..………..47

CONCLUSION ………………………………………………………..48

CERTIFICATE OF COMPLIANCE………………………………………...49

CERTIFICATE OF SERVICE………………………………….…………...50

Appellate Case: 23-1374    Page: 4    Date Filed: 07/19/2023 Entry ID: 5297480

# TABLE OF AUTHORITIES

**Cases**

*281 Care Comm. v. Arneson*, 638 F.3d 621 (8th Cir. 2011),
*cert. denied*, 567 U.S. 951 (2012)………………………………………………………….29

*Abbott v. Pastides*, 900 F.3d 160 (4th Cir. 2018), *cert. denied*,
139 S.Ct. 1292 (2019)……………………………………………………….…1, 28, 32

*Altman v. Minn. Dep't of Corr.*, 251 F.3d 1199 (8th Cir. 2001)……………1, 31, 32

*A.M. ex rel McAllum v. Cash*, 585 F.3d 214 (5th Cir. 2009)………………………36

*Am. Fam. Life Ass. Co. v. Teasdale*, 733 F.2d 559 (8th Cir. 1984)……………..1, 43

*Axson-Flynn v. Johnson*, 356 F.3d 1277 (10th Cir. 2004)…………………...…22, 23

*Bantam Books, Inc. v. Sullivan¸* 372 U.S. 58, 83 S.Ct. 631 (1963)….……………29

*Bond v. Keck*, 629 F. Supp. 225, 227 (E.D. Mo. 1986),
*aff'd*, 802 F.2d 463 (8th Cir. 1986)..…………………………………………….……41

*Bourgeois v. U.S. Coast Guard*, 151 F. Supp. 3d 726 (W.D. La. 2015)...……..……34

*Carlisle v. McNair*, 2023 WL 3340080 (5th Cir. May 10, 2023)…………………..13

*Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 98 S.Ct. 694 (1978)….….…40

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 133 S.Ct. 1138 (2013)..………1, 26, 31

*C.N. v. Ridgewood Bd. of Edu.*, 430 F.3d 159 (3rd Cir. 2005)……………….…..…16

*Cressman v. Thompson*, 719 F.3d 1139 (10th Cir. 2013)……..………….…………22

*Cressman v. Thompson*, 798 F.3d 938 (10th Cir. 2015), *cert. denied*,
577 U.S. 1216 (2016)………………………………………………………..…………22

*CRST Van Expedited, Inc. v. EEOC*, 578 U.S. 419, 136 S.Ct. 1642 (2016)..………39

iv

*Daniels v. Alphabet, Inc*., 2023 WL 2414258 (N.D. Cal. March 8, 2023)...………..47

*EEOC v. CRST Van Expedited, Inc*., 944 F.3d 750 (8th Cir. 2019)…………......1, 44

*Farrar v. Hobby*, 506 U.S. 103, 113 S.Ct. 566 (1992)……………………………46

*Fish v. St. Cloud State Univ*., 295 F.3d 849 (8th Cir. 2002)……….………….………44

*Fisher v. Walmart*, 619 F.3d 811 (8th Cir. 2010)…………………..……………40

*Flowers v. Jefferson Hosp. Ass'n*, 49 F.3d 391 (8th Cir. 1995)…………...…41, 46

*Fox v. Vice*, 563 U.S. 826, 131 S.Ct. 2205 (2011)..……………………………12, 39

*Garcetti v. Ceballos*, 547 U.S. 410, 126 S.Ct. 1951 (2006)……….…….…………36

*Gralike v. Cook*, 191 F.3d 911 (8th Cir. 1999), *aff'd*, 531 U.S. 510 (2001)………25

*Hein v. Freedom From Religion Found*., 551 U.S. 587, 127 S.Ct. 2553 (2007)……14

*Huizenga v. Indep. Sch. Dist. No. 11*, 44 F.4th 806 (8th Cir. 2022)………...…12, 14

*Janus v. AFSCME, Council 31*, 138 S. Ct. 2448 (2018)………………………25, 36

*Keeton v. Anderson-Wiley*, 664 F.3d 865 (11th Cir. 2011)………………..………27

*Koester v. YMCA*, 2018 WL 10425458 (E.D. Mo. May 4, 2018)…………...……46

*Kohlbeck v. Wyndham Vacation Resorts, Inc*., 7 F.4th 729 (8th Cir. 2021)…..……12

*Laird v. Tatum*, 408 U.S. 1, 92 S.Ct. 2318 (1972)…………………………………19

*League of Wm. Vtrs. of Mo. v. Ashcroft*, 5 F.4th 937 (8th Cir. 2021)………..………12

*Little Rock Sch. Dist. v. State of Ark*., 127 F.3d 693 (8th Cir. 1997)……..…………44

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130 (1992)...……………14

*Menders v. Loudoun Cty. Sch. Bd*.¸ 65 F.4th 157 (4th Cir. 2023)...……………..1, 15

Appellate Case: 23-1374    Page: 6    Date Filed: 07/19/2023 Entry ID: 5297480

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021)…………………….…………22

*Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831 (1974)……..……18

*Morrison v. Bd. of Ed. of Boyd Cty.*, 521 F.3d 602 (6th Cir. 2008)………………..22

*Morse v. Frederick*, 551 U.S. 393, 127 S.Ct. 2618 (2007)…..………………….……37

*Pacific Gas and Electric v. Pub. Utilities Comm. of Calif.*,
475 U.S. 1, 106 S.Ct. 903 (1986)………………………………………..………18

*Padilla v. South Harrison R-II Sch. Dist.*, 181 F.3d 992 (8th Cir. 1999)…..…………37

*Parker v. Hurley*, 514 F.3d 87 (1st Cir. 2008), *cert. denied*,
555 U.S. 815 (2008)………………………………………………………37

*Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694 (1972)…..…………………….31

*Phelan v. Laramie Cty. Comm. Coll. Bd. of Trustees*,
235 F.3d 1243 (10th Cir. 2000)…..………………….…………………18, 19, 22

*Pickering v. Bd. of Edu. of Twp. High Sch. Dist.*, 391 U.S. 563,
88 S.Ct. 1731 (1968)…..………………………………………..…1, 31, 36

*Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 92 S.Ct. 2286 (1972)…..………………28

*R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 112 S.Ct. 2538 (1992)……………27

*Raniere v. Microsoft Corp.*, 887 F.3d 1298 (Fed. Cir. 2018)…..……………………39

*Robertson v. Anderson Mill Elem. Sch.*, 989 F.3d 282 (4th Cir. 2021),
*cert. denied*, 532 U.S. 1020 (2001) …...……………………………………37

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819,115 S.Ct. 2510 (1995)…………………………………………26

*Sabra v. Maricopa Cty. Cmty. Coll. Dist.*, 479 F.Supp.3d 808
(D. Ariz. 2020), *aff'd*, 44 F.4th 867 (9th Cir. 2022)…………………..…………16

*Small Justice v. Xcentric Ventures*, 873 F.3d 313 (1st Cir. 2017) …..…………...…39

Appellate Case: 23-1374    Page: 7    Date Filed: 07/19/2023 Entry ID: 5297480

*Speech First, Inc. v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022) …....…..…………29

*Speech First, Inc. v. Schlissel*, 939 F.3d 756 (6th Cir. 2019)…………..…………30

*Telescope Media Grp. v. Lucero*, 936 F.3d 740 (8th Cir. 2019)...…………..………25

*Tumey v. Mycroft Al, Inc*., 27 F.4th 657 (8th Cir. 2022)...…………….….………47

*U.S. v. Sindel*, 53 F.3d 874 (8th Cir. 1995)………………………….…………18

*Virginia v. Am. Booksellers* Ass'n, 484 U.S. 383, 108 S.Ct. 636 (1988)………28, 29

*West Virginia State Bd. of Edu. v. Barnette*, 319 U.S. 624,
63 S.Ct. 1178 (1943)..……………………………………………...…………18

*Williams v. City of Carl Junction, Mo.*, 523 F.3d 841 (8th Cir. 2008)..…………1, 40

*Winter v. Cerro Gordo Cty. Cons. Bd*., 925 F.2d 1069 (8th Cir. 1991)……...……13

*Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428 (1977)…………….…………18

*Wragg v. Village of Thornton*, 604 F.3d 464 (7th Cir. 2010)..…………..…………30

*Zanders v. Swanson*, 573 F.3d 591 (8th Cir. 2009)…………………….…1, 13, 26

*Zieper v. Metzinger*, 474 F.3d 60 (2nd Cir. 2007)...………………..…………21

**Statutes**

20 U.S.C. §1681 *et seq*. (Title IX)..…………………………….…………34, 35

29 U.S.C. § 701 et seq. (Section 504)……………………………………...35

42 U.S.C. § 1983………………………………………………9, 40, 42

42 U.S.C. § 1988..…………………………………….…………*passim*

42 U.S.C. § 2000d *et seq*. (Title VI)…………………………..…………34

Appellate Case: 23-1374     Page: 8     Date Filed: 07/19/2023 Entry ID: 5297480

42 U.S.C. §§ 2000e *et seq.* (Title VII)……………………………………..………35

42 U.S.C. §§ 12132 *et seq.* (Title II of the ADA)..…………………………………35

RSMo. § 213.010 *et seq.*.…………………………………………..………………35

**Rules**

Federal Rule of Appellate Procedure 38……………..………………………47

Federal Rule of Civil Procedure 56……………………..………………………12

**Other**

Don't Shoot Portland v. City of Portland, 2022 WL 2700307
(D. Oregon 2022)..…………………………………………………………..3

U.S. Department of Justice's Civil Rights Division (CRD) and the U.S.
Department of Education's Office for Civil Rights (OCR) Fact Sheets……………35

Appellate Case: 23-1374    Page: 9    Date Filed: 07/19/2023 Entry ID: 5297480

**STATEMENT OF THE ISSUES PRESENTED FOR REVIEW**

I.     Whether the district court properly granted summary judgment in favor of Defendants as to Plaintiff's First Amendment claims when it found that Plaintiffs suffered no adverse employment action (i.e., no injury-in-fact) sufficient to confer standing.

> Apposite Authorities
>
> *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013)
>
> *Menders v. Loudoun Cty. Sch. Bd.¸* 65 F.4th 157 (4th Cir. 2023)
>
> *Zanders v. Swanson*, 573 F.3d 591 (8th Cir. 2009)

II.    Assuming Plaintiffs could show standing, whether the district court properly granted summary judgment in favor of Defendants as to Plaintiff's First Amendment claims when it found that Plaintiffs' interests in speaking did not outweigh SPS's interest in an effective and efficient, nondiscriminatory environment.

> Apposite Authorities
>
> *Abbott v. Pastides*, 900 F.3d 160 (4th Cir. 2018)
>
> *Altman v. Minn. Dep't of Corr.*, 251 F.3d 1199 (8th Cir. 2001)
>
> *Pickering v. Bd. of Edu. of Twp. High Sch. Dist.*, 391 U.S. 563 (1968)

III.    Whether the district court acted within its discretion when it awarded Defendants their reasonable attorney's fees and costs.

