# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

BROOKE HENDERSON and JENNIFER LUMLEY,
*Plaintiffs – Appellants,*

v.

SCHOOL DISTRICT OF SPRINGFIELD R12 ("SPRINGFIELD PUBLIC
SCHOOLS"), BOARD OF EDUCATION OF THE SCHOOL DISTRICT OF
SPRINGFIELD R12, GRENITA LATHAN, YVANIA GARCIA-PUSATERI
and LAWRENCE ANDERSON
*Defendants – Appellees.*

On Appeal from the United States District Court
for the Western District of Missouri, Southern Division
No. 6:21-cv-03219 (Harpool, J.)

## *AMICUS CURIAE* BRIEF OF
## MISSOURI SCHOOL BOARDS' ASSOCIATION
## IN SUPPORT OF APPELLEES

*(Rule 29(a)(2) Consent Received)*

Keith R. Powell (8th Cir. No. 97-0549)
Missouri School Boards' Association
2100 I-70 Drive Southwest
Columbia, MO 65203
powell@mosba.org
573-445-9920

*Attorney for Amicus Curiae*

*Missouri School Boards' Association*

## (A)      Rule 26.1 Statement

The Missouri School Boards' Association (MSBA) is formed under the Missouri Nonprofit Corporation Act, R.S.Mo. § 355.001 *et seq*. MSBA has neither a parent corporation nor stock.

1

## (B) Table of Contents

Rule 26.1 Statement …………………………………………………………..1

Table of Contents ………………………………………………………..2

Table of Authorities…………………………………………………...........3

Statement of Consent Obtained to File as *Amicus Curiae*…………………………5

Identity, Interest, and Authority Statement……………………………………...6

Argument…………………………………………………………………...8

Signature Page…………………………………………………………22

Certificates…………………………………………………………...23

Appellate Case: 23-1374    Page: 3    Date Filed: 07/24/2023 Entry ID: 5298809

# (C) Table of Authorities

Mo. Const. Art. XI, § 1…………………………………………………………..6

§ 160.011(8), R.S.Mo…………………………………………………………..15

§ 160.051, R.S.Mo…………………………………………………………...15

§ 162.261, R.S.Mo…………………………………………………………….6

§ 162.471 R.S.Mo…………………………………………………………...6, 8

§ 168.201, R.S.Mo…………………………………………………….8, 15, 21

§ 171.011, R.S.Mo…………………………………………………………8, 21

5 Mo. Code Regs. § 20-100.125………………………………………….....9

303 Creative LLC v. Elenis,, 600 U.S. __, No. 21-476, 2023 U.S. LEXIS 2794 (June 30, 2023)…………………………………………………………………..21

Altman v. Minn. Dep't of Corr., 251 F.3d 1199 (8th Cir. 2001)…………………..9,15

Anzaldua v. Northeast Ambulance & Fire Prot. Dist., 793 F.3d 822 (8th Cir. 2015) *reh'g denied, reh'g en banc denied,* 2105 U.S. App. LEXIS 14246………………14

Bonn v. City of Omaha, 623 F.3d 587 (8th Cir. 2010)……………………………...14

Bradley v. James, 479 F.3d 536 (8th Cir. 2007)…………………………………….14

Bresnahan v. City of St. Peters, 58 F.4th 381 (8th Cir. 2023)……………………...15

Brown v. Chicago Bd. of Educ., 824 F3d 713 (7th Cir. 2016)……………………...16

Buehrle v. City of O'Fallon, 695 F.3d 807 (8th Cir. 2012)…………………………14

Davenport v. Univ. of Ark. Bd. of Trs., 553 F3d 1110 (8th Cir. 2009)……………14

Downs v. Los Angeles Unified Sch. Dist., 228 F.3d 1003 (9th Cir. 2000) *cert. denied* 2001 U.S. LEXIS 3238……………………………………………………...16-17

Epperson v. Arkansas, 393 U.S. 97, 104 (1968)……………………………………10

Evans-Marshall v. Bd. of Educ. Of the Tipp City Exempted Vill. Sch. Dist., 624 F3d 322 (6th Cir. 2010), *reh'g denied, reh'g en banc denied* 2011 U.S. App. LEXIS 3516, *cert. denied* 2011 U.S. LEXIS 4909…………………………………………17-19

