# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

BROOKE HENDERSON, et al.,

*Plaintiffs – Appellants,*

v.

SPRINGFIELD R-12 SCHOOL DISTRICT, et al.,

*Defendants – Appellees.*

On Appeal from the United States District Court
for the Western District of Missouri, Southern Division
No. 6:21-cv-03219 (Harpool, J.)

# REPLY BRIEF OF APPELLANTS
# BROOKE HENDERSON AND JENNIFER LUMLEY

Kimberly S. Hermann
Braden H. Boucek
Celia Howard O'Leary
SOUTHEASTERN LEGAL FOUNDATION
560 W. Crossville Rd., Ste. 104
Roswell, GA 30075
(770) 977-2131
khermann@southeasternlegal.org
bboucek@southeasternlegal.org
coleary@southeasternlegal.org

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

ARGUMENT .......................................................................................................1

I. Plaintiffs suffered a constitutional injury that conferred standing...............2

    A. Standing exists where the government's words and actions could lead a reasonable person to speak or self-censor. ...............................................3

    B. SPS compelled Plaintiffs to speak, then discriminated against their views, forcing them to self-censor. ....................................................................7

II. SPS cannot survive any balancing test to justify Plaintiffs' injury. ..........15

    A. The training involved speech outside the scope of Plaintiffs' job duties. ...................................................................................................................17

    B. SPS's actions are per se unconstitutional. ..............................................21

III. SPS created, and continues to maintain, an unconstitutional condition of Plaintiffs' employment...............................................................................22

IV. SPS is not entitled to attorney fees and costs totaling $316,136.60. ..........22

V. Reassignment is proper on any remand. .....................................................26

CONCLUSION ..................................................................................................29

CERTIFICATE OF COMPLIANCE ..................................................................30

CERTIFICATE OF SERVICE ...........................................................................30

Appellate Case: 23-1374    Page: 2    Date Filed: 08/23/2023 Entry ID: 5309193

# TABLE OF AUTHORITIES

**Cases**

*281 Care Comm. v. Arneson*, 638 F.3d 621 (8th Cir. 2011).......................................5

*303 Creative LLC v. Elenis*, 143 S. Ct. 2298 (2023) ...................................... passim

*Advantage Media, LLC v. City of Hopkins*, 511 F.3d 833 (8th Cir. 2008)..............23

*Anzaldua v. Ne. Ambulance & Fire Prot. Dist.*, 793 F.3d 822 (8th Cir. 2015).......16

*Axson-Flynn v. Johnson*, 356 F.3d 1277 (10th Cir. 2004).........................................6

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963) .................................................6

*Belk v. City of Eldon*, 228 F.3d 872 (8th Cir. 2001) ................................................15

*Bethel Sch. Dist. v. Fraser*, 478 U.S. 675 (1986) ...................................................18

*Bond v. Keck*, 629 F. Supp. 225 (E.D. Mo. 1986) ...................................................25

*Boyd v. ConAgra Foods, Inc.*, 879 F.3d 314 (8th Cir. 2018) ...................................23

*Christiansburg Garment Co. v. EEOC*, 434 U.S. 412 (1978) .................................24

*Cole v. Richardson*, 405 U.S. 676 (1972)................................................................22

*Denton v. Hernandez*, 504 U.S. 25 (1992)...............................................................23

*Doe v. Bolton*, 410 U.S. 179 (1973).........................................................................14

*Elrod v Burns*, 427 U.S. 347 (1976) ........................................................................12

*Flowers v. Jefferson Hosp. Ass'n*, 49 F.3d 391 (8th Cir. 1995) .............................23

*Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994) ........................................................23

*Fox v. Vice*, 563 U.S. 826 (2011).............................................................................26

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) .............................................................17

iii

*Garcia v. City of Trenton*, 348 F.3d 726 (8th Cir. 2003)......................................6, 13

*Gralike v. Cook*, 191 F.3d 911 (8th Cir. 1999)................................................ 4, 8, 11

*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988) ......................................19

*Hurley v. Irish-Am. Gay, Lesbian, and Bisexual Grp. of Boston, Inc.*, 515 U.S. 557 (1995)........................................................................................................ passim

*Janus v. AFSCME, Council 31*, 138 S. Ct. 2448 (2018)........................ 3, 15, 17, 19

*Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (2022) ......................................17

*Kilborn v. Amiridis*, 2023 U.S. Dist. LEXIS 26451 (N.D. Ill. Feb. 15, 2023)........25

*Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038 (2021)......................................18

*Menders v. Loudoun Cnty. Sch. Bd.*, 65 F.4th 157 (4th Cir. 2023) ........................25

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) ................................... 5, 18, 22

*Nagel v. City of Jamestown*, 952 F.3d 923 (8th Cir. 2020) ....................................15

*Parks v. City of Horseshoe Bend*, 480 F.3d 837 (8th Cir. 2007)............................14

*Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968)............................................... 15, 19

*Plessy v. Ferguson*, 163 U.S. 537 (1896) ...............................................................20

*Richmond v. Southwire Co.*, 980 F.2d 518 (8th Cir. 1992) ....................................26

*Riley v. Nat'l Fed'n of Blind*, 487 U.S. 781 (1988) ..................................................3

*Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282 (4th Cir. 2021)..........18

*Rosenberger v. Rector & Visitors of U. of Va.*, 515 U.S. 819 (1995) ....................22

*Sentis Group, Inc. v. Shell Oil Co.*, 559 F.3d 888 (8th Cir. 2009) .........................27

*Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105 (1991).................................................................................................................5

iv

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) ........................................................5

*Speech First, Inc. v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022) ...........................6

*Speech First, Inc. v. Schlissel*, 939 F.3d 756 (6th Cir. 2019) ..................................12

*Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 143 S. Ct. 2141 (2023) ........................................................................................ 2, 20, 21

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014).......................................14

