# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

BROOKE HENDERSON, et al.,
                                    *Plaintiffs – Appellants,*
v.

SPRINGFIELD R-12 SCHOOL DISTRICT, et al.,
                                    *Defendants – Appellees*.

On Appeal from the United States District Court
for the Western District of Missouri, Southern Division
No. 6:21-cv-03219 (Harpool, J.)

## PETITION FOR REHEARING EN BANC

Kimberly S. Hermann
Braden H. Boucek
Celia Howard O'Leary
SOUTHEASTERN LEGAL FOUNDATION
560 W. Crossville Rd., Ste. 104
Roswell, GA 30075
(770) 977-2131
khermann@southeasternlegal.org
bboucek@southeasternlegal.org
coleary@southeasternlegal.org

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................... ii

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION AND RULE 35(B) STATEMENT ........................................... 1

BACKGROUND ..........................................................................3

ARGUMENT..........................................................................8

I.     The Panel's punishment analysis conflicts with the Supreme Court and creates an intra- and inter-circuit split........................................................8

     A. Contrary to the Panel decision, controlling precedent demonstrates that Plaintiffs suffered a punishment. Other circuits agree.......................... 9

     B. Plaintiffs need not demonstrate they suffered punishment ...................11

II.    Contrary to the Panel opinion, Plaintiffs demonstrate a non-speculative fear of punishment........................................................................13

III.   This case involves one of exceptional importance regarding the power of public employers to force their employees to speak and adopt its preferred politics...................................................................18

CONCLUSION ..........................................................................20

CERTIFICATE OF COMPLIANCE....................................................21

CERTIFICATE OF SERVICE..........................................................22

Appellate Case: 23-1374     Page: 2     Date Filed: 09/27/2024 Entry ID: 5440708

# TABLE OF AUTHORITIES

**Cases**

*281 Care Comm. v. Arneson*, 638 F.3d 621 (8th Cir. 2011)........................2, 11, 14

*303 Creative, LLC v. Elenis*, 600 U.S. 570 (2023) ...................................................12

*Axson-Flynn v. Johnson*, 356 F.3d 1277 (10th Cir. 2004) ...........................2, 12, 13

*Babbitt v. UFW Nat'l Union*, 442 U.S. 289 (1979)................................2, 11, 14, 16

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963).......................................passim

*Bart v. Telford*, 677 F.2d 622 (7th Cir. 1982).........................................................13

*Dakotans for Health v. Noem*, 52 F.4th 381 (8th Cir. 2022) .................................... 2

*Elrod v. Burns*, 427 U.S. 347 (1976) ......................................................................13

*Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233 (2d Cir. 2014)...............16

*Garcia v. City of Trenton*, 348 F.3d 726 (8th Cir. 2003) .......................................13

*Gralike v. Cook*, 191 F.3d 911 (8th Cir. 1999) ...............................................2, 9, 10

*Lee v. Weisman,* 505 U.S. 577 (1992) ...............................................................15, 17

*Majors v. Abell*, 317 F.3d 719 (7th Cir. 2003)........................................................16

*Menders v. Loudon Cnty. Sch. Bd.*, 65 F.4th 157 (4th Cir. 2023) ...................11, 12

*Speech First Inc. v. Sands*, 144 S. Ct. 675 (2024)...................................................12

*Speech First, Inc. v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022) ..................passim

*Speech First, Inc. v. Killeen*, 968 F.3d 628 (7th Cir. 2020) ...................................13

iii

*Speech First, Inc. v. Schlissel*, 939 F.3d 756 (6th Cir. 2019) ...........................11, 12

*Susan B. Anthony List v. Driehaus* (*SBA*), 573 U.S. 149 (2014) ......................14, 16

*Telescope Media Grp. v. Lucero*, 936 F.3d 740 (8th Cir. 2019) ...........................12

*Thompson v. Kanabec Cnty.*, 958 F.3d 698 (8th Cir. 2020)...................................10

*United Food & Com. Workers Int'l Union v. IBP, Inc.*, 857 F.2d 422 (8th Cir.

