Case No. 23-1374 & 23-1880

# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

BROOKE HENDERSON and JENNIFER LUMLEY,

                                        Plaintiffs-Appellants,

v.

SCHOOL DISTRICT OF SPRINGFIELD R-12, et al.,

                                        Defendants-Appellees.

**BRIEF *AMICUS CURIAE* OF GOLDWATER INSTITUTE, KANSAS JUSTICE INSTITUTE, MISSISSIPPI JUSTICE INSTITUTE, AND SHOW ME INSTITUTE IN SUPPORT OF APPELLANTS AND REVERSAL OF ATTORNEY FEES**

On Appeal from the United States District Court
for the Western District of Missouri - Springfield
Case No. 6:21-cv-03219, Hon. M. Douglas Harpool, presiding

                                        **Scharf-Norton Center for Constitutional Litigation at the GOLDWATER INSTITUTE**
                                        Timothy Sandefur
                                        Adam C. Shelton
                                        500 E. Coronado Rd.
                                        Phoenix, Arizona 85004
                                        (602) 462-5000
                                        litigation@goldwaterinstitute.org

                                        *Attorney for Amici Curiae*

# TABLE OF CONTENTS

Table of Contents ..................................................................................................i

Table of Authorities ...............................................................................................ii

Identity and Interest of Amici Curiae ................................................................... 1

Introduction and Summary of Argument ............................................................. 1

Argument ............................................................................................................... 2

I.  The panel's new standing rule for "speech chill" cases penalizes people for having the courage to speak—and ensures that "speech chills" will escape judicial review. ................................................................................... 2

II. The panel's compelled-speech theory ignored the context and established a rule whereby victims of compelled speech are barred from vindicating their rights. ........................................................................................................ 4

Conclusion ........................................................................................................... 12

Certificate of Compliance ................................................................................... 13

Certificate of Service .......................................................................................... 14

# TABLE OF AUTHORITIES

**Cases**

*Agosto–de–Feliciano v. Aponte–Roque*, 889 F.2d 1209 (1st Cir. 1989) .................. 2

*Bart v. Telford*, 677 F.2d 622 (7th Cir. 1982) ........................................................ 3

*Bennett v. Hendrix*, 423 F.3d 1247 (11th Cir. 2005) .................................................. 4

*Eaton v. Meneley*, 379 F.3d 949 (10th Cir. 2004) ..................................................... 2

*Garcia v. City of Trenton,* 348 F.3d 726 (8th Cir. 2003) ........................................... 2

*Glickman v. Wileman Bros. & Elliott, Inc.,* 521 U.S. 457 (1997) ............................. 6

*Henderson v. Sch. Dist. of Springfield R-12*, 650 F. Supp.3d 786 (W.D. Mo. 2023) ................................................................................................................................ 6

*Lee v. Weisman*, 505 U.S. 577 (1992) .............................................................. 1, 6, 7

*Mendocino Env't Ctr. v. Mendocino Cnty.*, 192 F.3d 1283 (9th Cir. 1999) .......... 3, 4

*Mitchell v. Horn*, 318 F.3d 523 (3d Cir. 2003) ..................................................... 2, 3

*NIFLA v. Becerra*, 585 U.S. 755 (2018) .................................................................... 5

*Poole v. Horne,* 318 F.3d 523 (3rd Cir. 2003) ....................................................... 2, 3

*Poole v. County of Otero*, 271 F.3d 955 (10th Cir. 2001) ......................................... 3

*Rodriguez v. Serna*, No. 1:17-cv-01147-WJ-LF, 2019 WL 2340958 (D.N.M. June 3, 2019) ................................................................................................................... 4

*Santiago v. Blair*, 707 F.3d 984 (8th Cir. 2013) ........................................................ 3

*Speech First, Inc. v. Schlissel*, 939 F.3d 756 (6th Cir. 2019) .................................. 11

*Thaddeus–X v. Blatter*, 175 F.3d 378 (6th Cir. 1999) ............................................... 3

*Toolasprashad v. Bureau of Prisons*, 286 F.3d 576 (D.C. Cir. 2002) ....................... 3

*West Virginia Board of Education v. Barnette*, 319 U.S. 624 (1943) ................. 5, 12

**Other Authorities**

Applebaum, *Being White, Being Good: White Complicity, White Moral Responsibility, and Social Justice Pedagogy* (2011) ............................................. 9

