No. 23-1374
No. 23-1880

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

BROOKE HENDERSON, *et al.*,
*Plaintiff-Appellants*,

v.

SCHOOL DISTRICT OF SPRINGFIELD R-12, *et al.*,
*Defendant-Appellees*.

Appeal from the United States District Court for the Western District of Missouri, The Honorable Douglas Harpool, Case No. 6:21-cv-03219-MDH

BRIEF FOR THE STATE OF MISSOURI AND THIRTEEN ADDITIONAL STATES AS *AMICI CURIAE* IN SUPPORT OF APPELLANTS' PETITION FOR REHEARING EN BANC

OFFICE OF THE MISSOURI ATTORNEY GENERAL
Supreme Court Building
P.O. Box 899
Jefferson City, Missouri 65102
Phone: 573-751-8870
Fax: 573-751-0774
Joshua.Divine@ago.mo.gov

ANDREW T. BAILEY
*Attorney General*

Joshua M. Divine, MO 69875
*Solicitor General*
Samuel C. Freedlund, MO 73707
*Deputy Solicitor General*

*Attorneys for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................i
TABLE OF AUTHORITIES .........................................................................ii
STATEMENT OF INTEREST ......................................................................1
ARGUMENT .................................................................................................2
   I. This Court should grant rehearing en banc to guarantee fundamental First Amendment protections against compelled speech. ...................................................................................................2
      A. The American legal system has served as a bulwark against attempts to tear down the principle of equality on the basis of race. ...................................................................................................2
      B. Based on the evidence in the record, the school district violated the First Amendment rights of the school employees ...............................................................................................6
         i. Appellants were unconstitutionally pressured to express favored political views ............................................7
         ii. Appellants were unconstitutionally pressured not to speak disfavored political view ............................................9
CONCLUSION ............................................................................................14
CERTIFICATE OF COMPLIANCE ...........................................................16
CERTIFICATE OF SERVICE .....................................................................16

# TABLE OF AUTHORITIES

**Cases** Page(s)

*Adarand Constructors, Inc. v. Pena,*
  515 U.S. 200 (1995)..................................................................................5

*Arkansas Times LP v. Waldrip as Tr. of Univ. of Arkansas Bd. of Trustees,*
  37 F.4th 1386 (8th Cir. 2022) ...............................................................7

*Brown v. Board of Educ.,*
  347 U.S. 483 (1954)................................................................................10

*Crozier for A.C. v. Westside Community School District,*
  973 F.3d 882 (8th Cir. 2020)......................................................... 11, 12

*Faust v. Vilsack,*
  519 F. Supp.3d 470 (E.D. Wis. 2021)..................................................6

*League of United Latin Am. Citizens v. Perry,*
  548 U.S. 399 (2006)..................................................................................6

*Norwood v. Harrison,*
  413 U.S. 455 (1973)................................................................................12

*Parents Involved in Community Schools v. Seattle Sch. Dist. No. 1,*
  551 U.S. 701 (2007).............................................................................5, 6

*Perry v. Sindermann,*
  408 U.S. 593 (1972)..................................................................................7

*Plessy v. Ferguson,*
  163 U.S. 537 (1896)................................................................................10

*Reitman v. Mulkey,*
  387 U.S. 369 (1967)................................................................................12

*Republican Party of Minn., Third Congr. Dist. v. Klobuchar,*
  381 F.3d 785 (8th Cir. 2004)................................................................11

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*,
  487 U.S. 781 (1988) .................................................................................9

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*,
  600 U.S. 181 (2023) .................................................................................6

*Thomas v. Tenneco Packaging Co.*,
  293 F.3d 1306 (11th Cir. 2002) .............................................................10

*Vitolo v. Guzman*,
  999 F.3d 353 (6th Cir. 2021) ...............................................................5, 6

*Wooley v. Maynard*,
  430 U.S. 705 (1977) ..............................................................................7, 8

**Other Authorities**

Amar, *America's Unwritten Constitution* 270 (2012) ...............................3

Curry, *Will the Real Crt Please Stand Up? The Dangers of Philosophical Contributions to Crt*, 2 the crit: Critical Stud. J. 1, 41 (2009) ..............3