> Apposite Authorities
>
> *Am. Fam. Life Ass. Co. v. Teasdale*, 733 F.2d 559 (8th Cir. 1984)
>
> *EEOC v. CRST Van Expedited, Inc.*, 944 F.3d 750 (8th Cir. 2019)
>
> *Williams v. City of Carl Junction*, 523 F.3d 841 (8th Cir. 2008)

1

## STATEMENT OF THE CASE

This appeal is brought by two employees of the School District of Springfield, R-12 ("SPS"), Brooke Henderson ("Henderson") and Jennifer Lumley ("Lumley") (collectively "Plaintiffs"). Plaintiffs allege that SPS violated their rights under the First Amendment when it required Plaintiffs, as non-teacher SPS employees, to attend equity and diversity training in fall 2020.

## I. The Training Endeavored to Increase Employee Awareness of, and Sensitivity to, Potential Discrimination Faced by Under-Represented and Under-Resourced Students

SPS is an urban public school district in Springfield, Missouri which enrolls approximately 24,000 students, employs approximately 3,900 staff and operates 55 buildings. App. 2514-15; R. Doc. 78, at 7-8. SPS is governed by a Board of Education (the "Board"). App. 2515; R. Doc. 78, at 8.

During school year 2018-19, SPS experienced a series of disturbing events. App. 152; R. Doc. 75, at 11. The acts targeted students of color and LGBTQ+ students, and represented what the Board believed to be "opposition to basic human rights and to a learning environment defined by inclusivity and respect for every individual." *Id.* The Board issued a statement opposing racism, bigotry and disrespect, and in May 2019, passed a Resolution to Affirm Commitment to Equity and Inclusivity. App. 1153; R. Doc. 75-5, at 827; and App. 2519; R. Doc. 78, at 12.

2

A 46-person citizen's committee was then formed, named the Equity and Diversity Advisory Council ("EDAC"). *Id.*

In April 2020, EDAC issued a report recommending that SPS develop ongoing equity training for students, staff, faculty and leaders. App. 2522; R. Doc. 78, at 15. In May 2020, based on EDAC's recommendations, SPS added a focus area to its strategic plan titled "Equity and Diversity." App. 2526-27; R. Doc. 78, at 19-20. This area focused on under-represented students, including students of color, students with disabilities, LGBTQ+ students, students from diverse religions, and English language learners. App. 2525-27; R. Doc. 78, at 18-20. It also focused on under-resourced students, including students qualifying for free and reduced lunches, and students receiving McKinney-Vento services. *Id.*

In June 2020, consistent with EDAC's recommendations, and in the backdrop of the targeting events against SPS students, and national events relating to the pandemic and racial unrest (*also see* Appellants' Brief, p. 5),[1] SPS put employees on notice of its commitment to equity and diversity. SPS told staff, "[I]t is our responsibility to be equity champions for all students and to create learning environments that are inclusive and affirming of all identities and lived experiences." App. 1642; R. Doc. 77-8, at 1.

---

[1] *See Don't Shoot Portland v. City of Portland*, 2022 WL 2700307 (D. Oregon 2022) (discussing daily protests starting in May 2020 through November 2020 in relation to what was described as the "murder of George Floyd by a…police officer").

Appellate Case: 23-1374     Page: 12     Date Filed: 07/19/2023 Entry ID: 5297480

In fall 2020, SPS required employees to attend equity and diversity training. App. 161-62; R. Doc. 75, at 20-21. The training was implemented to create more equitable environments for students by giving employees opportunities to learn about barriers to education faced by students, with a focus on under-represented and under-resourced students. *Id.* The training was not used in the classroom. *Id.* It consisted of two hours of equity and diversity training, and one hour each for mental health and active-shooter training. App. 159-60; R. Doc. 75, at 18-19. For attending, employees received supplemental pay. *Id.* Employees who failed to attend some, but not all programs, received a portion of the supplemental pay. *Id.* Five employees did not attend and did not receive supplemental pay. App. 161; R. Doc. 75, at 20. Employees attending also received professional development credit. App. 5307; R. Doc. 88, at 2. Plaintiffs generally take issue with four training portions described as the George Floyd video, the social identities chart, the oppression matrix, and the white supremacy chart. App. 290-91; R. Doc. 75-2, 11-12. Henderson also participated in a "four corners exercise" and completed online training. App. 2560; R. Doc. 78, at 53; and App. 2567-68; R. Doc. 78, at 60.

## II. Henderson's Employment and Training

Henderson is a Section 504 Process Coordinator for SPS and she has been employed since 2008. App. 2513; R. Doc. 78, at 6. In October 2020, Henderson attended the training virtually. App. 2543; R. Doc. 78, at 36. Although Henderson

4

did not feel that watching the George Floyd video violated her rights, she voiced an opinion about the video during a small group session, but was not asked for comment during the large session. App. 2548-49; R. Doc. 78, at 41-42. Henderson did not identify where she placed herself on the oppression matrix (App. 259-261; R. Doc. 75-1, at 54-56), and she elected not to fill out the social identities chart, nor was she asked to share where she fell on the chart, but other employees did so share (App. 262-65; R. Doc. 75-1, at 57-60).

Although others expressed their opinions, and Henderson did ask questions, Henderson was not directly called on for her opinions. App. 237; R. Doc. 75-1, at 32; and App. 2550; R. Doc. 78, at 43. She was not asked her opinion about socialism (App. 2551; R. Doc. 78, at 44), or about the Indigenous Peoples' Statement (App. 2556-57; R. Doc. 78, at 49-50). Nor was she asked to affirm alleged statements relating to parents oppressing children, educators voting for socialization, or marginalization of certain people. App. 244-52; R. Doc. 75-1, at 39-47. Henderson was not asked to give an opinion regarding white supremacy or the chart (App. 250; R. Doc., at 45), but she did express concerns about a Black Lives Matter protest (App. 1297-98; R. Doc. 77, 33-34; and App. 2554; R. Doc. 78, at 47). She claims that during the four corners exercise she held up "agree" signs but that she did not agree with some statements, such as, "I feel represented in the District." App. 2560; R. Doc. 78, at 53.

Appellate Case: 23-1374     Page: 14     Date Filed: 07/19/2023 Entry ID: 5297480

Henderson completed online modules with multiple-choice answers, which were not graded or recorded. App. 2570-71; R. Doc. 78, at 63-64. She was asked questions such as, "When you witness racism and xenophobia in the classroom, how should you respond? Address the situation in private after it has passed; or Address the situation the moment you realize it is happening?" *Id.*

In December 2020, Henderson spoke to a Board candidate claiming the training and the online modules violated her rights. App. 2619; R. Doc. 78-3, at 4; depo. p. 15. In June 2021, she spoke at an open Board meeting and complained about the trainings' content. App. 2618; R. Doc. 78-3, at 3; depo. p. 10. After the meeting, she sent an email to the Board complaining further. *Id.* at depo. p. 11.

## III. Lumley's Employment and Training

In July 2020, Lumley was hired as a Secretary in Special Services. App. 2514; R. Doc. 78, at 7. In September 2021, Lumley was promoted to the position of Secretary in Analytics, Accountability and Assessment and received a pay increase. *Id.* In October 2020, Lumley attended the training in-person. App. 2536; R. Doc. 78, at 29. She did not complete online training (App. 287-88; R. Doc. 75-2, at 8-9), or participate in the four corners exercise (App. 290; R. Doc. 75-2, at 11).

Lumley viewed the "George Floyd video," broke into a small session to discuss, and when returning to the large group, she did not share her opinion, nor was she asked for it. App. 2538-40; R. Doc. 78, at 31-33. As for the social identities

6

chart, no small group discussion was held, and Lumley was not asked her opinion or how she would have filled it in, nor was anyone else. App. 2541-42; R. Doc. 78, at 34-35; and App. 295-96, R. Doc. 75-2, at 16-17. In Lumley's session, no employee had to rate themselves on the oppression matrix, nor was Lumley asked her opinion. App. 2540-41; R. Doc. 78, at 33-34. Per Lumley, it was not discussed "in great detail." App. 293-94; R. Doc. 75-2, at 14-15.

Regarding the white supremacy chart, no group session was held, no one called Lumley's name or asked if she understood the chart, and she was not asked to affirm anything that was presented. App. 294-95; R. Doc. 75-2, at 15-16. Between the discussion about the oppression matrix and the white supremacy chart, Lumley "spoke up" and shared her "opinion" that she thought the trainers "were painting a broad-brush stroke of white people as racist, and [she] said that was wrong…[she] wasn't born into white privilege." App. 2542; R. Doc. 78, at 35. Lumley claims SPS corrected her, and that her coworkers berated her, but SPS did not intervene. App. 1298; R. Doc. 77, at 34. Lumley admits she was expressing her opinions and that others participated in the discussions. App. 298; R. Doc. 75-2, at 19. In this regard, and per other employees, the trainers asked for comments or let individuals volunteer. App. 2540; R. Doc. 78, at 33.

## IV. Plaintiffs Attended the Training, Expressed Their Views, Were Not Penalized, and Remain Employees of SPS

Henderson, who also completed the online training, received credit for the trainings, additional pay for the equity training (App. 2530; R. Doc. 78, at 23), and her pay was never reduced (App. 2575-76; R. Doc. 78, at 68-69). Lumley too received credit and was paid her regular rate of pay for attending (App. 2530; R. Doc. 78, at 23), and her pay was not reduced (App. 2574; R. Doc. 78, at 67). SPS continues to employ Plaintiffs, and Lumley was promoted in September 2021 (App. 2513-14; R. Doc. 78, at 6-7), after this lawsuit was served on Defendants (App. 1; R. Doc. 1).

While employed by SPS, Plaintiffs have never been subjected to any form of discipline. App. 2531; R. Doc. 78, at 24; and App. 2576; R. Doc. 78, at 69. Further, no SPS employee was terminated because they failed or refused to attend the training or failed to complete the training. *Id.* Plaintiffs also are not aware of any SPS employee who was disciplined, refused credit or asked to leave a training session because of their conduct or comments during a training session. *Id.*

## V. Procedural History

On August 18, 2021, Plaintiffs filed suit against SPS, its Board, and the following employees: Dr. Grenita Lathan (Superintendent); Dr. Garcia-Pusateri (Chief Equity and Diversity Officer); and Lawrence Anderson (Coordinator, Office of Equity and Diversity). App. 1-27; R. Doc. 1, at 1-27; and App. 2515-16; R. Doc.

8

78, at 8-9. Plaintiffs allege three constitutional violations under the First Amendment and 42 U.S.C. § 1983. App. 24-26; R. Doc. 1, at 24-26.