Garcetti v. Ceballos, 547 U.S. 410, 126 S.Ct. 1951 (2006)………………..12, *passim*

3

Groenwold v. Kelley, 888 F.3d 365 (2018), *reh'g denied, reh'g en banc denied* 2018 U.S. App. LEXIS 17181……………………………………………………...13

Heffernan v. City of Paterson, 578 U.S. 266, 136 S.Ct. 1412 (2016)………………20

Hemminghaus v. Missouri, 756 F.3d 1100 (8th Cir. 2014)…………………………14

Hinshaw v. Smith, 436 F.3d 997 (8th Cir. 2006), *reh'g denied, reh'g en banc denied* 2006 U.S. App. LEXIS 8155……………………………………………………..14, 19-20

In re Kemp, 894 F.3d 900 (8th Cir. 2018) *reh'g denied, reh'g en banc denied* 2018 U.S. Appl LEXIS 24581, *cert. denied* 139 S.Ct. 1176 (2019)…………………12, 13

Janus v. AFSCME, Council 31, _ U.S. _, 138 S.Ct. 2448 (2018)…………………20

Johnson V. Poway Unified Sch. Dist., 658 F3d 954 (9th Cir. 2011)………………17

Kennedy v. Bremerton Sch. Dist., _ U.S. _, 142 S.Ct. 2407 (2022)……10-13, 15, 20

Lyons v. Vaught, 875 F3d 1168 (8th Cir. 2017)…………………………………………13

Mayer v. Monroe County Cmty. Sch. Corp., 474 F3d 477 (7th Cir. 2007), *reh'g denied, reh'g en banc denied* 2007 U.S. App. LEXIS 7157, *cert. denied* 2007 U.S. LEXIS 9149……………………………………………………………………16

McGee v. Pub. Water Supply, 471 F.3d 918 (8th Cir. 2006)……………………...14

Meyers v. Neb. HHS, 324 F.3d 655 (8th Cir. 2003)…………………………...10, 12

Mogard v. City of Milbank, 932 F.3d 1184 (8th Cir. 2019), *reh'g denied* 2019 U.S. App. LEXIS 28489……………………………………………………………………..13

Nagel v. City of Jamestown, 952 F.3d 923 (8th Cir. 2020)………………………..13

Parks v. City of Horseshoe Bend, 480 F.3d 887 (8th Cir. 2007)………………13, 21

Sparr v. Ward, 306 F3d 589 (8th Cir. 2002)………………………………………15

Shurtleff v. City of Boston, _ U.S. _, 142 S.Ct. 1583 (2022)……………………..11

Stark v. Indep. Sch. Dist., No. 640, 123 F.3d 1068, 1073 (8th Cir. 1997)………..10

Tinker v. Des Moines Ind. Comm. Sch. Dist., 393 U.S. 50 (1969)………………15

W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624 (1943)……………………19-21

4

**STATEMENT OF CONSENT TO FILE:**

**Pursuant to F.R.A.P. 29(a)(2), MSBA received the consent of the parties to file this amicus curiae brief.**

5

**(D) Identity, Interest, and Authority**

School districts of Missouri exist pursuant to Mo. Const. Art. XI, § 1, and their governance and control is vested in the board of education of each school district. §§ 162.261, .471 R.S.Mo. MSBA is a private, voluntary association of Missouri public school governing bodies. MSBA's interest and authority to file comes from *MSBA Advocacy Positions*, which are controlled and adopted annually by the MSBA Delegate Assembly consisting of local school board members appointed to represent their school districts:

> MSBA believes that locally elected boards of education represent the most fundamental element of a democratic society and are the embodiment of representative government. It is critical that school boards set the vision for school districts, establish structures, adopt policies, hire the superintendent, and engage in advocacy on behalf of children and the schools.
>
> …
>
> MSBA opposes any … judicial decision that would diminish local control, increase bureaucratic and administrative burdens, or allow the governance of public school districts to be removed from local boards of education.
>
> …
>
> It is critical that education policy is focused on the student — not on partisan ideology.

*Id,* at V-VI ([https://www.mosba.org/page/advocacy-positions](https://www.mosba.org/page/advocacy-positions) ). MSBA is not here to join battle on the desirability *vel non* of the specific programs used for employee training by Springfield R-12. That political battle belongs to the denizens of Springfield R-12 School District - not this court. As stated above, MSBA's interest

6

is in the functionality of the local control model of public school governance, which includes choosing the messaging that local entity uses in accomplishing its task and having the prerogative to speak for itself when acting as itself.