*Telescope Media Grp. v. Lucero*, 936 F.3d 740 (8th Cir. 2019) ...............................4

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) .............. 19, 21

*Tumey v. Mycroft AU, Inc.*, 27 F.4th 657 (8th Cir. 2022).......................................26

*Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021)...................................................2

*Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383 (1988).......................................15

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) ....................................5

*Watson v. O'Neill*, 365 F.3d 609 (8th Cir. 2004)....................................................29

*Wooley v. Maynard* 430 U.S. 705 (1976) ...............................................................21

*Zieper v. Metzinger*, 474 F.3d 60 (2d Cir. 2007) ................................................6, 14

**Statutes**

§ 36.157 R.S.Mo ........................................................................................................19

**Other Authorities**

*In re Diversity, Equity, Inclusion & Access Training for Continuing Legal Educ.*, 2023 Wisc. LEXIS 167 (S. Ct. Wis. July 13, 2023).............................................25

Appellate Case: 23-1374    Page: 5    Date Filed: 08/23/2023 Entry ID: 5309193

## ARGUMENT

Plaintiffs Brooke Henderson and Jennifer Lumley believe in our nation's promise of equality, colorblindness, and equal opportunity. But when Springfield Public Schools ("SPS") gathered all staff in a mandatory districtwide training, directed them to discuss controversial matters of political and social opinion, and told them that colorblindness and equality contribute to white supremacy, Plaintiffs were met with a dilemma no public employee should have to face: abandon their sincerely held beliefs or defend them and risk the consequences. SPS prescribed a political orthodoxy—anti-racism—at the expense of Plaintiffs' sincerely held beliefs. That is the basis for their First Amendment claims.[1]

SPS ignores the facts that frame Plaintiffs' claims.[2] It broadly asserts that it is owed deference by virtue of being a public employer. But "deference must exist within constitutionally prescribed limits, and that deference does not imply abandonment or abdication of judicial review[.]" *Students for Fair Admissions, Inc.*

---

[1] As described below, this case is not about whether a school district may regulate the conduct of employees, nor does it involve curricular speech inside the classroom or other on-the-job speech that may justify a public employer's intervention. This case is about SPS's attempts to change Plaintiffs' private, sincerely held beliefs.

[2] For example, SPS incorrectly asserts that Plaintiffs challenged only four parts of the training. Plaintiffs have consistently challenged dozens of slides, statements, and exercises from the training and Canvas modules.

1

*v. President & Fellows of Harv. Coll.*, 143 S. Ct. 2141, 2168 (2023) (internal quotation marks and citations omitted) ("*Harvard*"). SPS cannot simply say "trust us" and expect this Court to turn a blind eye to Plaintiffs' constitutional injuries. *Id*.

## I.  Plaintiffs suffered a constitutional injury that conferred standing.

Under Article III, a plaintiff must maintain a personal interest in the matter "[a]t all stages of litigation[.]" *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796 (2021). Standing requires showing a redressable injury that is fairly traceable to a government action. *Id*. The only issue regarding standing on appeal is whether SPS's actions created a First Amendment injury. *See* Add.12, App.5315, R.Doc.88, at 10.

Plaintiffs alleged that SPS imposed such an injury in its fall 2020 equity training and Canvas modules, and that SPS continues to violate their rights by requiring an ongoing commitment to anti-racism. They alleged that SPS compelled their speech, discriminated against their views and chilled their speech, and imposed an unconstitutional condition on their employment. The district court held that Plaintiffs did not suffer an injury in fact, and thus lacked standing, because SPS did not require them to articulate a specific message and did not take adverse employment action against them. Add.5, App.5308, R.Doc.88, at 3; Add.11, App.5314, R.Doc.88, at 9. Thus, their appeal turns on whether they suffered a First

Appellate Case: 23-1374    Page: 7    Date Filed: 08/23/2023 Entry ID: 5309193

Amendment injury that conferred standing; they have not waived their claims.[3] *See* Br. of Appellants at 46, 48, 52, 57.

### A. Standing exists where the government's words and actions could lead a reasonable person to speak or self-censor.

Because freedom of speech "includes both the right to speak freely and the right to refrain from speaking at all," a plaintiff has standing under the First Amendment any time the government compels her speech or silence. *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2463 (2018) (collecting cases); *accord Riley v. Nat'l Fed'n of Blind*, 487 U.S. 781, 796 (1988) (any difference between compelled speech and compelled silence "is without constitutional significance, for the First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what not to say"). To that end, forcing individuals "to choose between remaining silent, producing speech that violates their beliefs, or speaking their minds and incurring sanctions for doing so" presents an impossible choice. *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2314 (2023).

---

[3] Beyond standing, the district court held that even if Plaintiffs were injured, it would *still* rule for SPS because it was their employer. Add.24, App.5327, R.Doc.88, at 22. Plaintiffs thus addressed First Amendment standing and the employer-employee relationship in their opening brief.

The government may only compel "the dissemination of purely factual and uncontroversial information" in areas like commercial advertising. *Id*. at 2317-18 (internal quotation marks and citation omitted). When it comes to political, social, and ideological matters which inherently involve opinion, coaxing speech out of someone who would prefer to remain silent causes an injury. *Gralike v. Cook*, 191 F.3d 911, 917-18 (8th Cir. 1999) (refusing to allow individuals "to remain silent" on matters of public concern "is precisely the type of state-compelled speech which violates the First Amendment").

The government need not even require a speaker to articulate a specific message for an injury to exist. *See id*.; *303 Creative*, 143 S. Ct. at 2312 (it does not matter "whether the government seeks to compel a person to speak its message . . . or to force an individual to include other ideas with his own speech that he would prefer not to include. . . . All that offends the First Amendment just the same") (internal citations omitted); *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 753-54 (8th Cir. 2019) (requiring individuals to engage in speech they "would not otherwise make" is unconstitutional).