   1988) ..........................................................................................12, 14, 16

*Zieper v. Metzinger*, 474 F.3d 60 (2d Cir. 2007) ............................................12, 16

**Rules**

FRAP 35(a)(1) ................................................................................. 1

FRAP 35(a)(2) ................................................................................. 3

FRAP 35(b)(1)(A) ........................................................................... 1

FRAP 35(b)(1)(B)..........................................................................1, 3

FRAP 40(a)(2) ................................................................................15

iv

## INTRODUCTION AND RULE 35(B) STATEMENT

As the Panel recognized, this is a First Amendment case of "first impression" on "especially controversial" anti-racist training for public school employees. Slip.Op.13. Springfield Public Schools (SPS)—Plaintiffs' employer and the largest school district in Missouri, Springfield Public Schools, Our District/About Our District (sps.org), https://perma.cc/34S9-RM5G—gave them direct commands to discuss controversial topics at training and become "anti-racists" who must advocate for political change. En banc review is necessary because the Panel ruled that SPS did not inflict an Article III injury, creating conflict with the Supreme Court and within and among the circuits.

The Panel held that Plaintiffs were not injured since they were not formally disciplined, and their fear of punishment was speculative. But SPS did punish them when it branded them as somehow complicit in white supremacy for refusing to support anti-racism, and SPS can injure through "informal sanctions" including "coercion, persuasion, and intimidation." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963). This opinion conflicts with the decisions of this Circuit, the Supreme Court, and other circuits. FRAP 35(a)(1), (b)(1)(A), (b)(1)(B).

First, by ruling that SPS did not punish Plaintiffs when it labeled them as complicit with white supremacy, the opinion conflicts with this Circuit's opinion in

1

*Gralike v. Cook*, 191 F.3d 911 (8th Cir. 1999) (deeming it a punishment to label candidates as refusing to take a position on term limits). Other circuits find that far less derogatory labels are impermissible. In short, the opinion heightens the "lenient" and "forgiving" First Amendment standing inquiry that "manifests itself most commonly in the" injury prong, *Dakotans for Health v. Noem*, 52 F.4th 381, 386 (8th Cir. 2022) (internal quotation marks omitted)*,* and makes a "gun to the head" a constitutional requirement, *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1290 (10th Cir. 2004).

Second, the opinion, in placing its primary focus on whether Plaintiffs were punished, is in tension with the Supreme Court, prior decisions of this Court, and other circuits that have recognized that government can injure First Amendment rights without formal punishment, a threat, or even the ability to punish.

Third, by ruling that Plaintiffs' fear of punishment was speculative, the opinion also conflicts with Supreme Court, this Court, and other circuits. Fears are only too speculative when they are "imaginary" or "wholly speculative." *281 Care Comm. v. Arneson*, 638 F.3d 621, 630 (8th Cir. 2011) (quoting *Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 302 (1979)). Nothing is imaginary about fearing punishment from disobeying the direct commands of one's employer.

2

Finally, as instances of public employers pressing their employees to adopt their preferred politics—in this case "anti-racism"—become more common, this case of first impression presents questions of exceptional importance. FRAP 35(a)(2), (b)(1)(B).

## BACKGROUND

Plaintiffs are both educators, employed by SPS in Missouri. Slip.Op.5–6. Both share a belief in equality and colorblindness. App.1322–23, R.Doc.77-2 at 1–2; App.1334, R.Doc.77-3 at 1–2.

SPS holds a different worldview. Before the 2020 schoolyear, SPS told its employees they had a "responsibility" to champion "equity." App.1642, R.Doc.77-8 at 1; App.2722 at 65:18–20, R.Doc.79-1 at 17. SPS directed staff to resources addressing topics like anti-racism, white privilege, and systematic oppression. App.1642, R.Doc.77-8 at 1; *see* App.1693, R.Doc.77-8 at 52 (discussing the "debt" owed by those enjoying white privilege).

Not content with just providing resources, SPS required employees attend "Equity Training" on anti-racism. Slip.Op.4. Because this was "part of our work and job responsibilities," SPS warned employees they were "now accountable." App.1717, R.Doc. 77-9 at 10. SPS disseminated an "anti-racist" reading list prior to

3

the training. App.1642–1707, R.Doc.77-8. SPS defined anti-racism to mean, "advocating for changes in political, economic, and social life." Slip.Op.4.

The training was "especially controversial," *id*. at 13, and overtly partisan. One video compared then-President Trump to a Klansman. App.1788 at 1:31, R.Doc.77-13 at 21.