DiAngelo, *Nice Racism: How Progressive White People Perpetuate Racial Harm* (2021) ............................................................................................................. 11

DiAngelo, *White Fragility* (2020) ................................................................................ 9

Dobbs & Kalev, *Why Diversity Training Doesn't Work,* 10 Anthropology Now 48 (2018) ................................................................................................................ 9

Dover, *et al.*, *Members of High-Status Groups are Threatened by Pro-Diversity Organizational Messages,* 62 J. Experimental Psych. 45 (2016) ......................... 9

El-Mekki, *No, You Should Not Be Teaching Black Children if You Reject Anti-Racism*, EdPost (May 5, 2021) ............................................................................. 10

Jones, et al., *On "Ceding Space": Pushing Back on Idealized Whiteness to Foster Freedom for Students of Color, in* Browne & Jean-Marie, eds*., Reconceptualizing Social Justice in Teacher Education: Moving to Anti-Racist Pedagog*y (2022) .................................................................................................. 10

Kendi, *How to be an Antiracist* (2023) ......................................................................... 9

Lanum, *North Carolina Professor Claims he was Fired for Criticizing Critical Race Theory, Files Suit,* N.Y. Post (Dec. 22, 2022) ............................................. 8

McWhorter, *The Dehumanizing Condescension of White Fragility*, The Atlantic (July 14, 2020) .................................................................................................... 11

Morrison, *Becoming Trustworthy White Allies*, Reflections (Spring 2013) ............ 11

Poff, *Massachusetts Teacher Fired for Opposing CRT on TikTok Sues Superintendent and Principal,* Wash. Examiner (Dec. 3, 2021) ........................... 8

Quinn, *A DEI Director Ousted for Questioning DEI?*, Inside Higher Ed (Mar. 9, 2023) .................................................................................................................... 8

Reid, *No More White Saviours, Thanks*, The Guardian (Sep. 19, 2021) .................. 11

# IDENTITY AND INTEREST OF AMICI CURIAE

The identity and interest of amici are set forth in the accompanying motion for leave to file.

# INTRODUCTION AND SUMMARY OF ARGUMENT

The panel established a new, unprecedented rule requiring plaintiffs in "chill" cases to *actually self-censor* before they have standing. That's never been the law. The precedent of this and most other circuits holds that a plaintiff can bring a chill case if *a reasonable person* would have self-censored, even if she didn't. The panel's new rule will bar the courthouse door to precisely those people who are in the best position to challenge speech-chilling government actions—thereby ensuring that such actions escape judicial review.

With regard to the compelled speech claim, the panel ignored the rule of *Lee v. Weisman*, 505 U.S. 577 (1992), which held that intense peer pressure and other forms of intimidation can amount to coercion for purposes of a compelled speech claim—and "anti-racism" ("AR") doctrine is *inherently* coercive because it holds that to disagree with it is a form of racism—which brings about the severest social and employment consequences for public school employees.

1

# ARGUMENT

I. **The panel's new standing rule for "speech chill" cases penalizes people for having the courage to speak—and ensures that "speech chills" will escape judicial review.**

The panel held that "[t]o establish a chilling injury, the plaintiffs must show that they self-censored to avoid a credible threat of prosecution or other adverse action." Slip Op. at 7. That's not the law, never has been, and conflicts with the precedent of this Circuit and most others. That alone requires correction by the *en banc* court.

Standing in chill cases depends *not* on whether the plaintiff self-censors, but whether "a person of ordinary firmness" *would* self-censor. This Court said so in *Garcia v. City of Trenton,* 348 F.3d 726, 729 (8th Cir. 2003): "[t]he question is *not* whether the plaintiff herself was deterred" from speaking, but whether "*a reasonable person*" would have been. *Id.* (emphasis added). That means a plaintiff can still bring a chill claim even if she went ahead and spoke out. The plaintiff in *Garcia,* in fact, *did* continue speaking—but could still sue because a person of ordinary prudence would not have.

That's the rule in most circuits: even someone "who perseveres despite governmental interference" can still challenge the constitutionality of a speech restriction. *Eaton v. Meneley*, 379 F.3d 949, 955 (10th Cir. 2004); *accord, Agosto–de–Feliciano v. Aponte–Roque*, 889 F.2d 1209, 1217 (1st Cir. 1989); *Poole v.*

2

*Horn*, 318 F.3d 523, 530 (3d Cir. 2003); *Thaddeus–X v. Blatter*, 175 F.3d 378, 396 (6th Cir. 1999) (en banc); *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982); *Mendocino Env't Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999); *Poole v. County of Otero*, 271 F.3d 955, 960 (10th Cir. 2001)[1]; *Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 585 (D.C. Cir. 2002).