Delgado & Stefancic, *Critical Race Theory: An Introduction* 3 (3d ed. 2017) ........................................................................................................4

Kendi, *How to be an Antiracist* 18–19 (2019) ...........................................4

*Language and Silence: Making Systems of Privilege Visible*,
  35 Santa Clara L. Rev. 881 (1995) ....................................................3, 4

NPR, *Read Martin Luther King Jr.'s 'I Have a Dream' speech in its entirety*, Jan. 16, 2023 ...........................................................................2

Wildman & Davis, *Language and Silence: Making Systems of Privilege Visible*, 35 Santa Clara L. Rev. 881, 897 (1995) ...................................3

## STATEMENT OF INTEREST

The States of Missouri, Georgia, Idaho, Iowa, Kansas, Montana, Nebraska, North Dakota, South Carolina, Texas, Tennessee, Utah, Virginia, and West Virginia have a strong interest in both securing adequate training of government employees and in protecting the First Amendment rights of those employees. These rights are violated when, as the record reflects here, a local government goes far beyond what is permitted under the Constitution. Rather than conduct a run-of-the-mill employee training, the record includes evidence that respondent school district told teachers and staff that they were required to adopt, affirm, and advocate highly controversial viewpoints both at school *and* in all other aspects of their lives. And to compel compliance, the school district threatened to dock pay and brand employees as bigots.[1]

---

[1] Because this brief is submitted by a number of States, no motion or consent of the parties is necessary. F.R.A.P. 29(b)(2).

1

# ARGUMENT

I. **This Court should grant rehearing en banc to guarantee fundamental First Amendment protections against compelled speech.**

   A. **The American legal system has served as a bulwark against attempts to tear down the principle of equality on the basis of race.**

On August 28, 1963, in the shadow of the Lincoln Memorial, Dr. Martin Luther King Jr. delivered one of the most iconic speeches in American history. Dr. King spoke of freedom and justice, called on America to "honor[]" her "sacred obligation," and urged all Americans to remember the guarantee of the Declaration of Independence and "the American dream" that all Americans—regardless of the color of their skin—are created equal.[2] Central to his vision was this: that all children "will one day live in a nation where they will not be judged by the color of their skin but by the content of their character."

This speech, along with the tireless efforts of the civil rights movement, inspired monumental legislative changes and a great leap forward in the pursuit of equality for all Americans. Because of the

---

[2] NPR, *Read Martin Luther King Jr.'s 'I Have a Dream' speech in its entirety*, Jan. 16, 2023, https://www.npr.org/2010/01/18/122701268/i-have-a-dream-speech-in-its-entirety.

moving words of Dr. King and others like him, generations of Americans came to embrace the long-overdue conviction that nobody should be treated with disfavor because of skin color. So important to the fabric of this nation is Dr. King's speech that it is often placed on a pedestal with the Constitution itself, as well as the Declaration of Independence. *See* Amar, *America's Unwritten Constitution* 270 (2012) (describing "King's final crowning vision" as "*part* of America's Constitution, rightly understood" (emphasis added)).

Recently, however, a growing number of people and organizations have begun to reject Dr. King's "final crowning vision." Many of these advocates teach that individuals of certain skin colors are inherently racist (and thus inherently inferior). *See, e.g.*, Curry, *Will the Real Crt Please Stand Up? The Dangers of Philosophical Contributions to Crt*, 2 the crit: Critical Stud. J. 1, 41 (2009) ("all whites remain racist"); Wildman & Davis, *Language and Silence: Making Systems of Privilege Visible*, 35 Santa Clara L. Rev. 881, 897 (1995) (defining "racist" in a way that ensures that "[a]ll whites are racist in this use of the term"). Some of these advocates in fact expressly *endorse* discrimination on the basis of skin color. Ibram Kendi, a prominent theorist in this area, advocates

3

"treating, considering, or making a distinction in favor *or against* an individual based on that person's race" if that discrimination leads to certain outcomes. Kendi, *How to be an Antiracist* 18–19 (2019) (emphasis added); *see also id.* ("The only remedy to past discrimination is present discrimination. The only remedy to present discrimination is future discrimination.").