On November 16, 2021, the district court held a case management conference. The court emphasized that Plaintiffs were SPS employees (App. 121) and when asked, Plaintiffs' counsel acknowledged that no employee had been fired, demoted, or had their pay cut due to SPS's trainings (App. 106). In response to the court's inquiry about whether a court had ever found that a school does not have an affirmative duty to see that racial justice occurs, Plaintiffs' counsel offered no case. App. 104-105. The court stated school boards were to decide how to implement policy concerning civil rights, with which Plaintiffs' counsel agreed. *Id*. The court then noted that fighting racism is within a school employee's job responsibilities. App. 112. It later asked if SPS could require Plaintiffs to implement the anti-racism policy consistent with the training they received and Plaintiffs' counsel stated "yes." App. 119. Defendants' counsel asserted Plaintiffs' lack of standing (App. 99-100), which was pled in Defendants' Answers (App. 60, R. Doc. 17, at 31; and App. 93, R. Doc. 31, at 32).

In July 2022, Defendants filed a Motion for Summary Judgment asserting Plaintiffs lacked Article III standing, or in the alternate, their claims failed on the merits. App. 138; R. Doc. 138. Plaintiffs also filed a Motion asserting they were entitled to judgment as a matter of law on all claims. App. 1262; R. Doc. 76.

Appellate Case: 23-1374     Page: 18     Date Filed: 07/19/2023 Entry ID: 5297480

On January 12, 2023, the district court granted Defendants' Motion and denied Plaintiffs' Motion. App. 5306; R. Doc. 88. The district court held Plaintiffs' compelled speech and content and viewpoint discrimination claims relating to the training sessions failed for lack of standing, and also held that Plaintiffs' claims relating to the four corners exercise, the online multiple-choice questions, and the unconstitutional employment conditions claims failed for lack of standing. App. 5315, 5318, 5320, 5326; R. Doc. 88, at 10, 13, 15, 21. Further, the district court held, or stated, "For the reasons described, even if plaintiffs could demonstrate injury-in-fact, which they cannot, this court would enter summary judgment on behalf of Defendants and would deny Plaintiffs' motion for summary judgment." App. 5329; R. Doc.88, at 24.

The district court also found Plaintiffs' claims to be frivolous and without foundation and on March 31, 2023, awarded Defendants their attorney's fees in the amount of $312,869.50. App. 5510; R. Doc. 107. It further awarded Defendants costs in the amount of $3,267.10. App. 5534; R. Doc. 120, at 1-2.

## SUMMARY OF THE ARGUMENT

The district court's orders granting Defendants' Motion for Summary Judgment and awarding Defendants their attorney's fees should be affirmed.

Plaintiffs were only required to attend the two-hour equity and diversity training to receive credit and compensation for attending. Plaintiffs never faced

discipline arising out of their participation in the training, or otherwise. Plaintiffs expressed their opinions and objected to anti-racism during, and even after the training, and were never reprimanded or counseled. Nor were Plaintiffs demoted, transferred, suspended, disciplined, or fired. Their claimed speculations that they had to attend the training and affirm anti-racism, or be harmed, or that they would be harmed if they either did not speak and affirm anti-racism, or spoke in opposition to anti-racism, are just that—mere speculations. Plaintiffs cannot generate their own constitutional standing based on rank speculation that they would be injured were they not to go along with what they claim was a requirement to speak, or not to speak. Because Plaintiffs cannot show the needed threshold element, injury-in-fact, Plaintiffs cannot show standing and their First Amendment claims fail.

Irrespective of their lack of standing, the equity and diversity training related to important and inherently controversial issues facing school districts. The training endeavored to address and enhance employees' understanding and sensitivity to race issues likely to be confronted by under-represented and under-resourced students. It did not require Plaintiffs by means of compulsion to express a specific message after encountering examples of discrimination. The training did not require any employee to violate the Constitution or any law, nor did it require Plaintiffs, apart from their official job duties, to express views with which they disagreed or face consequences. SPS's interests outweigh any interests Plaintiffs may have had in speaking.

Appellate Case: 23-1374    Page: 20    Date Filed: 07/19/2023 Entry ID: 5297480

Plaintiffs' claims are frivolous. The District Court did not abuse its discretion when awarding Defendants $321,869.50 in attorney's fees, and $3,267.10 in costs.

## STANDARD OF REVIEW

This Court "appl[ies] de novo review to the [district court's] grant of summary judgment." *Kohlbeck v. Wyndham Vacation Resorts*, 7 F.4th 729, 737 (8th Cir. 2021) (citation omitted). This Court views the record in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *Id.* (citation omitted) (internal quotations omitted). Summary judgment should be granted when, as here, " 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' " *Id.* (*quoting* Fed. R. Civ. P. 56(a)); and *Huizenga v. Indep. Sch. Dist. No. 11*, 44 F.4th 806, 809 (8th Cir. 2022) (reviewing, de novo, district court's dismissal for lack of standing).

As for the order awarding Defendants their attorney's fees, while "the legal issues related to an award of attorneys' fees" are reviewed "de novo," in this Circuit, "the actual award is reviewed for an abuse of discretion." *League of Wm. Vtrs. of Mo. v. Ashcroft*, 5 F.4th 937, 939 (8th Cir. 2021). A district court abuses its discretion when it makes an error of law, fails to consider a relevant factor, gives significant weight to an improper factor, or commits a clear error of judgment. *Id.* (citation omitted) (internal quotations omitted). Accordingly, "appellate courts must give substantial deference" to a district court's attorney fee award. *Fox v. Vice*, 563 U.S.

12

826, 828 (2011) (citation omitted). This is due to a "district court's superior understanding of the litigation." *Id.* The Supreme Court discourages "appellate micromanagement" of fee awards. *Id.*; *also see Winter v. Cerro Gordo Cty. Cons. Bd.*, 925 F.2d 1069, 1074 (8th Cir. 1991) ("district court has broad discretion in determining the amount of attorney's fees awarded pursuant to 42 U.S.C. § 1988").

## ARGUMENT

### I. The District Court Properly Granted Summary Judgment in Favor of Defendants Because Plaintiffs' Claims Are Not Justiciable.

Plaintiffs disavow anti-racism. While addressing Plaintiffs' conflated legal theories of compelled speech, chilled speech, and content and viewpoint discrimination in relation to their rejection of anti-racism, the district court correctly held Plaintiffs lacked standing, injury-in-fact, under all theories. App. 5310; R. Doc. 88, at 5, n. 5. On appeal, however, Plaintiffs ignore standing, their threshold requirement. Such snubbing is fatal to Plaintiffs' appeal.[2] As this Court notes, "it must first address whether Plaintiffs have alleged a case or controversy…or whether they assert only abstract questions not currently justiciable." *Zanders v. Swanson*, 573 F.3d 591, 593 (8th Cir. 2009) (citation omitted) (emphasis added). "This court defines 'case or controversy' to require 'a definite and concrete controversy involving adverse legal interests at every stage in the litigation.' " *Id.* To this end,

---

[2] Failure to adequately brief an issue on appeal constitutes waiver. *See, e.g., Carlisle v. McNair*, 2023 WL 3340080, at *3, n. 3 (5th Cir. 2023) (citation omitted).

Appellate Case: 23-1374     Page: 22     Date Filed: 07/19/2023 Entry ID: 5297480

""[f]ederal courts must always satisfy themselves that this requirement has been met before reaching the merits of a case…[by] employ[ing] a number of doctrines…such as standing, ripeness, and mootness." *Id.* (citation omitted); *also see Hein v. Freedom From Religion Found.*, 551 U.S. 587, 598 (2007) ("federal courts sit solely, to decide on the rights of individuals…[and only] when the question is raised by a party whose interests entitle him to raise it") (internal quotations, citations omitted).

### A. The District Court Correctly Held Plaintiffs Lacked Standing.

For Article III standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Huizenga*, *supra*, 44 F.4th at 809. Plaintiffs cannot satisfy the case or controversy requirement, the irreducible constitutional minimum of standing, as Plaintiffs did not suffer an injury-in-fact. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (party invoking federal jurisdiction bears burden of establishing injury-in-fact). Plaintiffs did not suffer "an invasion of a legally protected interest which is (a) concrete and particularized,…and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560.

Again on appeal, as when presenting their summary judgment motion, it is difficult to discern the injuries of which Plaintiffs complain. Their brief is replete with verbosity and rabble-rousing. Plaintiffs spend pages characterizing their views of, and objecting to, SPS's policies of equity and anti-racism. Appellants' Brief, at

14

4-26. Their policy objections do not confer standing. For example, in an analogous case, *Menders v. Loudoun Cty. Sch. Bd.*¸ 65 F.4th 157, 160 (4th Cir. 2023), parents of school students challenged an "Action Plan[] to Combat Systemic Racism." They claimed the "program erect[ed] a racially- or viewpoint-discriminatory barrier." *Id.* at 163. Although their children never sought to be ambassadors in the program, the parents "insist[ed]" the program was "part of a concerted effort to indoctrinate [their] children with a certain viewpoint." *Id.* at 164. Finding lack of Article III standing, the court noted the parents' allegations were "general disagreements with the School Board's implementation of the… Program," stating, "But whether that is or is not a legitimate concern, it is a concern about policy. And concerns about policy should be made to policymakers, not judges." *Id.* Such is true here. Plaintiffs disagree with SPS's anti-racism policy. But, their disagreements mean nothing; there is no evidence they would be reported or reprimanded.[3] Plaintiffs were free to object or disagree and still remain employees of SPS, undisciplined, unsanctioned, and in Lumley's case, even promoted. App. 5307-08; R. Doc. 88, at 2-3.; and App. 2515; R. Doc. 78, at 7.

---

[3] *Cf. Menders*, *supra*, 65 F.4th at 161, 165 (allegations that perceived bias incidents reported under the program against a student could ruin a student's college or career prospects were sufficient to survive a motion to dismiss for lack of standing).

In short, even giving Plaintiffs all reasonable inferences which could possibly infer injury, none exist. The following, upon which Plaintiffs rely, and as the district court found, are not enough to confer standing: (1) <u>saying what SPS wanted to hear</u> by affirming anti-racism and equity (admitting their white privilege); (2) <u>refraining from speaking</u> and risk being labeled white supremacists; or (3) <u>speaking their views</u> and risk losing professional credit and pay (and being referred to administrators at year-end).[4] App. 1295; R. Doc. 77, at 31; and App. 2582; R. Doc. 78, at 75. Henderson also claims injury from completing online modules which required responses inconsistent with her beliefs. App. 1301-04; R. Doc. 77, at 37-40.[5]

And, that's it—the totality of their alleged injuries. Which is not surprising when the training is put into perspective. It was a training, of only two hours, during

---

[4] In an attempt to breathe life into nonexistent injuries and claims, Plaintiffs' allegations are now broader than those before the district court. *See*, *infra*, note 8.