MSBA states that: (i) no party's counsel authored the brief in whole or in part; (ii) no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and (iii) no person—other than the amicus curiae, its members, or its counsel—contributed money that was intended to fund preparing or submitting the brief. Springfield R-12 School District is a member of MSBA but has not specially contributed content or funds to this brief.

7

**(F) Argument**

MSBA advances three interrelated reasons why this court should affirm the district court in the context presented:

1. In workplace paid training of government employees, the employee is engaged in government speech when speaking in the course of the training program's exercises and its content comprehension checks.

2. The context of participation in an employer-paid workplace training program precludes the employee's speech, even if not government speech, from being speech as a citizen would make upon matter of public concern.

3. Even if some of the employee's speech in paid workplace training as a government employee might be speech upon a matter of public concern, where there is no adverse employment action, there is no legal remedy.

Springfield R-12 School District ("Springfield R-12") exists pursuant to § 162.471, R.S.Mo. Its governing body "may make all needful rules and regulations for the organization, grading and government in the school district." § 171.011, R.S.Mo. Among its powers is to, "employ such … servants and agents as it deems necessary, and prescribe their powers, duties, compensation and term of office or employment," § 168.201, R.S.Mo., as it did with the plaintiffs-appellants in this case.

For public school boards, legal and prudential reasons to train staff abound. Obviously they are subject to federal and state constitutional, statutory, and regulatory nondiscrimination requirements, frequently with both administrative and judicial remedies attached. This court is no doubt aware that what those require (or

8

forbid) is hotly debated within and between authorities making legal demands on school districts, who must interpret a cacophony of often incompatible compliance standards. The Missouri School Improvement Program, 5 Mo. Code Regs. § 20-100.125, under which school districts receive their accreditation, contains expectations that Springfield R-12, *e.g.*, "implements methodologies to support social-emotional learning, culturally responsive teaching, and trauma-informed practices based on student need," *id.*, at TL7(F)); that "[e]ach student has equitable access to responsive services and resources to assist them in addressing issues and concerns that may affect their academic, career, and social-emotional needs," *id.* at TL10(D); that the "school system promotes respect for individual differences (e.g., diversity training, diversity awareness, policies, and procedures)," *id.* at CC1(D); that the "school system assures student voices are heard and respected," *id.*, at DB3(B); and that the "school system initiates and promotes collaborative relationships with community partners, agencies, and institutions that promote open dialogue and respect for multiple perspectives, *id.* at E4(C). That's a lot to train for, under time and resource constraints.

"[A] public employer may decide to train its employees, it may establish the parameters of that training, and it may require employees to participate." Altman v. Minn. Dep't of Corr., 251 F.3d 1199, 1202 (8th Cir. 2001). Springfield R-12 chose and instituted a staff training program and paid its public employees to participate

Appellate Case: 23-1374    Page: 10    Date Filed: 07/24/2023 Entry ID: 5298809

in the training. Part of the training was to speak in small groups, and another part was to confirm understanding the content of the training by answering quiz questions immediately after delivery of the training content. The speech in small groups and the selection of the answer corresponding to the content of the training, all while being paid to undertake the employer's training program, was government speech. Moreover, even though the plaintiffs claim they didn't say, or didn't want to say, the message in the training, *nothing adverse happened to them*. *See,* <u>Meyers v. Neb. HHS</u>, 324 F3d 655, 659-60 (8th Cir 2003) ("not everything that makes an employee unhappy is actionable").

This court has noted that, "[a]s the Supreme Court has stated, courts 'do not . . . intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values.'" <u>Stark v. Indep. Sch. Dist., No. 640</u>, 123 F.3d 1068, 1073 (8th Cir. 1997) *quoting* <u>Epperson v. Arkansas</u>, 393 U.S. 97, 104 (1968). MSBA believes this matter is quotidian political conflict, all too commonly being visited upon MSBA members lately, exacerbated for political points, and properly dismissed by the trial court.

The U.S. Supreme Court recently went over much of the ground here:

> When it comes to [a public school employee] free speech claim, our precedents remind us that the First Amendment's protections extend to "teachers and students," neither of whom "shed their constitutional

10

rights to freedom of speech or expression at the schoolhouse gate." Of course, none of this means the speech rights of public school employees are so boundless that they may deliver any message to anyone anytime they wish. In addition to being private citizens, teachers and coaches are also government employees paid in part to speak on the government's behalf and convey its intended messages.