4

But when the government does adopt a specific viewpoint, then discriminates against opposing views to compel conformity, the injury is even more obvious.[4] *See Hurley v. Irish-Am. Gay, Lesbian, and Bisexual Grp. of Boston, Inc.*, 515 U.S. 557, 579 (1995); *303 Creative*, 143 S. Ct. at 2341-42 (Sotomayor, J., dissenting) (the government cannot "conscript [a speaker] into espousing the government's message," "invad[e] her sphere of intellect," or "violate her constitutional right to differ") (citing *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943)).

"Lawmakers may no more silence unwanted speech by burdening its utterance than by censoring its content." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011); *accord Meriwether v. Hartop*, 992 F.3d 492, 503 (6th Cir. 2021) (holding that the First Amendment is violated "[w]hen the government *tries*" to "compel affirmance of a belief") (quoting *Hurley*, 515 U.S. at 573) (emphasis added). Thus, the government need not punish a speaker for an injury of compulsion or chill to exist. *See 281 Care Comm. v. Arneson*, 638 F.3d 621, 627 (8th Cir. 2011) ("Self-censorship can itself constitute injury in fact.").

---

[4] Motive is not a factor for viewpoint discrimination. *See Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 117 (1991) (the Supreme Court has "consistently held" that plaintiffs need not show "evidence of an improper censorial motive" or an intent "to suppress certain ideas").

Appellate Case: 23-1374     Page: 10     Date Filed: 08/23/2023 Entry ID: 5309193

When assessing injury, courts examine the *appearance* of authority the government has, asking whether the words and actions of government officials could lead a reasonable person to speak or self-censor. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963) (looking "through forms to the substance" and finding that "the record amply demonstrate[d]" informal censorship); *Hurley*, 515 U.S. at 567 (considering all record facts to find a First Amendment violation); *Garcia v. City of Trenton*, 348 F.3d 726, 728 (8th Cir. 2003) (considering whether a "person of ordinary firmness" would have self-censored); *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1283, 1290 (10th Cir. 2004) (finding injury where speaker believed, based on school officials' words, that "it was only a matter of time" before she was punished); *Zieper v. Metzinger*, 474 F.3d 60, 66 (2d Cir. 2007) (considering "the entirety of the defendants' words and actions" to determine whether speech was chilled).

Thus, the threshold for First Amendment injury is low. *See Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1120 (11th Cir. 2022) ("We have long emphasized that the injury requirement is most loosely applied—particularly in terms of how directly the injury must result from the challenged governmental action—where First Amendment rights are involved[.]"). Plaintiffs need only show that SPS, by its words and actions, could have led a reasonable person to speak or self-censor during the training and modules.

6

**B. SPS compelled Plaintiffs to speak, then discriminated against their views, forcing them to self-censor.**

SPS violated the First Amendment when it directed Plaintiffs to engage in contentious discussions on what it admitted were "societal and political ideologies." App.3198, R.Doc.80, at 77. During the mandatory training, SPS gave several directives to speak, including "stay engaged" in "courageous *conversations*," "turn and *talk*"[5] to colleagues, and "share and *dialogue*." App.1774, R.Doc.77-13, at 7; App.1775, R.Doc.77-13, at 8 (emphasis added); App.1963, R.Doc.77-15, at 6 (emphasis added); App.2192 at 21:11-14, R.Doc.77-23, at 6 (emphasis added). SPS "directed" Plaintiffs to speak and warned that they could be called on if they did not participate. App.2192 at 21:11-14, R.Doc.77-23, at 6; App.2763 at 229:19-230:14, R.Doc.79-1, at 58; App.2777 at 288:18-24, R.Doc.79-1, at 72; App.2983 at 33:23-34:9, R.Doc.79-2, at 9; App.2987 at 50:4-13, R.Doc.79-2, at 13.

On top of that, SPS created inducements to speak. It warned that "white silence" contributes to white supremacy and that anti-racism meant staff could "no longer remain *silent or inactive*." App.1975, R.Doc.77-15, at 18 (emphasis added);

---

[5] SPS admitted that the "turn and talk" exercises were not "well thought out" because they required staff to discuss uncomfortable topics and "could pose a problem" because they involved "[h]aving to share your . . . opinion *out loud*." App.2191 at 20:2-21:24, R.Doc.77-23, at 5; App.2192 at 24:22-23, R.Doc.77-23, at 6 (emphasis added).

7

App.1789, R.Doc.77-13, at 22. SPS told Ms. Henderson she must be "an ally" and "take action" in SPS's politics. App.1327, R.Doc.77-2, at 6. It warned Plaintiffs to "Be Professional" or risk being removed from the training without receiving required credit and pay. App.1774, R.Doc.77-13, at 7. SPS monitored staff's behavior by requiring them to keep cameras on during the training, and it even admitted that it would "document" a lack of participation for administrators to discuss at the end of the year. App.1324, R.Doc.77-2, at 3; App.1766:12-13, R.Doc.77-12, at 6; App.2742 at 148:2-12, R.Doc.79-1, at 37.

Coercing Plaintiffs to speak at all—as SPS did—is a First Amendment injury. *See Gralike*, 191 F.3d at 917-18. But worse still, SPS foisted its preferred viewpoint on Plaintiffs. SPS told Plaintiffs that oppression is "woven into the very foundation of American culture." App.1783, R.Doc.77-13, at 16. It presented an Oppression Matrix depicting white people as oppressors and told Plaintiffs that "dimensions of our history and culture . . . have allowed privileges associated with 'whiteness' and disadvantages associated with 'color' to endure and adapt over time." App.1784, R.Doc.77-13, at 17; App.1785, R.Doc.77-13, at 18. Then, SPS defined white supremacy as "the all-encompassing centrality and assumed superiority of [white] people," and told Plaintiffs that white supremacy included supporting

8

colorblindness, believing that all lives matter equally, and "white silence." App.1787, R.Doc.77-13, at 20; App.1789, R.Doc.77-13, at 22.