App.2972, R.Doc.79-1 at 267 (captioned, "White Supremacy*," "*Now with White House Allies!"). Henderson remembered being told that it was her duty to vote for socialists and teach students to do the same because "parents aren't always correct." App.1329, R.Doc.77-2 at 8. This occurred after SPS told staff that a "divisive election" was coming. App.1964, R.Doc.77-15 at 7. In some sessions, SPS taught that, "Make America Great Again," was white supremacy. App.2736 at 122:16–20, R.Doc.79-1 at 31.

4

The training said, "[p]articipants will . . . [r]eceive tools on how to become Anti-Racist educators," and "leaders." App.1775, R.Doc.77-13 at 8. Another video explained anti-racist training was necessary because "the United States is a settler colony built on white supremacy and capitalism." App.1798 at 0:07–0:11, R.Doc.77-13 at 31.

The training outlined how white supremacy included lynchings and burning crosses, but also "socially acceptable" forms, like "white silence," or "colorblindness."



App.1789, R.Doc.77-13 at 22.

5

The training displayed an "Oppression Matrix," that labeled white people as privileged oppressors and other races as oppressed.



App.1784, R.Doc.77-13 at 17. Henderson's trainers also warned that denying one's privilege is white supremacy. App.1327, R.Doc.77-2 at 6.

Staff were not just taught SPS's viewpoint. SPS told them to discuss matters of intense public concern like race and current events. App.1985, R.Doc.77-16 at 8 ("commit" to "courageous conversations"). That included "acknowledg[ing] YOUR privileges." *Id*. Trainers told Plaintiffs to speak, or they will be called on. App.1326, R.Doc.77-2 at 5; App.1336, R.Doc.77-3 at 3; App.1819, R.Doc.77-14 at 9, 34:8/12. Throughout the training, SPS required them to hold turn-and-*talk* exercises. App.2192 at 21:11–14, R.Doc. 77-23 at 6.

The turn-and-talk exercises involved watching videos on subjects ranging from George Floyd to America's history of racism, then breaking into small group discussions. App.1778-79,1786,1788 R.Doc.77–13 at 11-12,19,21. Trainees were

6

given worksheets to fill out for each exercise, including one to map out their "[s]ocial [i]dentities." App.1709–10, R.Doc. 77-9 at 2–3; App.1795, R.Doc.77-13 at 28. Training closed with an anti-racist "solo-write," where trainees were expected to detail what they will do to "become an Anti-Racist," and identify tools they needed to "be" anti-racist. App.1805–06, R.Doc.77-13 at 38-40.

The training was designed to make employees become anti-racists, which SPS defined as becoming political advocates. Slip.Op.4. Trainers repeated: "we will actively oppose racism by advocating for change. There is a proactive element in place to no longer remain silent or inactive." App.2016, R.Doc.77-16 at 39. All employees were told that school principals would "communicate" an "anti-racist vision" and "intervene when they see problems." App.1802, R.Doc.77-13 at 35. To SPS, the training was "**not an invitation**," (emphasis preserved), "meant to be difficult and at times uncomfortable"—even to the point of reducing one trainee to tears—because staff must "start the work of becoming antiracist educators." App.2021, R.Doc.77–17 at 1.

Both Plaintiffs attended. Slip.Op.5–6. When Henderson questioned if Kyle Rittenhouse acted in self-defense, trainers told her she was confused and wrong. *Id*. at 5. She stopped speaking, fearful she would be expelled. *Id*. at 5–6. Additionally, she agreed with some questions when she did not. *Id.* at 6. Lumley's experience was

7

similar. She disputed the stereotype that all white people were racists and that non-white individuals could not be. *Id*. Her trainer responded by telling her she was "was born into white privilege." *Id*. Fearing consequences from arguing further, she ceased talking. *Id*.

Plaintiffs sued for violations of the First and Fourteenth Amendments, specifically, that SPS compelled their speech, engaged in viewpoint discrimination, and imposed an unconstitutional employment condition. *Id.* The district court granted SPS's motion for summary judgment, finding that Plaintiffs were not injured. On September 13, 2024, the Panel affirmed dismissal. It determined that Plaintiffs lacked an injury because (1) they were not punished and (2) that their fear of punishment was too speculative. Slip.Op.8–10.