These cases all say that the standing inquiry in a chill case "is an 'objective one, not subjective,'" and that the question is *not* whether a person actually self-censored but whether a person of "ordinary firmness" would have. *Santiago v. Blair*, 707 F.3d 984, 992 (8th Cir. 2013) (citation omitted).

Yet the panel held that because these Plaintiffs had the courage of their convictions and continued to speak despite the pressures brought to bear on them, they lacked standing. Disregarding the overwhelming body of precedent, it held that plaintiffs in chill cases must first make "deci[de] to self-censor in light of the potential penalties." Slip Op. at 7.

The problem with that new, subjective rule is that it *punishes* people for standing up to restrictions on their speech rights. That's why the Ninth Circuit rejected it, saying it "would be unjust [because it would] allow a defendant to escape liability for a First Amendment violation merely because an unusually

---

[1] *Contra, Rio Grande Found. v. City of Santa Fe,* 7 F.4th 956, 960–61 (10th Cir. 2021) (holding, despite *Poole*, that plaintiff could not bring chill case because it continued to speak despite the chill).

3

determined plaintiff persists in his protected activity"—which is exactly what's happening here. *Mendocino Env't Ctr.*, 192 F.3d at 1300.

Moreover, the panel's new rule will close the courthouse doors to precisely those plaintiffs who are in the best position to challenge speech restrictions. It's people of "extraordinary persistence," *Rodriguez v. Serna*, No. 1:17-cv-01147-WJ-LF, 2019 WL 2340958, at *8 (D.N.M. June 3, 2019)—those most likely to defy a speech chill—who are also most likely to risk the hostility and spend the money necessary to go to court over a speech burden. By contrast, people who "deci[de] to self-censor in light of the potential penalties" are also more likely *not* to sue. Slip Op. at 7. So the panel's new rule will increase the risk that speech chills will go unchallenged—precisely because they're effective. And that "'reward[s]' government officials for picking on unusually hardy speakers," *Bennett v. Hendrix*, 423 F.3d 1247, 1252 (11th Cir. 2005), which, in turn, emboldens them to intimidate the least powerful and most marginalized elements of society.

II. **The panel's compelled-speech theory ignored the context and established a rule whereby victims of compelled speech are barred from vindicating their rights.**

The panel found that even though the Plaintiffs were required to attend the AR training, and to provide the so-called "correct" answers to the test at the end, this was nevertheless not compelled speech because all that happened was that Plaintiffs were required to "identify the question's credited response." Slip Op. at

4

11. This fallacious conclusion led it to conclude that the Plaintiffs lacked a cognizable constitutional injury.

That's fallacious because the whole point of compelled speech theory is that when the state forces someone to affirm something, or conditions benefits and burdens on such an affirmance in a way that's tantamount to compulsion, the state has intruded on that person's freedom of conscience and expression. And that is *synonymous* with "identifying the state's credited response."

By the panel's logic, the Jehovah's Witness schoolchildren who were forced to pledge allegiance in *West Virginia Board of Education v. Barnette*, 319 U.S. 624, 642 (1943), were not being deprived of their First Amendment rights; they were simply indicating that they knew what the state expected of them. And the pregnancy center operators in *NIFLA v. Becerra*, 585 U.S. 755, 766 (2018), weren't being compelled to speak—they were simply demonstrating their familiarity with the kind of disclosures the state required. Of course, that's illogical, because compelled speech doctrine forbids the state from compelling a person to "speak a particular message." *Id*.

True, the state *can* (a) hire speakers, including teachers, and establish a curriculum for them to employ, even if they personally disagree with it, and (b) implement educational and training rules whereby employees are required to demonstrate familiarity with the materials being taught, regardless of their personal

5

beliefs. A fundamentalist Christian teacher can be required to teach about evolution, and a socialist employee can be required to read and pass an exam on Adam Smith's *Wealth of Nations*, without running afoul of compelled speech doctrine. But that's categorically different from what happened here. These Plaintiffs were required to attend and *participate* in the training session, where they were directed to "acknowledge YOUR privilege," and "become anti-racist educators,"[2] and, when they objected, they were told that they were "confused and wrong" and "needed to work on [themselves]," *Henderson v. Sch. Dist. of Springfield R-12*, 650 F. Supp.3d 786, 793, 796 (W.D. Mo. 2023)—not merely that they could have a different opinion but had to master the material.