This once-obscure philosophy has gained steam in the last few years, emerging in academia, Hollywood, the mainstream press, large corporations, and (as this case illustrates) K-12 education. No single term encompasses all of it, but it has been labeled "Critical Race Theory," "antiracism," and "diversity, equity, and inclusion." Thinkers under these banners have advocated against Dr. King's vision—indeed, against the idea of neutrality in the law at all. *See, e.g.*, Delgado & Stefancic, *Critical Race Theory: An Introduction* 3 (3d ed. 2017) ("[C]ritical race theory questions the very foundations of the liberal order, including equality theory, legal reasoning, Enlightenment rationalism, and neutral principles of constitutional law.").

One institution in our country, however, largely continues to reject the suggestion that one group of people should be treated worse than

others based on the color of their skin: the American legal system. Although it took far too long for America to enact landmark laws like the Reconstruction Amendments and the Civil Rights Act of 1964, and although there is still much room for progress, it is now widely understood that "distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Parents Involved in Community Schools v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 745–46 (2007) (plurality op.) (quoting *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 214 (1995)) (brackets omitted).

In just the last few years, the rejection of Dr. King's vision has made its way into federal policy, and courts have not hesitated to strike down those policies as unconstitutional. For example, the U.S. Small Business Administration "injected explicit racial and ethnic preferences into the priority process" for COVID relief funds, thus sending individuals "from non-favored racial groups (including whites, some Asians, and most Middle Easterners) to the back of the line." *Vitolo v. Guzman*, 999 F.3d 353, 357, 361 (6th Cir. 2021). The Sixth Circuit declared this "racial gerrymandering" unconstitutional and admonished the federal

5

government that "[i]t is indeed 'a sordid business' to divide 'us up by race.'" *Id.* at 364 (quoting *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 511 (2006) (op. of Roberts, C.J.)); *see also Faust v. Vilsack*, 519 F. Supp.3d 470, 473 (E.D. Wis. 2021). As the Supreme Court observed as recently as last year when it rejected Harvard's race-based admissions policy, *Brown v. Board of Education* firmly established that "[t]he time for making distinctions based on race had passed." *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181, 204 (2023). Each of these cases is consistent with the Supreme Court's observation, contra Ibram Kendi, that "[t]he way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Parents Involved in Community Schools*, 551 U.S. at 748 (plurality op.). In other words, "[e]liminating racial discrimination means eliminating all of it." *Students for Fair Admissions*, 600 U.S. at 206.

**B. Based on the evidence in the record, the school district violated the First Amendment rights of the school employees.**

The panel erred when it affirmed the district court's judgment dismissing Lumley and Henderson's First Amendment claims. The broad protections of the First Amendment "don't just prevent outright

6

prohibitions on speech; they also prohibit the government from imposing unconstitutional conditions that chill or deter speech." *Arkansas Times LP v. Waldrip as Tr. of Univ. of Arkansas Bd. of Trustees*, 37 F.4th 1386, 1391 (8th Cir. 2022) (citing *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)). "The government imposes an unconstitutional condition when it requires someone to give up a constitutional right in exchange for a government benefit," including "making government benefits contingent on endorsing a particular message or agreeing not to engage in protected speech." *Id.* (internal citations omitted). Lumley and Henderson established both that they were unconstitutionally pressured to speak favored viewpoints and that they were unconstitutionally pressured not to speak disfavored viewpoints.

> i. **Appellants were unconstitutionally pressured to express favored political views.**

It is axiomatic "that the right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). The right of an individual to refrain from expressing the government's preferred message is a fundamental liberty, as "[t]he First Amendment protects the rights of individuals to

7

hold a point of view different from the majority and to refuse to foster … an idea they find morally objectionable." *Id.* at 715.