[5] Henderson was not injured when completing the online modules. Henderson did not disclose personal information, nor were her responses recorded. App. 2570-71; R. Doc. 78, at 63-64. *Cf. C.N. v. Ridgewood Bd. of Edu.*, 430 F.3d 159 (3rd Cir. 2005) (school survey asked students about personal matters, but information was safeguarded and released in aggregate; no constitutional violation found). Plus, the modules only required Henderson to show her ability to grasp the concepts. *See Sabra v. Maricopa Cty. Cmty. Coll. Dist.*, 479 F.Supp.3d 808 (D. Ariz. 2020), *aff'd*, 44 F.4th 867 (9th Cir. 2022). Henderson's selection of the credited "quick check" response suggested no personal affiliation of or affirmation with that response. App. 5324; R. Doc. 88, at 19. "This is…because one's selection of credited responses on an online multiple-choice question reflects at most a belief about how to identify the question's credited response. This is especially true where…the multiple-choice questions ask about general rather than personal issues…and focus on the content of a video presented during the same module." App. 5326; R. Doc. 88, at 21.

Appellate Case: 23-1374    Page: 25    Date Filed: 07/19/2023 Entry ID: 5297480

which Plaintiffs were never called on, although they did share their opinions, as did others.[6] Nor did Plaintiffs identify where they would have placed themselves on the three charts they take issue with.[7] Hence, pausing, and putting their allegations in context with their claimed injuries, it is easy to see why Plaintiffs' beliefs of injury are insufficient to confer standing. As stated by the district court when finding no injury, Plaintiffs and other employees only had to attend the training to receive professional credit and pay, Plaintiffs suffered no adverse employment action from their participation (or from the opinions they expressed), SPS did not change Plaintiffs' work duties or assignments, and SPS did not fire, demote, suspend, fail to promote, transfer, or discipline Plaintiffs. App. 5307-08; R. Doc. 88, at 2-3. In addition, even when considering their alleged injuries in specific relation to their

---

[6] App. 237; R. Doc. 75-1, at 32; and App. 244-52; R. Doc. 75-1, at 39-47; and App. 298; R. Doc. 75-2, at 19; and App. 1298; R. Doc. 77, at 34; and App. 2538-40; R. Doc. 78, at 31-33; and App. 2548-51; R. Doc. 78, at 41-44; and App. 2554-57; R. Doc. 78, at 47-50.

[7] Plaintiffs did not identify where they would have placed themselves on the white supremacy chart (App. 250; R. Doc., at 45; and App. 294-95; R. Doc. 75-2, at 15-16); or on the oppression matrix (App. 259-261; R. Doc. 75-1, at 54-56; and App. 2540-41; R. Doc. 78, at 33-34); or on the social identities chart (App. 262-65; R. Doc. 75-1, at 57-60; and App. 295-96, R. Doc. 75-2, at 16-17; and App. 2541-42; R. Doc. 78, at 34-35); nor were they required to do so. *Id*. Regarding this point, and critically, numerous amici curiae sensationalize the training content, pound the tables, and carry on about how Plaintiffs were required to adopt or affirm anti-racism, a claimed "highly controversial viewpoint" (*see*, *e.g.*, Attorney Generals' Brief, p. 1). Yet, none give any consideration to how the materials were actually presented or Plaintiffs' actual involvement in the presentations, or moreover, their lack of injury.

Appellate Case: 23-1374    Page: 26    Date Filed: 07/19/2023 Entry ID: 5297480

First Amendment claims, and as discussed in Sections I(B)-I(D), *infra*, Plaintiffs'

allegations do not pass the injury smell test.

### B. Plaintiffs' Factual Mischaracterizations Provide No Basis for Injury Sufficient to Show that SPS Compelled Plaintiffs' Speech.

"It is true that 'the right of freedom of thought protected by the First

Amendment against state action includes both the right to speak freely and the right

to refrain from speaking at all.' " *U.S. v. Sindel*, 53 F.3d 874, 878 (8th Cir. 1995)

(citation omitted). "A First Amendment protection against compelled speech,

however, has been found <u>only</u> in the context of governmental compulsion to

disseminate a particular political or ideological message." *Id.* (emphasis added)

(*citing West Virginia State Bd. of Edu. v. Barnette*, 319 U.S. 624 (1943) (state may

not compel schoolchildren to salute flag); *Miami Herald Pub. v. Tornillo*, 418 U.S.

241 (1974) (statute requiring newspapers publish replies of candidates they

criticized, unconstitutional); *Wooley v. Maynard*, 430 U.S. 705 (1977) (state may

not require citizen to display state motto on license plate); and *Pacific Gas and

Electric v. Pub. Utilities Comm. of Calif.*, 475 U.S. 1 (1986) (state may not order

utility company to distribute literature of hostile groups with its newsletters)). To

compel speech, "the governmental measure must punish, or threaten to punish,

protected speech by governmental action that is 'regulatory, proscriptive, or

Appellate Case: 23-1374    Page: 27    Date Filed: 07/19/2023 Entry ID: 5297480

compulsory in nature.' " *Phelan v. Laramie Cty. Comm. Coll. Bd. of Trustees*, 235 F.3d 1243, 1248 (10th Cir. 2000) (*quoting Laird v. Tatum*, 408 U.S. 1 (1972)).

Grappling to find a compelled speech violation, Plaintiffs' brief is replete with mischaracterized deposition testimony[8] and newly created allegations not before the district court.[9] Telling another story, however, does not make their claims any more plausible. Such tactics, along with the twisting of other's words,[10] only illustrate how

---

[8] By way of example, Plaintiffs claim "SPS never told Plaintiffs that silence was an option." Appellants' Brief, p. 36. In response to a question, Dr. Garcia-Pusateri stated, "No one ever said silence is optional." App. 2743; R. Doc. 79-1, at 38, depo. p. 151:22-25. This is a classic twisting of words as her response does not mean the converse, that anyone stated, "Silence is not an option." Moreover, she repeatedly testified that while SPS wanted discussion, it did not mean that an employee had to speak, or that an answer would be forced from someone. *See*, *e.g*., *id*. at depo. p. 152:5-10; and App. 1220-22; R. Doc. 75-7, at 21-23.

[9] For example, in a last-ditch attempt to show some scintilla of injury, Plaintiffs <u>now</u> claim that if they shared their views they would be referred at year-end to administrators. Appellants' Brief, p. 34. Plaintiffs have never before claimed this, claimed to have knowledge of this, pled this, or testified to this. Inferring <u>now</u> that they "kept quiet" for risk of being referred to administration for some speculative punishment is a fabrication. Plus, Dr. Garcia-Pusateri's deposition testimony, from which Plaintiffs cite (*id.* at 38), was in response to discussing trainer emails noting some trainees were not engaged in the training. She does not mention Plaintiffs, and moreover, she states engagement would not be noted in an employee's performance appraisal. App. 2742; R. Doc. 79-1, at 37, depo. p. 148:2-18.

[10] In another example, Plaintiffs claim SPS instructed white supremacy is "assumed superiority" and "made clear that a white staff member would be complicit in white supremacy if she dared to oppose anti-racism." Appellants' Brief, p. 9, 35. This is quite a stretch. Dr. Garcia-Pusateri described white supremacy as "a silence perpetuated mostly by white people…[so] when you are seeing things happen, that it is important that you speak out…address it…to ensure that these things do lead to

desperate Plaintiffs are to give life to constitutional claims that never existed. The record lacks any evidence that SPS forced Plaintiffs to speak, or accept, anti-racism, or any viewpoint contrary to their beliefs or face punishment.

Regardless, Plaintiffs argue, as they did before, that requiring Plaintiffs to engage in "turn and talk" exercises, or online modules,[11] or warning Plaintiffs to stay engaged and be professional, or that any white person who remained silent was complicit in white supremacy, caused Plaintiffs to forsake their beliefs and adopt anti-racism. Appellants' Brief, p. 33-34. They continue to claim training materials compelled their speech because such made it clear they would be complicit in white supremacy if they remained silent. *Id.* at 39 (*citing* App. 1789 and 1798). Plaintiffs claim that being told to be "professional" or be asked to leave without credit compelled their speech. *Id.* at 38. Generally speaking, they claim SPS compelled their speech when it asked Plaintiffs to be equity champions and told staff they must become anti-racist educators, advocates, and "commit" to SPS's views. *Id.* at 34-35.

---

good, safe, and supportive classrooms." App. 2745; R. Doc. 79-1, p. 40, depo. p. 157:11-25 and 158:1-3. Further, white supremacy was discussed from a historical, sociological standpoint relating to "barriers" students may experience in the classroom. App. 1787; and App. 2756; R. Doc. 79-1, at 51, depo. p. 202:8-19.

[11] Plaintiffs have abandoned their four corners exercise argument. This is because no evidence suggests that SPS encouraged Henderson to display signs at odds with her views or that SPS would have subjected her to adverse consequences if she expressed disfavor. App. 5318; R. Doc. 88, at 13.

Based on such facts, there is no evidence that SPS required Plaintiffs to express views at odds with their own, nor any evidence that SPS threatened punishment should they fail to express views at odds with their own. App. 5312; R. Doc. 88, at 7. In short, no amount of argument can show that SPS required Plaintiffs to "actually speak favorably about something Plaintiffs find objectionable." App. 5313; R. Doc. 88, at 8. Instead, the opposite occurred. Plaintiffs spoke openly objecting to anti-racism. App. 5312; R. Doc. 88, at 7. After discussing Black Lives Matter protests, Henderson stated that she believed Kyle Rittenhouse was defending himself. App. 1297-98; R. Doc. 77, 33-34. Lumley claimed she was "berated" by other employees for her views. App. 1298, R. Doc. 77, at 34. And importantly, after expressing their objections, there was no adverse action or threat that one would ensue. SPS "took no further action in response" to Plaintiffs' expressions of their views. App. 5313; R. Doc. 88, at 8.

Hence, Plaintiffs' claimed "Hobson's choice" based on what they characterize as "the appearance of authority SPS…had over Plaintiffs"[12] is based on pure speculation that an adverse action may have occurred. Such is simply not enough.

---

[12] The cases Plaintiffs cite in support fall flat. They cite *Zieper v. Metzinger*, 474 F.3d 60 (2nd Cir. 2007) and claim it holds that although "an official used polite language and did not mention consequences, a reasonable person could find his actions coercive." That official was a police officer and he sent an FBI agent and police officers to the plaintiff's home before even speaking with the plaintiff. The court thus held he could have reasonably inferred legal consequences. *Id.* at 66-67.