To account for the complexity associated with the interplay between free speech rights and government employment, this Court's decisions … suggest proceeding in two steps. The first step involves a threshold inquiry into the nature of the speech at issue. If a public employee speaks "pursuant to [his or her] official duties," this Court has said the Free Speech Clause generally will not shield the individual from an employer's control and discipline because that kind of speech is—for constitutional purposes at least—the government's own speech.

Kennedy v. Bremerton Sch. Dist., 124 S.Ct. 2407, 2423 (2022) (internal citations omitted). The "government's own speech" is protected from others' right to interject their own influence on that speech: "when the government speaks for itself, the First Amendment does not demand airtime for all views. After all, the government must be able to promote a program or espouse a policy in order to function." Shurtleff v. City of Boston, 142 S.Ct. 1583, 1587 (2022) (internal quotations and citations omitted). "The Constitution therefore relies first and foremost on the ballot box, not on rules against viewpoint discrimination, to check the government when it speaks." Id. 142 S.Ct. at 1589. As Springfield R-12 itself points out, the training program at issue evolved over time. And that's how local control is supposed to work.

11

Of course, all of these observations are encompassed by <u>Garcetti v. Ceballos</u>, 547 U.S. 410 (2006). "[W]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." <u>Id.</u>, at 418. The Court noted the "need for government employers attempting to perform their important government functions." <u>Id.</u>, 547 U.S. at 420. "Underlying our cases has been the premise that while the First Amendment invests public employees with certain rights, it does not empower them to constitutionalize the employee grievance." <u>Id</u>. As the Court noted in <u>Garcetti</u>, "restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." 547 U.S. at 421-422. "When he went to work and performed the tasks he was paid to perform, [he] acted as a government employee." <u>Id.</u>

<u>Garcetti</u> is all the more conclusive where the government employer does not even take adverse employment action for an employee's personal dislike of the speaking elements inherent in the government's training program. <u>See</u>, <u>In re Kemp</u>, 894 F.3d 900, 906 (8th Cir. 2018) *reh'g denied, reh'g en banc denied* 2018 U.S. Appl LEXIS 24581, *cert. denied* 139 S.Ct. 1176 (2019) (no adverse employment action without "material employment disadvantage" to plaintiff); <u>Meyers</u>, 324 F.3d at 659-

Appellate Case: 23-1374     Page: 13     Date Filed: 07/24/2023 Entry ID: 5298809

60; <u>Parks v. City of Horseshoe Bend</u>, 480 F.3d 837, 840 (8th Cir. 2007) (claim requires adverse action that causes an injury).

In <u>Kennedy</u>, <u>supra</u>, the coach, "did not speak pursuant to government policy. He was not seeking to convey a government-created message. He was not instructing players, discussing strategy, encouraging better on-field performance, or engaged in *any other speech the District paid him to produce* as a coach." <u>Kennedy</u>, 142 S.Ct. at 2424 (emphasis added) (applying <u>Garcetti</u>, <u>supra</u>). Roaming the field unburdened of immediate job duties after a football game is not the same setting as attending paid training that includes discussion groups or post-delivery quizzes.

This court has a long record of <u>Garcetti</u> cases that respect the government-*qua*-employer messaging prerogative. <u>Nagel v. City of Jamestown</u>, 952 F.3d 923, 929-930 (8th Cir. 2020); <u>Mogard v. City of Milbank</u>, 932 F.3d 1184, 1189 (8th Cir. 2019), *reh'g denied* 2019 U.S. App. LEXIS 28489; <u>In re Kemp</u>, 894 F.3d at 906 (state, as employer, may control how its employees perform their work, even when that work includes speech); <u>Groenwold v. Kelley</u>, 888 F.3d 365, 371 (2018), *reh'g denied, reh'g en banc denied* 2018 U.S. App. LEXIS 17181 ("Because his speech stemmed from professional responsibilities and was made in furtherance of those responsibilities, it was not protected under the First Amendment"); <u>Lyons v. Vaught</u>, 875 F3d 1168, 1173-1174 (8th Cir. 2017) (speech can be pursuant to a public employees official job duties even though it is not required by, or included in, the