After all of this, SPS directed Plaintiffs to discuss how white supremacy, oppression, and systemic racism have taken place in their own community. App.1790, R.Doc.77-13, at 23; App.1971, R.Doc.77-15, at 14. The rest of the training included discussions about the death of George Floyd and political protests, references to the 2020 election, and videos depicting the Ku Klux Klan as having support in the Trump administration and "myths" white people should stop saying. App.1779, R.Doc.77-13, at 12; App.1782, R.Doc.77-13, at 15; App.1964, R.Doc.77-15, at 7; App.1788, R.Doc.77-13, at 21; App.1319, R.Doc.77-1, at 8.

After introducing the problem—white supremacy, oppression, racism, and civil unrest—SPS presented a specific political ideology as the solution: anti-racism, or "the work of actively opposing racism by advocating for changes in political, economic, and social life[.]" App.1798, R.Doc.77-13, at 31. It called opponents to anti-racism "individual racist[s]." *Id*. And trainers reacted differently based on whether staff acknowledged their privilege and that America was founded on oppression. App.2756 at 203:7-204:13, R.Doc.79-1, at 51; App.2757 at 205:10-206:23, R.Doc.79-1, at 52. Thus, by SPS's own standard, our nation's core principles of colorblindness and equality feed racism.

9

SPS also told staff they "*must* commit to" equity and anti-racism as a job responsibility. App.1717, R.Doc.77-9, at 10 (emphasis added); *accord* App.2021, R.Doc.77-17, at 1 (staff must "start the work of becoming antiracist educators . . . it is important that we all see this as a part of our job and not a simple invitation"); App.2184, R.Doc.77-21, at 1 ("[I]t's import[ant] to keep the momentum going as anti-racist educators."); App.1775, R.Doc.77-13, at 8 (providing "tools" to become anti-racist educators); App.1806, R.Doc.77-13, at 39 (asking what steps staff will take to become anti-racist); App.1802-03, R.Doc.77-13, at 35-36 (directing administrators and principals to set anti-racist expectations for staff); App.3199, R.Doc.80, at 78 (SPS expected "commitment to anti-racism").

Through the Canvas modules, SPS directed Ms. Henderson to complete a self-assessment acknowledging that she would be "perceived as a person with power and racial privilege." App.2111-12, R.Doc.77-20, at 32-33. SPS also required her to adopt "[b]eing an anti-racist" as the "correct" answer to a question before she could complete the module and receive credit. App.2172, R.Doc.77-20, at 93. As the training and Canvas modules made clear, SPS did not merely offer "suggestions" for dealing with racial discrimination or ask employees to recite an understanding of racial issues. It directed staff to discuss current affairs and to adopt its position—anti-racism—in direct response to the political climate.

10

In arranging the training this way, SPS presented Plaintiffs with an unconstitutional dilemma: (1) adopt anti-racism as a job responsibility and affirm SPS's political and social views; (2) share their beliefs and risk consequences, including being labeled white supremacists, seen as unprofessional, losing credit and pay, and being referred to administrators at the end of the year; or (3) not speak and *still* face those consequences for their lack of participation and "white silence."

Not wanting to risk the consequences for failing to participate, Plaintiffs each tried speaking up. When Ms. Henderson expressed that Kyle Rittenhouse was defending himself during protests, Defendant Garcia-Pusateri responded that she was confused and wrong. App.1326, R.Doc.77-2, at 5. And when Ms. Lumley expressed from her own experience that not all white people are privileged, that black people can engage in racist behavior, and that all people are created equal, her trainers corrected her, told her to reflect on herself, and did not intervene when coworkers berated her. App.1338-39, R.Doc.77-3, at 5-6.

Given these reprimands, each Plaintiff self-censored for the rest of the training. Because SPS pejoratively labeled "white silence" as contributing to white supremacy, Plaintiffs automatically became complicit in white supremacy the moment they were intimidated into silence. *See Gralike*, 191 F.3d at 919 (labeling "ascribes a point of view" to a speaker). Thus, SPS simultaneously compelled their

11

speech and silence: Plaintiffs endorsed speech they would not otherwise make *and* refrained from further expressing views they wished to share. SPS further compelled Ms. Henderson's speech when she gave answers she disagreed with in Canvas because she feared further chastisement. App.2185, R.Doc.77-22, at 1; App.2646 at 121:17-122:24, R.Doc.78-3, at 31; App.1331, R.Doc.77-2, at 10. SPS "took no further action," *see* Add.9, App.5312, R.Doc.88, at 7, because it did not need to; it succeeded in suppressing their dissent. *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 766 (6th Cir. 2019) ("[L]ack of discipline . . . could just as well indicate that speech has already been chilled.").

SPS, like the district court, tries to isolate one fact—that each Plaintiff spoke during the training without suffering adverse employment action—as proof that there was no injury. But "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v Burns*, 427 U.S. 347, 373 (1976). SPS ignores the harm that took place *before* Plaintiffs spoke, which led them to understand they needed to actively participate or risk consequences. SPS ignores the harm that occurred *during* Plaintiffs' exchange with trainers, during which they were shamed and embarrassed for their views. And SPS ignores that *after* Plaintiffs spoke and were verbally reprimanded, they did not speak again during the training—endorsing white supremacy by their silence—and Ms.

12

Henderson only gave answers she believed SPS wanted to hear in Canvas because she did not want to face further embarrassment or other consequences.

Plaintiffs submitted undisputed proof that they were "deterred, *to some degree*, from further exercising [their] rights." *Garcia*, 348 F.3d at 729 (emphasis added). Moreover, "the question is not whether the plaintiff herself was deterred" but whether a reasonable person would have been. *Id.* Courts consider whether, under the totality of the circumstances, a reasonable person would have self-censored. *Garcia*, 348 F.3d at 729; *Hurley*, 515 U.S. at 567.