## ARGUMENT

I.  **The Panel's punishment analysis conflicts with the Supreme Court and creates an intra- and inter-circuit split.**

The Panel first ruled that Plaintiffs were not injured because they were not "directly punished." Slip.Op.8. Here, the Panel determined that Plaintiffs were not punished at all despite SPS labeling dissenters as complicit in white supremacy, and appeared to rule that punishment was required. On both levels, the opinion creates a conflict.

8

**A. Contrary to the Panel decision, controlling precedent demonstrates that Plaintiffs suffered a punishment. Other circuits agree.**

Even though punishment is not required, SPS did punish Plaintiffs by labeling their refusal to adopt its anti-racist message as complicit in white supremacy. By ruling otherwise, the opinion conflicts this Circuit's prior precedent holding that labels that are "calculated to give[] a negative impression" are a way of compelling speech. *Gralike*, 191 F.3d at 918. Other circuits have found far less derogatory labels are impermissible.

1.  The Panel reasoned that SPS's "epithet" was not as derogatory as in *Gralike* because SPS did not individually call Plaintiffs white supremacists. Slip.Op.9. But even under this charitable read of the facts, *see infra* Part I.A.2, en banc review is still necessary to secure uniformity with *Gralike*, which merely involved labeling candidates who refused to take a position on term limits.[1] Just saying someone "support[s]" structural white supremacy, Slip.Op.9, is "sufficient to coerce" speech—far more than saying someone refused to take a position on term limits, *Gralike*, 191 F.3d at 919. Anyone would consider that label "pejorative," and

---

[1] The Panel avoided identifying the "epithet[s]" in *Gralike*, which were the rather non-emotion-provoking phrases "DECLINED TO PLEDGE TO SUPPORT TERM LIMITS" and "DISREGARDED VOTERS' INSTRUCTIONS ON TERM LIMITS." 191 F.3d at 915. *Gralike* described these labels as not only a punishment but also "a serious sanction." *Id.* at 919.

9

"derogatory," even it if stopped just short of calling Plaintiffs individual white supremacists. *Id*. at 918–19.

**2.** Besides, the only evidence that SPS qualified calling silent participants white supremacists comes from a script for the presenters and SPS presented no evidence that it was read at Plaintiffs' sessions. *See* App.1970; R.Doc.77-15 at 13. The actual graphic itself bluntly categorized "White Silence" as a form of white supremacy with no qualification. App.1789, R.Doc. 77-13 at 22.



Henderson remembered seeing the graphic twice with no disclaimer before being told, "we can't sit on the sidelines and be silent, that we must be an ally and take action." App.1327, R.Doc.77-2 at 6. Plaintiffs are entitled to the strongest view of the evidence, *Thompson v. Kanabec Cnty.*, 958 F.3d 698, 705 (8th Cir. 2020), and under that view, SPS told its staff that they "must" ally with its politics or they were white supremacists. Regardless, even when viewed in the light most favorable to

SPS, the summary judgment *movant*, SPS's label was still more derogatory than in *Gralike*.

3.    The opinion also conflicts with the authoritative decisions of other circuits, which held that far less derogatory epithets are impermissible. *See Menders v. Loudon Cnty. Sch. Bd.*, 65 F.4th 157, 165 (4th Cir. 2023) (microaggressions from defending colorblindness); *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 765 (6th Cir. 2019) ("Nobody would choose to be considered biased[.]"); *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1124 (11th Cir. 2022) ("offensive," "hostile," "'negative," "harmful," or "let alone 'hate or bias'").

### B. Plaintiffs need not demonstrate they suffered punishment.

To the extent the opinion ruled that Plaintiffs' claims fail because they were not "directly punished," Slip.Op.8, it conflicts with well-settled precedent from the Supreme Court, this Circuit, and others.

1.    Punishment is not a requirement of a First Amendment injury. *See Bantam Books,* 372 U.S. at 67–68 (Commission "achieve[d] the suppression" of speech without punishment); *Babbitt*, 442 U.S. at 302 (plaintiffs need not "expose" themselves to punishment); *281 Care Comm.*, 638 F.3d at 627 ("To establish injury in fact for a First Amendment challenge . . . a plaintiff need not have been actually prosecuted or threatened with prosecution."); *United Food & Com. Workers Int'l*

11

*Union v. IBP, Inc.*, 857 F.2d 422, 427 (8th Cir. 1988) (argument that individuals must be punished or threatened "misapprehends the nature of the injury in fact requirement"). Lorie Smith was never punished. *303 Creative, LLC v. Elenis*, 600 U.S. 570, 580 (2023) (Smith "worries" state will take enforcement action). Neither were the Larsens. *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 749 (8th Cir. 2019) (family required to produce same-sex wedding videos "need not" be punished to challenge).