Moreover, the panel's opinion disregards the context—and context is everything in compelled-speech law. *Glickman v. Wileman Bros. & Elliott*, *Inc.,* 521 U.S. 457, 469 (1997). Particularly with respect to compulsion, the Supreme Court has made clear that not only is the state forbidden from *literally* forcing people to speak, but it also cannot use peer pressure and psychological tactics to achieve that end. *See Lee*, 505 U.S. at 593.

*Lee* concerned public school graduation ceremonies where the state invited members of the clergy to deliver prayers. The question was whether that violated the Establishment and Speech Clauses. The state said there was no compulsion;

---

[2] Complaint ¶¶ 53, 55.

students could refuse to participate in the prayer. *Id*. at 592. But the Court recognized that "public pressure, as well as peer pressure" can be "as real as any overt compulsion," and when used to "enforce a religious orthodoxy," is just as unconstitutional as outright compulsion. *Id.* at 592–93. Importantly, **the option of remaining silent did not prove otherwise**, because that "can signify adherence to a view." *Id.* It was "of little comfort to a dissenter," the Court said, "to be told that for her the act of standing or remaining in silence signifies mere respect, rather than participation. What matters is that … a reasonable dissenter in this [context] could believe that the group exercise signified her own participation or approval of it." *Id.*

The panel here, however, found that there was no compulsion because all the Plaintiffs had to do was provide the "correct" answers to the exam—as determined by the state—Slip Op at 11, and although Plaintiffs were "required [to] attend[]" the session, *id.,* and **were told at the outset that their "personal and professional development" required them to "advocat[e] for changes in political, economic, and social life,"** *id*. at 10, 4—they were nevertheless not coerced. That plainly ignores the lesson of *Lee*.

Worse, in fact, because the pressures involved in *Lee* were *miniscule* compared to the pressures exerted here.

7

It's a matter of common knowledge that AR theory is one few public-school employees dare to openly challenge, because they risk severe professional and personal retaliation for doing so. Nothing is more fraught in today's political environment than for a public-school employee to openly disagree with AR doctrine. To do so is to risk ostracism, the loss of professional opportunities, widespread publicity, and—obviously—the career-ending accusation of racism. *See, e.g.*, Lanum, *North Carolina Professor Claims he was Fired for Criticizing Critical Race Theory, Files Suit,* N.Y. Post (Dec. 22, 2022)[3]; Poff, *Massachusetts Teacher Fired for Opposing CRT on TikTok Sues Superintendent and Principal,* Wash. Examiner (Dec. 3, 2021).[4] A California college even fired its director of Diversity, Equity, and Inclusion—a black woman—because she opposed AR. Quinn, *A DEI Director Ousted for Questioning DEI?*, Inside Higher Ed (Mar. 9, 2023).[5]

*Any rational person* knows that "training" sessions like these aren't places where ideas are openly discussed. They're confrontational exercises at which disagreement is treated as a blameworthy aberration. Research demonstrates that

---

[3] https://nypost.com/2022/12/22/dr-david-phillips-sues-ncgs-claims-he-was-fired-for-criticizing-critical-race-theory/.
[4] https://www.washingtonexaminer.com/policy/education/massachusetts-teacher-fired-for-opposing-crt-on-tiktok-sues-superintendent-and-principal.
[5] https://www.insidehighered.com/news/2023/03/10/equity-director-targeted-she-says-questioning-antiracist-orthodoxy.

8

AR "function[s] as a cue that [white employees] are unwelcome or under-valued," and that in such training sessions, "contextual cues signal to [white] individuals that they may be treated poorly, devalued, or made to feel that members of their group do not belong." Dover, *et al.*, *Members of High-Status Groups are Threatened by Pro-Diversity Organizational Messages,* 62 J. Experimental Psych. 45, 65 (2016). "Mandatory participation" in such sessions "send[s] the message that employees need to change, and the employer will require it." Dobbs & Kalev, *Why Diversity Training Doesn't Work,* 10 Anthropology Now 48, 51 (2018).

Worse, intimidation, pressure, and threats are *built into* AR, which, unlike ordinary anti-discrimination principles, holds that for a white person to disagree with AR's theses—including the proposition that all white people are racist—is "normative violence," Applebaum, *Being White, Being Good: White Complicity, White Moral Responsibility, and Social Justice Pedagogy* 73, 172 (2011), or a form of "denial[ism] [which] is a fundamental way in which white people maintain unequal racial power." DiAngelo, *White Fragility* 86 (2020).