From start to finish, SPS engaged in an unconstitutional pressure campaign to induce teachers and employees to advocate favored political views. Throughout the process of mandatory "Equity Training," SPS instructed Lumley and Henderson that they "must commit to" its views on "equity" and "anti-racism." App. 1277, R. Doc. 77 at 9. Teachers and employees had to commit to becoming "champions" of "anti-racism," which was defined as "advocating for changes in political, economic, and social life"—that is, *all* aspects of a person's life, not just her time at work. App. 1271, 1277, R. Doc. 77 at 3, 9. And critically, SPS made it clear that no one could "champion" these ideas quietly. "Silence," the school district said, was tantamount to "white supremacy." App. 1276, 1278–79, 1281, R. Doc. 77 at 8, 10–11, 13.

The district court downplayed these issues as mere "[e]ncouragement to follow general principles of equity and anti-racism" without any "incentive or disincentive to actually express a specific message." Add. 12, App. 5315, R. Doc. 88 at 7. Not so. SPS said participation was mandatory—on pain of financial and professional

8

punishment. And by branding silence as "white supremacy" and stating that staff "must commit" to certain values, the school district made clear that participants had to speak up and affirmatively adopt certain views or risk having their pay docked for being "unprofessional." App. 1271, 1277, R. Doc. 77 at 3, 9. SPS thus backed up its requirements with both hard and soft pressure.

### ii. Appellants were unconstitutionally pressured not to speak disfavored political views.

A government action, statement, or policy that unduly "chill[s] speech" is "in direct contravention of the First Amendment's dictates." *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 794 (1988). On the summary judgment record, the school district also imposed substantial unlawful pressure to prevent Lumley and Henderson from speaking. Worse, this pressure was successful.

Here, too, the school district used the same playbook: silence dissenting voices by threatening ahead of time to withhold pay and brand dissenters racists, ruining their professional reputations. The school district made clear that a laundry list of ideas were forbidden unless a person wanted to be labeled as a "white supremacist." App. 1271, 1277, 1281–82, R. Doc. 77 at 3, 9, 13–14.

9

In a twist of irony, the school district even made clear that it would label teachers and employees racist for agreeing with Supreme Court justices who are famous for their opposition to racial discrimination. Staff were told they would be branded "white supremacists" if they professed a favorable view toward "colorblindness." App. 1274, 1281, R. Doc. 77, at 6, 13. But colorblindness was advanced by Justice Harlan, the "Great Dissenter," in his famous lone dissent against the pernicious "separate-but-equal" doctrine: "Our constitution is color-blind, and neither knows nor tolerates classes among citizens." *Plessy v. Ferguson*, 163 U.S. 537, 559 (1896) (Harlan, J., dis.). That view was also advanced by future Supreme Court Justice Thurgood Marshall on behalf of the NAACP when Marshall successfully convinced the Supreme Court to overturn *Plessy*. Brief for Appellants in Nos. 1, 2, and 4 and for Respondents in No. 10 on Reargument at 41, *Brown v. Board of Educ.*, 347 U.S. 483 (1954). Yet according to the school district, expressing this view is unacceptable.

Given the sordid history of racism in this country, "the implications of being labeled racist" can lead to "huge reputational costs." *Thomas v. Tenneco Packaging Co.*, 293 F.3d 1306, 1330 (11th Cir. 2002). That is because "individuals take allegations of racism very seriously." *Id.* No one

10

wants to risk being branded a racist, especially in a professional setting. As this Court has noted, being "falsely label[ed] … as a racist" can result in "stress, anxiety and ostracization" sufficient to potentially give rise to a First Amendment claim. *Crozier for A.C. v. Westside Community School District*, 973 F.3d 882, 891 (8th Cir. 2020). Unquestionably, an employer labeling certain beliefs as "white supremacy" would reasonably chill an employee from expressing those beliefs. *Republican Party of Minn., Third Congr. Dist. v. Klobuchar*, 381 F.3d 785, 792 (8th Cir. 2004).[3]

Both the district court and the panel failed to properly consider this threat of opprobrium. Indeed, Appellants censored themselves in response to these threats. App. 1281–84, R. Doc. 77 at 13–16. And the district court did not dispute that after Lumley expressed some views declared anathema by the school district, her "coworkers berated her." Add. 10, App. 5313, R. Doc. 88 at 8.