*See Phelan*, *supra*, 235 F.3d at 1247-48 ("A discouragement that is 'minimal' and 'wholly subjective' does not…impermissibly deter…free speech."). The facts here stand in stark contrast to cases where coercion was actually found, such as a teacher receiving a written reprimand and being told "to change the way he address[ed] transgender students to 'avoid further corrective actions' " (*see Meriwether v. Hartop*, 992 F.3d 492, 501 (6th Cir. 2021)); or, a law requiring one to display an image on a license plate they found religiously offensive[13] or face prosecution and penalties (*see Cressman v. Thompson*, 719 F.3d 1139 (10th Cir. 2013) (*Cressman I*)). In the standing context, an employee's "subjective apprehension…without any specific action by the [employer] that were [s]he to speak, punishment would result," is insufficient to find a justiciable injury. *Morrison v. Bd. of Ed. of Boyd Cty.*, 521 F.3d 602, 610 (6th Cir. 2008).

Regardless of the lack of compulsion, or even indirect discouragement, Plaintiffs continue to rely on *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1290 (10th Cir. 2004), claiming compulsion "need not take the form of a direct threat," and they

---

[13] But, although surviving a motion to dismiss, the Tenth Circuit later affirmed the district court's finding of no compulsion in that a reasonable person would not understand the image to convey a pantheistic message. *Cressman v. Thompson*, 798 F.3d 938 (10th Cir. 2015) (*Cressman II*), *cert. denied*, 577 U.S. 1216 (2016).

Appellate Case: 23-1374     Page: 31     Date Filed: 07/19/2023 Entry ID: 5297480

embellish its facts.[14] They then liken a Mormon student facing expulsion from a university if she did not change her values and recite words that were objectionable to her, with Plaintiffs being told during training that they would be called on to speak, or with Plaintiffs being told they must speak out against racism or be labeled a white supremacist. As the district court noted, such is grossly attenuated. App. 5314; R. Doc. 88, at 9. Again, there is no evidence that SPS required Plaintiffs to articulate views they found objectionable or face undesirable consequences. *Id.*

And, crucially, no matter how hard they try to create facts,[15] there is no evidence that SPS would have penalized Plaintiffs for expressing views disavowing anti-racism.[16] Plaintiffs objected to anti-racism during training and faced no

---

[14] Plaintiffs' statement that "[al]though [the university] never…threatened to punish her, the [*Axson-Flynn*] plaintiff 'believed that it was only a matter of time,' " is a complete exaggeration. Appellants' Brief, at 32-33. There was a threat. The university told plaintiff, at least twice, that she needed to modify her values or leave and find another program. *Axson-Flynn*, 356 F.3d at 1282.

[15] Another example is Plaintiffs' claim that "SPS gave every impression that it was monitoring employees' performance." Appellant's Brief, p. 43. What they cite in support does not say such. The training language states equity and diversity was part of SPS's strategic plan and that SPS and its employees were accountable in that endeavor. App. 1717; R. Doc. 77-9, at 10.

[16] Plaintiffs' argument that their fears were reasonable based on others' disagreements (Appellants' Brief, p. 44) also does not show that SPS would have penalized Plaintiffs. Some employees did not attend the training. App. 161; R. Doc. 75, at 20. Yet, no employee was disciplined or terminated because they failed or refused to attend. App. 2531; R. Doc. 78, at 24; and App. 2526; R. Doc. 78, at 69. Nor do Plaintiffs know of any employee that was kicked out of a training session, denied credit or disciplined for their conduct during the training. *Id.*

consequences. Plaintiffs then continued to object without consequence. In fact, Henderson spoke to a Board candidate in December 2020 claiming the training violated her rights. App. 2619; R. Doc. 78-3, at 4; depo. p. 15. She then spoke openly at a Board meeting in June 2021 complaining about the content of the trainings, and later sent an email. App. 2618; R. Doc. 78-3, at 3; depo. p. 10-11. Yet, she was not counseled or reprimanded. Hence, Plaintiffs' argument that they "were punished first when they were publicly shamed and embarrassed" is farfetched. Appellants' Brief, p. 42. Plaintiffs had no problem continuing their objections. Plaintiffs then filed suit, further objecting, and were not disciplined. Rather, Lumley was promoted. App. 2514; R. Doc. 78, at 7.

Plaintiffs also cannot show injury by alleging that they had to attend the training to receive professional credit and pay. Plaintiffs claim that if they spoke their real views they risked losing credit and pay. But, Plaintiffs only needed to attend to get credit and be paid. App. 5314; R. Doc. 88, at 9. There is no evidence that Plaintiffs had to express support for anti-racism to receive credit and pay. *Id.* Rather, the exact opposite is true. Both Plaintiffs expressed their views opposing anti-racism (App. 5312; R. Doc. 88, at 7) and both received credit and pay.[17] Thus,

---

[17] Plaintiffs' new allegation (i.e., that if they spoke their views they would be referred to administration at year-end) similarly falls short. Plaintiffs did express their views and no evidence remotely suggests that they, or any other employee, were the subject of any discussion by administration, or any discipline.

and as found by the district court, SPS did not condition pay or credit on Plaintiffs expressing a specific viewpoint. App. 5314; R. Doc. 88, at 9 (stating, "Conditioning employees' professional…credit and pay upon their attending a professional training…is altogether different than conditioning credit and pay on the expression of a specific message Plaintiffs find objectionable."). Requiring Plaintiffs to attend the training for credit and pay simply "fails to implicate First Amendment free speech protections." *Id.* at n. 2.

In sum, Plaintiffs' apposite authorities[18] purporting to show their speech was compelled, as with the other authority they cite, do not support their cause. Unlike in *Gralike*, where an amendment persuaded non-incumbent candidates to pledge support for term limits to keep their declination from being noted on the ballet, here, SPS did not entice or require Plaintiffs to speak favorably about anti-racism or face reprisal. Further, unlike in *Telescope Media*, where a law forced videographers, in order to do business, to produce same-sex marriage videos if they produced opposite-sex ones, here, SPS did not force Plaintiffs to endorse anti-racism to receive credit or pay. Wholly distinct from the compulsion in these cases, SPS encouraged

---

[18] *Gralike v. Cook*, 191 F.3d 911 (8th Cir. 1999); and *Telescope Media Grp. V. Lucero*, 936 F.3d 740 (8th Cir. 2019); *also see Janus v. AFSCME, Council 31*, 138 S. Ct. 2448 (2018) (notably, a compelled-subsidy case, wherein a law authorizing private entities, unions, to charge fair share dues to non-member public employees was found to be unconstitutional).

Appellate Case: 23-1374    Page: 34    Date Filed: 07/19/2023 Entry ID: 5297480

Plaintiffs to adhere to its anti-racism policies. "Such an incentive or disincentive to do or say a specific thing is what separates Plaintiffs' circumstances from precedent they cite." App. 5315; R. Doc. 88, at 10. The district court correctly held Plaintiffs lacked the requisite injury-in-fact to show standing in the compelled speech context.

### C. Plaintiffs' Factual Mischaracterizations Provide No Basis for Injury Sufficient to Show that SPS Discriminated Against Plaintiffs' Views or Chilled Plaintiffs' Speech.

The government may not regulate speech based on its substantive content or the message it conveys. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). When the government targets not subject matter, but particular views, it engages in viewpoint discrimination, an egregious form of content discrimination. *Id.* at 829 (citation omitted). Plaintiffs argue SPS discriminated against their viewpoints by commanding they adopt its view on anti-racism. Appellants' Brief, p. 48. They then argue that they were chastised when they shared their own views, and forced to self-censor. *Id.* Thus, Plaintiffs' views about content and viewpoint discrimination, and chilled speech, continue to be commingled. For their "claimed chilling effect to confer standing," Plaintiffs "must face a <u>credible threat</u> of present or future" adverse action, and their decision to self-censor "must be <u>objectively reasonable</u>." *Zanders*, *supra*, 573 F.3d at 593-94 (citations omitted) (emphasis added); *also see Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013).

Appellate Case: 23-1374    Page: 35    Date Filed: 07/19/2023 Entry ID: 5297480

Lack of an identifiable threat of negative consequences towards Plaintiffs after their expression of their views shows any self-censorship is not objectively reasonable.[19]

To support their chill claim, Plaintiffs focus on training that addressed white supremacy and claim that if they spoke against anti-racism, they would be labeled white supremacists.[20] Plaintiffs' focus does not support subjective chill. No evidence suggests that SPS called Plaintiffs, or anyone else for that matter, white supremacists. In fact, and as confirmed by Plaintiffs on appeal, SPS told Plaintiffs the exact opposite. SPS explicitly stated, "We want to stress that we are <u>not</u> calling you as an individual a white supremacist." Appellants' Brief, p. 12; App. 1970; R.

---

[19] Any standalone discrimination claim too fails. The "crucial or ultimate fact that will determine" such claims is SPS's "motivation for imposing" the training. *Keeton v. Anderson-Wiley*, 664 F.3d 865, 872 (11th Cir. 2011). There is no evidence SPS implemented the training because it disagreed with Plaintiffs' views, or that it targeted Plaintiffs' views. *Cf. R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377 (1992) (ordinance specifically targeting bias-motivated disorderly conduct held unconstitutional). Rather, on the heels of a series of disturbing events targeting students of color and LGBTQ+ students, and consistent with a resolution from the Board opposing racism and bigotry, SPS amended its strategic plan to include an equity and diversity component and paid employee training addressing these issues. App. 152; R. Doc. 75, at 11; and App. 2519-22; R. Doc. 78, at 12-15.

[20] *See*, *e.g.*, Appellants' Brief, p. 34; App. 2582; R. Doc. 78, at 75. In support, Plaintiffs argue: SPS taught white supremacy is not just a label for the KKK and includes those who believe in colorblindness; "white silence" is a form of white supremacy; SPS warned staff that denying one's white privilege is white supremacy; and that a video character resembling the KKK was a reference to the Trump administration. Appellants' Brief, p. 9-11; and App. 1297; R. Doc. 77, at 33. They claim earlier trainings, not attended by Plaintiffs, taught the slogan "Make America Great Again" was white supremacy. Appellants' Brief, p. 11, n. 1.

Doc. 77-15, at 13 (emphasis added). Plaintiffs were just informed that certain actions or statements listed on the white supremacy chart <u>could</u> support that structural system. *Id.* Thus, Plaintiffs' claimed need to self-sensor is not at all objectively reasonable.[21] There is no evidence that SPS implemented its anti-racism policy whereby a view contrary to anti-racism would result in one being labeled a white supremacist, or moreover, subjected to adverse action.

Other attempts by Plaintiff to show self-censorship likewise fail. Plaintiffs claim that the trainers' questioning or countering of Plaintiffs' comments regarding anti-racism (allegedly telling them they were wrong) is enough to end the inquiry because government "must afford all points of view an equal opportunity to be heard." Appellants' Brief, p. 49 (*quoting Police Dep't of Chi. v. Mosley*, 408 U.S. 92 (1972)). But *Mosley* concerned an ordinance that prohibited certain types of picketing, thus certain views were legally prohibited. Plaintiffs too miss the mark when claiming they only need to "show that SPS *appeared* to have authority to censor them" (relying on *Virginia v. Am. Booksellers*, 484 U.S. 383 (1988)). In *Am. Booksellers*, a statute prohibited certain types of commercial displays which forced

---

[21] To be objectively reasonable, the action must be one that is "likely to deter a person of ordinary firmness from the exercise of First Amendment rights." *Abbott v. Pastides*, 900 F.3d 160, 169 (4th Cir. 2018). Hence, "a credible threat of enforcement is critical; without one, a…plaintiff can establish neither a realistic threat of legal sanction if he engages in the speech…, nor an objectively good reason for refraining from speaking and 'self-censoring' instead." *Id.* at 176.