13

employee's job description, or in request to a response by the employer); Anzaldua v. Northeast Ambulance & Fire Prot. Dist., 793 F.3d 822, 833 (8th Cir. 2015) *reh'g denied, reh'g en banc denied,* 2105 U.S. App. LEXIS 14246 (if employee was not speaking on a matter of public concern, after examining the content, form and context of the speech … the employee has no First Amendment cause of action based on his or her employer's reaction); Hemminghaus v. Missouri, 756 F.3d 1100, 1110 (8th Cir. 2014); Buehrle v. City of O'Fallon, 695 F.3d 807, 812 (8th Cir. 2012) (employee gave report on "all the information he learned during his investigation" and was "specifically told to give conclusions…"); Bonn v. City of Omaha, 623 F.3d 587, 593 (8th Cir. 2010); Davenport v. Univ. of Ark. Bd. of Trs., 553 F3d 1110,1113 (8th Cir. 2009); Bradley v. James, 479 F.3d 536 (8th Cir. 2007) (comments made only during employer investigation were pursuant to duties); McGee v. Pub. Water Supply, 471 F.3d 918, 921 (8th Cir. 2006) (complaints about city infrastructure were an exercise of his official duties; employer's response was "an exercise of the Board's managerial discretion that Garcetti expressly leaves to public employers, not to federal courts applying the First Amendment").

In pre-Garcetti decisions, this court made additional observations about the balance of public employers and public employees regarding speech. Hinshaw v. Smith, 436 F.3d 997, 1005 (8th Cir. 2006), *reh'g denied, reh'g en banc denied* 2006 U.S. App. LEXIS 8155 ("[G]overnment, as an employer, must have wide discretion

and control over the management of its personnel and internal affairs"); <u>Sparr v. Ward,</u> 306 F3d 589, 595 (8th Cir. 2002) ("the internal nature" of speech is a factor to be considered"); <u>Altman,</u> 251 F.3d at 1202. This court recently said, "[g]enerally, speech shared with coworkers, as opposed to the press or public, weighs against a finding that the speech involved a matter of public concern." <u>Bresnahan v. City of St. Peters,</u> 58 F.4th 381, 383 (8th Cir. 2023).

Springfield R-12 employees are there to operate a government institution that must serve a student population. §§ 160.011(8), .051, 168.201, R.S.Mo. It is common to abbreviate discussions of the usual people at schools as "students and teachers," *see, e.g.,* <u>Tinker v. Des Moines Ind. Comm. Sch. Dist.,</u> 393 U.S. 50 (1969), yet the Supreme Court has just decided <u>Kennedy</u>, *supra*, using the "job description" of *football coach*. The catch-all term "teachers" must include the many kinds of employees the school district uses to deliver its government services.

Sister circuits have addressed disputes with school employees in similar circumstances. The Seventh Circuit has addressed a teacher's claim as follows:

> Children who attend school because they must ought not be subject to teachers' idiosyncratic perspectives. Majority rule about what subjects and viewpoints will be expressed in the classroom has the potential to turn into indoctrination; elected school boards are tempted to support majority positions about religious or patriotic subjects especially. But if indoctrination is likely, the power should be reposed in someone the people can vote

15

out of office, rather than tenured teachers. At least the board's views can be debated openly, and the people may choose to elect persons committed to neutrality on contentious issues. … The Constitution does not entitle teachers to present personal views to captive audiences against the instructions of elected officials.

Mayer v. Monroe County Cmty. Sch. Corp., 474 F3d 477, 479 (7th Cir. 2007), *reh'g denied, reh'g en banc denied* 2007 U.S. App. LEXIS 7157, *cert. denied* 2007 U.S. LEXIS 9149, *followed in,* Brown v. Chicago Bd. of Educ., 824 F3d 713, 715 (7th Cir. 2016).

The Ninth Circuit, in a case where a teacher decided to put up his own in-school bulletin board to counter the messages on the school's bulletin board, noted: "Although it can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the school house gate, where that speech or expression begins to implicate the school as speaker, First Amendment rights have been limited." Downs v. Los Angeles Unified Sch. Dist., 228 F.3d 1003, 1009 (9th Cir. 2000) *cert. denied* 2001 U.S. LEXIS 3238. The employee was not entitled to speak his "viewpoint" of the message, because,

We do not face an example of the government opening up a forum for either unlimited or limited public discussion. Instead, we face an example of the government opening up its own mouth: …. The bulletin boards served as an expressive vehicle for the school board's policy of "Educating for Diversity." ... Because the bulletin boards were a manifestation of the school board's policy to promote tolerance, … all speech that occurred on the

16

> bulletin boards was the school board's and LAUSD's speech.