Not only would any reasonable person have reacted similarly to Plaintiffs, but many *did*. Their colleagues feared consequences if they dissented or failed to participate. One colleague even tried dissenting like Plaintiffs, but her trainers were so dismissive that she cried. App.2021, R.Doc.77-17, at 1. Staff understood that SPS "expected" them to "express their feelings/opinions" during the training but felt "uncomfortable" doing so. *Id.* And since "the topics were very political," they feared a "hostile work environment" if they shared their real views. *Id.* (internal quotation marks omitted).

If Plaintiffs had suffered adverse employment action for their speech—such as being fired or demoted—they would have brought a retaliation claim.[6] *See Parks v. City of Horseshoe Bend*, 480 F.3d 837, 840 (8th Cir. 2007). But adverse action is not a prerequisite for claims like Plaintiffs', where the government compels speech or silence through implicit or explicit authority. *See Zieper*, 474 F.3d at 65-66 ("[T]he First Amendment prohibits government officials from encouraging the suppression of speech in a manner which 'can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request.'") (internal citation omitted). If it were, chill would never be an injury, nor would pre-enforcement challenges exist; the government could issue intimidating threats but avoid liability by never fully acting on them. *See Doe v. Bolton*, 410 U.S. 179, 188 (1973) (a plaintiff "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief"); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158-61 (2014) (plaintiffs

---

[6] In earlier pleadings, SPS claimed it "first found out that Plaintiffs believed their constitutional rights were violated when their Complaint was filed." App.199; R.Doc.75, at 53 n.25. Now, it says that it knew about Ms. Henderson's concerns before the lawsuit and did not retaliate against her for expressing them. Br. of Appellees at 33. Either way, just because SPS did not commit a *second* constitutional violation by reprimanding Ms. Henderson for her statements at a board meeting does not absolve it from the *first* violation committed during the training and modules.

14

showed an injury based on "an intention to engage in a course of conduct arguably affected with a constitutional interest"). It is the threat of consequences—not the punishment delivered—that supports such claims.

## II. SPS cannot survive any balancing test to justify Plaintiffs' injury.

SPS cannot justify injuring Plaintiffs. First, because SPS compelled Plaintiffs to speak on matters of public concern, the *Pickering* balancing test does not apply. *See Pickering v. Bd. of Educ.*, 391 U.S. 563, 572-73 (1968) (considering whether a teacher's criticism of a school board impeded the "proper performance of his daily duties" or "interfered with the regular operation of the schools"). *Pickering* only applies when outspoken employees cause a disruption in the workplace; it "is a poor fit" when employees who want to remain silent are compelled to speak. *Compare Janus*, 138 S. Ct. at 2473-74 (the Supreme Court has "never applied *Pickering*" to cases when "a public employer does not simply restrict potentially disruptive speech but commands that its employees mouth a message on its own behalf") *and Belk v. City of Eldon*, 228 F.3d 872, 881 (8th Cir. 2001) ("Where there is no evidence of disruption, resort to the *Pickering* factors is unnecessary because there are no government interests in efficiency to weigh against First Amendment interests.") *with Nagel v. City of Jamestown*, 952 F.3d 923, 927-31 (8th Cir. 2020) (upholding discharge of employee who created "chaos" when he gave a media interview about

15

a private employment matter) *and Anzaldua v. Ne. Ambulance & Fire Prot. Dist.*, 793 F.3d 822, 833-35 (8th Cir. 2015) (upholding termination of employee over email about his employer which divided colleagues and created a public safety issue).

SPS *intended* for the equity training to be disruptive and uncomfortable. *See* App.2021, R.Doc.77-17, at 1 ("[E]quity work is not easy and is meant to be difficult and at times uncomfortable . . . [It] is part of everyone's role to . . . implement equity into their site and or departments, no matter how uncomfortable or difficult it is."). When one administrator suggested that "awareness and unity [was] the goal of this training, not divisiveness," trainers said that he had a "poor understanding of what this training is and what this training is for." App.2965, R.Doc. 79-1, at 1. The training was designed to induce pressure. This was evident when SPS trainers caused staff to cry and allowed employees to berate Ms. Lumley. App.2021, R.Doc.77-17, at 1; *see also* App.1338-39, R.Doc.77-3, at 5-6. SPS cannot pivot now and accuse *Plaintiffs* of causing a disruption that warrants *Pickering* balancing.

The Supreme Court has suggested only one narrow exception when an employer might be allowed to compel speech: "if the speech in question is part of

16

an employee's official duties, the employer may insist that the employee deliver any lawful message."[7] *Janus*, 138 S. Ct. at 2473. SPS has not met that exception.

**A. The training involved speech outside the scope of Plaintiffs' job duties.**

Any compelled speech or silence on the job must be "ordinarily within the scope of an employee's duties." *See Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2423-24 (2022) (praying was not part of football coach's duties because speech must do more than "touch[] on matters related to public employment"). The government cannot create "excessively broad job descriptions" to compel speech or silence on every matter, *especially* matters of public concern. *Garcetti*, 547 U.S. at 424.

The equity training and Canvas modules were rife with directives to discuss controversial matters, from BLM and COVID protests, to the death of George Floyd, to discussions about racial hierarchy and privilege. SPS has not disputed the contents of the training or modules, and it even admitted that they involved "societal and political ideologies," App.3198, R.Doc.80, at 77; *accord* App.197, R.Doc.75, at 56

---

[7] At first glance, the standard for compelled employee speech may seem low. Employers could compel employees to say any number of "lawful" messages, from "cats are superior to dogs" to "vaccines cause autism." Thus, the official job duties test is the key inquiry to an employee's compelled speech claim, which must be interpreted narrowly. *See Garcetti v. Ceballos*, 547 U.S. 410, 424 (2006).