2.   Other circuits agree and recognize that the Supreme Court has found a First Amendment injury when the government lacked even the power to impose punishment. *Bantam Books,* 372 U.S. at 66 (Commission had no "power to apply formal legal sanctions"); *Menders*, 65 F.4th at 165 (injury from policy that couldn't result in discipline); *Schlissel*, 939 F.3d at 764 (same); *Axson-Flynn*, 356 F.3d at 1283, 1290 (speaker believed "it was only a matter of time" before she was punished); *Cartwright*, 32 F.4th at 1123 ("Neither formal punishment nor the formal power to impose it is strictly necessary[.]"); *see also Speech First Inc. v. Sands*, 144 S. Ct. 675, 676–77 (2024) (possibility of self-censorship is "particularly true regarding controversial issues where dissenting opinions might be deemed biased" and recognizing circuit split) (Thomas, J., dissenting from remand with instructions to dismiss as moot); *Zieper v. Metzinger*, 474 F.3d 60, 66–67 (2d Cir. 2007)

12

(authorities "may not have expressly told" Zieper he faced punishment); *contra Speech First, Inc. v. Killeen*, 968 F.3d 628 (7th Cir. 2020). If the Panel sought to require more than just a threat, but in fact "direct[]" punishment, it made this Circuit an outlier. Slip.op.8

3.      Because First Amendment rights are so sensitive to pressure, infractions "need not be particularly great in order to find that rights have been violated." *Elrod v. Burns*, 427 U.S. 347, 356, 358 n.11, 359 n.13 (1976); *see Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003); *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982). Speakers, of course, do not know when they decide to speak whether the government is serious about carrying through with veiled threats. Many will conform rather than find out. To the extent the Panel believed a punishment was required for Article III standing, it required a showing of not just a "gun to the head," *Axson-Flynn*, 356 F.3d at 1290, but blood on the floor—a departure from the well-settled precedent of the Supreme Court, this Circuit, and other circuits.

**II.     Contrary to the Panel opinion, Plaintiffs demonstrate a non-speculative fear of punishment.**

By ruling that Plaintiffs' fear of punishment was too "speculative" because the trainers never expressly threatened them, Slip.Op.9–10, the opinion conflicts with the decisions of the Supreme Court, this Circuit, and others.

13

**1.** The finding that Plaintiffs' fear was "speculative" conflicts with the Supreme Court and this Circuit, which both recognize that fear of punishment is only unreasonable when it is "'*imaginary*' or '*wholly* speculative.'" *281 Care Comm.*, 638 F.3d at 630 (quoting *Babbitt*, 442 U.S. at 302) (emphasis added); *United Food*, 857 F.2d at 427 (same); *accord Susan B. Anthony List v. Driehaus* (*SBA*), 573 U.S. 149, 165 (2014) (quoting *Babbitt*, 442 U.S. at 298). Nothing is "imaginary" about fearing a penalty from disregarding an employer's commands.

SPS gave direct commands to engage in First Amendment activity. Plaintiffs' employer unambiguously told them that if they would not reveal their views on SPS's chosen topics, then they would be called on, App.1326, R.Doc.77-2 at 5; App.1336, R.Doc.77-3 at 3; App.1819, R.Doc.77–14 at 9, 34:8/12, and that its training was part of their "job responsibilities." App.1717, R.Doc.77-9 at 10. SPS told them to have "courageous conversations," in the form of the turn-and-talk exercises, App.1985, R.Doc.77–16 at 8, and "become" anti-racists, which meant, per its own definition, political advocacy, App.1799,1805–06, R.Doc.77-13 at 32, 38–39.[2]

---

[2] The opinion focused exclusively on Plaintiffs' specific fears that they would be expelled from training if they voiced opposition. Even if that fear was unreasonable (and a reasonable factfinder could certainly look at Lumley's exchange and conclude that she risked being viewed as unprofessional and kicked out if she continued to

Appellate Case: 23-1374     Page: 18     Date Filed: 09/27/2024 Entry ID: 5440708