In other words, disagreeing with AR is automatically deemed racism. "The claim of 'not racist' neutrality is a mask for being racist," Kendi, *How to be an Antiracist* 10 (2023) and being deemed a racist is tantamount to termination.

Public school employees *especially* are pressured not to speak against the AR dogma that all white people are racists, because doing that "is rooted in white

9

ideologies of teacher professionalism that proclaims all students should be treated equally, but when white teachers profess not to see color, what they are doing is performing in fear of being labeled 'bad,' 'racist,' or 'unprofessional'…. Colorblind pedagogies … and treating everyone equally [is a] … performative fear [that] results in the marginalization of the lived racial disparities experienced by their Students of Color." Jones, et al., *On "Ceding Space": Pushing Back on Idealized Whiteness to Foster Freedom for Students of Color, in* Browne & Jean-Marie, eds.*, Reconceptualizing Social Justice in Teacher Education: Moving to Anti-Racist Pedagog*y 94 (2022) (emphasis removed). Indeed, Sharif El-Mekki, Founder of the Center for Black Educator Development, says that anybody who disagrees with AR theory is "unfit to teach Black and brown children." *See* El-Mekki, *No, You Should Not Be Teaching Black Children if You Reject Anti-Racism*, EdPost (May 5, 2021).[6]

Because it perceives the mere absence of racism *as itself racism*, AR deems any white person who objects to its propositions—such as the idea that the American constitutional order is inherently racist—as either a racist deserving of denunciation, or is, at best, in need of learning "racial humility"—i.e., not to

---

[6] https://www.edpost.com/stories/no-you-should-not-be-teaching-black-children-if-you-reject-anti-racism.

10

express her opinions. *See* DiAngelo, *Nice Racism: How Progressive White People Perpetuate Racial Harm* 87 (2021).

In fact, not only is expressing disagreement with AR ideology taken as proof of one's racism, *see generally* McWhorter, *The Dehumanizing Condescension of White Fragility*, The Atlantic (July 14, 2020),[7] but even *agreeing* with it can be a form of racism, because that, too, shows insufficient "humility" and "comes from a place of superiority and/or a desire to be forgiven." Morrison, *Becoming Trustworthy White Allies*, Reflections (Spring 2013)[8]; Reid, *No More White Saviours, Thanks*, The Guardian (Sep. 19, 2021).[9]

Mandatory AR sessions are therefore *inherently* exercises in peer pressure, intimidation, bullying, and "implicit threat[s]" of ostracism and retaliation. *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 765 (6th Cir. 2019). *Any* reasonably prudent person would feel coerced into professing agreement with the training's content. "By mandating participation, employers send the message that employees need to change and the employer will require it … [and] that external government mandates are behind the training. These features may lead employees to think that commitment to [AR] is being forced." Dobbin & Kalev, *supra*.

---

[7] https://www.theatlantic.com/ideas/archive/2020/07/dehumanizing-condescension-white-fragility/614146/.
[8] https://reflections.yale.edu/article/future-race/becoming-trustworthy-white-allies.
[9] https://www.theguardian.com/world/2021/sep/19/no-more-white-saviours-thanks-how-to-be-a-true-anti-racist-ally.

11

Thus the panel's conclusion that nobody was compelled to speak here ignores context, and establishes a precedent whereby the state can bring enormous pressure to bear on people to "prescribe what shall be orthodox in politics," *Barnette*, 319 U.S. at 642—with impunity.

## CONCLUSION

The petition should be granted, and the decision of the panel should be *reversed*.

Respectfully submitted this 4th day of October, 2024.

/s/ *Timothy Sandefur*
Timothy Sandefur
Adam C. Shelton
**Scharf-Norton Center for Constitutional Litigation at the GOLDWATER INSTITUTE**
*Attorney for Amici Curiae*

12

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 2,475 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionately spaced typeface using Microsoft Word Times New Roman 14-point font.

Date: October 4, 2024

/s/ *Timothy Sandefur*
Timothy Sandefur
Adam C. Shelton
**Scharf-Norton Center for Constitutional Litigation at the GOLDWATER INSTITUTE**
*Attorney for Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 4, 2024, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Timothy Sandefur*
Timothy Sandefur