That Lumley was berated by her coworkers and not her employer makes no difference here. The district court thought it significant that

---

[3] The panel's opinion in this case suggested Appellants' were "press[ing] the limits" of the standing analysis. Op. at 13. *Amici* respectfully disagree that Appellants' claims "press" any alteration of the normal requirements for standing. Rather, Appellants' claims satisfy even the most robust standing requirements.

11

the school district officials did not themselves "call Plaintiffs or other employees white supremacists." Add. 14, App. 5317, R. Doc. 88 at 12. But the school district marched the ball 99 yards down that field. The school district did not need to specifically declare that *Appellants* were white supremacists. It was more than enough for the school district to brand people *like* Appellants as racists. Once the school district did so, it was entirely foreseeable Lumley and Henderson would experience professional ostracism from coworkers. *Crozier*, 973 F.3d at 891.

The government is still liable for "significant encouragement" when third parties—at the government's backing—ostracize people for their speech. A "state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973). Under this standard, government conduct need not be the but-for cause of censorship. Rather, the government acts unconstitutionally in some circumstances even when it "can be charted with only encouraging, rather than commanding" improper conduct. *Reitman v. Mulkey*, 387 U.S. 369, 375 (1967) (quotation marks omitted). Even if SPS did not directly censor Lumley

12

and Henderson's speech, it significantly encouraged its employees to compel them into silence when SPS took steps to brand them racists.

* * *

Nobody disputes that public school districts, like other government agencies, have authority to require their employees to go through training programs. *Amici* States conduct these kinds of trainings all the time, and have a strong interest in preventing employees from suing over training programs simply because they do not like the content of those programs.

But that is not this case here. The evidence in the record reveals a "training" that went well beyond the scope of what the Constitution permits. Teachers and staff were informed that their job duties included "advocating for changes in political, economic, and social life"; that they had to advocate certain political views with which the plaintiffs disagreed; and that if they did not, they would be branded racists and potentially docked pay. The training exceeded the scope of the plaintiffs' official duties and harmed them by forcing them to self-censor their true thoughts and express views they did not hold or else suffer reputational and economic harm.

13

## CONCLUSION

For the foregoing reasons, the en banc Court should grant the petition and reverse the district court's decision.

October 4, 2024

Respectfully submitted,

**ANDREW T. BAILEY**,
Attorney General

/s/ *Joshua M. Divine*
Joshua M. Divine, 69875MO
  *Solicitor General*
Samuel C. Freedlund, 73707MO
  *Deputy Solicitor General*

Office of the Attorney General
207 West High St.
Jefferson City, MO 65101
Phone: (573) 751-8870
Josh.Divine@ago.mo.gov
Samuel.Freedlund@ago.mo.gov

*Counsel for Amicus Curiae States*

*Counsel for Additional Amici States*

Christopher M. Carr
Attorney General
State of Georgia

Raúl Labrador
Attorney General
State of Idaho

Brenna Bird
Attorney General
State of Iowa

Kris W. Kobach
Attorney General
State of Kansas

Austin Knudsen
Attorney General
State of Montana

Michael T. Hilgers
Attorney General
State of Nebraska

Drew H. Wrigley
Attorney General
State of North Dakota

Alan Wilson
Attorney General
State of South Carolina

Jonathan Skrmetti
Attorney General
State of Tennessee

Ken Paxton
Attorney General
State of Texas

Sean D. Reyes
Attorney General
State of Utah

Jason S. Miyares
Attorney General
Commonwealth of Virginia

Patrick Morrisey
Attorney General
State of West Virginia

15

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that Appellants' Brief complies with the typeface and formatting requirements of Fed. R. App. P. 29 and 32, in that it is written in Century Schoolbook 14-point font, and that it contains 2,595 words as determined by the word-count feature of Microsoft Word, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). The hard copies submitted to the clerk are exact copies of the CM/ECF submission.

<i>/s/ Joshua M. Divine</i><br>
Joshua M. Divine

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document was electronically filed on October 4, 2024, with the Clerk of Court for the United States Court of Appeals for the Eighth Circuit using the CM/ECF system; that all participants are registered CM/ECF users; and that service will be accomplished by the CM/ECF system.

<i>/s/ Joshua M. Divine</i><br>
Joshua M. Divine