Appellate Case: 23-1374     Page: 37     Date Filed: 07/19/2023 Entry ID: 5297480

costly compliance measures on booksellers to avoid prosecution. *Id.* at 392. So, much more than appearance of censorship was at play—the booksellers had to pay money and comply, or be charged with a crime. Here, conversely, and as noted by the district court, the trainers' responses were at most disagreement; there was "no evidence whatsoever [SPS] would subject Plaintiffs to any sort of negative consequence, should Plaintiffs choose to reassert their personal views." App. 5317; R. Doc. 88, at 12. SPS never suggested that Plaintiffs were at risk of an adverse threat comparable to those in their cited cases.[22]

      Plaintiffs' odd position that the district court erred when it held Plaintiffs were not injured because SPS did not have a policy threatening punishment for dissention (Appellants' Brief, p. 50), is also erroneous. While the district court did acknowledge that SPS, by policy, required anti-racism training, it found no policy, practice, regulation, or otherwise, that required Plaintiffs to express any viewpoints at odds with their personal ones or face undesirable consequences. App. 5317; R. Doc. 88, at 12; *also see* App. 5314; R. Doc. 88, at 9 n. 2 ("[A]nd no evidence [or policy]

---

[22] *See Bantam Books, Inc. v. Sullivan¸* 372 U.S. 58 (1963) (law that gave no notice to publishers before publications were listed to wholesalers/distributors as objectional, suppressed sales of listed publications, impairing business); *Speech First, Inc. v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022) (students anonymously accused of engaging in bias-related incidents were reported to university officials for investigation and possibly to the police); and *281 Care Comm. v. Arneson*, 638 F.3d 621 (8th Cir. 2011) (finding standing as law made plaintiffs subject to prosecution should they knowingly, recklessly disregard the truth when opposing proposed ballot initiative).

Appellate Case: 23-1374    Page: 38    Date Filed: 07/19/2023 Entry ID: 5297480

suggest[ed], Defendants conditioned pay or professional development credit on Plaintiffs' expressing a specific viewpoint."). Plaintiffs, by policy, or practice, only needed to attend the training. During training, Plaintiffs spoke openly, objecting to anti-racism. And, regardless of their views, no action was taken. In short, Plaintiffs' "formal policy" argument is illogical. *See*, *e.g.*, *Wragg v. Village of Thornton*, 604 F.3d 464 (7th Cir. 2010) (policy does not have to be written—it can be established through a widespread practice or through actions of final decision-makers).

Arguing that lack of discipline can support objective self-censorship because Plaintiffs' speech was <u>already</u> chilled, is also illogical. Appellants' Brief, p. 50-51 (emphasis in original). In support, Plaintiffs cite *Speech First, Inc. v. Schlissel*, 939 F.3d 756 (6th Cir. 2019). But, Plaintiffs did not face an implicit threat of harm remotely comparable to that faced by the *Schlissel* plaintiffs. There, the university implemented a bias response initiative wherein a student accused of bias, who did not meet with the response team, could suffer administrative action. "The referral [to the team] initiate[d] the formal investigative process, which itself [could be] chilling even if it d[id] not result in a finding of responsibility." *Id.* at 765. Hence, and why, the court rejected the university's argument that there was no evidence that a student "had" faced discipline stating, "This misses the point. The lack of discipline against students could just as well indicate that speech has already been chilled." *Id.* at 766. Here, SPS did not put forth any initiative tasked with responding to bias

Appellate Case: 23-1374     Page: 39     Date Filed: 07/19/2023 Entry ID: 5297480

incidents. Plaintiffs' "mere speculation" about what might happen should they not attend mandatory training, or what may happen if they continued to speak out, "constitutes a textbook example of the 'subjective chill' that lacks standing." *See* App. 5319; R. Doc. 88, at 14 (*citing Clapper*, *supra*, 568 U.S. at 417-18).

### D. Plaintiffs' Factual Mischaracterizations Provide No Basis for Injury Sufficient to Show that SPS Subjected Plaintiffs to an Unconstitutional Condition of Employment.

As discussed, Plaintiffs have failed to show that the training or online modules resulted in injury. Without a showing of a denial of a government benefit, Plaintiffs cannot establish that the training or on-line modules were unconstitutional conditions of their employment. *See Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

### II. Irrespective of Their Lack of Standing, the District Court Properly Granted Summary Judgment in Favor of Defendants Because Plaintiffs' Interests in Speaking Do Not Outweigh SPS's Interest in an Effective and Efficient, Nondiscriminatory Environment.

The First Amendment does not protect a government employee's speech on a matter of public concern if "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees" outweighs "the interests of the [employee], as a citizen, in commenting upon matters of public concern." *Pickering v. Bd. of Edu. of Twp. High Sch. Dist.*, 391 U.S. 563, 568 (1968).

Applying *Pickering* in the context of employment diversity training, this Court has held that making attendance at diversity training mandatory, in a setting where employees may speak opposition, is speech on a matter of public concern.

31

*Altman v. Minn. Dep't of Corr.*, 251 F.3d 1199, 1202 (8th Cir. 2001). But, <u>unless</u> the employee shows punishment giving rise to a claim,[23] as in *Altman*, an employee's right to speak in opposition to diversity training principles does not outweigh an employer's interest in the effective and efficient fulfillment of its responsibilities to the public. *Id.* at 1202-03. "In this regard, a public employer may decide to train its employees, it may establish the parameters of that training, and it may require employees to participate. An employee who refuses to be trained has, from the employer's reasonable perspective, impeded his or her ability to do the job." *Id.*

Here, SPS certainly had an interest necessitating the training.[24] In conjunction with concerns arising out of events targeting certain student groups (*see* n. 18, *supra*), the trainings were implemented to facilitate employees' learning opportunities to improve engagement, safety, core academic success, and attendance and graduation rates, with a focus on under-represented and under-resourced students, including students of color, among others. App. 2525-27; R. Doc. 78, at

---

[23] Plaintiffs miss the point here. They claim SPS must show Plaintiffs were hired to speak on race and political matters. Appellants' Brief, p. 55. If this were true, an employer could never require its employees to comply with reasonable workplace rules and policies as a condition of employment.

[24] *See*, *e.g.*¸ *Abbott*, *supra*, 900 F.3d at 174 (even if the university's inquiry into complaints about a student political organizational event restricted the organization's speech, its First Amendment rights were not violated as the inquiry was narrowly tailored to the university's compelling interest in maintaining an environment free from discrimination and harassment).

32

18-20. It was not designed to suppress viewpoints. Although the subject matter was not taught in the classroom, the training concerned how these issues would be addressed by employees in the school system. App. 161-62; R. Doc. 75, at 20-21.

In its analysis, the district court readily noted that the "training in question related to important but inherently controversial issues facing public entities, and in particular, school districts." App. 5327; R. Doc. 88, at 22. Due to the divisive nature of the issues, amici curiae flooded this Court with briefs wanting to express their partisan opinions. One claims to define "the nature of the 'anti-racism' (AR) theory" arguing it differs from anti-discrimination principles. Brief of Goldwater Inst., *et al.*, p. 1-3. Another accuses SPS of advocating for race-centric societal change. Brief of Inst. for Free Speech, *et al.*, p. 2. Yet another unbelievably claims antiracism training cannot be compared with legitimate human-resources training which call for an employee response, like sexual harassment training. Brief of Ctr. of Am. Exp., p. 6-8. Considering this rhetoric, the following assessment by the district court is very poignant:

> Issues of race discrimination, inequality, and prejudice have confounded policymakers throughout our country's history. It started with the framers of the Constitution, continued with debates about whether to admit states as slave states or free states, led to a bloody Civil War, and persisted through Jim Crow laws, the rise of the Ku Klux Klan, racially-motivated lynchings and massacres, controversy over the separate but equal doctrine, race riots, enactment of the Civil Rights Acts, and claims of inverse discrimination. None of these developments have put the controversy to rest.

App. 5327; R. Doc. 88, at 22.

Absorbing the reality of this case, as surmised by the district court, while putting the rhetoric aside, solidifies why Plaintiffs have never had a basis for their First Amendment claims. They have never been remotely hurt while continuing to make clear, without pause, their abhorrence towards anti-racism. No matter how Plaintiffs twist the facts, they cannot show SPS compelled, or chilled, their speech. Even if SPS mandated Plaintiffs' attendance at anti-racism training as part of their employment, no facts show that SPS disciplined Plaintiffs, or threatened discipline, or that SPS would have deemed that Plaintiffs did not complete the training, if they spoke dissention, or did not speak. Under this Court's precedent, Plaintiffs cannot show a compelled speech violation. *Also cf. Bourgeois v. U.S. Coast Guard*, 151 F. Supp. 3d 726, 740 (W.D. La. 2015) (requiring employees to watch anti-harassment video about diversity did not constitute an adverse employment action). Nor can Plaintiffs show their viewpoints were stifled. Again, there is no evidence SPS implemented the training because it disagreed with Plaintiffs' views, or that the goal of the trainings was to alter their views, as stated above.

Moreover, SPS never asked Plaintiffs to violate the law. Requiring its employees to attend anti-racism and equity training is well within the constitutional limits of a public school employer—in fact, it is required by federal and state law. Title VI, 42 U.S.C. § 2000d *et seq*., prohibits discrimination against students on the basis of race, color, and national origin. Title IX of the Education Amendments, 20

Appellate Case: 23-1374     Page: 43     Date Filed: 07/19/2023 Entry ID: 5297480

U.S.C. §1681 *et seq.*, prohibits discrimination against students on the basis of sex. Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act of 1990 prohibits discrimination against students on the basis of disability. The U.S. Department of Justice's Civil Rights Division (CRD) and the U.S. Department of Education's Office for Civil Rights (OCR)[25] enforce these laws. SPS certainly has a legal obligation to provide antidiscrimination training insofar as its employees must provide services to students on a non-discriminatory basis. Similarly, in the employment arena, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and the Missouri Human Rights Act, RSMo. § 213.010 *et seq.* ("MHRA"), prohibit discrimination.