Id., at 1012. Similarly, Springfield R-12's employee training program was Springfield R-12's speech in its own workplace.

The Ninth Circuit continued to follow <u>Downs</u> after <u>Garcetti</u> was decided. <u>Johnson v. Poway Unified Sch. Dist.</u>, 658 F.3d 954 (9th Cir. 2011). First Amendment rights, "*applied in light of the special characteristics of the school environment*, are available to teachers and students." 658 F.3d at 962 (emphasis by court). Thus,

> The First Amendment "does not invest [government employees] with a right to perform their jobs however they see fit. … Simply because the government opens its mouth to speak does not give every outside individual or group a First Amendment right to play ventriloquist. …
>
> We consider next our legal inquiry: whether Johnson's speech owes its existence to his position, or whether he spoke just as any non-employee citizen could have. The answer is clear; he spoke as an employee. Certainly, Johnson did not act as a citizen when he went to school and taught class, took attendance, supervised students, or regulated their comings-and-goings; he acted as a teacher—a government employee.

Id., 658 F.3d at 966-967 (internal quotations and citations omitted). In so doing, the Ninth Circuit followed the Sixth Circuit decision in <u>Evans-Marshall v. Bd. of Educ. Of the Tipp City Exempted Vill. Sch. Dist.</u>, 624 F3d 322 (6th Cir. 2010), *reh'g denied, reh'g en banc denied* 2011 U.S. App. LEXIS 3516, *cert. denied* 2011 U.S. LEXIS 4909. Judge Sutton, for the court, observed: "Any dispute over the board's

17

motivations, <u>Pickering</u> balancing or the "public concerns" of her speech under

<u>Connick</u> is beside the point if … she made her curricular and pedagogical choices in

connection with her official duties as a teacher." <u>Id.</u>, at 340 (internal quotations

omitted). The answer to governments' choices of message is not for the employee,

while acting as such, to substitute or admix her own message. The answer is political

accountability, which is a core function of local control of the Springfield R-12

School District by the people thereof. As Judge Sutton continued:

> State law gives elected officials--the school board--not teachers, not the chair of a department, not the principal, not even the superintendent, responsibility over the curriculum. This is an accountability measure, pure and simple, one that ensures the citizens of a community have a say over a matter of considerable importance to many of them--their children's education--by giving them control over membership on the board.

> The First Amendment does not ban this policy choice or this accountability measure. The Constitution does not prohibit a State from creating elected school boards and from placing responsibility for the curriculum of each school district in the hands of each board. Teachers no doubt are "required . . . to speak or write" and otherwise express themselves, <u>Garcetti</u>, 547 U.S. at 422, but this does not make them sovereigns unto themselves. The curricular choices of the schools should be presumptively their own--the fact that such choices arouse deep feelings argues strongly for democratic means of reaching them.

> …

> Placing the First Amendment's stamp of approval on these kinds of debates not only would "demand permanent judicial intervention in the conduct of governmental operations," <u>Garcetti</u>, 547 U.S. at 423, but it also would

18

transform run-of-the-mine curricular disputes into constitutional stalemates.

That is not the only problem. What employer discipline arising from an employee's manner of teaching--choices of books and the methods of teaching them--does not implicate speech? Could a teacher respond to a principal's insistence that she discuss certain materials by claiming that it improperly *compels* speech? <u>Cf. W. Va. State Bd. of Educ. v. Barnette,</u> 319 U.S. 624, 63 S. Ct. 1178, 87 L. Ed. 1628 (1943).

…

The key insight of *Garcetti* is that the First Amendment has nothing to say about these kinds of decisions. An employee does not lose "any liberties the employee might have enjoyed as a private citizen" by signing on to work for the government, but by the same token, the government, just like a private employer, retains "control over what the employer itself has commissioned or created": the employee's job. *Garcetti*, 547 U.S. at 422. And that insight has particular resonance in the context of public education. Every child in Ohio must attend school, providing public school teachers with a captive audience for their in-class speech, *see Mayer*, 474 F.3d at 479, and providing a compelling reason for putting curricular choices in the hands of someone they can vote out of office, or who is otherwise democratically accountable….