Appellate Case: 23-1374    Page: 22    Date Filed: 08/23/2023 Entry ID: 5309193

n.21 (associating colorblindness with white supremacy was a political message). The training covered deeply divisive matters of public opinion. *See Meriwether*, 992 F.3d at 508 ("When speech relates 'to any matter of political, social, or other concern to the community,' it addresses a matter of public concern.") (citation omitted).

SPS conflates speech inside the classroom with private speech on matters of public concern. For example, SPS quotes *Robertson v. Anderson Mill Elementary School*, 989 F.3d 282 (4th Cir. 2021), to suggest that it can require staff to share its political views. *See* Br. of Appellees at 46. But while the court in *Robertson* held, "[I]t is not a court's obligation to determine which messages of social or moral values are appropriate *in a classroom*," SPS omits the critical phrase, "in a classroom" from its brief, changing the court's holding. *Compare id. with Robertson*, 989 F.3d at 289 (emphasis added).

By its omission, SPS seems to recognize a longstanding distinction: while schools may regulate some *student* speech inside the classroom to serve a legitimate pedagogical value, the same standard does not apply to *adults* outside the classroom. *Bethel Sch. Dist. v. Fraser*, 478 U.S. 675, 682 (1986) ("[T]he constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings."); *Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038, 2045 (2021) (explaining the few times schools can regulate student speech); *Hazelwood*

18

*Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271 (1988) ("[e]ducators are entitled to exercise greater control" over student speech related to curriculum).

This is true even for teachers and school employees. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505-06 (1969) (reiterating the "unmistakable holding" that students and teachers do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate" when it comes to political speech)[8]; *Pickering*, 391 U.S. at 574-75 (upholding teacher's freedom of speech); *Janus*, 138 S. Ct. 2478 ("Nothing in the *Pickering* line of cases requires us to uphold every speech restriction the government imposes as an employer.").

As 504 process coordinator and records secretary, Plaintiffs were not paid to engage in discussions about or share SPS's views on race, white supremacy, protests, elections, and other matters covered in the training.[9] Indeed, it would be illegal to pay Plaintiffs to engage in political speech on the job. *See* § 36.157 R.S.Mo.

---

[8] The Supreme Court recently relied on *Tinker* to hold that "the government may not compel a person to speak its own preferred messages." *303 Creative*, 143 S. Ct. at 2312. If K-12 students—who are traditionally afforded fewer First Amendment protections—cannot be forced to adopt a preferred viewpoint on public affairs like the Vietnam War, the same must be true for adults working there.

[9] Government employers may regulate *conduct*, including requiring staff to treat students equally, but they are "not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." *Hurley*, 515 U.S. at 579.

19

Moreover, SPS did not conduct any equity training during the 2021 school year, which did not affect staff's ability to do their jobs. App.2203 at 66:16-67:5, 68:9-13, R.Doc.77-23, at 17.

Plaintiffs support the settled view that "[o]ur Constitution is color-blind, and it neither knows nor tolerates classes among citizens." *Harvard*, 143 S. Ct. at 2175 (quoting *Plessy v. Ferguson*, 163 U.S. 537, 559 (1896) (Harlan, J., dissenting)). But SPS made clear that their beliefs did not fit its anti-racism job requirement. App.2728 at 89:13-17, R.Doc.79-1, at 23 (equality and colorblindness do not "correspond" with anti-racism); App.2722 at 68:7-11, R.Doc.79-1, at 17 (equality "takes in colorblindness"); App.2729 at 96:4-7, R.Doc.79-1, at 24 (colorblindness is "harmful"). It has even argued—to a federal court—that it "*cannot* be colorblind." App.3201, R.Doc.80, at 80 (emphasis added). SPS required Plaintiffs to commit to "equity" while admitting that equity was different from equality. App.2722 at 65:18-20, R.Doc.79-1, at 17. And it assigned sweeping stereotypes—such as "privileged" or "oppressed"—based on skin color. App.1784, R.Doc.77-13, at 17.[10]

---

[10] SPS has not shown how espousing the views that America was founded on white supremacy, that the KKK had White House Allies, or that staff should "[g]o grocery shopping for a black person" to decrease "the burden that's on the black body" relates to any legitimate anti-discrimination policy. *See* App.1783, R.Doc.77-13, at 16; App.1788, R.Doc.77-13, at 21; App.1320, R.Doc.77-1, at 9 (Canvas video titled,

Requiring Plaintiffs to adopt SPS's beliefs violated the Constitution. SPS has not shown how requiring Plaintiffs to engage in political speech and affirm anti-racism related to their official duties at the time, which included processing student records and accommodating children with disabilities.[11] App.2617 at 6:2-8:15, R.Doc.78-3, at 2; App.2599 at 4:1-3, R.Doc.78-1, at 1; App.3301-03, R.Doc.80-5, at 15-17. Instead, it forced Plaintiffs to "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker*, 393 U.S. at 506.

**B. SPS's actions are per se unconstitutional.**

Strict scrutiny does not apply to viewpoint discrimination or compulsion because there can *never* be a compelling interest in forcing individuals to affirm views they oppose. *See 303 Creative*, 143 S. Ct. at 2321-22 (striking down compulsory law without conducting strict scrutiny); *Wooley v. Maynard* 430 U.S. 705, 717 (1976) ("[W]here the State's interest is to disseminate an ideology, no matter how acceptable to some, such interest *cannot outweigh* an individual's First Amendment right[.]") (emphasis added); *accord Hurley*, 515 U.S. at 579 ("The

---

"Advice for White People from Anti-Racism Trainer"). Such political statements have nothing to do with equal protection under the law.

[11] Nor can it; its views on anti-racism are hardly lawful. *See Harvard*, 143 S. Ct. at 2170 ("[to] treat individuals as the product of their race, evaluating their thoughts and efforts—their very worth as citizens" violates the Equal Protection Clause).