SPS went out of its way to communicate that it was not making suggestions. It told them the lessons in the training were "more than a value, but now part of our *work and job responsibilities*" for which employees "are now *accountable*." App.1717, R.Doc. 77-9 at 10 (emphasis added). SPS told trainees to detail the steps they would take to become anti-racists. App.1805–06, R.Doc.77-13 at 38–39. Trainees were told to expect that the principals—who supervise the school—will "intervene when they see problems" with a failure to live up to their "anti-racist vision." App.1802, R.Doc.77-13 at 35. SPS thought this training was "just as important" as "curriculum training," App.2021, R.Doc.77-17 at 1, and no reasonable teacher thinks a district's curriculum training is a suggestion.

**2.** Just as with public officers, "[p]eople do not lightly disregard" the "thinly veiled threats" of their employer.[3] *Bantam Books,* 372 U.S. at 68; *Lee v. Weisman,* 505 U.S. 577, 592 (1992) ("subtle coercive pressure" may violate the First

---

argue with her employer, App.1338–39, R.Doc.77-3 at 5–6), the opinion overlooked Plaintiffs' general argument, FRAP 40(a)(2), that they had an objective fear of disobeying their employer's clear directives to become political advocates and speak at training as a job requirement. *See* Pls'Br. 34; Pls'Reply 11.

[3] The same is true of the opinion's conclusion that SPS could direct Plaintiffs to become anti-racist political advocates just so long as it stops short of threatening to "penalize" them if they did not. Slip.Op.10; *see Cartwright*, 32 F.4th at 1120 (absence of threats is "not decisive"). Reasonable employees assume that training that directs them to lay out concrete steps to take a particular action are setting a job expectation.

15

Amendment even absent a formal mandate). "[M]ost people are frightened," *Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003), to disobey direct commands from their employer. The opinion did not consider how a reasonable employee would react in this particular setting and thereby conflicts with the authoritative decisions of other circuits that recognize, "[w]hen evaluating compelled speech, [courts] consider the context in which the speech is made." *Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233, 249 (2d Cir. 2014).

**3.** Those fears are only more reasonable because the trainers never reassured Plaintiffs that they faced no penalty. App.2743 at 151:22–25, R.Doc.79-1 at 38; *see SBA*, 573 U.S. at 165 ("[R]espondents have not disavowed enforcement"); *Babbitt*, 442 U.S. at 302 (state "has not disavowed any intention" to punish); *United Food,* 857 F.2d at 430 ("Defendants in this case did not disclaim their intent to enforce."); *Zieper*, 474 F.3d at 66 (government failed to tell speaker "he would not face consequences"). The opinion does not account for this factor.

Here, local administrators warned SPS that the pressure was so great that staff feared speaking would put a "target on their backs," and that the training was not a "safe space for them to express their feelings/opinions as they were asked and expected to do." App.2021, R.Doc.77-17 at 1. The pressure caused one trainee to cry and—showing that SPS *intended* to use pressure to enforce conformity—SPS

16

responded that it was "unfortunate" the training reduced a trainee to tears, but that it was "meant" to be "uncomfortable" so as to "start the work of becoming antiracist[.]" *Id.* To the trainees, SPS's pressures were understandably "as real as any overt compulsion." *Weisman*, 505 U.S. at 593.

4.    By seeming to require an "or else" threat to be expressly stated before it is actionable, the opinion conflicts with the Supreme Court's instruction to look "through forms to the substance" to find "informal censorship." *Bantam Books,* 372 U.S. at 67; *see also Cartwright,* 32 F.4th at 1120 (district court erred by "focusing so singularly on the…power to punish"). A reasonable employee—*any* employee— would take SPS's directives to mean that it was setting concrete job expectations. App.1717, R.Doc.77-9 at 10 ("[M]ore than a value.").