Thus, there is no evidence that the training was unlawful or that it was provided because SPS disagreed with Plaintiffs' views or wanted to change them. The training was designed to increase awareness of, and sensitivity to, racial issues, and it strived to provide employees with methods of, or suggestions towards, dealing with potential discrimination when witnessed or identified. Plaintiffs were free to

---

[25] The CRD and OCR issue guidance to help school districts identify discrimination or harassment. Their guidance makes it clear that districts may not deny educational access to any child based on protected status and that districts have a responsibility to investigate and address discrimination or harassment. *See*, *e.g*., CRD/OCR Fact Sheets: Confronting Discrimination Based on National Origin and Immigration Status (August 19, 2021); Confronting LGBTQ+ Harassment in Schools (June 23, 2021); and Confronting COVID-19-Related Harassment in Schools (May 10, 2021).

Appellate Case: 23-1374    Page: 44    Date Filed: 07/19/2023 Entry ID: 5297480

disagree,[26] which they did, but they were not required to express a certain message in relation to examples of potential racism. Rather, they could act consistent with the training's suggestions, even if a job responsibility, and not violate the law.[27]

In sum, Plaintiffs' attendance at anti-racism and equity training is a lawful requirement. SPS may, as it did, take action to ensure its employees understand its policies against discrimination without violating the First Amendment. To be clear, government efforts aimed at eradicating discrimination, even eradicating discrimination based on one's perception of a symbol or saying, do not infringe on constitutional rights. *See*, *e.g.*, *McAllum v. Cash*, 585 F.3d 214, 222-24 (5th Cir. 2009) (given "some view the Confederate flag…as a symbol of racism" school policy prohibiting its display did not violate First Amendment). Moreover, it is the

---

[26] Because "the speech of a public-sector employee may interfere with the effective operation of a government office," such employees are not free to disregard policy just because they disagree. *Janus*, *supra*, 138 S.Ct. at 2473 (*citing Pickering*). In this regard, Plaintiffs' reliance on *Janus* is inapposite. Even if *Janus* stands for the proposition claimed by Plaintiffs, that a public employer cannot require employees to speak a certain message unrelated to their duties, *Janus* has no application due to lack of compulsion. *See* App. 5328; R. Doc. 88, at 23.

[27] "Of course, if the speech in question is part of an employee's official duties, the employer may insist that the employee deliver any lawful message." *Janus*, *supra*, 138 S.Ct. at 2473 (*citing Garcetti v. Ceballos*, 547 U.S. 410, 421-22 (2006) ("Public employees, moreover, often occupy trusted positions in society. When they speak out, they can express views that contravene governmental policies or impair the proper performance of governmental functions.").

Appellate Case: 23-1374     Page: 45     Date Filed: 07/19/2023 Entry ID: 5297480

right and duty[28] of SPS, through its Board, to determine, SPS's position on policy issues. *See, e.g., Robertson v. Anderson Mill Elem. Sch.*, 989 F.3d 282, 289 (4th Cir. 2021) ("[I]t is not a court's obligation to determine which messages of social or moral values are appropriate…it is the school board, whose responsibility includes the well-being of the students, that must make such determinations."). Such determinations by the Board are particularly necessary when varying opinions are prevalent.[29] *See, e.g., Parker v. Hurley*, 514 F.3d 87, 107 (1st Cir. 2008) (*citing Morse v. Frederick*, 551 U.S. 393 (2007)) (stating "[p]ublic schools often walk a tightrope between the many competing constitutional demands made by parents, students, teachers, and the schools' other constituents," holding curriculum encouraging respect for gay parents did not violate constitutional rights). For all reasons above, the district court's summary judgment order should be affirmed.

---

[28] This Court routinely recognizes the various duties a public school owes to its students. *See Padilla v. South Harrison R-II Sch. Dist.*, 181 F.3d 992 (8th Cir. 1999).

[29] Yet another reason why the district court properly granted Defendants' motion. *See* App. 5328; R. Doc. 88, at 23 ("Plaintiffs contend they should not have to listen to, learn, or follow Defendants' description of equity and anti-racism discussed during the training because they personally disagree. The problem with such a theory is, particularly in areas of controversy like racial policy, a government entity would be unlikely to find any approach all employees find agreeable.").

Appellate Case: 23-1374   Page: 46   Date Filed: 07/19/2023 Entry ID: 5297480

### III. The District Court Did Not Abuse Its Discretion When Awarding Defendants Their Attorney's Fees and Costs.

This case is solely a calculated attempt by Plaintiffs to do nothing more than bring a political dispute before the judiciary. It reeks of frivolity. Plaintiffs disavow any instruction designed to increase their awareness and understanding of racial discrimination that may be confronted by SPS students. They are blind to the fact that their actions have forced SPS to spend monies fighting against frivolous claims. Plaintiffs choose to disregard that at its core, the underlying premise for the training was vindicating the rights of students by ensuring that school employees are cognizant of situations, words, phrases, references, or even inadvertent actions, that another may perceive as discriminatory based on race and other protections. Very early, the district court saw its baselessness and gave Plaintiffs every opportunity to stop wasting the judiciary's time and resources. But, Plaintiffs, even after discovery confirmed no basis for their claims, did not heed that warning. Instead, riding high on their political agenda, they pushed ahead even more aggressively and filed their own motion for summary judgment.

If ever a school district deserved to be awarded its attorney's fees and costs, it is SPS. Through workplace anti-racism training, SPS did nothing more than seek to encourage its staff to fight for and advocate for minority students. Yet, it found itself fighting against the frivolous claims of egocentric Plaintiffs, who elect to be unaware of the potential barriers students may face, making SPS the posterchild for

38

when, how, and why a school district should be awarded its attorney's fees. The fact that the district court under these circumstances awarded SPS its attorney's fees, particularly when those monies should have been spent on education, is a testament to the fortitude of the district court. It did not abuse its discretion. School districts should not have to pay to defend against claims brought by professed civil rights Plaintiffs, who misuse their claimed beliefs in equality. The district court's order should be affirmed in all respects.

### A.    The District Court Correctly Found Plaintiffs' Claims to be Frivolous, Unreasonable, or Without Foundation.

Defendants are the prevailing parties entitled to an award of attorney's fees. *See*, *e.g.*, *CRST Van Expedited, Inc. v. EEOC*, 578 U.S. 419, 432 (2016) ("Congress…intended that a defendant could recover fees expended in frivolous, unreasonable, or groundless litigation when the case is resolved in the defendant's favor, whether on the merits or not.").[30] Given its intimate knowledge of this matter, the district court did not abuse its discretion when finding Plaintiffs' claims frivolous and awarding Defendants their requested fees. *See Fox*, *supra*, 563 U.S. at 838.

---

[30] The Attorney Generals' Brief claims the fee decision "was wrong" because fees cannot be awarded when a complaint is dismissed for lack of standing. AG Brief, p. 27-28. They are wrong. *See Raniere v. Microsoft Corp.*, 887 F.3d 1298, 1303 (Fed. Cir. 2018)("Even without *CRST*, we conclude that the…court's dismissal with prejudice…for lack of standing is tantamount to a judgment on the merits."); and *Small Justice v. Xcentric Ventures*, 873 F.3d 313, 327 (1st Cir. 2017) (under *CRST*, no abuse of discretion in awarding fees when case resolved on standing grounds).

Defendants recognize that per this Court, a prevailing § 1983 defendant " 'is entitled to attorney's fees only in very narrow circumstances.' " *Williams v. City of Carl Junction*, 523 F.3d 841, 843 (8th Cir. 2008) (quotations in original, citations omitted). " '[A] plaintiff should not be assessed his opponent's attorney's fees' " unless the district court " 'finds that his claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so.' " *Id.* (*quoting Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 422 (1978)). So long as "plaintiff has 'some basis' for [her] claim, a prevailing defendant may not recover attorneys' fees." *Id.* (quotations in original, citation omitted). If, however, a district court finds a § 1983 action frivolous and awards fees to a prevailing party defendant, the "stringent abuse-of-discretion review standard requires that even if [this Court may] disagree with the district court [it] may not simply substitute [its] judgment for that of the district court." *Fisher v. Walmart*, 619 F.3d 811, 819 (8th Cir. 2010).[31]

Here, the district court correctly found frivolity based on a "total lack of a factual basis for any sort of First Amendment claim" warranting an assessment of fees against Plaintiffs. App. 5512; R. Doc. 107, at 3. In this regard, and importantly, in its case management conference (App. 97-98), the district court pointed out to Plaintiffs that their claims lacked factual basis. It did this just three months after

---

[31] This is not a case of first impression as Plaintiffs claim. Appellants' Brief, p. 59. No caselaw exists under "the specific facts at bar" because reasonable individuals realize such facts would never give rise to a constitutional claim in the first instance.

Appellate Case: 23-1374    Page: 49    Date Filed: 07/19/2023 Entry ID: 5297480

Plaintiffs filed suit. *Id.* The district court stressed that Plaintiffs were still employed, that no employee had suffered any sanction, that school boards were to decide how to implement policy, and that fighting against racism is within a school employee's job duties. App. 104-106, 112, 121. The district confirmed through Plaintiffs that SPS could require Plaintiffs to implement its anti-racism policy consistent with the training they received, and that a court had never found a school district does not have an affirmative duty to see that racial justice occurs. App. 104-105, 119. Defendants stated Plaintiffs lacked standing. App. 99-100.[32]

Regardless of the district court's admonishments,[33] Plaintiffs trudged ahead forcing Defendants to undergo extensive discovery. App. 5340-41; R. Doc. 98, at 7-8. Then Plaintiffs remarkedly, even after discovery confirmed no factual basis for their case, filed a summary judgment motion.[34] Due to Plaintiffs' comingled

---

[32] Defendants did not have to call Plaintiffs' claim frivolous as alleged by Plaintiffs to receive fees. That determination is left up to the district court. *Flowers v. Jefferson Hosp. Ass'n*, 49 F.3d 391, 392 (8th Cir. 1995). Plus, it makes no difference that Defendants engaged in discovery before filing their summary judgment motion. "Although in some instances a frivolous case will be quickly revealed as such, it may sometimes be necessary for defendants to 'blow away the smoke screens the plaintiffs had thrown up' before the defendants may prevail." *Id.* at 393.

[33] *See Bond v. Keck*, 629 F. Supp. 225, 227 (E.D. Mo. 1986), *aff'd*, 802 F.2d 463 (8th Cir. 1986) (awarding fees to school defendants in civil rights action as plaintiffs proceeded despite the court's admonitions).

[34] *See Flowers*, *supra*, 49 F.3d at 392-93 (affirming defendants' fee award in § 1981 claim as plaintiff should have known from discovery claim was without foundation).