Id., at 341-342 (internal quotations & citations omitted). Judge Sutton's hypothetical

about <u>Barnette</u> warrants special attention.

While the government's actions toward its citizenry in general is greatly circumscribed by the individual rights guaranteed by the Constitution, the government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs.

19

Hinshaw, 436 F.3d at 1005 (internal quotations and citations omitted). Barnette was cited in Janus v. AFSCME, Council 31,138 S.Ct. 2448, 2464 (2018), as governing "[f]orcing *free and independent individuals* to *endorse* ideas they find objectionable." Id. (emphases added). Being on the clock as a government employee engaged in government speech concerning a workplace training program established to implement discretionary government policy, however, is not being "free and independent" at that moment. The tension here is not new – it is the origin story of the Pickering-Garcetti family of cases. Indeed, in Kennedy, the Supreme Court parsed Kennedy's employee status nearly minute-by-minute. 142 S.Ct. at 2425.

Employees were (and remain) free to use their "free and independent" status time to decry Springfield R-12's trainings, which they have done without any adverse employment action. Contextually, the district did not ascribe to them any "free and independent" thought or word. While the First Amendment is attended by "hostility to government action that 'prescribe[s] what shall be orthodox in politics,'" Heffernan v. City of Paterson, 578 U.S. 266, 270 (2016), even when there is some adverse action taken, there are "exceptions to take account of 'practical realities' such as the need for 'efficiency' and 'effective[ness]' in government service." Id.

Step One of being subject to some kind of Springfield R-12 "orthodoxy," in the context of this case, is to get a job there. That job was created and defined by

Appellate Case: 23-1374     Page: 21     Date Filed: 07/24/2023 Entry ID: 5298809

Springfield R-12 under §§ 168,201 and 171.011, R.S.Mo. Having done that, outside a moment of "free and independent" agency like Coach Kennedy had, means speaking as Springfield R-12, as directed. Nobody is compelled to stay employed under these conditions – it's part of the bargain. No public endorsement compelled by sovereign fiat apports from this context. *Contra,* 303 Creative LLC v. Elenis,, 600 U.S. __, No. 21-476, 2023 U.S. LEXIS 2794, *26-*29 (June 30, 2023) (speech compelled by state public accommodations laws). In sum, the District Court properly rejected the Barnette gambit. MSBA's members could not serve the children of their districts pursuant to locally-elected boards' policies, were employees nonetheless able to put Barnette wrenches in the gears. Circuit Judge Sutton, *supra*, has this right.

As noted in its statement of Identity, Interest, and Authority, *supra*, *MSBA Advocacy Positions* state, "It is critical that education policy is focused on the student — not on partisan ideology." This aspiration may at present be down on its luck, but Missouri school policy microphones are obtained by politics,[1] not legal claims. In this court's words, "[t]his case, at its core, is a dispute fueled by the rough and tumble of local politics," Parks, 480 F.2d at 840, but it has produced no injury redressable by a First Amendment claim.

---

[1] *C.f.,* Aristophanes, The Knights (vying for the favor of Demos)
https://classics.mit.edu/Aristophanes/knights.html

Respectfully submitted,

/s/ Keith Robert Powell (No.97-0549)

Missouri School Boards' Association

2100 I-70 Drive SW

Columbia MO 65203

powell@mosba.org

573-445-9920 ext. 339

Attorney for *amicus curiae* Missouri School Boards' Association

**(G) certificates**

### *Certificate of Compliance With Type-Volume Limit, Typeface Requirements, and Type-Style Requirements*

1. This document complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) this document contains 3560 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. **P.** 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using *Micosoft Office 365 Word, Times New Roman 14 point font*.

3.      Pursuant to Eighth Circuit Local Rule 28(h)(2), the brief has been scanned for viruses to be virus-free.

/S/ Keith Robert Powell (No. 97-0549)

Attorney for Amicus Curiae Missouri School Boards' Association

Date: July 24, 2023

### *CERTIFICATE OF SERVICE*

I hereby certify that on this 24th day of July, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/S/ Keith Robert Powell (No. 97-0549)

Attorney for Amicus Curiae Missouri School Boards' Association

Date: July 24, 2023