Appellate Case: 23-1374    Page: 26    Date Filed: 08/23/2023 Entry ID: 5309193

Speech Clause has no more certain antithesis" than the government's attempt to produce preferred views); *Rosenberger v. Rector & Visitors of U. of Va.*, 515 U.S. 819, 829-30 (1995) (finding viewpoint discrimination without conducting strict scrutiny). Compulsion and viewpoint discrimination are per se unconstitutional.

## III. SPS created, and continues to maintain, an unconstitutional condition of Plaintiffs' employment.

For the reasons above, SPS placed an unconstitutional condition on Plaintiffs' employment. Presenting staff with the impossible choice of affirming anti-racism or facing the consequences created this condition. *See Cole v. Richardson*, 405 U.S. 676, 680 (1972) ("We have made clear that neither federal nor state government may condition employment on taking oaths that impinge on rights guaranteed by the First and Fourteenth Amendments respectively, as for example those relating to political beliefs."); *see also Meriwether*, 992 F.3d at 517. And because SPS imposed a forward-looking job requirement in the training—that Plaintiffs become anti-racist educators—the unconstitutional condition remains in place.

## IV. SPS is not entitled to attorney fees and costs totaling $316,136.60.

While the decision to award attorney fees is reviewed for an abuse of discretion, legal issues—such as whether a litigant is a prevailing party—are reviewed de novo. *See Advantage Media, LLC v. City of Hopkins*, 511 F.3d 833, 836

22

(8th Cir. 2008); *see also Boyd v. ConAgra Foods, Inc.*, 879 F.3d 314, 324 (8th Cir. 2018) (assessing the legal issues surrounding fees, including frivolity).

Section 1983 claims are meant to vindicate the constitutional rights of plaintiffs.[12] *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 523 (1994). Thus, to receive any fee award in a Section 1983 case, a defendant must prove that a plaintiff's claim was so frivolous that it was "delusional." *Denton v. Hernandez*, 504 U.S. 25, 32 (1992). SPS has not denied or disproved any dispositive facts, much less show that the facts were delusional; it only disputes the legal significance of them. Even though the same dispositive facts were in Plaintiffs' complaint, SPS never filed a motion to dismiss.

While it "may sometimes be necessary" to proceed to discovery to "blow away the smoke screens" a plaintiff creates with a baseless lawsuit, that was not the case here.[13] *See Flowers v. Jefferson Hosp. Ass'n*, 49 F.3d 391, 393 (8th Cir. 1995)

---

[12] SPS has shown its hand by calling Plaintiffs "egocentric." Br. of Appellees at 38. Just as it did not tolerate Plaintiffs' dissenting views in 2020, it still does not tolerate dissent and instead pejoratively labels individuals asserting their constitutional rights.

[13] The district court did not "warn" Plaintiffs during the scheduling conference that their claims were frivolous. By the court's own admission, it was asking questions to understand the case. App.100:24. Even though the court's questions displayed bias against Plaintiffs' claims, *infra* Sec. V, it never said that Plaintiffs' claims were frivolous or that they should dismiss the case.

23

(finding lawsuit frivolous when plaintiff made a broad claim, then only offered his own opinion and unsupported testimony as supporting facts). SPS never claimed that a fact pled in the complaint that would have precluded it from filing a motion to dismiss was undermined by discovery. Instead, facts produced in discovery only bolstered Plaintiffs' claims. For example, SPS stipulated to the contents of the training presentation and Canvas modules, including the script containing directions to discuss white supremacy and warnings to be professional or leave the training without credit. App.1312-22, R.Doc.77-1, at 1-10. Defendant Garcia-Pusateri testified on behalf of SPS that equality does not "correspond" with anti-racism, that colorblindness is "harmful," and that equality "takes in colorblindness." App.2728 at 89:13-17, R.Doc.79-1, at 23; App.2729 at 96:4-7, R.Doc.79-1, at 24; App.2722 at 68:3-11, R.Doc.79-1, at 17. And discovery revealed that staff shared Plaintiffs' fears and that SPS ignored initial complaints about how divisive the training was, reinforcing that staff needed to feel "uncomfortable" in the pursuit of anti-racism. App.2021, R.Doc.77-17, at 1.

This is a case of first impression about compelled speech in a newly emergent factual context. *See Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 423-24 (1978). Courts are grappling with similar claims and have issued rulings *against* schools. *See Kilborn v. Amiridis*, 2023 U.S. Dist. LEXIS 26451, *22 (N.D. Ill. Feb.

24

15, 2023) (professor sufficiently pled compulsion where university officials required him to attend diversity training and commit to university goals even though he was not required to articulate a specific message); *Menders v. Loudoun Cnty. Sch. Bd.*, 65 F.4th 157, 165 (4th Cir. 2023) (parents had standing to challenge bias reporting system because students feared being accused of bias for holding views including colorblindness).[14] There is no binding precedent in this Circuit that Plaintiffs disregarded. Together with sixteen states and twenty organizations that filed amicus briefs supporting Plaintiffs, including the State of Missouri and the American Civil Liberties Union of Missouri, this shows—at the very least—that this case is not so obviously frivolous that Defendants are entitled to attorney fees.

The district court never addressed, nor has SPS shown, why any fee award should not be reduced by 90%. *Bond v. Keck*, 629 F. Supp. 225, 228 (E.D. Mo. 1986) (reducing fee by 91% because an award to the government is meant to deter "groundless civil rights suits, not to make the defendant whole") (citation omitted). Plaintiffs sued to vindicate their constitutional rights in a case of first impression,

---

[14] At least one judge has firmly rejected equity and diversity training, warning that such trainings "impose group think" and that equity violates "both equal protection and federal law." *In re Diversity, Equity, Inclusion & Access Training for Continuing Legal Educ.*, 2023 Wisc. LEXIS 167 at *30-34 (S. Ct. Wis. July 13, 2023) (Bradley, J., concurring).