5.    The opinion particularly conflicts with the Eleventh Circuit's decision in *Cartwright*. The Panel distinguished *Cartwright* on the grounds that SPS never said that anyone would be called "unprofessional" for expressing opposing views or remaining silent. Slip.Op.9–10. But SPS did tell Lumley she was manifesting her "white privilege," and Henderson she was wrong and confused "because of" her expressed opposition. *Id.* at 5–6, 10. *Cartwright* recognized that merely being called "offensive," or "negative," was sufficient to inflict a First Amendment injury. 32 F.4th at 1124. SPS then labeled their silence as complicit with white supremacy, *see*

17

*supra* Part.I.A, and *Cartwright* recognized that being called "biased" or "hateful" was more than enough to chill speech. *Id.*

While SPS didn't call them unprofessional (although a reasonable factfinder could conclude it would have had Plaintiffs persisted), there is nothing legally significant about that particular label. SPS called them something far worse "*because of*" their speech and then their silence, Slip.Op.10, putting this Circuit in conflict with the Eleventh.

**III.** **This case involves one of exceptional importance regarding the power of public employers to force their employees to speak and adopt its preferred politics.**

En banc review is essential in this case of "first impression" on an "especially controversial" training session that is certain to recur. Slip.Op.13. America is a divided place. Millions would prefer to not discuss the most divisive issues of the day—whether the country is founded on white supremacy or the death of George Floyd. They certainly may not wish to do so in front of their colleagues. It is critical that public employers cannot use their positions of power to dragoon their employees to support their preferred politics.

18

The rapid acceleration of the diversity, equity, and inclusion sector shows no signs of abating.[4] Public employers who chose this path must understand constitutional boundaries. Presenting it is one thing, pressuring employees to advocate for it is another. If employers can pressure their employees to discuss its preferred topics, publicly humiliate them for holding differing viewpoints, and direct them to lay out the steps they would take to "become" anti-racists who will advocate for change in America, App.1805, R.Doc.77-13 at 38, just so long as they don't "threaten[] with punishment," Slip.Op.11, then the public workplace will be indistinguishable from an advocacy training ground. The opinion provides a roadmap for how to get away with it.

Following that roadmap, public employers could, of course, easily go in another direction. A different school may require its educators discuss the ways that the 2020 election was "stolen," and tell them they don't care about election integrity and are "confused and wrong" or "born into privilege," if they disagree, then direct them to advocate for ballot integrity measures. Or discuss arming teachers as a strategy against school shootings. Or to "take a stand" for Palestine. The public

---

[4] World Economic Forum, Global Parity Alliance: Diversity, Equity and Inclusion Lighthouses at 5 (2023) WEF_Global_Parity_Alliance_2023.pdf (weforum.org) (2023), https://perma.cc/XCY8-K939, (DEI spending in 2020 of $7.5 billion with expectation of $15.4 billion by 2026).

employer could even tell them it is part of their "job responsibilities," for which they would be held "accountable," App.1717, R.Doc.77-9 at 10, and just allow them to reach the natural conclusion, no matter how many employees assume they must advocate for their employer's politics because they *fear* punishment. Public employment would then just become a delusive name for turning taxpayer-funded employees—schoolteachers—into political advocates.

## CONCLUSION

Plaintiffs respectfully ask the en banc Court to grant the petition, reverse the district court's decision, and award attorneys' fees and costs.

Dated: <u>September 27, 2024</u>　　　　<u>/s/ Braden H. Boucek</u>

Kimberly S. Hermann
  GA Bar No. 646473
Braden H. Boucek
  TN BPR No. 021399
  GA Bar No. 396831
Celia H. O'Leary
  GA Bar No. 747472
Southeastern Legal Foundation
560 W. Crossville Road, Suite 104
Roswell, GA  30075
Telephone: (770) 977-2131
khermann@southeasternlegal.org
bboucek@southeasternlegal.org
coleary@southeasternlegal.org

20

**CERTIFICATE OF COMPLIANCE**

Under Fed. R. App. Proc. 32(g)(1), this is to certify the foregoing complies with the type-volume limitation of Fed. R. App. P. 35(b)(2)(A) because it contains 3,898 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), using Microsoft Word 2016. The foregoing complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared on a computer using Times New Roman font (14 point).

/s/ Braden H. Boucek
Braden H. Boucek

## CERTIFICATE OF SERVICE

I hereby certify that on, September 27, 2024, a copy of the foregoing was filed electronically with the Clerk of Court for the United Sates Court of Appeals for the Eighth Circuit using the CM/ECF system, which will send notification of such filing to all parties. Parties may access the filing through the Court's electronic filing system.

/s/ Braden H. Boucek
Braden H. Boucek

Appellate Case: 23-1374   Page: 26   Date Filed: 09/27/2024 Entry ID: 5440708