41

constitutional claims and theories that strained any legitimate cause of action, Defendants were required to respond, a fact that continues through their meritless appeal. App. 5341-42; R. Doc. 98, at 8-9. After reviewing the competing motions, the district court found Plaintiffs' claims to be frivolous and when entering its attorney's fee order stated:

> "[I]t is not acceptable for public employees to simply disregard a training that is lawful, but may be at odds with the employee's personal views. To hold the opposite would make the management of a large, urban school district untenable. Finally, the political undertones of Plaintiffs' allegations, when considered alongside the lack of a factual basis for their claims, demonstrate how Plaintiffs' lawsuit has trivialized the important work of the federal judiciary. Plaintiffs attempted to drag Defendants into a political dispute rather than seek remedy for a genuine harm. This Court is a forum for litigation of genuine disputes of fact and law alone, rather that frivolous political disagreement. Defendants have invested significant time and tax dollars into defending this lawsuit. These resources would have been better spent ensuring educational opportunities for students."

App. 5512; R. Doc. 107, at 3.

On appeal, Plaintiffs dispute the district court's finding of frivolity. Plaintiffs claim that the award "appears aimed at making the government whole and restoring 'tax dollars' and 'resources' to schools, contrary to Section 1983's purpose of vindicating individual civil rights." Appellants' Brief, at 65-65. Several amici curiae assert this position, including Americans for Prosperity Foundation, which is joined by the American Civil Liberties Union, among others, (collectively "APF"). It argues that awards of attorney's fees to defendants will chill civil rights litigation.

42

Brief of APF, *et al*., at 16. While APF recognizes that § 1988 allows "prevailing parties" to recover fees in "civil rights litigation," it chooses to limit that litigation to "injured citizens." *Id*. at 6. It claims this is because § 1988 was enacted "to allow plaintiffs to vindicate their civil rights," and that "routinely granting…fees" to defendants would undercut its purpose. *Id*. at 14-15.[35]

But, the district court's order was not routine. It was based on the fact that Plaintiffs brought a clearly frivolous suit. Regardless, and although APF does recognize that frivolity is a basis for a defendant's fee award (*id*. at 15), it continues its one-sided argument by claiming it advocates for certain civil rights plaintiffs, including students and parents, who will be hesitant to file suit if Defendants' award stands. In its world, as well Plaintiffs', only individual prevailing party civil rights litigants can have any recourse and governmental entities, particularly school districts, should just assume that even if they prevail, they can never tax an individual litigant with fees. And here lies the irony. SPS's policies were implemented to advocate for students and increase sensitivity to race issues likely to be confronted by under-represented and under-resourced students. Plus, the fees were awarded to

---

[35] Fee awards are not solely reserved for civil rights plaintiffs. *See Am. Fam. Life Ass. Co. v. Teasdale*, 733 F.2d 559, 569 (8th Cir. 1984) (upholding district court's order awarding defendant its fees in § 1988 action and stating, "Even if [plaintiff] initially believed it could support the sweeping allegations of [its claims], it continued to litigate the suit after it became apparent that its claims were groundless and unreasonable.").

Appellate Case: 23-1374   Page: 52   Date Filed: 07/19/2023 Entry ID: 5297480

SPS in the employment context and based on the fact that SPS made reasonable requests that Plaintiffs join in that endeavor during a two-hour training. Plaintiffs balked, objected, continued to object, filed suit, and were not remotely harmed.

Hence, the spirit of § 1988 certainly supports, if not mandates, upholding of the district court's fee award in favor of Defendants.[36] What is good for the goose is good for the gander. It was well within the district court's discretion, and the true essence of § 1988, to award Defendants their attorney's fees and costs. As this Court aptly states, it "will not disturb a district court's discretionary decision if it remains within the range of choices available, accounts for all relevant factors, does not rely on any irrelevant factors, and does not constitute a clear error of judgment." *EEOC v. CRST Van Expedited, Inc.*, 944 F.3d 750, 755 (8th Cir. 2019) (quotation in original, citation omitted). The district court's order should stand.

**B.    The District Court Correctly Found Defendants' Hourly Rates and the Attorney Hours Expended Reasonable.**

"The starting point in determining attorney fees is the lodestar, which is calculated by multiplying the number of hours reasonably expended by the reasonable hourly rates." *Fish v. St. Cloud State Univ.*, 295 F.3d 849, 851 (8th Cir.

---

[36] Because SPS sought to protect under-represented and under-resourced students, the district court's fee award will benefit these students, even if indirectly. *See Little Rock Sch. Dist. v. State of Ark.*, 127 F.3d 693, 697 (8th Cir. 1997) (Section 1988 authorized fee award to school districts, and against the state, as districts, who sought to vindicate the constitutional rights of Black schoolchildren, were prevailing parties, and fee award would benefit schoolchildren).

2002) (citation omitted). Plaintiffs did not challenge the hourly rates requested by Defendants' counsel, and the district court found the requested rates reasonable. App. 5512; R. Doc. 107, at 3. Plaintiffs also did not generally challenge the attorney hours expended by Defendant's counsel.[37] Rather, they just wanted a proportional reduction of 90%. App. 5432; R. Doc. 103, at 27. The district rejected Plaintiffs' request and found:

> Defendants request a total of $312,869.50, representing a total of 1,538.6 hours of work. In support, Defendants include various affidavits outlining hourly rates and tables identifying specific tasks undertaken. Defendants' description of tasks performed is sufficiently specific to allow for meaningful review. Given the nature of Plaintiffs' claims and the amount of discovery involved, Defendants' request is reasonable. Further, as Defendants note, even though extensive discovery revealed an obvious lack of injury-in-fact, Plaintiffs nonetheless continued pursuing their claims. This speaks not only to a basis for granting attorney's fees, but also a basis for awarding a higher amount of fees, as significant time was spent preparing dispositive motions.

App. 5512-13; R. Doc. 107, at 3-4 (emphasis added).

On appeal, Plaintiffs similarly do not challenge the hourly rates requested or the time entries. Again, they seek a blanket reduction of the fee award by 90%

---

[37] Some amici curiae claim "the district court did not do the required lodestar analysis" because it "awarded Defendants their full amount of claimed fees." *See*, *e.g.*, Brief of APF, *et al.*, at 8. Their position ignores that Defendants' counsels' rates are less than half the median rate for comparable cases under fee-shifting statutes (App. 5351-52; R. Doc. 98, at 18-19), and that Defendants' fee request was reduced by 17% due to Defendants' counsels' elimination of excessive, redundant, or unnecessary hours (App. 5354-55; R. Doc. 98, at 21-22). Defendants further did not seek to recover the fees expended in preparing their attorney's fees motion.

45

arguing that Plaintiffs are public school employees, who only requested $1.00 in damages, and there is little need to deter them from filing such lawsuits in the future. Appellants' Brief, at 65. They argue the "district court erred when it assessed…costs and fees against Plaintiffs for requesting only a $1.00 remedy." *Id.* at 66.[38]

Plaintiffs offer no justifiable basis for any reduction in the fee award, nor does their caselaw support any reduction.[39] While, and as this Court cautions, an award of attorney's fees might have a chilling effect upon the filing of meritorious claims, such was certainly not the case here. *See Flowers*, 49 F.3d at 392-93 (after "acknowledging the 'chilling effect' an award of attorney's fees 'might have upon the filing of even meritorious claims' and the 'very high' standard for imposing such an award," finding district court did not abuse its discretion when awarding defendant its fees, even after plaintiff's case survived summary judgment). No

---

[38] Plaintiffs' purported apposite case, *Farrar v. Hobby*, 506 U.S. 103 (1992), does not infer a court should look at what a plaintiff asked for when assessing fees against that plaintiff. It addresses whether a plaintiff should be awarded fees when that "plaintiff recovers only nominal damages" holding that they should not. *Id.* at 115 (in such a case the only "reasonable fee is usually no fee at all").

[39] In *Koester v. YMCA*, 2018 WL 10425458, at *1 (E.D. Mo. May 4, 2018), an action alleging ADA discrimination, the defendant's fees were reduced for when it submitted attorney hours for 8 attorneys, per the court, it "confused *reasonable* with *all* attorneys' fees." (emphasis in original).

46

proportional reduction in the district court's attorney's fee award is warranted.[40] The district court's order should be affirmed.

## IV.  If Remanded, Which Should Not Occur, Plaintiffs Have Not Shown a Basis for Case Reassignment.

Plaintiffs rely on *Tumey v. Mycroft Al, Inc*., 27 F.4th 657 (8th Cir. 2022), and claim that upon any remand, this case should be reassigned. Not only would this be a waste of judicial efficiency, the facts do not support reassignment. In *Tumey*, there was unprecedented conduct by the lawyers and parties. *Id.* at 668. It involved "a rare case in which the history, proceedings, and order reflect[ed] a sufficiently high degree of antagonism against Mycroft to warrant reassignment of the case on remand." *Id.* at 668. Here, there has been no such conduct and the district court appropriately applied the facts and law when issuing its rulings. No "reasonable person aware of all the circumstances and events that have transpired…would harbor doubts about the judge's impartiality." *Id.* Reassignment is not appropriate.

## V.  Plaintiffs' Appeal is Frivolous—Defendants Should be Awarded Just Damages Pursuant to FED.R.CIV.P. 38.

Defendants respectfully request that this Court find Plaintiffs' Appeal frivolous and award Defendants just damages including their attorney's fees and costs incurred on appeal pursuant to FED.R.CIV.P. 38.

---

[40] *See*, *e.g.*, *Daniels v. Alphabet, Inc.*, 2023 WL 2414258, at *6 (N.D. Cal. March 8, 2023) (awarding defendants the full amount of the attorney's fees requested associated with defending against plaintiff's frivolous First Amendment claims).

## CONCLUSION

Defendants-Appellees respectfully request that this Court affirm the District Court's Order granting Defendants' Motion for Summary Judgment, and affirm the District Court's Orders awarding Defendants their attorney's fees and costs, and for such other relief as this Court deems just.

Respectfully submitted,

ELLIS ELLIS HAMMONS & JOHNSON, P.C.

By: ___ */s/ Ransom A Ellis* _____
      Ransom A Ellis, III
      Missouri Bar No. 29129
      rellis3@eehjfirm.com

      Tina G. Fowler
      Missouri Bar No. 48522
      tfowler@eehjfirm.com

      2808 S. Ingram Mill Road
      Suite A-104
      Springfield, Missouri 65804

      *Attorneys for Defendants-Appellees*

## Certificate of Compliance With Type-Volume Limit, Typeface Requirements, and Type-Style Requirements Pursuant to FED.R.APP.P 32(g)(1)

1.      This document complies with the word limit of Fed. R. App. P. 32(a)(7) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,975 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Word for Windows (Microsoft Office Word Version 2306, updated June 2023) in 14-point font and Times New Roman type style.

3.      Pursuant to Eighth Circuit Local Rule 28A(h)(2), this brief has been scanned for viruses and is virus-free.

(s) *Tina G. Fowler*

Attorney for  Defendants-Appellees

Dated:   July 19, 2023

Appellate Case: 23-1374     Page: 58     Date Filed: 07/19/2023 Entry ID: 5297480

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of July, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

_/s/ Tina G. Fowler_
Attorney of Record