25

seeking only $1.00 in damages. Further, the court's decision to award Defendants $312,869.50—*more* than they asked for—amounts to an abuse of discretion and should be reversed. *Compare* Add.31, App.5513, R.Doc.107, at 4 *with* App.5442, R.Doc.106, at 9; *see also Fox v. Vice*, 563 U.S. 826, 838-39 (2011) (trial court has discretion to calculate an attorney's time "when, but only when, it calls the game by the right rules"). The same is true for costs assessed against Plaintiffs in the amount of $3,267.10. *See Richmond v. Southwire Co.*, 980 F.2d 518, 520 (8th Cir. 1992).

## V. Reassignment is proper on any remand.

Reassignment of a case is proper where "the judge's impartiality might reasonably be questioned by the average person on the street who knows all the relevant facts[.]" *Tumey v. Mycroft AU, Inc.*, 27 F.4th 657, 668 (8th Cir. 2022) (internal quotation marks and citations omitted). Reassignment is proper here.

At the initial scheduling conference, the court questioned why Plaintiffs put "political" statements in their complaint. App.102. When counsel explained that those statements were introducing Plaintiffs' beliefs—a necessary part of their First Amendment claims—the court compared Plaintiffs' position to advocating for slavery and segregation. App.102:5-103:18. Without seeing the training, the court asked Plaintiffs' counsel whether a school district has an "obligation to teach proper race relations." App.103:24-25. Counsel explained that schools have a duty to

26

implement lawful anti-discrimination training, but they cannot make "unrelated political topic[s]" part of the training.[15] App.105:1-12. In response, the court categorized Plaintiffs with a "bunch of people who don't like the modern trend of race relations." App.105:20-22. And when counsel explained that SPS made a political position a job responsibility that violated Plaintiffs' rights, the court asked, "They're not required to work at the school district, right?" App.106:10-11.

None of this was merely "salty language" within the "bounds of what imperfect men" might use on a bad day, but actions that could cause a reasonable person to question the court's impartiality. *Sentis Group, Inc. v. Shell Oil Co.*, 559 F.3d 888, 905 (8th Cir. 2009). This is especially true because the day after the hearing, the court sua sponte struck "political" paragraphs from the complaint as "impertinent." Add.1-2, R.Doc.30, at 1-2.

The court continued in its summary judgment ruling, describing the training as merely "enhancing awareness of racial issues" on a matter that has "confounded policymakers throughout our country's history." Add.24, App.5327, R.Doc.88, at

---

[15] The court also asked whether Plaintiffs could be required to implement racial policy consistent with a training. Plaintiffs' counsel responded, "As long as it's consistent with the Equal Protection Clause and Civil Rights Act," and that Plaintiffs had not "put that question before the Court." App.119:6-12.

27

22; Add.26, App.5329, R.Doc.88, at 24. But the Supreme Court has made clear based on years of settled precedent that policies rejecting colorblindness and reinforcing racial stereotypes are presumptively unconstitutional. *See Harvard* 143 S. Ct. at 2161-62, 2170.

The court added that Plaintiffs' First Amendment case "trivializes the important work of the federal judiciary," and that the "students of the district deserve better." Add.27, App.5330, R.Doc.88, at 25. It characterized Plaintiffs' position as arguing that "they should not have to listen to, learn, or follow" SPS's training, which Plaintiffs specifically and repeatedly disclaimed. *Compare* Add.25, App.5328, R.Doc.88, at 23 *with* App.108:22-25; App.4377, R.Doc.82, at 131 n.5.

The court determined that Defendants' standing argument "*may* constitute an argument that Plaintiffs' claims lack a factual basis" and invited SPS to file a motion for attorney fees. Add.27, App.5330, R.Doc.88, at 25 (emphasis added). When, in earlier briefings, Plaintiffs pointed out that SPS was not entitled to fees because it never alleged Plaintiffs' claims were frivolous, SPS appeared to abandon its request altogether. *Compare* App.2596, R.Doc.78, at 89 *with* App.4417, R.Doc.83, at 29. Although courts "regularly decline to consider cursory or summary arguments that are unsupported by citations to legal authorities," *Watson v. O'Neill*, 365 F.3d 609,

28

615 (8th Cir. 2004), the court created an argument for SPS and invited briefing anyway.

The court then awarded SPS *more* money than it requested in its adjusted amount without explaining or showing an awareness that it reduced the amount following Plaintiffs' objections. It concluded by scolding Plaintiffs for depleting the government's "tax dollars" with their "political" lawsuit. Add.30, App.5512, R.Doc.107, at 3. Thus, reassignment on any remand is proper.

## CONCLUSION

This Court should reverse the district court's judgment, grant summary judgment to Plaintiffs, and reassign the case on any remand.

August 22, 2023.                    /s/ Braden H. Boucek

Kimberly S. Hermann
  GA Bar No. 646473
Braden H. Boucek
  TN BPR No. 021399
  GA Bar No. 396831
Celia H. O'Leary
  GA Bar No. 747472
Southeastern Legal Foundation
560 W. Crossville Road, Suite 104
Roswell, GA  30075
Telephone: (770) 977-2131
khermann@southeasternlegal.org
bboucek@southeasternlegal.org
coleary@southeasternlegal.org

29

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. Proc. 32(g)(1), this is to certify the foregoing complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,481 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), using Microsoft Word 2016. The foregoing complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it was prepared on a computer using Times New Roman font (14 point). Pursuant to Local Rule 28A(h)(2), the foregoing was scanned for viruses and is virus free.

 August 22, 2023.                              /s/ Braden H. Boucek
                                                    Braden H. Boucek


## CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2023 a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail and/or facsimile. Parties may access the filing through the Court's electronic filing system.

                                                    /s/ Braden H. Boucek
                                                    Braden H. Boucek